UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------x

ELWYN MACKINNON,

                         Plaintiff,

              - against -

GALVEX HOLDINGS LTD., GALVEX TRADE LTD.,
GALVEX SERVICES OÜ, GALVEX ESTONIA OÜ,
GALVEX INTERTRADE OÜ, GALVEX CAPITAL
L.L.C., ALVAREZ & MARSAL EUROPE LLP,
ALVAREZ & MARSAL EUROPE LTD., SILVER
POINT CAPITAL, L.P., SILVER POINT EUROPE
LLP, SPCP GROUP, LLP, and ARCELORMITTAL,

                         Defendants.

No. 08 Civ. 2065

ECF Case

--------------------------------------------------------------------x

**MEMORANDUM OF LAW OF GALVEX TRADE LTD, GALVEX SERVICES OÜ, GALVEX ESTONIA OÜ, GALVEX INTERTRADE OÜ, ALVAREZ & MARSAL EUROPE LLP, ALVAREZ & MARSAL EUROPE LTD., SILVER POINT CAPITAL, L.P., SILVER POINT EUROPE LLP, SPCP GROUP, LLC AND ARCELORMITTAL, S.A. IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT**

FRIEDMAN KAPLAN SEILER &
   ADELMAN LLP
Eric Seiler (ES5437)
Hallie B. Levin (HL1628)
John N. Orsini (JO6329)
1633 Broadway
New York, New York  10019-6708
(212) 833-1100

*Attorneys for Defendants Galvex Trade Ltd,*
*Galvex Services OÜ, Galvex Estonia OÜ,*
*Galvex Intertrade OÜ, Alvarez & Marsal*
*Europe LLP, Alvarez & Marsal Europe Ltd.,*
*Silver Point Capital, L.P., Silver Point*
*Europe LLP, SPCP Group, LLC and*
*ArcelorMittal S.A.*

May 16, 2008

593531.3

# TABLE OF CONTENTS

*Page*

Table of Authorities ...................................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 3

ARGUMENT .................................................................................................................. 5

I.   THE COMPLAINT MUST BE DISMISSED FOR
     LACK OF SUBJECT MATTER JURISDICTION ............................................... 5

II.  PLAINTIFF HAS FAILED TO STATE A CLAIM UPON WHICH
     RELIEF MAY BE GRANTED AGAINST ARCELORMITTAL,
     THE A&M ENTITIES AND THE SILVER POINT ENTITIES ............................ 8

     A.   Choice of Law Analysis ............................................................................... 9

     B.   Plaintiff Has Failed to State a Claim Against
          Silver Point Capital or SPCP Group ........................................................ 10

     C.   Plaintiff Has Failed to State a Claim Against
          the A&M Entities, Silver Point Europe and ArcelorMittal .................... 13

III. THIS COURT LACKS PERSONAL JURISDICTION OVER THE
     A&M ENTITIES, SILVER POINT EUROPE AND ARCELORMITTAL ............ 16

     A.   The Court Lacks Personal Jurisdiction Over the A&M Entities ............. 18

     B.   The Court Lacks Personal Jurisdiction Over Silver Point Europe ......... 20

     C.   The Court Lacks Personal Jurisdiction Over ArcelorMittal .................. 21

CONCLUSION ............................................................................................................. 22

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Achtman v. Kirby, McInerney & Squire, LLP,*
   464 F.3d 328 (2d Cir. 2006)........................................................................ 12

*Adams v. Cape Indus. PLC,*
   [1990] 1 Ch. 433 (C.A. 1989) ................................................................ 13, 14

*Barlow & Ors v. Polly Peck Int'l Fin. Ltd. and Anor.,*
   [1996] B.C.C. 486 (Ch. 1995)...................................................................... 13

*Berwick v. New World Network Int'l., Ltd.,*
   No. 06 Civ. 2641, 2007 WL 949767 (S.D.N.Y. Mar. 28, 2007) ............................. *passim*

*Bresciani v. Leela Mumbai-A-Kempinski Hotel,*
   311 F. Supp. 2d 440 (S.D.N.Y. 2004)...................................... 16, 17, 18, 20, 21

*Bulger v. Royal Doulton, PLC,*
   No. 05 Civ. 7709, 2006 WL 3771016 (S.D.N.Y. Dec. 19, 2006)........................ 19, 20, 22

*Buti v. Impressa Perosa, S.R.L.,*
   935 F. Supp. 458 (S.D.N.Y. 1996), *aff'd on other grounds,* 139 F.3d 98
   (2d Cir. 1998) ............................................................................................. 6

*Chicago Mill and Lumber Co. v. Boatmen's Bank,*
   234 F. 41 (8th Cir. 1916) ........................................................................... 12

*Corporacion Venezolana de Fomento v. Vintero Sales Corp.,*
   629 F.2d 786 (2d Cir. 1980)......................................................................... 7

*Creaciones Con Idea, S.A. de C.V. v. Mashreqbank PSC,*
   232 F.3d 79 (2d Cir. 2000) (per curiam).................................................... 5, 7

*Cresswell v. Sullivan & Cromwell,*
   922 F.2d 60 (2d Cir. 1990)........................................................................... 6

*Dunlop Pneumatic Tyre Co. Ltd. v. Selfridge and Co. Ltd.,*
   [1915] A.C. 847 (H.L.) .............................................................................. 13

*Eze v. Yellow Cab Co. of Alexandria, VA, Inc.,*
   782 F.2d 1064 (D.C. Cir. 1986) (per curiam) .............................................. 6

*Ford v. C.E. Wilson & Co.,*
129 F.2d 614 (2d Cir. 1942)................................................................. 15

*Forsen v. United Techs. Corp.,*
484 F. Supp. 490 (S.D.N.Y.), *aff'd*, 633 F.2d 203 (2d Cir. 1980) ......................... 6

*Franceskin v. Credit Suisse,*
214 F.3d 253 (2d Cir. 2000)................................................................. 7

*Growth Fund v. Morgan Stanley & Co. Int'l Ltd.,*
No. 97 Civ. 2583, 1998 WL 375201 (S.D.N.Y. July 2, 1998) ........................... 5

*Harco Nat'l Ins. Co. v. Green Farms, Inc.,*
Civ. A. No. 1131, 1989 WL 110537 (Del. Ch. Sept. 19, 1989)........................ 12

*Impulse Mktg. Group, Inc. v. Nat'l Small Bus. Alliance, Inc.,*
No. 05 CV 7776, 2007 WL 1701813 (S.D.N.Y. June 12, 2007) ...................... 19

*Int'l Shipping Co., S.A. v. Hydra Offshore, Inc.,*
875 F.2d 388 (2d Cir. 1989)................................................................. 7

*Irwin & Leighton, Inc. v. W.M. Anderson Co.,*
532 A.2d 983 (Del. Ch. 1987)............................................................. 11

*Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.,*
456 F. Supp. 831 (D. Del. 1978) .................................................... 10, 11

*JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.,*
536 U.S. 88 (2002) ......................................................................... 6

*Klonis v. Nat'l Bank of Greece, S.A.,*
492 F. Supp. 2d 293 (S.D.N.Y. 2007)................................. 16, 17, 18, 20, 21

*Krivo Indus. Supply Co. v. Nat'l Distillers and Chem. Corp.,*
483 F.2d 1098 (5th Cir. 1973), *modified on reh'g*, 490 F.2d 916 (5th Cir. 1974)............ 11

*Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.,*
918 F.2d 1039 (2d Cir. 1990)....................................... 17, 18, 20, 21

*LiButti v. U.S.,*
178 F.3d 114 (2d Cir. 1999)............................................................. 21

*Lloyds Bank PLC v. Norkin,*
817 F. Supp. 414 (S.D.N.Y. 1993) ................................................... 6

*Mabon, Nugent & Co. v. Texas Am. Energy Corp.,*
Civ. A. No. 8578, 1990 WL 44267 (Del. Ch. Apr. 12, 1990) ....................... 12

*Owl Fumigating Corp. v. Cal. Cyanide Co.*,
   24 F.2d 718 (D. Del. 1928), *aff'd* 30 F.2d 812 (3d Cir. 1929) ........................ 11

*Perma Pave Contracting Corp. v. Paerdegat Boat & Racquet Club, Inc.*,
   156 A.D.2d 550, 549 N.Y.S.2d 57 (2d Dep't 1989) ......................................... 15

*Salomon v. A. Salomon & Co., Ltd.*,
   [1897] A.C. 22 (H.L. 1896) ............................................................................ 13

*Scruttons Ltd. v. Midland Silicones Ltd.*,
   [1962] A.C. 446 (H.L. 1961) ........................................................................... 13

*Siam Commercial Bank Public Co. Ltd. v. Bel-Aire Knitworks, Inc.*,
   Nos. 04 Civ. 10319, 05 Civ. 5551, 06 Civ. 1991, 2006 WL 1816327
   (S.D.N.Y. June 28, 2006), *aff'd on other grounds*, 247 Fed. Appx. 299,
   2007 WL 2718718 (2d Cir. 2007) ................................................................... 15

*Solow v. Aspect Res., LLC*,
   No. Civ. A. 20397, 2004 WL 2694916 (Del. Ch. Oct. 19, 2004) .............................. 10, 11

*Strawbridge v. Curtiss*,
   3 Cranch 267, 7 U.S. 267 (1806) ...................................................................... 6

*Sunnyside Dev. Co., LLC v. Opsys Ltd.*,
   No. C 05-0553, 2005 WL 1876106 (N.D. Cal. Aug. 8, 2005) ............................. 9

*Tese-Milner v. Ad EFX Promotions, Inc.*,
   No. 06 Civ.1630, 2007 WL 196866 (S.D.N.Y.  Jan. 26, 2007) ..................... 17, 19, 20, 22

*Yucyco, Ltd. v. Republic of Slovenia*,
   984 F. Supp. 209  (S.D.N.Y. 1997) ................................................................. 15

## STATUTES

28 U.S.C. § 1332 ...............................................................................................5, 6, 7

N.Y. C.P.L.R. § 301 ........................................................................................... 16

N.Y. C.P.L.R. § 302(a) ...................................................................................... 16, 17

Article 23 of the Law of 10 August 1915, as amended, on Commercial Companies ................... 14

Article 179(1) of the Law of 10 August 1915, as amended, on Commercial Companies ............ 14

Article 495 of the Luxembourg Commercial Code  ................................................... 14

593531.3                                             iv

<u>RULES</u>

Fed. R. Civ. P. 4(k)(1)(A) ................................................................................ 16

Fed. R. Civ. P. 12(b)(1) ............................................................................. *passim*

Fed. R. Civ. P. 12(b)(2) ................................................................... 1, 20, 21, 22

Fed. R. Civ. P. 12(b)(6) ....................................................................... 1, 15, 22

Defendants Galvex Trade Ltd, Galvex Services OÜ, Galvex Estonia OÜ, Galvex Intertrade OÜ, Alvarez & Marsal Europe LLP, Alvarez & Marsal Europe Ltd. (together with Alvarez & Marsal Europe LLP, the "A&M Entities"), Silver Point Capital, L.P. ("Silver Point Capital"), Silver Point Europe LLP ("Silver Point Europe") SPCP Group, LLC ("SPCP Group" and together with Silver Point Capital and Silver Point Europe, the "Silver Point Entities"), and ArcelorMittal, S.A. (ArcelorMittal) respectfully submit this memorandum of law in support of their motion to dismiss the Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2) and 12(b)(6).

## PRELIMINARY STATEMENT

Plaintiff Elwyn MacKinnon alleges that on December 29, 2004 he entered into an Employment Agreement with the Galvex defendants (deemed the "Galvex Group") to serve as their Chief Operating Officer.[1] MacKinnon – a resident of Ontario, Canada – now asserts a claim for breach of contract for $483,700 in payments allegedly due to him under that Employment Agreement. In addition to seeking payment from these actual *parties* to the contract, however, he also asserts this claim against entities that were *not* parties to the Employment Agreement, and for whom plaintiff has *not* served as an employee: (1) the Silver Point Entities, which, he alleges "purchased the debt" of the Galvex Group; (2) the A&M entities, which, he asserts was engaged by a creditor of the Galvex Group "to report the internal affairs of the Galvex Group and be responsible for paying any and all liabilities due to the

---

[1] The "Galvex Group" purports to consist of the following entities: Galvex Holdings Ltd., Galvex Trade Ltd, Galvex Services OÜ, Galvex Estonia OÜ, Galvex Intertrade OÜ, and Galvex Capital L.L.C. The instant motion to dismiss is made on behalf of Galvex Trade Ltd, Galvex Services OÜ, Galvex Estonia OÜ, Galvex Intertrade OÜ, but *not* Galvex Holdings Ltd. or Galvex Capital L.L.C.

employees of Galvex Group"; and (3) ArcelorMittal, which, he asserts "purchased defendant Galvex Estonia OÜ and became responsible for paying any liability to employees." Even assuming these facts to be true, as the Court must, plaintiff's Complaint cannot succeed.

*First*, and fatal to this action, MacKinnon (Canada) is a foreign citizen, and defendants Galvex Holdings Ltd. (Bermuda), Galvex Trade Ltd (Bermuda), Galvex Services OÜ (Estonia), Galvex Estonia OÜ (Estonia), Galvex Intertrade OÜ (Estonia), Alvarez & Marsal Europe LLP (England), Alvarez & Marsal Europe Ltd. (England), Silver Point Europe (England), and ArcelorMittal (Luxembourg) are also foreign citizens. Because there are both a foreign plaintiff and foreign defendants, complete diversity is lacking and this Court does not possess subject matter jurisdiction to adjudicate this dispute.

*Second*, plaintiff's claim for breach of contract against the Silver Point Entities, ArcelorMittal, and the A&M Entities – non-parties to the Employment Agreement – is simply not legally cognizable. Plaintiff has no privity of contract with these entities, and he has failed to allege any specific facts that would allow the law to impose the liabilities and obligations of the Galvex Group on the Silver Point Entities, ArcelorMittal, or the A&M Entities.

*Third*, the claims against Silver Point Europe, the A&M Entities and ArcelorMittal must be dismissed, as they are foreign entities who do not do business in New York sufficient to confer this Court's personal jurisdiction over them pursuant to New York law.

Accordingly, the Complaint should be dismissed in its entirety.

## STATEMENT OF FACTS[2]

Plaintiff, a resident of Ontario, Canada, brings this purported diversity action against twelve separate international business entities. (Compl. ¶¶ 1-14). He also alleges, however, that nine of the defendants – Galvex Holdings Ltd. (Bermuda), Galvex Trade Ltd (Bermuda), Galvex Services OÜ (Estonia), Galvex Intertrade OÜ (Estonia), Galvex Estonia OÜ (Estonia), Alvarez & Marsal Europe LLP (United Kingdom), Silver Point Europe (United Kingdom), SPCP Group, LLP (United Kingdom), and ArcelorMittal (Luxembourg) – are also foreign, (Id. at ¶¶ 2-6, 8, 11, 13),[3] while summarily (and inaccurately) asserting "on information and belief" that many of them have principal places of business in New York, New York. (Compl. ¶¶ 2-6, 8-9).[4] In addition, he alleges that Silver Point Europe (London) and ArcelorMittal (Luxembourg) also have foreign principal places of business – i.e., he freely admits that they have no citizenship in the United States. (Id. at ¶ 13).

---

[2] This statement of facts is based on the allegations of the Complaint, a copy of which is annexed as Exhibit A to the accompanying Declaration of Gay Bronson ("Bronson Decl.").

[3] Certain of these allegations are incorrect. MacKinnon inaccurately asserts that Alvarez Marsal Europe Ltd. is a New York limited company, when in fact it is a limited company organized under the laws of England. (Compl. ¶ 9; Declaration of Shepard C. Spink ("Spink Decl.") ¶ 2). SPCP Group is a not a United Kingdom limited liability partnership, but rather a Delaware limited liability company. (Compl. ¶ 12; Bronson Decl. ¶ 14). In addition, Silver Point Europe's limited partners include citizens of England and Ireland, and Alvarez & Marsal Europe, LLP's limited partners include citizens of the United States, France, Germany, Italy and Belgium. (Bronson Decl. ¶ 4; Spink Decl. ¶ 3).

[4] In fact, Galvex Trade Ltd has its principal place of business in Bermuda; Galvex Services OÜ, Galvex Intertrade OÜ and Galvex Estonia OÜ have their principal places of business in Estonia; and the A&M Entities have their principal places of business in England. (Spink Decl. ¶¶ 2-3, 18-20; Declaration of Antoine Van Schooten ("Van Schooten Decl.") ¶ 2).

In substance, plaintiff alleges that on December 29, 2004, he entered into a written Employment Agreement with Galvex Holdings Ltd., Galvex Trade Ltd, Galvex Services OÜ, Galvex Estonia OÜ, Galvex Intertrade OÜ, and Galvex Capital L.L.C. (which plaintiff defines as the "Galvex Group") to serve as their Chief Operating Officer. (*Id.* ¶¶ 15, 17). Plaintiff further asserts that "on or about January 16, 2006, the Galvex Group changed control of its ownership and filed for Chapter 11 bankruptcy," which, he claims, terminated his employment with the Galvex Group and triggered certain severance payments and other payments due to him pursuant to the written Employment Agreement. (*Id.* ¶¶ 21, 24). MacKinnon claims that $483,700 is due to him under that Agreement – severance pay in the amount of $480,000, and unpaid salary and travel expenses in the amount of $3,700. (*Id.* ¶ 26).

Plaintiff seeks to recover these sums not only from the "Galvex Group," but also from the A&M Entities, the Silver Point Entities and ArcelorMittal. (*Id. passim*). In support of these claims, MacKinnon alleges that "during October, 2005, [the A&M Entities were] engaged by Deutsche Bank, a creditor of Galvex Group, to report the internal affairs of Galvex Group," and that "during November, 2005, [the Silver Point Entities] purchased the debt from Deutsche Bank." (*Id.* ¶¶ 19-20). He further asserts, without detail, that Silver Point Capital and ArcelorMittal serially "purchased defendant Galvex Estonia OÜ." (*Id.* ¶¶ 22-23). He additionally claims that, in these capacities, ArcelorMittal, the A&M Entities and the Silver Point Entities somehow became responsible for paying liabilities to employees of the Galvex Group, and that they – in addition to the Galvex Group companies – have separately breached the Employment Agreement. (*Id.* ¶¶ 19-24).

# ARGUMENT

## I.

## THE COMPLAINT MUST BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION

MacKinnon, a Canadian resident, alleges that this Court possesses subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 – the federal diversity statute. (Compl. ¶ 14). In fact, complete diversity does not exist because MacKinnon is a foreign plaintiff, and most of the defendants are foreign as well. Accordingly, the Court possesses no subject matter jurisdiction over this dispute and the Complaint must be dismissed.

A federal court possesses diversity jurisdiction in accordance with 28 U.S.C. § 1332(a)(2) if the action is between citizens of a domestic state and citizens or subjects of a foreign state. It is black letter law that diversity must be *complete* – that is, if any party on one side of the dispute is alien, then no party on the other side can also be alien. *See Creaciones Con Idea, S.A. de C.V. v. Mashreqbank PSC*, 232 F.3d 79, 82 (2d Cir. 2000) (per curiam); *Growth Fund v. Morgan Stanley & Co. Int'l Ltd.*, No. 97 Civ. 2583, 1998 WL 375201, at *2 (S.D.N.Y. July 2, 1998). Courts rely on the confluence of two rules "[i]n concluding that diversity jurisdiction is lacking [in] cases with foreign and domestic parties on one side and only foreign parties on the other ... one holding that there is no jurisdiction over cases involving only alien parties, and the other requiring complete diversity between the parties." *Growth Fund*, 1998 WL 375201 at *2.

Thus, it is settled law that where there are foreign and domestic parties on one side of a dispute, and only foreign parties on the other side – as is the case here – diversity is lacking. *See Growth Fund*, 1998 WL 375201 at *2 ("Because the plaintiffs here include both

United States citizens and foreigners, and the defendant is a foreigner, there is no diversity jurisdiction over this action."); *Eze v. Yellow Cab Co. of Alexandria, VA, Inc.*, 782 F.2d 1064, 1065 (D.C. Cir. 1986) (per curiam) ("[U]nder long-held precedent, diversity must be 'complete' .... A diversity suit in line with the *Strawbridge* [*v. Curtiss*, 3 Cranch 267, 7 U.S. 267 (1806)] rule, may not be maintained in federal court by an alien against a citizen of a state and a citizen of some other foreign country."); *Buti v. Impressa Perosa, S.R.L.*, 935 F. Supp. 458, 461-62 (S.D.N.Y. 1996), *aff'd on other grounds*, 139 F.3d 98 (2d Cir. 1998) ("[T]here is no subject matter jurisdiction over actions brought by an alien against another alien and a citizen of a state."); *Lloyds Bank PLC v. Norkin*, 817 F. Supp. 414, 416 (S.D.N.Y. 1993) ("[A]n action brought by an alien against a citizen of a state and another alien must be dismissed for lack of subject matter jurisdiction ...."); *Forsen v. United Techs. Corp.*, 484 F. Supp. 490, 495 (S.D.N.Y.), *aff'd*, 633 F.2d 203 (2d Cir. 1980) ("[P]laintiffs are Norwegian, the defendant ANA is Japanese; the fact that other defendants in this suit are citizens of a [domestic] state does not cure this jurisdictional defect.").

The (incorrect) allegations that certain of the foreign defendants have principal places of business in New York does not salvage any alleged diversity jurisdiction. When determining citizenship for diversity purposes, "a partnership is deemed to take on the citizenship of each of its partners" and "[a] corporation shall be deemed to be a citizen of any State by which it has been incorporated *and* of the State where it has its principal place of business." *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 69 (2d Cir. 1990); 28 U.S.C. § 1332(c)(1) (emphasis added); *see also JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.*, 536 U.S. 88, 98, n.3 (2002). Accordingly, "'even if a corporation organized under the laws of a foreign nation maintains its principal place of business in a [domestic] State,

and is considered a citizen of that [domestic] State, diversity is nonetheless defeated if another alien party is present on the other side of the litigation.'" *Creaciones*, 232 F.3d at 82 (quoting *Int'l Shipping Co., S.A. v. Hydra Offshore, Inc.*, 875 F.2d 388, 391 (2d Cir. 1989) (citing *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 790 (2d Cir. 1980))); *see also Franceskin v. Credit Suisse*, 214 F.3d 253, 258 (2d Cir. 2000).  The result is that this Court "need not address the question of the defendant[s] principal place of business" because "[d]iversity jurisdiction is lacking under § 1332(a)(2)" where aliens "are present on both sides of the dispute." *Creaciones*, 232 F.3d at 82.[5]

Applying these principles, the allegations set forth in the Complaint by their own terms defeat diversity jurisdiction.  As set forth above, MacKinnon asserts that he is a resident of Canada.  (Compl. ¶ 1).  He also correctly asserts that defendants Galvex Trade Ltd (Bermuda), Galvex Services OÜ (Estonia), Galvex Estonia OÜ (Estonia), Galvex Intertrade OÜ (Estonia), Alvarez & Marsal Europe LLP (United Kingdom), Silver Point Europe (United Kingdom), and ArcelorMittal (Luxembourg) are all foreign entities, (and in fact Alvarez & Marsal Europe Ltd. (England) is also a foreign entity).  (*Id.* at ¶¶ 2-6, 8, 11, 13; Spink Decl. ¶ 2).  Based on these allegations alone, and regardless of MacKinnon's inaccurate assertions that certain defendants' principal places of business are domestic, there are aliens on both sides of this dispute.

---

[5]  Indeed, nearly 20 years ago, the Second Circuit granted a request for sanctions against an attorney who claimed that diversity jurisdiction could be maintained if defendants' principal places of business were in New York, holding: "[w]e are forced to conclude that a reasonable inquiry into the current law would have precluded the argument . . . that '[w]hether or not you have aliens on both sides [of a litigation] is irrelevant once their principal places of business are here in New York.'" *Int'l Shipping Co., S.A.*, 875 F.2d at 392 (2d Cir. 1989) (alterations in original).

Accordingly, diversity is not complete, subject matter jurisdiction does not exist, and the Complaint must be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).

## II.

## PLAINTIFF HAS FAILED TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED AGAINST ARCELORMITTAL, THE A&M ENTITIES AND THE SILVER POINT ENTITIES

In addition to suffering from the foregoing fatal jurisdictional defect, plaintiff's Complaint also fails to state a claim upon which relief can be granted with respect to defendants ArcelorMittal, the A&M Entities and the Silver Point Entities. As described above, MacKinnon seeks to hold these defendants responsible for $483,700 in payments allegedly due to him pursuant to his Employment Agreement. (Compl. *passim*). The Employment Agreement provides that each of the Galvex Group entities "are jointly and severally liable to pay to the Employee the remuneration and compensation for the services provided by the Employee under this Agreement." (Employment Agreement ¶ 4.1).[6] However, none of the A&M Entities, ArcelorMittal, or the Silver Point Entities is a signatory or otherwise a party to the Employment Agreement.

To somehow justify his demand for these contractual payments from non-parties the A&M Entities and the Silver Point Entities, MacKinnon alleges that "during October, 2005, [the A&M Entities were] engaged by Deutsche Bank, a creditor of Galvex Group, to report the internal affairs of Galvex Group" and that "during November, 2005, [the Silver Point Entities] purchased the debt from Deutsche Bank." (Compl. ¶¶ 19-20). He also asserts, in wholly

---

[6] The Employment Agreement is attached to the Complaint, which is Exhibit A to the Bronson Declaration.

conclusory fashion, that the A&M Entities and the Silver Point Entities became "responsible for paying" liabilities to employees of the Galvex Group and that they, themselves breached plaintiff's Employment Agreement. (*Id.* ¶¶ 19-20, 24). Finally, he claims, again without any detail, that Silver Point Capital, L.P. and ArcelorMittal serially "purchased defendant Galvex Estonia OÜ and became responsible for paying any liability to employees." (*Id.* ¶¶ 22-23).

As set forth below, it is firmly settled under the law of Delaware, England and Luxembourg, (the jurisdictions of organization of the Silver Point Entities, the A&M Entities and ArcelorMittal), that these allegations are not sufficient to state a claim for breach of the Employment Agreement against any of these entities, or to otherwise hold any of them responsible for payments allegedly due from the Galvex Group pursuant to that Agreement.

**A.    <u>Choice of Law Analysis</u>**

A Federal District Court sitting in diversity applies the choice-of-law rules of its forum state. *See Impulse Mktg. Group, Inc. v. Nat'l Small Bus. Alliance, Inc.*, No. 05 CV 7776, 2007 WL 1701813, at *7 (S.D.N.Y. June 12, 2007). At best, plaintiff's allegations against the Silver Point Entities, the A&M Entities and ArcelorMittal may be construed as a (fatally deficient) attempt to state some manner of "alter ego" or "control liability" claims. In accordance with New York choice of law regarding such claims, courts will apply the substantive law of the state under which the allegedly "dominant" corporation is organized. *See id.* (finding that "[u]nder New York choice of law principles, the law of the state of incorporation determines when corporate form will be disregarded," and holding that the substantive law of the state of incorporation of the allegedly-controlling defendant company governed plaintiff's "alter ego" claims) (internal quotations omitted); *cf. Sunnyside Dev. Co., LLC v. Opsys Ltd.*, No. C 05-0553, 2005 WL 1876106, at *3 (N.D. Cal. Aug. 8, 2005) (engaging in California choice of law

analysis to conclude that the law of the country of incorporation of the allegedly-dominant company governed "alter ego" claims).

Here, MacKinnon has summarily asserted that the Silver Point Entities, the A&M Entities and ArcelorMittal are somehow "responsible" for contractual liabilities to employees of the Galvex Group entities. (*See* Compl. ¶¶ 19-24). Accordingly, the claims against Silver Point Europe and the A&M Entities should be analyzed under the laws of England (where they are organized), the claims against Silver Point Capital, L.P. and SPCP Group should be analyzed under the laws of Delaware (where those entities are organized), and the claims against ArcelorMittal should be analyzed under the laws of Luxembourg (where, as MacKinnon correctly alleges, it is organized). (*See* Spink Decl. ¶¶ 2-3; Bronson Decl. ¶¶ 2, 14). MacKinnon has not stated a claim under the laws of any of these jurisdictions.[7]

**B.    Plaintiff Has Failed to State a Claim Against Silver Point Capital or SPCP Group**

Plaintiff alleges that Silver Point Capital and SPCP Group "breached the [Employment] contract" and owe him severance and salary payments due thereunder. (Compl. ¶ 24). This claim cannot survive. Under Delaware law a claim for breach on contract requires contractual privity between the parties. *See Solow v. Aspect Res., LLC*, No. Civ. A. 20397, 2004 WL 2694916, at *4 (Del. Ch. Oct. 19, 2004). Since neither Silver Point Capital nor SPCP Group is a party to the Employment Agreement, neither cannot be held liable for a breach of that

---

[7]  Indeed, plaintiff has failed to state a claim under the laws of *any* potentially-relevant jurisdiction. As set forth in footnote 12, New York law is in accord with the law of England, Delaware and Luxembourg, and accordingly plaintiff has also failed to state a claim under New York law. Moreover, federal courts have held that "alter ego" or "control liability" claims "can be decided under the general principles of corporate and agency law, which do not vary significantly from jurisdiction to jurisdiction." *See, e.g., Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F. Supp. 831, 840 n.17 (D. Del. 1978).

Agreement. *See id.* (dismissing breach of contract claim because defendants "were not parties to the [contract] and are not in privity with [plaintiff]").

In limited circumstances, Delaware courts will hold one entity liable for the obligations of another where, for example, "those in control of the corporate enterprise have not treated it as a distinct legal entity – have ignored the 'corporateness' of the corporation and have themselves treated it has their 'instrumentality.'" *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 987 (Del. Ch. 1987). It is long-settled law, however, that "the loan of money by one corporation to another does not make the borrower the agent of the lender, or the business and acts of the borrower the acts and business of the lender." *Owl Fumigating Corp. v. Cal. Cyanide Co.*, 24 F.2d 718, 720 (D. Del. 1928), *aff'd*, 30 F.2d 812 (3d Cir. 1929). Likewise, "[w]here one corporation is a large creditor of another, the fact that the former takes an active part in the management of the latter to protect its debt does not make it liable for the debts of the debtor company." *Id.*; *see also Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F. Supp. 831, 841 (D. Del. 1978) ("The fact that a creditor corporation takes an active part in the management of a debtor corporation does not indicate the necessary control.").

Indeed, in the *Irwin & Leighton* case, the court specifically addressed whether a creditor who "involved itself in the management of its troubled debtor is to be held answerable for a liability of that debtor to a third person arising from a breach of contract." *Id.* at 984. The court held that liability would *not* attach, writing that "[w]here . . . the third party creditor became involved with the corporation as the result of an arms-length extension of credit or other arms-lengths transactions and thereafter comes to exercise control over the debtor by reason of a default or threatened default, such a creditor has not been held to thereby assume liability for its debtor's obligations." *Id.* at 989. (citing with approval *Krivo Indus. Supply Co. v. Nat'l Distillers*

*and Chem. Corp.*, 483 F.2d 1098 (5th Cir. 1973), *modified on reh'g*, 490 F.2d 916 (5th Cir. 1974); *Chicago Mill and Lumber Co. v. Boatmen's Bank*, 234 F. 41 (8th Cir. 1916)).

Likewise, the lone, conclusory allegation that Silver Point Capital "purchased defendant Galvex Estonia OÜ" does not suffice to state a claim against Silver Point Capital under a "control liability" theory under Delaware law. "Under Delaware law, the separate corporate existences of parent and subsidiary will not be set aside merely on a showing of common management of the two entities, nor on a showing that the parent owned all the stock of the subsidiary." *Mabon, Nugent & Co. v. Texas Am. Energy Corp.*, Civ. A. No. 8578, 1990 WL 44267, at *5 (Del. Ch. Apr. 12, 1990). Moreover, "persuading a Delaware court to disregard the corporate entity is a difficult task." *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, Civ. A. No. 1131, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989). Here, MacKinnon plainly has not pled any allegations to warrant such disregard.

In sum, MacKinnon has not alleged *any facts whatsoever* to support his assertion that by purchasing Deutsche Bank's debt of the Galvex Group, or that by merely "purchas[ing]" Galvex Estonia, any of the Silver Point Entities gained control over those companies so as to support any argument that they might have become responsible for the Galvex Group's contractual liabilities.[8] As a matter of settled Delaware law, this is insufficient to state a claim, and the Complaint against Silver Point Capital and SPCP Group should be dismissed accordingly.

---

[8] *See Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) ("[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss") (internal quotations omitted).

C.    **Plaintiff Has Failed to State a Claim Against**
      **the A&M Entities, Silver Point Europe and ArcelorMittal**

English law, which applies to the claims against Silver Point Europe and the A&M Entities, and Luxembourg law, which applies to the claims against ArcelorMittal, are arguably even *more* restrictive than Delaware law in this regard.

As in Delaware, it is well-established under English law that the only entities responsible for contractual liabilities are the contracting parties themselves. *See Dunlop Pneumatic Tyre Co. Ltd. v. Selfridge and Co. Ltd.*, [1915] A.C. 847, 862-63 (H.L.) (appeal taken from C.A.) ("strangers" to a contract have no obligations thereunder); *Scruttons Ltd. v. Midland Silicones Ltd.*, [1962] A.C. 446, 493-94 (H.L. 1961) (appeal taken from C.A.) (same).[9]

For more than a century, English courts have strictly adhered to the principle of separation with respect to corporate identity, and have not held parent corporations, subsidiary companies, affiliates or other related entities liable for one another's contractual obligations and duties. *See Salomon v. A. Salomon & Co., Ltd.*, [1897] A.C. 22 (H.L. 1896) (appeal taken from C.A.); *Adams v. Cape Indus. PLC*, [1990] 1 Ch. 433 (C.A. 1989); *Barlow & Ors v. Polly Peck Int'l Fin. Ltd. and Anor.*, [1996] B.C.C. 486 (Ch. 1995). As the *Adams* court noted, "[English] law, for better or worse, recognises the creation of subsidiary companies, which though in one sense the creatures of their parent companies, will nevertheless under the general law fall to be treated as separate legal entities with all the rights and liabilities which would normally attach to separate legal entities." *Adams*, 1 Ch. at 536.

---

[9] The English authorities cited herein are provided in the accompanying Appendix of English Legal Authorities.

Indeed, as with Delaware law, English law allows piercing of the corporate veil only under exceptional circumstances. Specifically, under English law the legal separation of corporate entities may be abrogated only: (1) where the construction of a particular statute requires the court to treat different group companies as a single economic entity;[10] (2) where there is an express agency relationship between the entities;[11] or (3) where the plaintiff has alleged exceptional circumstances indicating that the separate corporate entities are a mere facade that conceals their true nature. *See id.* at 532-44.

These same principles adhere under the law of Luxembourg. Under the law of that jurisdiction, shareholders (including entities like corporate parents) are not liable for the obligations of the companies in which they hold shares (including their subsidiaries), absent exceptional circumstances when the parent shareholder is shown to be the "de facto manager" of the subsidiary, which requires a showing of effective and continuing control. *See* Article 495 of the Luxembourg Commercial Code; Article 23 of the Law of 10 August 1915, as amended, on Commercial Companies (the "Law of 1915"); Article 179(1) of the Law of 1915. The mere allegation that one company "purchased" another does not suffice state such a claim of "de facto management" under Luxembourg law. *See id.*

Here, MacKinnon demands payment from Silver Point Europe and the A&M Entities on the grounds that that "during October, 2005, [the A&M Entities were] engaged by

---

[10] This exception includes provision for the filing of consolidated accounts by groups of companies, or treating separate companies as a single "undertaking" for competition (antitrust) purposes. This category accounts for the vast majority of cases in which English courts have pierced the corporate veil. *See Adams,* 1 Ch. at 532-39.

[11] Under English law, agency will not be presumed in the absence of an express agreement. *See Adams,* 1 Ch. at 536-37.

Deutsche Bank, a creditor of Galvex Group, to report the internal affairs of Galvex Group" and

that "during November, 2005, [the Silver Point Entities] purchased the debt from Deutsche

Bank." (Compl. ¶¶ 19-20).  His claim for payment against ArcelorMittal, is likewise premised

on the sole allegation that it "purchased Galvex Estonia. (*Id.* ¶ 23).

These summary allegations simply do not pass muster under English or

Luxembourg law.[12]  MacKinnon has not alleged that the A&M Entities, Silver Point Europe or

ArcelorMittal were parties to his Employment Agreement.  He has not alleged any specific facts

to demonstrate that the separate corporate existence of Silver Point Europe, A&M Entities or

ArcelorMittal vis-à-vis the actual signatories to the Employment Agreement was a mere facade.

Indeed, he has alleged no facts that, as a matter of English or Luxembourg law, would permit the

contractual obligations of the Galvex Group to be imposed on Silver Point Europe, the A&M

Entities or ArcelorMittal.  Accordingly, the claims against these entities should be dismissed

pursuant to Fed. R. Civ. P. 12(b)(6).

---

[12] New York law is in accord with that of Delaware, England and Luxembourg for purposes of this motion.  To begin with, "[i]t is well established [under New York law] that a plaintiff in a breach of contract action 'may not assert a cause of action to recover damages for breach of contract against a party with whom it is not in privity.'" *Yucyco, Ltd. v. Republic of Slovenia*, 984 F. Supp. 209, 215 (S.D.N.Y. 1997) (quoting *Perma Pave Contracting Corp. v. Paerdegat Boat & Racquet Club, Inc.*, 156 A.D.2d 550, 551, 549 N.Y.S.2d 57, 58 (2d Dep't 1989)) (dismissing breach of contract claim against Slovenia, which participated in the restructuring of former Yugoslavian debt and agreed to assume a portion of that debt, but was not a signatory to the contract, was not in privity with the plaintiff creditor, and was not an alter-ego to signatories).  Indeed, under New York law there is "no legal merit" to a lender liability claim where the allegations show "nothing more than a typical lender-creditor relationship" and "[n]o assumption of actual, participatory, and total control." *Siam Commercial Bank Public Co. Ltd. v. Bel-Aire Knitworks, Inc.*, Nos. 04 Civ. 10319, 05 Civ. 5551, 06 Civ. 1991, 2006 WL 1816327, at * 3 (S.D.N.Y. June 28, 2006), *aff'd on other grounds*, 247 Fed. Appx. 299, 2007 WL 2718718 (2d Cir. 2007); *see Ford v. C.E. Wilson & Co.*, 129 F.2d 614, 617 (2d Cir. 1942).

## III.

## THIS COURT LACKS PERSONAL JURISDICTION
## OVER THE A&M ENTITIES, SILVER POINT EUROPE AND ARCELORMITTAL

In addition to the foregoing grounds for dismissal, the claims against the A&M Entities, Silver Point Europe and ArcelorMittal should also be dismissed because this Court lacks personal jurisdiction over them.

"A district court sitting in diversity must apply the forum state's law in determining whether it has personal jurisdiction over a defendant." *Berwick v. New World Network Int'l., Ltd.*, No. 06 Civ. 2641, 2007 WL 949767, at *9 (S.D.N.Y. Mar. 28, 2007) (Koeltl, J.).[13] "The Court must determine whether the forum state's law allows the exercise of personal jurisdiction and, if so, whether doing so comports with constitutional due process guarantees." *Id.*[14] The plaintiff bears the burden of demonstrating that the court possesses jurisdiction when a defendant moves to dismiss for lack of personal jurisdiction. *Klonis v. Nat'l Bank of Greece, S.A.*, 492 F. Supp. 2d 293, 298 (S.D.N.Y. 2007).

New York law provides for both general and specific personal jurisdiction. *Berwick*, 2007 WL 949767, at *10 (citing N.Y. C.P.L.R. §§ 301, 302(a)); *Bresciani v. Leela Mumbai-A-Kempinski Hotel*, 311 F. Supp. 2d 440, 444 (S.D.N.Y. 2004) (Koeltl, J.) (same). Pursuant to New York's *general* jurisdiction statute, C.P.L.R. § 301, "a non-domiciliary

---

[13] *See also Bresciani v. Leela Mumbai-A-Kempinski Hotel*, 311 F. Supp. 2d 440, 444 (S.D.N.Y. 2004) (Koeltl, J.) (same); *Klonis v. Nat'l Bank of Greece, S.A.*, 492 F. Supp. 2d 293, 299 (S.D.N.Y. Mar. 28, 2007) ("The Federal Rules of Civil Procedure authorize the exercise of personal jurisdiction in federal court over any defendant 'who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located.'") (quoting Fed. R. Civ. P. 4(k)(1)(A)).

[14] *See also Bresciani*, 311 F. Supp. 2d at 444.

defendant is amenable to suit in New York courts . . . if it has engaged in such a continuous and systematic course of 'doing business' here that a finding of its 'presence' in this jurisdiction is warranted." *Bresciani*, 311 F. Supp. 2d at 444 (internal quotations and citations omitted). "The test for 'doing business' is fact-sensitive, but even fairly substantial contacts can fail to satisfy the statute." *Id.* (internal citations omitted).[15] "Factors to consider in a 'doing business' inquiry include whether the defendant maintains offices and bank accounts, employs agents, and regularly solicits business in New York." *Id.* "As for 'presence,' the non-domiciliary must be present in New York not occasionally or casually, but with a fair measure of permanence and continuity." *Id.* (internal quotations and citations omitted).[16]

New York's long-arm statute, C.P.L.R. § 302(a)(1), authorizes *specific* jurisdiction where the defendant "transacts any business within the state or contracts anywhere to supply goods or services in the state," *and* the plaintiff's cause of action "arise[s] from the defendant's specific business transactions in New York." *Berwick*, 2007 WL 949767, at *10 (citing C.P.L.R. § 302(a)).[17] "New York courts have held that a claim 'arises from' a particular transaction when there is some articulable nexus between the business transacted and the cause of action sued upon, or when there is a substantial relationship between the transaction and the claim asserted." *Tese-Milner v. Ad EFX Promotions, Inc.*, No. 06 Civ.1630, 2007 WL 196866, at *5 (S.D.N.Y. Jan. 26, 2007) (internal quotations omitted).

---

[15] *See also Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990) (same).

[16] *See also Klonis*, 492 F. Supp. 2d at 299 (same).

[17] Although C.P.L.R. §§ 302(a)(2) and (3) provide for specific jurisdiction arising out of tort claims, because plaintiff does not assert a tort claim, these provisions are not implicated.

A.    **The Court Lacks Personal Jurisdiction Over the A&M Entities**

Applying these standards to the A&M Entities, it is clear that this Court lacks both general and specific personal jurisdiction. As reflected in the accompanying Declaration of Shepard C. Spink, Managing Director of Alvarez & Marsal Europe Ltd., the A&M Entities have no offices in New York, no employees who work in New York, no bank accounts in New York, and no telephone listing in New York. (*See* Spink Decl. ¶¶ 5, 7-9).[18] The A&M Entities have never paid taxes in New York, have no registered agent for the acceptance of service of process in New York, have not registered with the New York Department of State as foreign corporations doing business in New York, have no clients in New York, solicit no business in New York, and disseminate no marketing materials in New York. (*See id.* ¶¶ 10-14).

In short, the A&M Entities have none of the contacts with New York traditionally considered indicia of maintaining a "presence" here sufficient to confer general personal jurisdiction. Indeed, courts routinely dismiss claims against defendants that have little or no contacts with, or presence in, New York. *See, e.g., Bresciani*, 311 F. Supp. 2d at 444-45 (dismissing for lack of general jurisdiction claims against Indian hotel whose contacts in New York consisted of its contract with a reservation agency in New York to solicit business, distribute promotional materials, and receive and process reservations); *Klonis*, 492 F. Supp. 2d at 299-300 (dismissing for lack of personal jurisdiction claims against Greek bank with no office, property, phone listing, or public relations work in New York); *Landoil Res. Corp. v. Alexander*

---

[18] The court may rely on matters outside the pleadings for purposes of assessing personal jurisdiction. *See Berwick*, 2007 WL 949767, at *9. Where a defendant rebuts a plaintiff's unsupported jurisdictional allegations with "direct, highly specific, testimonial evidence regarding a fact essential to jurisdiction – and the plaintiffs do not counter that evidence – the allegation may be deemed refuted." *Id.* (internal quotations and citations omitted).

593531.3

18

*& Alexander Servs., Inc.*, 918 F.2d 1039, 1045-46 (2d Cir. 1990) (affirming dismissal for lack of general jurisdiction claims against a United Kingdom insurance broker without a permanent locale in New York). As such, this Court lacks general personal jurisdiction over the A&M Entities.

Likewise, the Court does not possess specific personal jurisdiction over the A&M Entities. Plaintiff's claim is for breach of his Employment Agreement – an agreement to which neither of the A&M Entities is a party. (Spink Decl. ¶ 16). Plaintiff has not alleged any specific business either A&M Entity has transacted *in New York* (or anywhere else, for that matter) from which the instant claim might otherwise arise. Accordingly, this Court lacks specific personal jurisdiction over the A&M Entities, as well. *See, e.g., Berwick*, 2007 WL 949767, at *9-10 (dismissing for lack of specific jurisdiction claim against Bahamas company based on CEO's affidavit stating that the company did not transact business in New York, is not registered to do business in New York, neither owns no rents property in New York, has no agents or employees in New York, and receives no revenues from New York); *Tese-Milner*, 2007 WL 196866, at *6 (dismissing for lack of specific jurisdiction claim against Florida motel where motel accepts reservations from New York residents through web site, but there was no "articulable nexus" or "substantial relationship" to the action because plaintiff made the reservation from a telephone in Florida); *Bulger v. Royal Doulton, PLC*, No. 05 Civ. 7709, 2006 WL 3771016, at *3-6 (S.D.N.Y. Dec. 19, 2006) (dismissing for lack of specific jurisdiction claims against English company where plaintiff made conclusory allegations that defendant transacts business and supplies goods within New York, and made only bare allegations that defendant controlled an American subsidiary, (which were rebutted by defendant's declaration)).

This Court lacks personal jurisdiction over the A&M Entities, and plaintiff's claim against them should be dismissed pursuant to Fed. R. Civ. P. 12(b)(2) accordingly.

**B.**   **The Court Lacks Personal Jurisdiction Over Silver Point Europe**

The analysis of Silver Point Europe's contacts with New York is nearly identical to that of the A&M Entities' contacts, and thus it is similarly clear that this Court lacks both general and specific jurisdiction over Silver Point Europe.

As set forth in the accompanying Declaration of Gay Bronson, Silver Point Europe has no offices in New York, no bank account in New York, and no telephone listing in New York. (*See* Bronson Decl. ¶¶ 5, 7-8). Silver Point Europe has never paid taxes in New York, it has no agent for service of process in New York, it has not registered with the New York Department of State as a foreign corporation doing business in New York, and has no clients in New York. (*See id.* ¶¶ 9-12). In sum, Silver Point Europe has not engaged in a continuous and systematic course of doing business in this forum, and thus this Court lacks general jurisdiction over it. *See Bresciani*, 311 F. Supp. 2d at 444-45; *Klonis*, 492 F. Supp. 2d at 299-301,; *Landoil*, 918 F.2d at 1045-46.

Silver Point Europe, like the A&M Entities, is not a party to plaintiff's Employment Agreement, (Bronson Decl. ¶ 13), and plaintiff has not alleged any specific business that Silver Point Europe has transacted *in New York* (or elsewhere) from which his claim might otherwise arise. Accordingly, this Court also lacks specific jurisdiction over Silver Point Europe. *See, e.g.*, *Berwick*, 2007 WL 949767, at *9-10); *Tese-Milner*, 2007 WL 196866, at *6; *Bulger*, 2006 WL 3771016, at *3-6.

Because this Court lacks both general and specific jurisdiction over Silver Point Europe, it should dismiss plaintiff's claim against it in accordance with Fed. R. Civ. P. 12(b)(2).[19]

## C.    The Court Lacks Personal Jurisdiction Over ArcelorMittal

The same analysis adheres to ArcelorMittal.  Like the A&M Entities and Silver Point Europe, ArcelorMittal has no offices in New York, owns no real estate in New York, has no employees who work in New York, no bank account in New York, and no telephone listing in New York.  (*See* Declaration of Hendrikus J. Scheffer ("Scheffer Decl.") ¶¶ 3-7).  ArcelorMittal has never paid taxes in New York, it has no agent for service of process in New York, it has not registered with the New York Department of State as a foreign corporation doing business in New York, and it has no clients in New York.  (*See id.* ¶¶ 8-11).  As such, ArcelorMittal has not engaged in a continuous and systematic course of doing business in this forum, and thus this Court lacks general jurisdiction over it.  *See Bresciani*, 311 F. Supp. 2d at 444-45; *Klonis*, 492 F. Supp. 2d at 299-300; *Landoil*, 918 F.2d at 1045-46.

---

[19] If the Court were to conclude that it has either general or specific jurisdiction over the A&M Entities, Silver Point Europe or ArcelorMittal pursuant to New York law, the Court should nevertheless refrain from exercising that jurisdiction because none of these defendants has the "minimum contacts" required by the Fourteenth Amendment's Due Process Clause.  The Due Process Clause requires that "in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  *LiButti v. U.S.*, 178 F.3d 114, 122 (2d Cir. 1999) (court lacked jurisdiction over a Kentucky LLC that entered into a horse syndicate agreement in Kentucky) (internal quotations omitted).  Plaintiff has not alleged any such purposeful availment by either the A&M Entities, Silver Point Europe or ArcelorMittal of the privilege of conducting activities within New York, or otherwise invoking the benefits and protections of New York's laws.

In addition, ArcelorMittal is not a party to plaintiff's Employment Agreement, (Scheffer Decl. ¶ 13), and MacKinnon has not alleged any specific business that ArcelorMittal has transacted in New York – or anywhere else – from which his claim might otherwise arise. Accordingly, in addition to lacking general jurisdiction over ArcelorMittal, this Court also lacks specific jurisdiction over it, and MacKinnon's claims against it should be dismissed. *See, e.g.*, *Berwick*, 2007 WL 949767, at *9-10; *Tese-Milner*, 2007 WL 196866, at *6; *Bulger*, 2006 WL 3771016, at *3-6.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2) and 12(b)(6).

Dated:  New York, New York
        May 16, 2008

Respectfully submitted,

FRIEDMAN KAPLAN SEILER &
ADELMAN LLP


Eric Seiler (ES5437)
Hallie B. Levin (HL1628)
John N. Orsini (JO6329)
1633 Broadway
New York, NY 10019-6708
(212) 833-1100

*Attorneys for Defendants Galvex Trade Ltd, Galvex Services OÜ, Galvex Estonia OÜ, Galvex Intertrade OÜ, Alvarez & Marsal Europe Ltd., Silver Point Capital, L.P., Silver Point Europe LLP, SPCP Group, LLC and ArcelorMittal S.A.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
                                 :

ELWYN MACKINNON,               :

                     Plaintiff,    :    No. 08 Civ. 2065

                                  :

          - against -       :    ECF Case

                                  :

GALVEX HOLDINGS LTD., GALVEX TRADE LTD, :
GALVEX SERVICES OÜ, GALVEX ESTONIA OÜ, :
GALVEX INTERTRADE OÜ, GALVEX CAPITAL :
L.L.C., ALVAREZ & MARSAL EUROPE LLP, :
ALVAREZ & MARSAL EUROPE LTD., SILVER :
POINT CAPITAL, L.P., SILVER POINT EUROPE :
LLP, SPCP GROUP, LLP, and ARCELORMITTAL, :

                    Defendants.   :

                                  :
-------------------------------------------------------------------x

**APPENDIX OF ENGLISH AUTHORITIES CITED IN THE MEMORANDUM OF LAW OF GALVEX TRADE LTD, GALVEX SERVICES OÜ, GALVEX ESTONIA OÜ, GALVEX INTERTRADE OÜ, ALVAREZ & MARSAL EUROPE LLP, ALVAREZ & MARSAL EUROPE LTD., SILVER POINT CAPITAL, L.P., SILVER POINT EUROPE LLP, SPCP GROUP, LLC AND ARCELORMITTAL, S.A. IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT**

FRIEDMAN KAPLAN SEILER &
  ADELMAN LLP
Eric Seiler (ES5437)
Hallie B. Levin (HL1628)
John N. Orsini (JO6329)
1633 Broadway
New York, New York 10019-6708
(212) 833-1100

*Attorneys for Defendants Galvex Trade Ltd,
Galvex Services OÜ, Galvex Estonia OÜ,
Galvex Intertrade OÜ, Alvarez & Marsal
Europe LLP, Alvarez & Marsal Europe Ltd.,
Silver Point Capital, L.P., Silver Point
Europe LLP, SPCP Group, LLC and
ArcelorMittal S.A.*

500842.1

## TABLE OF AUTHORITIES

**CASES**                                                            **TAB**

*Adams v. Cape Indus. PLC,*
    [1990] 1 Ch. 433 (C.A. 1989) ...................................................................1

*Barlow & Ors v. Polly Peck Int'l Fin. Ltd. and Anor.,*
    [1996] B.C.C. 486 (Ch. 1995) .............................................................2

*Dunlop Pneumatic Tyre Co. Ltd. v. Selfridge and Co. Ltd.,*
    [1915] A.C. 847, 862-63 (H.L.) (appeal taken from C.A.) .......................................3

*Salomon v. A. Salomon & Co., Ltd.,*
    [1897] A.C. 22 (H.L. 1896) (appeal taken from C.A.) ...........................................4

*Scruttons Ltd. v. Midland Silicones Ltd.,*
    [1962] A.C. 446, 493-94 (H.L. 1961) (appeal taken from C.A.) .............................5

# Exhibit 1

433

1 Ch.                         S.I.B. v. Pantell S.A.                    Sir Nicolas
                                                                   Browne-Wilkinson V.-C.

A   the jurisdiction of the Guernsey court. However, if the branch of
    Barclays Bank in Guernsey is holding moneys belonging to either of the
    defendants, the bank (being a bank locally resident in England) will,
    after service of the order, be required not to part with such moneys
    from the accounts held with the bank with their Guernsey branch.

        I should make it clear that, although I in fact decided this case on
    the basis that I have mentioned (namely on the basis of sections 3 and 6
B   of the Act of 1986), my researches overnight suggest that an alternative,
    and possibly clearer, route would be under section 57 of the Act, which
    deals specifically with advertisements, in relation to which section 61
    confers on the Secretary of State (and therefore on the S.I.B.) powers
    which are very similar to those contained in section 6 of the Act, which
    I have considered.

C       Finally, I should point out that these orders do not in any way
    preclude customers of Pantell individually from enforcing their rights
    against any assets of Pantell: see sections 6(9) and 61(9) of the Act.

                                                    *Order accordingly.*

D       Solicitors: *Booth & Blackwell.*

                                                            S. W.

E                            _____

                        [COURT OF APPEAL]

F   ADAMS AND OTHERS v. CAPE INDUSTRIES PLC. AND ANOTHER

                          [1984 A. No. 2597]

    1988  Feb. 15, 16, 17, 18, 19, 24, 25, 26, 29;                   Scott J.
          March 1, 2, 3, 4, 7, 8, 9, 10, 11, 14,
          15, 16, 17, 18, 21, 22, 23, 24, 25;
G   April 11, 12, 13, 14, 18, 19;
          June 17;
          July 26;
    1989  April 5, 6, 7, 10, 11, 13, 14, 17,
          18, 20, 21, 24, 25, 27, 28;                          Slade, Mustill and
          May 2, 3, 24;                                        Ralph Gibson L.JJ.
          July 27

H   *Conflict of Laws—Foreign judgment—Jurisdiction to enforce—English
    companies mining asbestos in South Africa—Marketing subsidiary
    of English parent company incorporated in Illinois—Subsidiary
    trading in asbestos but having no authority to bind English*

434

*companies in contract—Claim against English companies arising*                A
*from sale of English companies' asbestos for use in Texas settled*
*by consent judgment in Texas—Whether submission to Texas*
*court's jurisdiction—Further claims—Whether English companies*
*having presence within jurisdiction—Default judgment given in*
*Texas court against English companies—Damages assessed without*
*evidence relating to individual plaintiffs—Whether contrary to*
*natural justice—Whether default judgment enforceable*

        Until 1979 the first defendant, Cape, an English company,                B
presided over a group of subsidiary companies engaged in the
mining in South Africa, and marketing, of asbestos. The
marketing subsidiary in the United States of America was a
wholly owned subsidiary, N.A.A.C., incorporated in Illinois in
1953. The marketing subsidiary worldwide was the second
defendant, Capasco, a wholly owned English company. Asbestos
from the South African mines was sold for use in an asbestos                C
factory at Owentown, Texas. In 1974, some 462 plaintiffs,
mainly employees or ex-employees at the Owentown factory,
brought actions in the United States Federal District Court at
Tyler, Texas, for damages for personal injuries allegedly suffered
as a result of exposure to asbestos dust ("the Tyler 1 actions").
The defendants included Cape, Capasco, N.A.A.C., the South
African mining subsidiary and other parties including the United                D
States Government. Those actions were settled in September
1977 for U.S.$20m. of which Cape and its subsidiaries were to
bear over $5m. Cape and Capasco had entered motions
protesting the jurisdiction of the Tyler court and had filed
defences as to the merits which, inter alia, repeated the
jurisdiction protests. The settlement of the Tyler 1 actions was
recorded by a consent order made on 5 May 1978.
        Between April 1978 and November 1979, a further 206                E
plaintiffs instituted actions in the Tyler court against the same
defendants ("the Tyler 2 actions"). Cape and Capasco took no
part in the Tyler 2 actions maintaining that that court lacked
jurisdiction over them. They were prepared to let default
judgments be entered against them but to resist their enforcement
in England. Cape decided to put N.A.A.C. into liquidation
and, as from 31 January 1978, N.A.A.C. ceased to carry on                F
business. Cape promoted the incorporation of a new Illinois
corporation, C.P.C., and a Liechtenstein entity, A.M.C. The
shares in C.P.C. were held by M., the chief executive of
N.A.A.C., and those in A.M.C. were held by a nominee on
trust for a Cape subsidiary, C.I.O.L. Arrangements were made
for C.P.C. to carry out much the same marketing function for
the sale of Cape asbestos in the United States as had previously
been carried out by A.M.C. Those arrangements continued                G
until 1979 when Cape sold its asbestos mining and marketing
subsidiaries. In 1983, 133 plaintiffs in the Tyler 2 actions settled
their actions against the main United States defendants, including
N.A.A.C. but excluding the United States Government. Later
all the 206 plaintiffs in the Tyler 2 actions agreed to settle their
actions against the United States Government on terms that
they would obtain default judgments against Cape and Capasco
and that the United States Government would finance the steps                H
to be taken to enforce those judgments against Cape and
Capasco in England. The Tyler court fixed 12 September 1983
as the date for the hearing of the default judgment applications.

A    Under the United States Federal Rules, since Cape and Capasco were in default, the pleaded allegations against them were, save in relation to damage, taken to be admitted. But no judicial hearing took place. On 12 September the judge signed a default judgment for over U.S.$15½m. The awards made to individual plaintiffs fell into a number of bands: 67 were awarded $37,000, 31 $60,000, 47 $85,000 and 61 $120,000. The judge directed that

B    the total award should represent an average award of $75,000 per plaintiff but it was the plaintiffs' counsel who selected the level of the bands and who identified the plaintiffs to be placed in each band in order to produce the directed average award. All those plaintiffs, but one, sought to enforce the default judgment against Cape and Capasco by the present proceedings. They contended that Cape and Capasco had submitted to the jurisdiction in the Tyler 1 actions, and that the submission to

C    the jurisdiction in the Tyler 1 actions constituted a submission to the jurisdiction in the Tyler 2 actions or, alternatively, an agreement to submit to the jurisdiction in the Tyler 2 actions. Secondly, the plaintiffs contended that the Tyler court was entitled to take jurisdiction over Cape and Capasco by reason of their presence in Illinois when the Tyler 2 actions were commenced.

D    Scott J. dismissed the actions holding, inter alia, that the jurisdiction of a foreign court over defendants could be established either on a territorial basis by showing that the defendants were present within the territory of the foreign court or on a consensual basis by showing that the defendants had consented to the foreign court exercising jurisdiction over them; that Cape and Capasco by participating in the application in the Tyler 1 actions to the judge to make the consent order of 5 May

E    1978 submitted to the jurisdiction of the Tyler court, but that the Tyler 1 actions and the Tyler 2 actions were distinct and separate actions so that submission to the jurisdiction in the Tyler 1 actions could not be regarded as a submission to the jurisdiction in the Tyler 2 actions; that an agreement to submit to the jurisdiction of a foreign court might be evidenced either by a term of an agreement binding in contract or by a unilateral representation of willingness to submit to the jurisdiction, but if

F    such a representation was to be relied on, it should be clear and unequivocal and have been acted on by the plaintiff and that Cape and Capasco had not contracted to submit nor made any representation of willingness to submit in the Tyler 2 actions; that, on the basis that the same principles applied to the question whether a corporation was present in the territory of a foreign court as applied to the question whether a corporation had a sufficient presence in England to enable service of a writ

G    on the corporation to be effected by service on its agent in England, the presence of N.A.A.C. and C.P.C. in Illinois and the business carried on from their respective offices in Illinois did not constitute the presence of Cape or Capasco in Illinois; and that the procedure adopted by the judge in the Tyler court in giving the default judgment of 12 September 1983 offended against English principles of natural justice, in that there had been no judicial assessment of the defendants' liability and the

H    award of damages had been arbitrary, not based on evidence and not related to the individual entitlements of the various plaintiffs.

    On an appeal by the plaintiffs:—

436

*Held*, dismissing the appeal, (1) that an overseas trading corporation was likely to be treated by the English court as present within the jurisdiction of the courts of another country only where either such a corporation had established and maintained at its own expense in that other country a fixed place of business and had carried on from there its business for more than a minimal period of time through its servants or agents or through a representative; that in either of those two cases presence could only be established where the overseas corporation's business, whether together with the representative's own business or not, had been transacted at or from the fixed place and, in order to ascertain whether the representative had carried on the corporation's business or his own, it would be necessary to investigate his functions and his relationship with the overseas corporation (post, p. 530D–G).

*Okura & Co. Ltd. v. Forsbacka Jernverks Aktiebolag* [1914] 1 K.B. 715, C.A.; *Littauer Glove Corporation v. F. W. Millington (1920) Ltd.* (1928) 44 T.L.R. 746 and *Vogel v. R. and A. Kohnstamm Ltd.* [1973] Q.B. 133 applied.

*Quaere.* Whether residence without presence will suffice (post, p. 518C–D).

(2) That, on the facts, C.P.C. was an independently owned company and by the liquidation of N.A.A.C. and the creation of A.M.C. and C.P.C. Cape wanted sales of asbestos from its subsidiaries to continue in the United States but intended, by any lawful means which it was entitled to do, to reduce the appearance of its, or its subsidiaries', involvement there and to reduce the risk of its being held liable for United States taxation or subject to the jurisdiction of the United States courts, and that, accordingly, since it was not a mere facade concealing the true facts it was not appropriate to pierce the corporate veil; that furthermore, since it was accepted that N.A.A.C. was incorporated so as to assist in marketing and to be a marketing agent of the Cape group in the United States and, since a substantial part of its business at all material times was, in every sense, its own business, it did not act as an agent of the Cape group; that, in any event, since N.A.A.C. had no general authority to enter into contracts binding Cape or Capasco and third parties no such transactions were ever entered into by N.A.A.C.; and that, accordingly, the defendants were not present in the United States of America through N.A.A.C., C.P.C. or A.M.C. (post, pp. 541F–H, 544A–C, 544H—545B, G—546A, 547A–D, 549C–D).

(3) That, as a matter of principle, the onus fell on the plaintiff, who sought to enforce a judgment of a foreign court, to demonstrate the competence of that court and that it was only the judgment of the competent foreign court recognised as such by English law which would bind the defendant; that, if the onus fell on the defendants to disprove the competence of the Tyler court to give judgment against them, they had discharged that onus because they had shown that they were not present in the United States (post, p. 550C–F).

(4) That the method by which the Tyler court came to a decision as to the amount of the default judgment was contrary to the requirements of substantial justice contained in English law (post, p. 568F).

(5) That the failure of the defendants to apply to set aside the default judgment did not preclude them from relying on

A

B

C

D

E

F

G

H

1 Ch.    Adams v. Cape Industries Plc. (C.A.)

A  that breach of natural justice by way of defence to the present action to enforce that judgment, since the plaintiffs had failed to give prior notice to the defendants of the unusual course they were proposing to take, did not seek to dissuade the judge from adopting that method of assessment of damages and drew up and served a form of judgment which did not show the procedure adopted, and the effect on the defendants, although everything was done by the plaintiffs in good faith, was that

B  they remained unaware of any basis for seeking relief from the Tyler court in respect of the defect in the judgment (post, p. 572B–E).

Pemberton v. Hughes [1899] 1 Ch. 781, C.A. and Jacobson v. Frachon (1928) 138 L.T. 386, C.A. applied.

Decision of Scott J., post, p. 441G, affirmed.

C  The following cases are referred to in the judgment of the Court of Appeal:

Abouloff v. Oppenheimer & Co. (1882) 10 Q.B.D. 295, C.A.

Albazero, The [1977] A.C. 774; [1976] 3 W.L.R. 419; [1976] 3 All E.R. 129, H.L.(E.)

Bank of Tokyo Ltd. v. Karoon (Note) [1987] A.C. 45; [1986] 3 W.L.R. 414; [1986] 3 All E.R. 468, C.A.

Baroda (Maharanee of) v. Wildenstein [1972] 2 Q.B. 283; [1972] 2 W.L.R. 1077; [1972] 2 All E.R. 689, C.A.

D  Boys v. Chaplin [1971] A.C. 356; [1969] 3 W.L.R. 322; [1969] 2 All E.R. 1085, H.L.(E.)

Bulova Watch Co. Inc. v. K. Hattori & Co. Ltd. (1981) 508 F. Supp. 1322.

Burnet v. Francis Industries Plc. [1987] 1 W.L.R. 802; [1987] 2 All E.R. 323, C.A.

Canada Enterprises Corporation Ltd. v. MacNab Distilleries Ltd. (Note) [1987] 1 W.L.R. 813, C.A.

E  Carrick v. Hancock (1895) 12 T.L.R. 59

Castrique v. Imrie (1870) L.R. 4 H.L. 414, H.L.(E.)

Colt Industries Inc. v. Sarlie [1966] 1 W.L.R. 440; [1966] 1 All E.R. 673, C.A.

Crawley v. Isaacs (1867) 16 L.T. 529

D.H.N. Food Distributors Ltd. v. Tower Hamlets London Borough Council [1976] 1 W.L.R. 852; [1976] 3 All E.R. 462, C.A.

F  Dunlop Pneumatic Tyre Co. Ltd. v. Actien-gesellschaft für Motor und Motorfahrzeugbau vorm. Cudell & Co. [1902] 1 K.B. 342, C.A.

Emanuel v. Symon [1908] 1 K.B. 302, C.A.

Employers' Liability Assurance Corporation Ltd. v. Sedgwick, Collins & Co. Ltd. [1927] A.C. 95, H.L.(E.)

Erie Railroad Co. v. Tompkins (1938) 304 U.S. 64

Firestone Tyre and Rubber Co. Ltd. v. Lewellin (Inspector of Taxes) [1957] 1 W.L.R. 464; [1957] 1 All E.R. 561, H.L.(E.)

G  General Steam Navigation Co. v. Guillou (1843) 11 M. & W. 877

Godard v. Gray (1870) L.R. 6 Q.B. 139

Grant v. Anderson & Co. [1892] 1 Q.B. 108, C.A.

Guaranty Trust Co. v. York (1945) 326 U.S. 99

Haggin v. Comptoir d'Escompte de Paris (1889) 23 Q.B.D. 519, C.A.

Holdsworth (Harold) & Co. (Wakefield) Ltd. v. Caddies [1955] 1 W.L.R. 352; [1955] 1 All E.R. 725, H.L.(Sc.)

H  Holstein, The [1936] 2 All E.R. 1660

Istituto Chemioterapico Italiano S.p.A. and Commercial Solvents Corporation v. Commission of the European Communities (Cases 6 and 7/73) [1974] E.C.R. 223, E.C.J.

438

*Jabbour (F. & K.) v. Custodian of Israeli Absentee Property* [1954] 1
   W.L.R. 139; [1954] 1 All E.R. 145                                        **A**
*Jacobson v. Frachon* (1928) 138 L.T. 386, C.A.
*Jeannot v. Fuerst* (1909) 100 L.T. 816
*Jet Holdings Inc. v. Patel* [1990] 1 Q.B. 335; [1988] 3 W.L.R. 295, C.A.
*Jones v. Lipman* [1962] 1 W.L.R. 832; [1962] 1 All E.R. 442
*La Bourgogne* [1899] P. 1; sub nom. *Compagnie Générale Transatlantique v.
   Thomas Law & Co.* [1899] A.C. 431, H.L.(E.)
*Lalandia, The* [1933] P. 56                                                **B**
*Littauer Glove Corporation v. F. W. Millington (1920) Ltd.* (1928) 44
   T.L.R. 746
*Littlewoods Mail Order Stores Ltd. v. Inland Revenue Commissioners* [1969]
   1 W.L.R. 1241; [1969] 3 All E.R. 855, C.A.
*Local Government Board v. Arlidge* [1915] A.C. 120, H.L.(E.)
*Merchandise Transport Ltd. v. British Transport Commission* [1962] 2 Q.B.
   173; [1961] 3 W.L.R. 1358; [1961] 3 All E.R. 495, C.A.                   **C**
*Miller v. B.C. Turf Ltd.* (1969) 8 D.L.R. (3d) 383
*Mississippi Publishing Corporation v. Murphree* (1946) 326 U.S. 438
*Moore v. Mercator Enterprises Ltd.* (1978) 90 D.L.R. (3d) 590
*Newby v. Von Oppen & The Colt's Patent Firearms Manufacturing Co.*
   (1872) L.R. 7 Q.B. 293
*Okura & Co. Ltd. v. Forsbacka Jernverks Aktiebolag* [1914] 1 K.B. 715,
   C.A.                                                                     **D**
*Omni Capital International v. Rudolph Wolff & Co. Ltd.* (1987) 108 S. Ct.
   404
*Pemberton v. Hughes* [1899] 1 Ch. 781, C.A.
*Princesse Clementine, The* [1897] P. 18
*Revlon Inc. v. Cripps & Lee Ltd.* [1980] F.S.R. 85, C.A.
*Reynolds v. Fenton* (1846) 16 L.J. C.P. 15
*Roberta, The* (1937) 58 Ll. L.R. 159                                       **E**
*Robinson v. Fenner* [1913] 3 K.B. 835
*Rousillon v. Rousillon* (1880) 14 Ch.D. 351
*Saccharin Corporation Ltd. v. Chemische Fabrik Von Heyden Aktiengesell-
   schaft* [1911] 2 K.B. 516, C.A.
*Salomon v. A. Salomon & Co. Ltd.* [1897] A.C. 22, H.L.(E.)
*Schibsby v. Westenholz* (1870) L.R. 6 Q.B. 155
*Scottish Co-operative Wholesale Society Ltd. v. Meyer* [1959] A.C. 324;   **F**
   [1958] 3 W.L.R. 404; [1958] 3 All E.R. 56, H.L.(Sc.)
*Sfeir & Co. v. National Insurance Co. of New Zealand Ltd.* [1964] 1 Lloyd's
   Rep. 330
*Sirdar Gurdyal Singh v. Rajah of Faridkote* [1894] A.C. 670, P.C.
*South India Shipping Corporation Ltd. v. Export-Import Bank of Korea*
   [1985] 1 W.L.R. 585; [1985] 2 All E.R. 219, C.A.
*Thames and Mersey Marine Insurance Co. v. Societa di Navigazione a
   Vapore del Lloyd Austriaco* (1914) 111 L.T. 97, C.A.                    **G**
*Theodohos, The* [1977] 2 Lloyd's Rep. 428
*Vogel v. R. and A. Kohnstamm Ltd.* [1973] Q.B. 133; [1971] 3 W.L.R. 537;
   [1971] 2 All E.R. 1428
*Wallersteiner v. Moir* [1974] 1 W.L.R. 991; [1974] 3 All E.R. 217, C.A.
*Williams v. Jones* (1845) 13 M. & W. 628
*Woolfson v. Strathclyde Regional Council,* 1978 S.L.T. 159                 **H**
*World Harmony, The* [1967] P. 341; [1965] 2 W.L.R. 1275; [1965] 2 All
   E.R. 139
*X Bank Ltd. v. G.* (1985) 82 L.S.G. 2016, C.A.

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A      The following additional cases were cited in argument in the Court of
       Appeal:

       *Badcock v. Cumberland Gap Park Co.* [1893] 1 Ch. 362
       *Blohn v. Desser* [1962] 2 Q.B. 116; [1961] 3 W.L.R. 719; [1961] 3 All E.R. 1
       *Calvin's Case* (1608) 7 Co. Rep. 1a
       *Hercules v. Grand Trunk Pacific Railway Co.* [1912] 1 K.B. 222
       *Joyce v. Director of Public Prosecution* [1946] A.C. 347, H.L.(E.)

B
       The following cases are referred to in the judgment of Scott J.:
       *Albazero, The* [1977] A.C. 774; [1976] 3 W.L.R. 419; [1976] 3 All E.R.
          129, H.L.(E.)
       *Bank of Tokyo v. Karoon (Note)* [1987] A.C. 45; [1986] 3 W.L.R. 414;
          [1986] 3 All E.R. 468, C.A.
       *Blohn v. Desser* [1962] 2 Q.B. 116; [1961] 3 W.L.R. 719; [1961] 3 All E.R. 1
C      *Boissière & Co v. Brockner & Co.* (1889) 6 T.L.R. 85
       *Dunlop Pneumatic Tyre Co. Ltd. v. Actien-Gesellschaft für Motor und
          Motorfahrzeugbau Vorm. Cudell & Co.* [1902] 1 K.B. 342, C.A.
       *Emanuel v. Symon* [1908] 1 K.B. 302, C.A.
       *Erie Railroad Co. v. Tompkins* (1938) 304 U.S. 64
       *Firestone Tyre and Rubber Co. Ltd. v. Lewellin* [1957] 1 W.L.R. 464; [1957]
          1 All E.R. 561, H.L.(E.)
D      *Godard v. Gray* (1870) L.R. 6 Q.B. 139, D.C.
       *Holstein, The* [1936] 2 All E.R. 1660
       *Istituto Chemioterapico Italiano S.p.A. and Commercial Solvents Corporation
          v. Commission of the European Communities* (Cases 6 and 7/73) [1974]
          E.C.R. 223, E.C.J.
       *Jabbour (F. & K.) v. Custodian of Israeli Absentee Property* [1954] 1
          W.L.R. 139; [1954] 1 All E.R. 145
E      *Jacobson v. Frachon* (1928) 138 L.T. 386, C.A.
       *La Bourgogne* [1899] P. 1, C.A.
       *Lalandia, The* [1933] P. 56
       *Littauer Glove Corporation v. F. W. Millington (1920) Ltd.* (1928) 44
          T.L.R. 746
       *Ochsenbein v. Papelier* (1873) L.R. 8 Ch.App. 695
       *Okura & Co. Ltd. v. Forsbacka Jernverks Aktiebolag* [1914] 1 K.B. 715,
          C.A.
F      *Pemberton v. Hughes* [1899] 1 Ch. 781, C.A.
       *Point Landing Inc. v. Omni Capital International Ltd.* (1986) 795 F. 2d 415
       *Prima Paint Corporation v. Flood & Conklin Manufacturing Co.* (1967) 388
          U.S. 395
       *Princesse Clementine, The* [1897] P. 18
       *Rein v. Stein* (1892) 66 L.T. 469, C.A.
       *Robinson v. Fenner* [1913] 3 K.B. 835
G      *Russell v. Smyth* (1842) 9 M. & W. 810
       *S.A. Consortium General Textiles v. Sun and Sand Agencies Ltd.* [1978]
          Q.B. 279; [1978] 2 W.L.R. 1; [1978] 2 All E.R. 339, Parker J. and
          C.A.
       *Saccharin Corporation Ltd. v. Chemische Fabrik Von Heyden Aktiengesellsch-
          aft* [1911] 2 K.B. 516, C.A.
       *Schibsby v. Westenholz* (1870) L.R. 6 Q.B. 155
H      *Sfeir & Co. v. National Insurance Co. of New Zealand Ltd.* [1964] 1 Lloyd's
          Rep. 330
       *Sirdar Gurdyal Singh v. The Rajah of Faridkote* [1894] A.C. 670, P.C.
       *South India Shipping Corporation Ltd. v. Export-Import Bank of Korea*
          [1985] 1 W.L.R. 585; [1985] 2 All E.R. 219, C.A.

440

*Thames and Mersey Marine Insurance Co. v. Societa di Navigazione a*    A
*Vapore del Lloyd Austriaco* (1914) 111 L.T. 97, C.A.
*Vogel v. R. and A. Kohnstamm Ltd.* [1973] Q.B. 133; [1971] 3 W.L.R. 537;
[1971] 2 All E.R. 1428
*Williams & Glyn's Bank Plc. v. Astro Dinamico Compania Naviera S.A.*
[1984] 1 W.L.R. 438; [1984] 1 All E.R. 760, H.L.(E.)
*World Harmony, The* [1967] P. 341; [1965] 2 W.L.R. 1275; [1965] 2 All
E.R. 139
                                                                          B

The following additional cases were cited in argument before Scott J.:

*Abouloff v. Oppenheimer & Co.* (1882) 10 Q.B.D. 295, C.A.
*Actiesselskabet Dampskib "Hercules" v. Grand Trunk Pacific Railway Co.*
[1912] 1 K.B. 222, C.A.
*Attorney-General for Alberta v. Cook* [1926] A.C. 444, P.C.
*Bank of Australasia v. Nias* (1851) 16 Q.B. 717
*Béguelin Import Co. v. G. L. Import-Export S.A.* (1972) 11 C.M.L.R. 81,    C
E.C.J.
*Bergerem v. Marsh* (1921) 91 L.J.K.B. 80
*Berliner Industriebank Aktiengesellschaft v. Jost* [1971] 2 Q.B. 463; [1971] 3
W.L.R. 61; [1971] 2 All E.R. 1513, C.A.
*Casdagli v. Casdagli* [1919] A.C. 145, H.L.(E.)
*Castrique v. Imrie* (1870) L.R. 4 H.L. 414, H.L.(E.)
*Crawley v. Isaacs* (1867) 16 L.T. 529                                     D
*Deverall v. Grant Advertising Inc.* [1955] Ch. 111; [1954] 3 W.L.R. 688;
[1954] 3 All E.R. 389, C.A.
*Elefanten Schuh GmbH. v. Pierre Jacqmain* [1981] E.C.R. 1671, E.C.J.
*Europemballage Corporation and Continental Can Co. Inc. v. Commission
of European Communities* (1973) 12 C.M.L.R. 199, E.C.J.
*Fender v. St. John-Mildmay* [1938] A.C. 1; [1937] 3 All E.R. 402, H.L.(E.)    E
*Ferguson v. Mahon* (1839) 11 Ad. & E. 179
*Gatty (F.A.) and Gatty (P.V.) v. Attorney-General* [1951] P. 444
*Gray(orse. Formosa) v. Formosa* [1963] P. 259; [1962] 3 W.L.R. 1246;
[1962] 3 All E.R. 419, C.A.
*Henderson v. Henderson* (1844) 6 Q.B. 288
*Houlditch v. Marquess of Donegal* (1834) 2 Cl. & Fin. 470
*Imperial Chemical Industries Ltd. v. Commission of European Communities*    F
(1972) 11 C.M.L.R. 557, E.C.J.
*Jeannot v. Fuerst* (1909) 25 T.L.R. 424
*Jet Holdings Inc. v. Patel* [1990] 1 Q.B. 335; [1988] 3 W.L.R. 295, C.A.
*Local Government Board v. Arlidge* [1915] A.C. 120, H.L.(E.)
*Macalpine v. Macalpine* [1958] P. 35; [1957] 3 W.L.R. 698; [1957] 3 All
E.R. 134
*Meyer, In re* [1971] P. 298; [1971] 2 W.L.R. 401; [1971] 1 All E.R. 378
*Newby v. Von Oppen and the Colt's Patent Firearms Manufacturing Co.*    G
(1872) L.R. 7 Q.B. 293
*Price v. Dewhurst* (1837) 8 Sim. 279
*Reg. v. Chief Registrar of Friendly Societies, Ex parte New Cross Building
Society* [1984] Q.B. 227; [1984] 2 W.L.R. 370; [1984] 2 All E.R. 27,
C.A.
*Rousillon v. Rousillon* (1880) 14 Ch.D.351
*Secretary of State for Foreign Affairs v. Charlesworth Pilling & Co.* [1901]    H
A.C. 373, P.C.
*Smith, Stone and Knight Ltd. v. Birmingham Corporation* [1939] 4 All E.R.
116
*Syal v. Heyward* [1948] 2 K.B. 443; [1948] 2 All E.R. 576, C.A.

A    *Trottier v. Rajotte* [1940] 1 D.L.R. 433
     *Vadala v. Lawes* (1890) 25 Q.B.D. 310, C.A.
     *Vervaeke (formerly Messina) v. Smith* [1983] 1 A.C. 145; [1982] 2 W.L.R.
        855; [1982] 2 All E.R. 144, H.L.(E.)
     *Wahl v. Attorney-General* (1932) 147 L.T. 382, H.L.(E.)
     *Weiss, Biheller and Brooks Ltd. v. Farmer* [1923] 1 K.B. 226, C.A.

B    ACTION
        By a writ and statement of claim dated 1 August 1984, the plaintiff,
     Jimmy Wayne Adams commenced an action against Cape Industries Plc.
     and its wholly owned subsidiary, Capasco Ltd., seeking to enforce a
     default judgment which had been awarded to him in the United States
     of America. In the statement of claim it was alleged that (1) on 21 April
     1978, the plaintiff commenced an action against the defendants in the
C    United States District Court for the Eastern District of Texas, Tyler
     Division, in the State of Texas in the United States of America; (2) the
     court was duly constituted and held in accordance with the laws of
     the state and had jurisdiction in that behalf; (3) on 12 September 1983
     the court gave judgment in favour of the plaintiff for damages and
     assessed the damages to which the plaintiff was entitled in the sum of
D    U.S.$37,000 and ordered the defendants to pay the plaintiff forthwith
     the sum of $37,000 and interest at the rate of 9 per cent. per annum
     from that date until payment. Payment was claimed accordingly, it being
     certified that at the appropriate rate $37,000 amounted to £25,298.28.
        The writ was one of 205 claims to enforce the default judgment of
     the Tyler court in consolidated actions by plaintiffs with similar claims in
     respect of personal injuries alleged to have been caused by asbestos
E    dust. The defendants denied that the Tyler court had, for the purposes
     of English law, jurisdiction over them.
        The facts are stated in the judgments of Scott J. and the Court of
     Appeal.

     *T. R. A. Morison Q.C.* and *Charles Falconer* for the plaintiffs.
F    *Sir Godfray Le Quesne Q.C., Jonathan Playford Q.C., Adrian
     Brunner* and *George Alliott* for the defendants.

                                                        *Cur. adv. vult.*

G    17 June 1988.  SCOTT J. read the following judgment. The judgment
     I am about to give is nearly but not quite my complete judgment. After
     reserving judgment on Tuesday 19 April my judicial duties required me
     to sit in the North of England until the end of May. A consequence has
     been that preparation of my judgment in this important case has been
     unavoidably delayed. Representations have been made to me on behalf
     of Cape Industries Plc. to the effect that if the result of the case remains
     uncertain beyond this week, serious financial damage may ensue to the
     company and to its shareholders. I need not elaborate on the nature of
H    the fears but will say that they did not seem to me to be without
     substance.
        I would think it unacceptable in principle that litigants or those
     connected with them should be brought to suffer financial loss by a

A

judge's delay in preparing a reserved judgment, if that result can be avoided. Since the outcome of this case is now clear in my mind and it is only the expression of that outcome that is incomplete, the result can, I think, be avoided. I have proposed to both sides that I should deliver now my judgment to the extent that it is complete—something over three-quarters is in fact complete—and express, in summary form, my conclusions on the issues to be covered by that part of my judgment that is not yet complete.

B

The defendants have pressed me to take that course. The plaintiffs have asked that I should hold my hand until my complete judgment is ready for delivery. I have decided, however, that I ought to proceed in the manner I have indicated. I do not think any injustice will be occasioned thereby to the plaintiffs or anyone connected with them.

C

I will make clear the point at which my definitive judgment ends. What I say thereafter will not form part of my definitive judgment but will be an indication in summary terms of what will be contained in the final part of my judgment when it is complete. I will reconvene the court in due course for the delivery of that final part. The delay will, I trust, be a short one. The order to be made consequent upon my judgment will not be drawn up until the final part has been delivered. So time for appeal will not start running. I will deal with costs at that stage.

D

I have before me 205 consolidated actions. In each action the defendants are Cape Industries Plc. ("Cape") and Capasco Ltd. ("Capasco"). Each of the plaintiffs is a person or the personal representative of a person in whose favour a damages award was made on 12 September 1983 in the United States District Court for the Eastern District of Texas, Tyler Division, in the State of Texas, United States of America. I shall refer to this federal district court as the "Tyler court."

E

The judgment of 12 September 1983 was a default judgment given by Judge Steger, a federal district judge, sitting in the Tyler court. The judgment, after setting out a number of findings of fact and conclusions of law, concluded:

F

"By virtue of defaulting defendants' acts and omissions of negligence and breaches of warranty, this court finds that defaulting defendants are liable jointly and severally to each plaintiff listed in appendix A for the amounts of money indicated for each plaintiff. It is therefore ordered and adjudged by the court that plaintiffs recover from defendants, jointly and severally, $15,654,000 and further that such judgment shall run with 9 per cent. interest per annum from the date hereof until paid . . ."

G

The awards made to the individual plaintiffs as set out in appendix A to the judgment fell into a number of bands. 67 plaintiffs were awarded $37,000, 31 plaintiffs were awarded $60,000, 47 plaintiffs were awarded $85,000 and 61 plaintiffs were awarded $120,000. There were thus 206 awards in all. The surviving plaintiffs and the personal representatives of all bar one of the plaintiffs who have died since 12 September 1983 have brought actions in this country for payment of the damages and interest ordered to be paid by the judgment of 12 September 1983. The cause of

H

A   action asserted and sued on in each action is the judgment of the Tyler court. These are the consolidated actions before me.

   A judgment of a foreign court can be enforced by action in this country only if the jurisdiction of the foreign court to have given the judgment is recognised by the law of this country. The jurisdiction of the Tyler court over Cape and Capasco is in issue in these actions. It is well settled also that a foreign judgment given by a court of competent jurisdiction will not be enforced in this country if the judgment can be shown to have been obtained by fraud or if its enforcement would offend natural justice or public policy. These defences are relied on by Cape and Capasco. So the actions and the defences thereto raise a number of issues both of fact and of law and I must, in order to enable the issues to be comprehensible, start by briefly relating the history that has led to these actions. When I have done so I will endeavour to describe the issues that arise for decision.

B

C

## History

   Cape until 1979 presided over a group of subsidiary companies engaged in the mining and marketing of asbestos. On 29 June 1979 the mining and marketing companies were sold by Cape to a South African company, Transvaal Consolidated Exploration Co. Ltd. It was, however, the mining and marketing of the asbestos in the period before the 1979 sale that gave rise to the litigation against Cape that culminated in the 12 September 1983 default judgment. The mines from which the asbestos came were situated in South Africa. The mining companies, the most important of which for present purposes was Egnep Pty. Ltd. ("Egnep"), were South African companies. Egnep mined amosite asbestos. The shares in Egnep and the other mining companies were held by Cape Asbestos South Africa (Pty.) Ltd. ("Casap"), also a South African company. Prior to 2 December 1975 the shares in Casap were held by Cape.

D

E

   One of the important markets for sale of the asbestos produced by the South African mines was the United State of America. On 14 October 1953, Cape had caused to be incorporated in Illinois a company called North American Asbestos Corporation ("N.A.A.C."). The shares in N.A.A.C. were held by Cape. The function of N.A.A.C. which I shall have to examine in more detail later, was to assist in the marketing of the asbestos in the United States of America. N.A.A.C. acted as a liaison between the United States purchasers of the asbestos and the seller, either Egnep or Casap. N.A.A.C. also purchased asbestos on its own account and sold the asbestos in the U.S. market. In the later 1950s Capasco, an English company, was incorporated. Its shares were and still are held by Cape. Capasco, formerly called Cape Asbestos Fibres Ltd., was responsible for the marketing world wide of Cape's asbestos and asbestos products. But the prior existence of N.A.A.C. had the result that marketing in the United States of America was left in the main to N.A.A.C.

F

G

H

   In 1975 an organisational change took place. Cape International & Overseas Ltd. ("C.I.O.L.") was incorporated. C.I.O.L. was an English company and its shares were held by Cape. The shares in Casap and the

444

Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

shares in N.A.A.C. were transferred to C.I.O.L. But the manner in     A
which Capasco, N.A.A.C., and Casap and the mining companies carried
on business and managed their affairs was not materially altered by the
insertion of C.I.O.L. between Cape, on the one hand, and Casap and
N.A.A.C. on the other hand. The sale to Transvaal Consolidated
Exploration Co. Ltd. in 1979 took the form of a sale of the shares in
C.I.O.L. So, to rehearse the corporate structure, Cape was the parent
company; N.A.A.C. was the marketing subsidiary for the United States     B
of America; Capasco was the marketing subsidiary world wide; Casap
was the subsidiary which owned the mining companies and Egnep
owned the asbestos mines from which came the amosite asbestos which
was sold into the United States of America.

One of the main customers in the United States for Egnep's amosite
asbestos was Pittsburg Corning Corporation ("P.C.C."). In 1962, P.C.C.     C
purchased from Union Asbestos and Rubber Corporation ("Unarco")
an asbestos factory at Owentown in Texas. Unarco had been a customer
for Egnep's amosite asbestos. After its purchase of the Owentown
factory in 1962 P.C.C. became a customer. Egnep's amosite asbestos
was purchased by P.C.C. and used in the factory for 10 years from 1962
until 1972 when the factory was closed.

Awareness of the potential long-term damage capable of being     D
caused by asbestos dust to those exposed to it reached the point in the
mid-1970s in the United States of America at which personal injuries
actions began on a large scale to be instituted. Many of those who had
worked or were working in the Owentown factory and those who lived
in the neighbourhood of the factory commenced actions in the period
1974 to 1979. An accurate estimate is difficult to make but from what I
have heard in the course of this action it seems that over that period     E
some 2,000 to 3,000 plaintiffs issued proceedings based upon allegations
of injury caused by exposure to asbestos dust emanating from the
Owentown factory. There were several defendants to the actions. Unarco
and P.C.C., the successive owners of the factory, were defendants. The
corporate shareholders of P.C.C., namely P.P.G. Industries Inc.
("P.P.G.") and Corning Glassworks Inc., were joined as defendants on     F
the basis that each had taken sufficient part in management decisions
regarding the use of asbestos at the Owentown factory to subject itself
to tortious liability arising from that use. N.A.A.C., Cape and Egnep
became defendants.

Liability was alleged on the ground that they had been responsible
for the supply of the amosite asbestos used in the Owentown factory
and, notwithstanding knowledge of its dangers, had failed to warn     G
against those dangers. In addition, the United States itself became a
defendant in some of the actions and a third party defendant in others.
So did the union to which most of the Owentown factory workers
belonged, the Oil Chemical and Atomic Workers International Union.
Not all these defendants were residents of Texas. Moreover, the
defendants included the United States of America itself. So the actions     H
were brought not in a Texas state court but in a federal court under its
diversity of citizenship jurisdiction, which I will later endeavour to
explain.

A    The first action was commenced in the Tyler court on 2 January 1974. There were some seven plaintiffs. The action was framed as a "class" action with the plaintiffs purporting to sue "on behalf of themselves and all others similarly situated." This was the "Yandle" action. On 17 January 1974 a second action was commenced in the Tyler court, the "Kay" action. Both actions were assigned to Judge Steger.

B    On 25 February 1974 Cape filed a motion in the Yandle action to quash service on the ground of lack of jurisdiction. On 26 March 1974 Cape filed a similar motion in the Kay action. On 10 April 1974 Egnep did likewise. In 1976 Capasco became a defendant and filed similar motions.

    On 31 July 1974, by which time it must have been apparent that hundreds of claimants alleging injury caused by the amosite asbestos used in the Owentown factory were queueing up in the wings, a

C    conference took place between Judge Steger and counsel for the parties in the two actions. It was decided that the Rules for Complex and Multi-District Litigation would be followed. I shall have to describe these more fully later. For the moment, it suffices to say that they are rules set out in the *Manual for Complex Litigation for use with Federal Practice and Procedure*, the authors of which are Professor Charles Wright and Professor Arthur Miller. The latter gave evidence before

D    me. The rules, widely used in federal courts, represent in substance management techniques for the efficient management and conduct of complex civil litigation.

    One of the first procedural questions which needed to be decided was whether or not the actions would proceed as "class" actions. A hearing on this issue took place on 17 December 1974. On 31 December

E    1974 Judge Steger ruled that the actions should not have "class" action status. His judgment contains a useful summary of the litigation and the issues therein. In the penultimate paragraph of his judgment, Judge Steger said:

F        "The court is of the opinion that the superior method for adjudication of this case is to continue to allow intervention freely for those who wish to join and to maintain firm control over this litigation by utilising the tools set forth in the *Manual for Complex and Multi District Litigation*. It is therefore ordered that the plaintiffs' motion for class action status be and the same is hereby in all things denied . . ."

G    I must explain the reference to "intervention." Under rule 24 of the Federal Rules of Civil Procedure, a person may, with leave of the court, intervene in an action and become a party thereto if the "applicant's claim or defence and the main action have a question of law or fact in common." Following Judge Steger's order of 31 December 1974 a large number of claimants intervened in the Yandle and Kay actions. On 31 December 1974 a third action was commenced in the Tyler court, the

H    "McNeece" action. The United States of America was the only defendant. The three actions I have mentioned (the Yandle action, the Kay action and the McNeece action) have become known compendiously as Tyler 1. I shall so refer to them.

446

Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

I have already referred to the motions based upon an alleged lack of    A
jurisdiction. Those motions were not dealt with until 19 April 1977. In
the meantime, Cape and Capasco took a number of procedural steps in
or in connection with the actions. The effect of these steps is one of the
issues before me.

On 19 August 1977 Judge Steger dismissed the motions. He gave no
written judgment or reasons. The dismissal was not, however, final. It    B
did not bar Cape and Capasco from taking the same jurisdiction point at
trial. In substance, the dismissal was, I think, no more than a decision
that the point was not so obvious as to warrant a summary dismissal of
Cape and Capasco from the action, and that the point should be left for
final decision at trial.

Following the dismissal of the motions, Cape and Capasco filed
answers in the Yandle action and the Kay action. They pleaded to the    C
merits of the claims while nonetheless maintaining their jurisdiction
objection. By this time, mid-1977, the process of intervention had
swelled the number of claimants for damages in the Tyler actions to well
over 400. The number was, moreover, still increasing. On 15 July 1977
Judge Steger set 12 September 1977 as the trial date for the three Tyler
actions.

One of the most striking features of the Tyler litigation, to English    D
eyes at least, is the personal involvement of Judge Steger in the
negotiations for a settlement between the claimants and the defendants.
It is a fair inference from the evidence before me that the judge set 12
September 1977 as the trial date in order to concentrate the minds of all
parties on the need for a settlement and without any real expectation
that an effective trial would commence on that date.

When, on 12 September 1977, the actions were called on, the    E
defendants applied for an adjournment on the ground that they were
not yet ready for trial. Judge Steger, without ruling on the application,
sent the parties away to negotiate. It is interesting to recall the evidence
of Mr. Richard Bernays, counsel for N.A.A.C. He said:

"Judge Steger then asked the marshall to show us all—and we were    F
quite an aggregation—into his conference room in his chambers,
and he was completing the call of his docket and said he would join
us shortly, which he did. There were a number of us round a very
large conference table and the judge finally appeared and directed
us to stay there and work until we had settled the cases. He gave us
orders that nobody was to leave Tyler, that we could set our own
hours of work, come and go as we pleased with that one restriction,    G
that nobody was to leave Tyler without his permission, and he
ordered us to stay and work as long as was required to get these
cases settled—period."

The negotiations continued in Tyler for some three days. The judge
played a broking role, putting pressure on the plaintiffs' counsel to
reduce the demands they were making and putting pressure on the    H
defendants' counsel to make offers he regarded as realistic. Sometimes it
was the judge himself who communicated the offers and counter-offers
to the other side. After the initial three days, counsel were permitted by

A   the judge to leave Tyler in order to confer with their clients and to obtain fresh instructions. They returned to Tyler about a week later and a further three days of negotiations took place. Final negotiations at which agreement was reached took place over the period 28 September to 30 September 1977. The agreed settlement figure was $20m.

B   One of the difficulties which had apparently stood in the way of settlement had been the ever increasing number of plaintiffs. Accordingly on 28 September, after I think agreement in principle on the $20m. figure had been reached, Judge Steger announced that no further intervention in any of the Tyler 1 actions would be permitted. There were then 462 plaintiffs. No more would be added. A formal order to that effect was in due course made on 16 December 1977 and was expressed to be "nunc pro tunc as of 28 September 1977."

C   The burden of providing the $20m. was shared among the defendants in agreed proportions. A sum of $5.2m. was to be contributed by N.A.A.C., Cape and Egnep; $8.05m. by P.C.C. and its shareholders; $1m. by Unarco; and $5.75m. by the United States Government. The $20m. was intended to settle all claims of the existing 462 plaintiffs.

D   Notwithstanding that effective agreement was reached in the negotiations on 28, 29 and 30 September 1977, the final judgment disposing of the Tyler 1 actions was not given until 5 May 1978. The judgment provided:

E   "all parties agreed to waive a jury herein and submit all matters to the court without the intervention of a jury, whereupon all parties made it know to the court that all matters in controversy between them and each of them had been settled by an agreement made in open court which agreement has been transcribed, and the court finds from the evidence that said agreement is fair, reasonable, just, and to the best interests of plaintiffs herein, including the minor plaintiffs, and that said agreement should be in all things approved, it is therefore, ordered, adjudged and decreed by the court that the compromise settlement agreement evidenced by the record of proceedings made herein on 28, 29 and 30 September 1977, and 15 February 1978, be and the same is hereby in all things approved. It is accordingly ordered, adjudged and decreed by the court that the plaintiffs and intervenor, and each of them, take nothing by reason of these suits and said causes are hereby dismissed with prejudice."

G   Judge Steger's oral direction given on 28 September 1977, confirmed by the written order of 16 December 1977, had prevented any further interventions in the Tyler 1 actions. New actions had, therefore, been commenced by claimants who would, no doubt, have otherwise intervened in the Tyler 1 actions. These new actions are referred to as the Tyler 2 actions. They, too, were assigned to Judge Steger. There are eight actions in all. The first was commenced on 19 April 1978. The last was commenced on 19 November 1979. Intervention by other claimants

H   into one or other of the Tyler 2 actions took place on an even greater scale than had been the case with the Tyler 1 actions. Cape, Egnep and N.A.A.C. were defendants in each of the eight Tyler 2 actions. But Capasco was a defendant in only three of them, namely those identified

448
Scott J.                Adams v. Cape Industries Plc. (Ch.D.)                [1990]

by the numbers 78–102, 78–104, and 79–114. P.C.C., P.P.G., Corning    A
Glass and O.C.A.W. were defendants in all actions. The United States
Government was a defendant in some of the actions and a third party
defendant in others.

On 28 December 1981 an important procedural order was made by
Judge Steger. The order commences with this explanatory passage:

"There are several issues in these massive tort actions which should    B
be addressed in order that the court may exercise more control over
the proceedings as this litigation progresses. First, the defendants
have filed motions in which they contend that the claims of many of
the plaintiffs are premature because no injury has yet been suffered
by the party allegedly exposed to asbestos. Second, it appears that a
pretrial statement of damages would improve the court's ability to
take a more active role in managing the progress of these actions."    C

The operative part of the order provided:

"It is ordered that each plaintiff asserting a claim for money/damages
in this action shall provide the information requested by the court
on or before 1 February 1982. The answers shall be based on
personal knowledge and attested to under penalty of perjury. Every    D
person providing the information requested has an obligation to
exercise good faith in disclosing all material facts that are relied on
in asserting the respective claims. Non-responsive or evasive answers
will not be permitted. Counsel shall assist in preparing the responses
when appropriate. This case has been pending for several years and
there has been ample time for counsel to evaluate the claims of
their clients.    E

"For the present time, a plaintiff whose deposition has previously
been taken in this action, need not provide the requested
information. However, the court urges counsel for the plaintiffs to
carefully examine and analyze the claims asserted by every individual
they purport to represent to determine whether the claims asserted
are premature or frivolous. If so, counsel should take whatever    F
action necessary to protect the rights of their clients.

"In the event a plaintiff determines that the claim he or she is
asserting has been filed prematurely, he or she may file a motion to
voluntarily dismiss under rule 41($a$)(2) of the Federal Rules of Civil
Procedure. Unless good cause to the contrary is demonstrated, the
court will grant said motions and dismiss the claims without
prejudice.    G

"In the event a plaintiff fails to provide the requested information
within the time allowed, his or her claim will be subject to dismissal
without prejudice in accordance with the provisions contained in
rule 37($b$)(2) and rule 41($b$) of the Federal Rules of Civil Procedure."

Under headings "Preliminary information," "Has the cause of action
accrued," and "Pre-trial statement of damages" the information to be    H
supplied was specified.

As a result of the order of 28 December 1981 and the response, or
lack of response, thereto by the respective plaintiffs, a large number

A   thereof had their claims summarily dismissed "without prejudice." The number of plaintiffs left in the Tyler 2 actions was 206 or thereabouts. It may be assumed that each of the 206 had responded to the order of 28 December 1981 by alleging some physical condition that was at least capable of having been caused by exposure to asbestos dust and was capable of constituting an injury.

B   Cape, Capasco and Egnep took no part in any of the Tyler 2 actions. This was a deliberate tactical decision. It appears from the evidence I have seen and heard that the senior officers of Cape regarded the Tyler 1 actions, initially at least, as of little more than nuisance value. They could not understand how tortious liability to the Owentown workers could be visited upon the Cape companies simply on the ground that Cape subsidiary companies had mined the asbestos and sold it into the United States of America. It may be that they underestimated the breadth of the net of tortious product liability as applied in the United States of America. They also, it seems, expected to succeed on their jurisdiction objection, either at the interlocutory stage or, later, at trial. But the Tyler 1 settlement negotiations and the pressure for a settlement exerted by Judge Steger shattered any previous complacency. If the other defendants had stood firm, Cape would, I think, have preferred to go to trial and to have endeavoured to win on the jurisdiction point. But if all the other defendants were to settle, Cape would be left as the only defendant in potentially big and expensive jury trials. So they agreed to participate in the Tyler 1 settlement at a group cost of $5.2m.

E   After the settlement had been concluded the future did not look attractive to Cape. It was known, or at least feared, that there were hundreds more claimants waiting to step forward and press claims. The $5.2m. contribution to the $20m. settlement had been borne as to $4.1m. by N.A.A.C.'s insurers. But the insurance cover was, apparently, virtually exhausted. Cape had no assets in the United States of America save for the shares in N.A.A.C. held by C.I.O.L. The N.A.A.C. shares were, by reason of the number of outstanding asbestos related claims, assets of no value. So the decision was taken by the senior management of Cape that Cape, Capasco and Egnep would take no step at all in any of the Tyler 2 actions. They were prepared to allow default judgments to be obtained. There were no United States assets against which any judgments could be enforced and they were prepared to defend actions brought in England to enforce any judgments on the ground that under English law, the United States courts had no jurisdiction over Cape, Capasco or Egnep. The decision to take no step in the Tyler 2 actions was necessary in order to avoid anything being done that might be represented as a submission to the jurisdiction of the Tyler court. In addition it was decided to put N.A.A.C. into liquidation.

These decisions were taken at a meeting of the board of Cape Industries held on 1 November 1977. The minutes of the meeting record:

H    "The managing director stated that, having regard to the opinion of Mr. J. Fox-Andrews Q.C., it was proposed in respect of any future United States claims not to contest the proceedings in the American courts and to accept the risk of a default judgment being given

against the company in the United States of America, it being    A
considered most unlikely that such a judgment would be enforced
by an English court. . . . Reference was made to a proposed re-
organisation of the group's asbestos selling arrangements, particularly
in the United States of America, which in future would be more
closely controlled from South Africa. As part of this re-organisation
it is proposed that North American Asbestos Corporation should be    B
wound up."

The minutes do not so state but there can really be no doubt but that
the decision to wind up N.A.A.C. was taken in order to try and avoid
the danger of an argument that under English law Cape's interest in
N.A.A.C.'s United States business sufficed to give the Tyler court
jurisdiction over Cape.                                              C
   It was not, however, desired that the United States of America, as a
market for Cape's asbestos, should be abandoned. The liquidation of
N.A.A.C. was accompanied by the devising and implementation of
alternative marketing arrangements. First, a Liechtenstein corporation,
Associated Mineral Corporation ("A.M.C."), was formed, the bearer
shares in which were held by Dr. Ritter, a Liechtenstein lawyer, as
fiduciary for C.I.O.L. All sales of Cape's asbestos into the United States    D
of America were to be sales by A.M.C. The second step involved the
creation of a new United States marketing entity. The president of
N.A.A.C. for the past four years or so had been a Mr. Morgan. On 12
December 1977 a new Illinois corporation, Continental Productions
Corporation ("C.P.C.") was formed. The shares in C.P.C. were held by
Mr. Morgan. Under an agreement dated 5 June 1978 made between
C.P.C. and A.M.C. it was agreed that C.P.C. would act as agent for    E
A.M.C. in the U.S.A. for the purpose of the sale of asbestos. C.P.C.
was to be remunerated on a commission basis but had no authority to
contract on behalf of its principal, A.M.C., or any other Cape company.
It was to act as a link between A.M.C. and the United States purchasers
in connection with shipping arrangements, insurance and the like.
   As from 31 January 1978, N.A.A.C. ceased to act on behalf of any    F
of the Cape companies or to carry on any business on its own account
save for the purpose of liquidating its assets. N.A.A.C. executed articles
of dissolution on 18 May 1978. The relationship between N.A.A.C.,
C.P.C., A.M.C. and the Cape companies is a matter on which a good
deal turns and to which I shall have to return in more detail. My
intention for the moment is simply to give an outline of events. Through    G
the medium of A.M.C. and with the assistance of C.P.C., Egnep's
amosite asbestos continued to be sold into the U.S. until the sale in 1979
to Transvaal Consolidated Exploration Co. Ltd. What happened
thereafter I do not know.
   I must return to the Tyler 2 actions. Between 1981 and 1982, it will
be recalled, the number of plaintiffs had been thinned down to about
206. On 3 November 1982 Judge Steger fixed 2 February 1983 as the    H
trial date. Shortly before the hearing date, settlement negotiations took
place. On 24 January 1983 there was a meeting between defence
counsel. The purpose was to discuss the forthcoming trial. The possibility

**1 Ch.**                    Adams v. Cape Industries Plc. (Ch.D.)                    Scott J.

A   of settlement of the Tyler 2 actions was also discussed. No one on behalf of Cape, Capasco or Egnep was present. They were taking no part in the proceedings. No one for Unarco was present. Unarco had entered into bankruptcy proceedings and, as I understand it, the actions against it had consequently been stayed. But the other defendants, including N.A.A.C. were represented. When discussion of a possible settlement began, counsel for the United States made clear that the United States

B   would not agree to make any payment by way of settlement. A policy decision had apparently been taken by the Justice Department that the industry and not the taxpayer should bear the cost of compensating claimants for asbestos related disease.

On the following day another conference took place. On this occasion the plaintiffs' counsel, too, were present. So was the judge, who seems

C   to have played a part comparable to that which he played in the 1978 settlement of the Tyler 1 actions. It is important to record that the plaintiffs represented at this conference did not include those plaintiffs, for convenience called "the Unarco plaintiffs," who had worked at the Owentown factory during its ownership by Unarco pre-1962 but not during its ownership by P.C.C. post-1962. The Unarco plaintiffs obviously

D   had no claim against P.C.C. or its shareholders. So they were not represented in the settlement negotiations that took place on 25 January 1983 and thereafter. The plaintiffs represented at these negotiations numbered 133.

Offers were made on behalf of the plaintiffs. Offers were made by the defendants. It is a feature of the negotiations that the plaintiffs' demands were presented in the form of an average figure per plaintiff.

E   Initially, a sum of $40,000 per plaintiff was sought. This, given 133 plaintiffs, would have led to a settlement figure of $5.32m. The defendants offered a total sum of only $619,000. So there was a wide gap between the two sides. In the course of the day, the plaintiffs' figure came down and the defendants' figure went up. Judge Steger was closely involved in the negotiations, discussing quantum sometimes with plaintiffs' counsel, sometimes with all counsel together. He made plain

F   that he thought the plaintiffs were asking for too much and that the defendants were not offering enough. He was instrumental in bringing the plaintiffs down to an average of $10,000 per plaintiff, a total of $1.33m.

This figure was within reach of a figure that defendants' counsel would have been prepared to accept. But they lacked authority from

G   their clients to go that high. So the negotiations were adjourned to 2 February 1983. The lead counsel for the plaintiffs in these negotiations was Mr. Blake Bailey. He occupied this position not because he represented more plaintiffs than anyone else, but simply because he had been appointed by Judge Steger to be liaison counsel on behalf of the plaintiffs. In the course of the discussions on 25 January Mr. Bailey

H   raised the question of the possible liability of the United States Government. The United States had indicated an unwillingness to agree to make any payment to the plaintiffs. But Mr. Bailey, apparently after discussions with Judge Steger, thought there was a good chance that a judgment against the United States Government could be obtained, at

least on the third party claims, if not on the plaintiffs' direct claims. Mr.     A
Bailey conceived the idea that the terms of settlement might keep alive,
for the benefit of the plaintiffs, the third party claims of the settling
defendants against the United States Government.

On 2 February 1983 the parties met once more. Agreement was
reached on a settlement at an average of $10,000 per plaintiff, a total of
$1.33m. This figure was that which on 25 January Judge Steger had told
Mr. Bailey that the plaintiffs should accept and had told the defendants     B
that they should offer. As between the settling defendants, the $1.33m.
was to be provided as to $900,000 by P.C.C. and P.P.G., $130,000 by
Corning Glass, $50,000 by O.C.A.W. and $250,000 by N.A.A.C. On
payment of these sums the settling defendants were to be released from
all claims by the 133 plaintiffs.

In addition, however, Mr. Bailey put to the defendants' counsel, and     C
obtained their agreement to, a device intended to give the plaintiffs the
chance of additional recovery against the United States Government.
The device was this: the settlement figure would be expressed in the
intended settlement agreement not as $1.33m. but instead as $6.65m.,
an average of $50,000 per plaintiff. The defendants would be obliged to
pay only $1.33m. The balance of $5.32m. ($40,000 per plaintiff) would
be payable only if and to the extent that the defendants' third party     D
claims against the United States succeeded. The prosecution of those
claims in the names of the defendants was to be the responsibility of the
plaintiffs' counsel, no costs in respect thereof falling on any of the
defendants. The $6.65m. was a figure proposed by Mr. Bailey. It was
not a figure which mattered at all to the defendants since their obligation
to pay was limited to the $1.33m. They did not bargain about the     E
amount. They simply agreed to Mr. Bailey's proposal which would cost
them nothing. Mr. Bailey told me that the figure was based upon what
he thought might be awarded against the United States at the suit of the
settling defendants. How it could have been supposed that the liability
of the United States under the third party claims could exceed the
$1.33m. that the settling defendants, the third party claimants, had
agreed to pay the plaintiffs, defeats me. But there it is. I shall have to     F
return to the implications of this device later.

Terms having been reached between plaintiffs and settling defendants,
the agreement was announced to Judge Steger in open court on the
same day, 2 February 1983. There is a transcript of what was said. Judge
Steger approved the settlement. He certainly knew of the true settlement
figure of $1.33m. Indeed, the $10,000 average had been suggested and
recommended by him. Whether he had any knowledge of the $6.65m.     G
figure is an important matter to which I must return.

On 8 April 1983 Judge Steger fixed 20 June 1983 as the trial date for
the outstanding Tyler 2 claims against the United States. In addition to
the third party claims, a few of the plaintiffs had direct claims against
the United States. The lead counsel for the United States in the Tyler 2
actions was Peter Nowinski. He and Mr. Bailey met and discussed the     H
possibility of settlement. Mr. Nowinski again made clear that the United
States Government thought that the industry, not the taxpayers, should
bear the burden of compensation for asbestos related injury. Mr. Bailey

A  then suggested an agreement under which, in settlement of the claims against the United States, the United States would agree to bear the costs of enforcement of default judgments against, Cape, Capasco and Egnep. Agreement on these lines was reached. A compromise agreement dated 15 June 1983 was signed. Paragraphs 3 and 4 thereof provided:

B  "Plaintiffs or third-party plaintiffs, or both, will promptly make due application to the Texas court for judgment against the Cape companies, or any of them, for damages suffered as a result of exposure to asbestos at or from the Texas plant. Such application shall not be presented to the Texas court without the prior approval of the United States of America, both as to form and content, which approval shall not be unreasonably withheld.

C  "Upon satisfaction of the promises made in clauses 1, 2 and 3 above and upon entry of judgment or judgments against the Cape companies, or any of them, the United States agrees diligently to cause to be taken or assist in taking of such appropriate action as may be reasonably required to enforce or attempt to enforce such judgment or judgments in the United Kingdom of Great Britain or the Union of South Africa, or in such other countries as may be

D  appropriate against the judgment debtors, their predecessors, successors, assigns or other appropriate entities."

The stage was therefore set for applications for default judgments against Cape, Capasco and Egnep, none of which had taken any part in the Tyler 2 actions and each of which therefore was in default in filing an answer to the plaintiffs' pleadings. The purpose of obtaining these

E  default judgments was that they should be enforced in England. It is not surprising, therefore, that the application should have been preceded by consultations between Mr. Bailey, Mr. Nowinski and Messrs. Oppenheimers, solicitors for the plaintiffs. The advice given by Oppenheimers is protected by privilege, but it is not hard to infer that it dealt with the English law on enforcement of foreign judgments.

F  The application for the default judgment and the judgment itself were drafted by Mr. Bailey. Various preliminary drafts are in evidence and there is some difficulty in following the development of the original draft to the final version. Mr. Bailey testified to consultations both with Mr. Nowinski and with Judge Steger on the matter. Cape and Capasco were informed by notice that the application for the default judgment would be heard on 12 September 1983. This notice was not strictly

G  required under the relevant Federal Rules of Procedure but, I expect, was given ex abundanti cautela on the advice of the plaintiffs' English lawyers.

A hearing of the application, or at least some judicial adjudication thereon, was necessary in order that the unliquidated damages claims of the respective plaintiffs should be quantified. The documents in support of the application were lodged with Judge Steger on 12 September 1983

H  and sought for each plaintiff one or other of four levels of damages, $150,000, $115,000, $85,000 and $60,000. The sum allocated to each plaintiff was designed to produce an average of $120,000 per plaintiff. On 12 September 1983 Judge Steger was sitting not in Tyler but in

454

Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

Marshall, Texas. The documents handed in on 12 September 1983    A
included medical records relating to each of the 206 plaintiffs. In relation
to a few of the plaintiffs there were doctors' reports. With the records
and reports relating to each plaintiff was a summary. Each summary
gave the name and age of the plaintiff, a short statement of the
plaintiff's exposure to asbestos dust, the name of the person or
organisation by whom the plaintiff had been medically examined and a
short statement of the result of the examination. The summaries had    B
been prepared by the plaintiffs' respective attorneys.

  The default judgment itself was signed by Judge Steger and dated 12
September 1983. It was presumably signed on that day. It was certainly
signed earlier than 14 September 1983 since on that date the judgment
was formally recorded on the court docket sheets relating to the Tyler 2
actions. At some point, perhaps in the afternoon of 12 September, Mr.    C
Bailey was informed on the telephone by Judge Steger's law clerk that
the judge was not prepared to give judgment for an average of $120,000
per plaintiff but was prepared to give judgment for an average of
$75,000 per plaintiff. It was left to Mr. Bailey and Mr. Charles Clark,
counsel for some 181 of the plaintiffs, to re-work the details in the
appendix to the judgment so as to produce an average award of $75,000.
They did so by reducing the four levels of damages to $115,000, $85,000,    D
$60,000 and $37,000. Thus the directed average of $75,000 was produced.
The re-worked appendix was handed in at the Tyler courthouse and was
annexed to the signed judgment. All this must have taken place earlier
than 14 September and before Judge Steger signed the judgment. No
hearing as such had taken place. No witness had given evidence, orally
or by affidavit. The extent to which Judge Steger looked at, or could    E
have looked at, the medical records and reports is in doubt. I will return
to this later. The propriety of the judge dealing with the assessment of
damages without any evidence, in the strict sense, is also in issue. It is
not necessary for me at this stage to do more than outline the manner in
which the default judgment came to be produced.

  The actions before me were commenced by specially endorsed writs    F
most of which were issued on 1 August 1984. Each statement of claim
pleaded the Tyler 2 action in which the plaintiff had been a party,
asserted that the Tyler court had had jurisdiction to deal with the action,
pleaded the default judgment of 12 September 1983, and claimed the
amount allocated by that judgment to the plaintiff with interest thereon.

*The issues*

  The plaintiffs cannot enforce the default judgment by action in this    G
country unless, by the standards of English law, the Tyler court was
entitled to take jurisdiction over Cape and Capasco. The plaintiffs rely
on three alternative grounds. First, the plaintiffs contend that Cape and
Capasco voluntarily appeared in the proceedings in the Tyler court. This
contention requires some explanation since it is common ground that
Cape and Capasco took no part at all in the Tyler 2 actions. The    H
plaintiffs rely, however, on the steps taken by Cape and Capasco in the
Tyler 1 actions and on the relationship between the Tyler 1 actions and
the Tyler 2 actions. The first step in the argument is that Cape and

A   Capasco voluntarily appeared in the Tyler 1 actions. Cape and Capasco deny this. They contend that each step they took in the actions was taken subject to the protest to the jurisdiction they had made at the outset and that, notwithstanding the interlocutory dismissal of their motions, jurisdiction remained a live issue for the trial. In the circumstances they contend that nothing was done in the Tyler 1 actions that could constitute a voluntary appearance or submission to the jurisdiction. The plaintiffs' second step in the argument is their assertion that the Tyler 1 actions and Tyler 2 actions represent "one litigation unit" so that a voluntary appearance or submission to the jurisdiction in any of the actions was sufficient to give the Tyler court jurisdiction over Cape and Capasco in all the actions. This somewhat startling proposition is based upon the alleged effect of bringing Owentown asbestos related litigation under the umbrella of the Rules for Complex and Multi District Litigation.

C       Second, the plaintiffs contend that even if they are wrong on their first point, nonetheless Cape and Capasco must be taken to have agreed to submit to the jurisdiction of the Tyler court in the Tyler 2 actions. The plaintiffs rely on the inferences which it is contended must be drawn from the various steps taken by Cape and Capasco in the Tyler 1 actions. Cape and Capasco deny that those steps can be represented as their agreement to submit to the jurisdiction in other actions.

        Third, the plaintiffs contend that the Tyler court was entitled to take jurisdiction over Cape and Capasco by reason of their presence in Illinois either in January 1974, when the Tyler 1 actions commenced or in April 1978 to November 1979, the period over which the Tyler 2 actions were commenced. This contention raises issues both of law and fact. For the fact of presence, the plaintiffs rely on N.A.A.C.'s Illinois presence up to its dissolution in 1978 and on C.P.C.'s Illinois presence from 31 January 1978 up to the sale to Transvaal Consolidated in June 1979. It is contended that the relationship between each of these companies and Cape and Capasco justifies treating their presence in Illinois as, for jurisdiction purposes, the presence of Cape and Capasco. This contention is in issue. It is also in issue whether, under English law, presence in Illinois is sufficient to give jurisdiction to a federal district court sitting in Texas on a tort claim governed by the law of Texas. The last of the Tyler 2 actions was commenced in November 1979, some months after the sale to Transvaal Consolidated. But, if the plaintiffs' presence in Illinois is sound so far as the earlier Tyler 2 actions are concerned, the plaintiffs rely on the "one litigation unit" argument for the purpose of bringing the last action under the same umbrella.

        Finally, the plaintiffs have a comity or reciprocity ground. It is pleaded in the further and better particulars of the statement of claim that, if the situation had been in reverse, the English courts would have assumed jurisdiction and that the English courts should therefore recognise the jurisdiction of the Tyler court. Mr. Morison, however, in opening the plaintiffs' case gave me the welcome news that he would not be relying before me on this fourth ground. There is apparently clear authority, binding at least on courts of first instance, that comity or

456

reciprocity is an inadequate ground for enforcement in England of the  A
judgment of a foreign court.

Cape and Capasco deny that the Tyler court had, for the purposes of
English law, jurisdiction over them on any of the three grounds relied
on by the plaintiffs. Cape and Capasco have, however, additional
defences. They allege that the default judgment is impeachable and
unenforceable, first upon the ground that it was obtained by the fraud of
Mr. Bailey, second that it was obtained in circumstances opposed to  B
natural justice; and, finally, that to enforce it would be contrary to
public policy. Broadly the same particulars are relied on in support of
each of the three grounds. It is alleged that the default judgment, as
drafted by Mr. Bailey and signed by Judge Steger, contained to the
knowledge of Mr. Bailey a number of mis-statements of fact. It is
alleged that, to Mr. Bailey's knowledge, the procedure employed for  C
quantification of the plaintiffs' damages did not represent a judicial
determination or assessment thereof. It is alleged that Mr. Bailey
induced the judge to award more than he would otherwise have awarded
by misrepresenting that the February 1983 settlement between the 133
plaintiffs and the settling defendants had been agreed at an average
figure of $50,000 per plaintiff, rather than the true figure of $10,000 per
plaintiff. It is alleged that the damages awarded by the default judgment  D
were to Mr. Bailey's knowledge, arbitrary, exorbitant and manifestly
unjust. There are additional allegations, but I have mentioned the
principal ones. These allegations are all denied and have been bitterly
contested. Apart from the issues of fact raised by these allegations they
raise also issues of law as to the criteria that must be satisfied if an
otherwise enforceable foreign judgment is to be rejected on grounds of  E
fraud, natural justice or public policy.

In summary, therefore, there are the following issues with which I
must deal. (1) Did Cape and Capasco voluntarily appear or submit to
the jurisdiction in the Tyler 1 actions? (2) If so, did they thereby submit
to the jurisdiction in the Tyler 2 actions? (3) Alternatively, did they
thereby agree to submit to the jurisdiction in the Tyler 2 actions?
(4) Did the presence of N.A.A.C. in Illinois represent the presence of  F
Cape and Capasco in Illinois for jurisdiction purposes? (5) Did the
presence of C.P.C. in Illinois represent the presence of Cape and
Capasco in Illinois for jurisdiction purposes? (6) Did the presence in
Illinois of Cape and Capasco entitle the Tyler court to take jurisdiction
over Cape and Capasco in the Tyler 2 actions? (7) Is the default
judgment impeachable on any of the fraud, natural justice and public  G
policy grounds pleaded by Cape and Capasco?

I will take these issues in turn, but it is worth first emphasising that
each falls to be decided in accordance with English law. Questions as to
whether certain acts represent a submission to the jurisdiction of the
Tyler court must be decided by reference to English law. It may be that
English law will answer certain questions by applying the law of Texas
or United States federal law, as the case may be, but that will be  H
because English law requires that approach. My task is to try and
identify the rule of English law that applies to each question and then to
apply that rule.

A    I can conveniently start by identifying the basis on which English courts will enforce the in personam judgments of foreign courts. In *Russell v. Smyth* (1842) 9 M. & W. 810, 818, Lord Abinger C.B. said: "Foreign judgments are enforced in these courts because the parties liable are bound in duty to satisfy them." Parke B. expressed the same principle, at p. 819: "Where the court of a foreign country imposes a duty to pay a sum certain, there arises an obligation to pay, which may B   be enforced in this country." In *Godard v. Gray* (1870) L.R. 6 Q.B. 139, 148–149, Blackburn J. said:

> C   "But in England and in those states which are governed by the common law, such judgments are enforced, not by virtue of any treaty, nor by virtue of any statute, but upon a principle very well stated by Parke B. in *Williams v. Jones* (1845) 13 M. & W. 628, 633: 'Where a court of competent jurisdiction has adjudicated a certain sum to be due from one person to another, a legal obligation arises to pay that sum, on which an action of debt to enforce the judgment may be maintained. It is in this way that the judgments of foreign and colonial courts are supported and enforced.' And taking this as the principle, it seems to follow that anything which negatives D   the existence of that legal obligation, or excuses the defendant from the performance of it, must form a good defence to the action. It must be open, therefore, to the defendant to show that the court which pronounced the judgment had no jurisdiction to pronounce it, either because they exceeded the jurisdiction given to them by the foreign law, or because he, the defendant, was not subject to that jurisdiction; and so far the foreign judgment must be E   examinable. Probably the defendant may show that the judgment was obtained by the fraud of the plaintiff, for that would show that the defendant was excused from the performance of an obligation thus obtained . . ."

In *Schibsby v. Westenholz* (1870) L.R. 6 Q.B. 155 judgment was delivered on the same day as the judgment in *Godard v. Gray*, L.R. 6 F   Q.B. 139. The same judge, Blackburn J., repeated the principle stated in *Godard v. Gray*, and added, at p. 159, that "anything which negatives that duty, or forms a legal excuse for not performing it, is a defence to the action."

    The "obligation to pay" to which Blackburn J. referred in *Godard v. Gray* may, under English law, arise in two ways. First, it is accepted G   that a foreign court is entitled to take jurisdiction on a territorial basis. "All jurisdiction is properly territorial" said the Earl of Selbourne L.C. in *Sirdar Gurdyal Singh v. Rajah of Faridkote* [1894] A.C. 670, 683. He expanded the proposition thus:

> H   "Territorial jurisdiction attaches (with special exceptions) upon all persons either permanently or temporarily resident within the territory while they are within it; but it does not follow them after they have withdrawn from it, and when they are living in another independent country. It exists always as to land within the territory, and it may be exercised over moveables within the territory; and, in questions of status or succession governed by domicil, it may exist

458

Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

as to persons domiciled, or who when living were domiciled, within the territory. As between different provinces under one sovereignty (e.g. under the Roman Empire) the legislation of the sovereign may distribute and regulate jurisdiction; but no territorial legislation can give jurisdiction which any foreign court ought to recognise against foreigners, who owe no allegiance or obedience to the power which so legislates."

It is the territorial basis of jurisdiction that the plaintiffs invoke in asserting that Cape, through N.A.A.C. or C.P.C., was present in Illinois.

The alternative basis of jurisdiction, where in personam money judgments are concerned, is that of consent. Prima facie, a foreign court does not, in the eyes of English law, have jurisdiction over an absent foreigner. But if the foreigner consents to the court exercising jurisdiction over him, the position is different. The element of consent is clearly present if the foreigner, as plaintiff, commences proceedings in the foreign court. It is also present if the foreigner, as defendant, makes a voluntary appearance without protest in the foreign court. In either case there is a submission by the foreigner to the jurisdiction of the foreign court that, in the eyes of English law, may give rise to an "obligation to pay." Further, whether or not a defendant takes any part in an action in a foreign court, he may have contractually bound himself to accept the jurisdiction of the foreign court. Accordingly, the jurisdiction of a foreign court over a defendant may be established, on a consensual basis, either by the defendant's participation in the proceedings or by the defendant's agreement to submit to the jurisdiction. This consensual basis is relied on by the plaintiffs both in its voluntary submission argument and in its contention that there was an agreement by Cape and Capasco to submit.

It is important, to my mind, to keep clear and distinct the two alternative bases upon which the jurisdiction of a foreign court over a defendant may be established. Jurisdiction on the ground of presence in the foreign country is based on territoriality. Consent on the part of the defendant is not necessary and is irrelevant. On the other hand, jurisdiction on the ground of voluntary submission or of an agreement to submit is based upon consent. An actual consent is, in principle, necessary. The over-riding consideration, however, relevant to each of the issues with which I must deal is whether the default judgment in the Tyler 2 actions created an "obligation to pay" which, under English law, the defendants are bound to discharge.

*Issue 1*

The principle that a foreign court has jurisdiction to give an in personam judgment if the judgment debtor, the defendant in the foreign court, submitted to the jurisdiction of the foreign court, is well settled in English law. Application of this principle presents no difficulty if the defendant took no part at all in the proceedings, nor if the defendant simply appeared therein and fought the case on its merits. Difficulty arises where the defendant has objected to the jurisdiction of the foreign

A  court and, while maintaining that objection, has taken part in the proceedings. The difficulty has, in part, been remedied by Parliament. Section 33(1) of the Civil Jurisdiction and Judgments Act 1982 provides:

> "For the purposes of determining whether a judgment given by a court of an overseas country should be recognised or enforced in England and Wales or Northern Ireland, the person against whom the judgment was given shall not be regarded as having submitted to the jurisdiction of the court by reason only of the fact that he appeared (conditionally or otherwise) in the proceedings for all or any one or more of the following purposes, namely (a) to contest the jurisdiction of the court; (b) to ask the court to dismiss or stay the proceedings on the ground that the dispute in question should be submitted to arbitration or to the determination of the courts of another country; (c) to protect, or obtain the release of, property seized or threatened with seizure in the proceedings."

Problems, obviously, still remain, particularly in cases where the steps taken by the defendant in the foreign proceedings were taken not only for the purpose of contesting the jurisdiction but also for the purpose of preparing for a trial on the merits. Some authority suggests that in such cases the defendant will be regarded as having submitted to the jurisdiction of the foreign court: see e.g. *Boissière & Co. v. Brockner & Co.* (1889) 6 T.L.R. 85. But in *Williams & Glyn's Bank Plc. v. Astro Dinamico Compania Naviera S.A.* [1984] 1 W.L.R. 438 the House of Lords approved a dictum of Cave J. in *Rein v. Stein* (1892) 66 L.T. 469, 471 that

> "in order to establish a waiver, you must show that the party alleged to have waived his objection has taken some step which is only necessary or only useful if the objection has been actually waived, or if the objection has never been entertained at all."

It is time I identified the various steps taken by Cape and Capasco in the Tyler 1 actions which bear upon this issue.

(i) The first step taken by each was to file a motion challenging the jurisdiction of the Tyler court. Cape did so on 25 February 1974 in the Yandle action and on 28 March 1974 in the Kay action. I am not clear on what date Capasco filed its motion in the Yandle action. The operative part of each motion declared that the applicant was

> "specially appearing . . . for the sole and only purpose of making this motion to assert lack of jurisdiction of this Honorable Court over its person and for said purpose only moves this Honorable Court to set aside and quash the supposed service of summons upon this defendant . . ."

(ii) On 31 July 1974 Judge Steger called the conference of counsel at which it was agreed that the Rules for Complex and Multi-District Litigation would be followed. Mr. Richard Bernays, who acted as counsel for Cape and Capasco until 14 September 1977, attended the conference.

(iii) On 26 September 1974 another conference of counsel took place. It was agreed that there would be limited discovery for the

460

purpose of dealing with the question whether the Yandle and Kay    A
actions should proceed as "class" actions. Cape and Capasco were
represented at this conference.

(iv) On 7 November 1974 Cape answered written interrogatories
which had been filed by the plaintiffs.

(v) On 29 November 1974 Cape filed a brief on the "class" action
question. The brief was expressed to be subject to Cape's objection to
the jurisdiction. In the brief Cape opposed "class" action status for the    B
Yandle and Kay actions.

(vi) On 17 December 1974 the hearing on the "class" action issue
took place. Cape was represented at the hearing. On 31 December 1974
Judge Steger denied "class" action status for the two actions.

(vii) On 4 June 1975 the deposition of Mr. Godfrey Higham was
taken in London. This was part of the pre-trial discovery normal under    C
the procedure of American courts. Mr. Higham gave the deposition as a
witness on behalf of Cape. Mr. Bernays, Cape's counsel, took part in
the taking of the deposition. Subsequently, depositions were taken from
other Cape witnesses and from a Mr. Buckley on behalf of P.C.C. with
counsel for Cape in attendance.

(viii) On 19 April 1977 Cape's and Capasco's motions on the
jurisdiction question were dismissed by Judge Steger. The jurisdiction    D
objection remained alive, however, as an objection to be taken, finally,
at trial. I have already commented that Judge Steger did not purport to
deal definitively with the jurisdiction point. He cut short Mr. Bernay's
submissions on behalf of Cape and gave no reasons for his decision. An
appeal by Cape was theoretically possible, but only theoretically. First,
Judge Steger would have had to be persuaded to certify the point as
suitable for an immediate interlocutory appeal. Second, the United    E
States Court of Appeals for the Fifth Circuit would have had to be
persuaded to give leave for the appeal to proceed. I was satisfied by the
evidence I heard from Mr. Bernays and Mr. Brin, both of whom were
Texan attorneys with wide experience in the federal courts, that the
prospects of getting an appeal heard would have been practically nil.
Both Judge Steger and the United States Court of Appeals would have    F
left the jurisdiction point to be taken at trial and, if necessary, to be
appealed thereafter.

(ix) On 6 May 1977 Cape and Capasco sought and obtained an
extension of time to answer interrogatories. They answered the
interrogatories on 17 June 1977.

(x) On 23 May 1977 Cape and Capasco filed answers in the two
actions. The answers commenced with this paragraph "These defendants    G
and each of them still insist that this Honorable Court does not have
jurisdiction over the person of said defendants." The answers proceeded
to plead to the merits of the case. In addition, and in the same
document, Cape and Capasco made cross-claims against the other
defendants claiming an indemnity against or contribution towards any
sum they might be adjudged liable to pay the plaintiffs. The pleading
ended with a demand for a jury trial.    H

(xi) On the same day, 23 May 1977, Cape and Capasco filed written
material opposing the plaintiffs' motion to be permitted to use depositions
taken in previous asbestos cases.

461

A    (xii) The date of trial was fixed for 12 September 1977. Cape and Capasco were represented in court on that day by Mr. Bernays; he also represented N.A.A.C. Mr. Bernays joined in the application for an adjournment. Thereafter Mr. Bernays represented only N.A.A.C. and Mr. Millwid participated on Cape and Capasco's behalf in the settlement negotiations which took place. The negotiations took place not simply in the face of the judge but at the insistence of the judge.

B    (xiii) Settlement terms were agreed. Cape and Capasco were represented before Judge Steger on 5 May 1978 when the consent was made. The order dismissed with prejudice both the plaintiffs' actions and the defendants' cross-claims.

These were the steps taken in the Tyler 1 actions by Cape and Capasco. Did they, taken cumulatively, represent a submission by Cape
C    and Capasco to the jurisdiction of the Tyler court in the Tyler 1 actions? Mr. Morison, for the plaintiffs, has submitted that they did. He relies, particularly, on the consent order. He is, in my view, right to do so. The various steps taken prior to the settlement negotiations on 23 September 1977 were all, either expressly or implicitly, accompanied by a re-assertion of the jurisdiction objection. I am satisfied that none of the steps taken would, under the law governing the Tyler court, have been
D    regarded as a submission by Cape and Capasco to the jurisdiction or as a waiver of the jurisdiction objection. If the steps would not have been regarded by the domestic law of the foreign court as a submission to the jurisdiction, they ought not, in my view, to be so regarded here, notwithstanding that if they had been steps taken in an English court they might have constituted a submission. The implication of procedural
E    steps taken in foreign proceedings must, in my view, be assessed in the context of the foreign proceedings.

But the consent order is another matter. It represented a clear exercise by the Tyler court of jurisdiction over the Tyler 1 actions. Cape and Capasco participated in inviting Judge Steger to make the order. If any of the Tyler 1 plaintiffs sought to sue Cape in England on the causes of action sued on in Tyler 1, Cape would be entitled to rely on the
F    consent order of 5 May 1978 as a bar to the action. The order extinguished the causes of action against Cape that the Tyler 1 plaintiffs had been asserting. So, in my judgment, the conclusion is inescapable that by participating in the application to Judge Steger to make the consent order of 5 May 1978 Cape and Capasco recognised the jurisdiction of the Tyler court to deal with, and dispose of, the claims
G    made against them in the Tyler 1 actions and waived the jurisdiction objection that was then still on foot.


*Issue 2*

Did the submission to the jurisdiction in the Tyler 1 actions represent also a submission to the jurisdiction in the Tyler 2 actions? The plaintiffs
H    contend that Cape and Capasco, by accepting the court's jurisdiction in the Tyler 1 actions, submitted to the jurisdiction of the court in the Tyler 2 actions. This contention is, in my opinion, for a number of reasons, unsustainable.

462

First and foremost, the basis of the contention is, in my judgment,   **A**
unsound. The argument advanced by Mr. Morison was that the Tyler 1
actions and the Tyler 2 actions were to be regarded as "one unit of
litigation." This followed, it was suggested, from Judge Steger's decision
to apply to the litigation the Rules for Complex and Multi-District
Litigation. But these rules represent no more than management
techniques designed to facilitate the handling of complex cases. They
have, in themselves, no direct procedural effect. The adoption of the   **B**
rules by Judge Steger on 31 July 1974 did not have the consequence that
discovery in Tyler 1 could be automatically used in Tyler 2. On the
contrary, specific orders to that effect were later necessary. It did not
have the effect that pleadings from plaintiffs and defendants in Tyler 2
were unnecessary. It did not have the effect that defendants' appearances
in Tyler 1 sufficed as appearances in Tyler 2. It did not have the effect   **C**
that the dismissal "with prejudice" of the Tyler 1 actions barred the
commencement of the Tyler 2 actions. It did not have any procedural
effect whatsoever in the Tyler 2 actions, save that the Tyler 2 actions,
like the Tyler 1 actions, became subjected for management purposes to
the Rules for Complex and Multi-District Litigation.

The proposition that because of the adoption of the "Complex
Rules" Cape's participation in the Tyler 1 actions can be treated as it   **D**
had been participation in the Tyler 2 actions is, in my view, a fanciful
one with no substance to it, either in American law or in English law.
Support for the proposition was given in evidence by Professor Miller, a
professor of law at Harvard University and co-author of the *Manual for
Complex and Multi-District Litigation*. Professor Miller is a highly
distinguished academic lawyer but in his evidence that all the Owentown   **E**
asbestos related litigation had become "one unit of litigation" he did not
give me the impression that he was testifying on a matter of current
procedural or substantive law applicable to United States federal courts.
Rather he seemed to me to be flying an academically attractive kite. In
so far as there was a conflict between the evidence of Professor Miller
and that of Mr. Brin and Mr. Bernays, I far preferred, on this point at
least, the evidence of Mr. Brin and Mr. Bernays. I am satisfied that   **F**
under the law applicable to United States federal courts the Tyler 2
actions were new actions separate and distinct from the Tyler 1 actions.

Second, the "one unit of litigation" theory, when used to translate a
submission to the jurisdiction in Tyler 1 into a submission to the
jurisdiction in Tyler 2, ignores the essential basis of English law
concerning submissions to the jurisdiction. Where steps taken in   **G**
proceedings are being examined in the context of an alleged submission
to the jurisdiction, what is being sought is evidence of consent on the
part of the defendant to the exercise by the court of jurisdiction over
him. Until the settlement negotiations in September 1977 the jurisdiction
objection which Cape and Capasco had taken was being maintained. I
have already expressed the view that the pre-settlement procedural steps
taken by Cape and Capasco in Tyler 1 could not, in the context of the   **H**
federal procedure applicable in the Tyler court, be regarded as a waiver
of the jurisdiction objection. But even if that is wrong, those steps could
not possibly be regarded as evidencing Cape's and Capasco's consent to

1 Ch.                     Adams v. Cape Industries Plc. (Ch.D.)                     Scott J.

A  jurisdiction being exercised over them in future actions not yet started. Nor could Cape's participation in the application to Tyler 1 for a consent order, under which the existing actions against Cape were to be dismissed "with prejudice," be regarded as evidencing that consent. Any other conclusion would, in my view, be grossly unfair to Cape and would divorce a submission to the jurisdiction from the bedrock of consent that ought to underlie it. Accordingly, in my judgment, there was no submission to the jurisdiction by Cape or Capasco in the Tyler 2 actions.

B

*Issue 3*

Did the steps taken by Cape and Capasco in the Tyler 1 actions represent their agreement to submit to the jurisdiction in the Tyler 2 actions? The rule that an agreement by a party to submit to the jurisdiction of a foreign court will, under English law, justify the foreign court in taking jurisdiction over that party (see *Dicey & Morris' Conflict of Laws*, 11th ed. (1987), pp. 444–445) is another example of the consensual basis whereby a party may, under English law, come under an obligation to obey a judgment of a foreign court. Consent may be evidenced by a term in a contract. A term expressly providing for disputes to be referred to the foreign court is the most obvious and common example. A unilateral statement by a party that he would accept the jurisdiction of a foreign court is an alternative means by which an agreement to submit might be constituted. But, here, caution is in my view needed. A contract containing a foreign court submission clause is one thing. A party to such a contract is prima facie bound by its terms. But a unilateral statement of willingness to accept the jurisdiction of a foreign court does not, of itself, have any obvious binding effect. It ought, in my view, like any other non-contractual statement of future intention, to be capable of being withdrawn, at any rate until acted upon.

C

D

E

In the present case, the "agreement to submit" that is relied on is not contractual. Nor can any unequivocal statement of willingness to submit be identified. The plaintiffs' contention is that Cape and Capasco, by participating in the Tyler 1 actions, impliedly agreed to submit to the jurisdiction in the Tyler 2 actions. The steps relied on are the same steps as were relied on as evidencing Cape and Capasco's submission to the jurisdiction in the Tyler 2 action. I have already detailed them, and need not do so again. The plaintiffs' argument, as initially advanced by Mr. Morison, was based upon implied agreement. The use of the verb "agree" in this formulation of the argument is, however, misleading. It was not contended that Cape or Capasco had entered into any contract with any of the plaintiffs. Rather it was contended that Cape and Capasco, by their conduct in the Tyler 1 actions, had represented that they would similarly participate in future asbestos related actions brought in the Tyler court by other Owentown plaintiffs, and, in that sense, had impliedly agreed to submit to the jurisdiction.

F

G

H

So, it seems to me, two questions arise. First, can the conduct of Cape and Capasco in Tyler 1 be fairly regarded as a representation that they would accept the jurisdiction of the court in the Tyler 2 actions?

464

Scott J.                  Adams v. Cape Industries Plc. (Ch.D.)                [1990]

Second, is a representation by conduct of the sort contended for a sufficient basis, in English law, to justify the taking by a foreign court of jurisdiction?

    The first question is one of fact. Mr. Morison relied heavily on the circumstances that under the directions for intervention given by Judge Steger in Tyler 1, any Owentown claimant could, until intervention was stopped on 23 September 1977, have become a plaintiff in Tyler 1. Intervention was stopped in order to facilitate a settlement of the claims of the then plaintiffs and in the expectation that claimants who had not yet intervened would become plaintiffs in new actions. All parties to Tyler 1, including the judge as well as Cape and Capasco, had that expectation. All parties contemplated that Cape and Capasco would be among the defendants in the new actions. I agree with Mr. Morison that all of this is borne out by the evidence. I accept also that counsel acting for the Tyler 1 plaintiffs, counsel acting for the non-Cape defendants and Judge Steger would, if they addressed their minds to the matter, which they did not, have assumed that Cape and Capasco would be participating in the new actions as they had done in the Tyler 1 actions. Nonetheless, in my judgment, Cape's and Capasco's conduct in Tyler 1 cannot fairly be regarded as a representation by them that they would be participating in Tyler 2. Nothing they did in Tyler 1 justified any observer in making assumptions about what they would do in or about the expected new actions. If they had been asked their intentions and had given a false or misleading answer, the position might have been different. But, as it was, they were, in my judgment, entitled to chest their cards, to keep their options open and to leave others who were minded to speculate about the future to do so at their own risk.

    There is a further point to be made on the facts. To whom was the alleged representation made? Who acted on it? Who relied on it to his detriment? No answer to any of these questions has been given by the pleadings, by the evidence or by the arguments addressed to me. In particular none of the Tyler 2 plaintiffs has pleaded or has claimed, or, on the evidence, could claim, to have refrained from intervening in Tyler 1 in reliance on a representation by Cape that it would submit to the jurisdiction in Tyler 2, or to have joined Cape as a defendant in Tyler 2 in that reliance, or in any other way to have acted on such a representation.

    The second question requires some reference to authority. In both *Cheshire and North's Private International Law*, 11th ed. (1987), p. 344 and in *Dicey & Morris' Conflict of Laws*, vol. 1, p. 446, the view is expressed that an agreement to submit must be express and cannot be implied. Cape and Capasco certainly did not expressly agree to submit to the jurisdiction in the Tyler 2 actions.

    Mr. Morison referred me to *Blohn v. Desser* [1962] 2 Q.B. 116 in which Diplock J., in an ex tempore judgment, considered the requirements of an agreement to submit to the jurisdiction. The defendant had been a sleeping partner in a firm carrying on business in Vienna, and her name, together with the names of the other partners, was registered on the commercial register in Vienna. The defendant was resident in England, took no part in the business and received no

A    income from it. But she remained, in Austrian law, a partner, and her name was on the register in Vienna. The plaintiff obtained judgment in the commercial court of Vienna against the partnership firm. The defendant took no part in the proceedings. The plaintiff sued the defendant in England on the Austrian judgment. Diplock J. said, at p. 123:

B    "It is also, I think, clear law that the contract referred to in the fifth case, to submit to the forum in which the judgment was obtained, may be express or implied. It seems to me that, where a person becomes a partner in a foreign firm with a place of business within the jurisdiction of a foreign court, and appoints an agent resident in that jurisdiction to conduct business on behalf of the partnership at that place of business, and causes or permits, as in the present case, C    these matters to be notified to persons dealing with that firm by registration in a public register, he does impliedly agree with all persons to whom such a notification is made—that is to say, the public—to submit to the jurisdiction of the court of the country in which the business is carried on in respect of transactions conducted at that place of business by that agent."

D    Diplock J. went on, however, to hold that the foreign judgment against the firm was an insufficient basis for enforcement of the judgment debt against the defendant personally. So the plaintiff's action failed and the remarks I have cited are only obiter. Nonetheless, Mr. Morison naturally relies on them. There are, however, two authorities which cast doubt on the dicta from *Blohn v. Desser* on which Mr. Morison relies.

E    In *Sfeir Co. v. National Insurance Co. of New Zealand Ltd.* [1964] 1 Lloyd's Rep. 330, 340, Mocatta J. said of an alleged implied agreement to submit:

"However, in considering whether conduct or oral or written agreements give rise to the implication, it is not in my judgment sufficient to reach the conclusion from the evidence that it would be reasonable to find the implied submission or agreement; the court F    must also conclude from the evidence that the implication is a necessary one."

The facts and circumstances from which Diplock J. was prepared to imply an agreement to submit do not satisfy the criterion suggested by Mocatta J. It could not, I think, have been argued that the implication G    was a necessary one. In *Vogel v. R. and A. Kohnstamm Ltd.* [1973] Q.B. 133 Ashworth J. declined to follow the dicta from *Blohn v. Desser* [1962] 2 Q.B. 116 that I have cited and held that an agreement to submit to the jurisdiction of a foreign court must, to be effective, be express and that an implied agreement would be insufficient.

   I do not think Diplock J. was right in regarding it as settled law that an agreement to submit to the jurisdiction need not be expressed but H    could be implied. The leading text books suggest otherwise and there are dicta in two cases which suggest otherwise: see Lord Selborne in *Sirdar Gurdyal Singh v. Rajah of Faridkote* [1894] A.C. 670, 686, and Kennedy L.J. in *Emanuel v. Symon* [1908] 1 K.B. 302, 314. But,

466

Scott J.        Adams v. Cape Industries Plc. (Ch.D.)        [1990]

accepting that an implied agreement to submit might suffice, nonetheless
it is, in my judgment, a clear indication of consent to the exercise by the
foreign court of jurisdiction that is required. I find it very difficult to
accept that the defendant's name in the commercial register in Vienna
was a clear indication of her consent to submit to the jurisdiction of the
Austrian court. She had entered into no contract to submit, implied or
otherwise, with anyone. The entry of her name in the register had,
obviously, a commercial purpose. But it seems to me an unacceptably
flimsy basis from which to imply that she was consenting to the exercise
by the court in Vienna of jurisdiction over her.

Mr. Morison referred also to *S.A. Consortium General Textiles v.
Sun and Sand Agencies Ltd.* [1978] Q.B. 279. One of the points
discussed in the judgments in the Court of Appeal was the meaning to
be attributed to the expression "agreed . . . to submit to the jurisdiction"
in paragraph (iii) of section 4(2)(*a*) of the Foreign Judgments (Reciprocal
Enforcement) Act 1933. Goff L.J. said, at p. 303: "It was argued that
'agreed' in paragraph (iii) means no more than consented. That is
probably right . . ." Shaw L.J. said, at pp. 307–308:

"In this context it seems to me that 'agreed' must mean expressed
willingness or consented to or acknowledged that he would accept
the jurisdiction of the foreign court. It does not require that the
judgment debtor must have bound himself contractually or in formal
terms so to do."

Mr. Morison argued that the requirements for an agreement to submit
at common law should be co-extensive with the requirements for an
agreement to submit for the purposes of paragraph (iii). This may very
well be a sound approach. But in the *Sun and Sand Agencies Ltd.* case
the expression of willingness, the consent to accept the jurisdiction of
the foreign court, had been signified to and had been acted upon by the
plaintiffs.

If the alleged "consent" does not form part of a contractually
enforceable agreement, it ought, in my view, to be treated not as an
agreement—for it is not one—but as a representation. As with any
representation it ought, in my view, to be of no legal effect if not acted
upon or if withdrawn before being acted on. It ought, in my opinion, to
follow that if proceedings in the foreign court were instituted and
brought to judgment against the absent defendant without reliance on
the representation of willingness to submit to the jurisdiction, or a
fortiori, in ignorance of it, the representation could not subsequently be
relied on by the plaintiff as a consensual basis for establishing the court's
jurisdiction. Finally, in my view, if a non-contractual representation is to
be relied on as establishing the court's jurisdiction, it must be a
representation intended to be acted upon or, at least, be a representation
that the plaintiff believed and had reasonable ground for believing was
intended to be acted upon.

In my judgment, the steps taken by Cape and Capasco in the Tyler 1
actions do not indicate the consent of Cape and Capasco to accept the
jurisdiction of the court in the Tyler 2 actions. Not only do these steps
fail to constitute the necessary consent, I do not see how an inference of

A  consent is even faintly arguable. Nor is there any evidence that these steps were relied on by any of the plaintiffs. Moreover, many of the plaintiffs intervened in the Tyler 2 actions long after it must have become apparent that Cape and Capasco were taking no part therein. For all these reasons there was, in my judgment, no agreement to submit sufficient under English law to establish on a consensual basis the jurisdiction of the Tyler court to give the default judgment against Cape

B  and Capasco.

*Issues 4 and 5*

The territorial basis of jurisdiction entitles a foreign court, in the eyes of English law, to exercise in personam jurisdiction over persons present in the country of the foreign court. Whether temporary presence

C  is sufficient is a matter that does not arise in the present case. Presence is a clear enough concept when applied to individuals. It is otherwise with corporations that have no physical existence. Where is a corporation resident or present? In what circumstances will the territorial basis of jurisdiction permit jurisdiction to be exercised over a foreign corporation? The answers to these questions, at least where a trading company is concerned, depend upon the extent to which the company has a place of

D  business in the relevant territory. In *Littauer Glove Corporation v. F.W. Millington (1920) Ltd.* (1928) 44 T.L.R. 746, 747, Salter J. said that "there must be some carrying on of business at a definite and, to some reasonable extent, permanent place," within the jurisdiction. The case was one in which an action had been brought in England on a money judgment given against an English company by a New York court. The

E  action failed on the ground that the company, although transacting business in New York through the medium of an agent, was not in any sense resident in New York. In *La Bourgogne* [1899] P. 1 the question for decision was whether an English court was entitled to take jurisdiction over a French company. It was held that it was. The French company had acquired business premises in London and had installed in the premises a manager whose duties included the carrying on of the

F  company's business. A. L. Smith L.J. expressed the question for the court, at p. 12:

> "The question is whether the defendant company, at the date when this writ was served, was carrying on business in this country under such circumstances as would enable it to be said that it was resident in this country."

G  He concluded, on the facts, at p. 15:

> "the company came over here and took premises within the jurisdiction for the purpose of carrying on its business, and it put in M. Fanet as manager . . . for the purpose of carrying on its business, though it may be in conjunction with his own business."

H  So the company was, he held, at p. 15: "carrying on business here in such a way as to constitute residence in this country." Collins L.J. agreed.

The critical feature in *La Bourgogne* was that the business premises in London at which the French company's business was transacted were

468

Scott J.          Adams v. Cape Industries Plc. (Ch.D.)          [1990]

the French company's premises, cf. *The Princesse Clémentine* [1897]    A
P. 18. The cases establish that jurisdiction on the territorial basis may be
taken by an English court over a foreign company if the foreign
company has business premises in England from which or at which its
business is carried on. A striking example of this principle may be found
in *Dunlop Pneumatic Tyre Co. Ltd. v. Actien-Gesellschaft für Motor und
Motorfahrzeugbau Vorm. Cudell & Co.* [1902] 1 K.B. 342 where a
foreign corporation, manufacturer of motor cars abroad, hired a stand at    B
a Crystal Palace exhibition and for a period of nine days exhibited a
motor car on the stand. It was held by the Court of Appeal that service
of a writ on the person in charge of the stand was good service on the
foreign corporation. Sir Richard Henn Collins M.R. said, at p. 346:

> "In order to see whether they were liable to be so served, it is
> necessary to consider whether, upon the facts, they can be said to    C
> have been resident in England when the service was effected."

He then referred to *La Bourgogne* [1899] P. 1 and said, at p. 347:

> "There, a foreign company employed as their agent in this country
> a person who also acted as agent for two other companies, and
> transacted their business on the same premises; and we held that
> the defendants were through him carrying on business in such a way    D
> as to be resident within the jurisdiction. No such difficulty arises
> here as arose in that case. Here the defendants hired premises for
> their own exclusive use, and did not resort for their purposes to
> some person who was carrying on an independent business, but
> employed their own servant to conduct the business."

There are, however, cases where residence or presence of a foreign    E
company in England has been held established notwithstanding that the
foreign company did not itself own or lease any business premises in
England. A feature of these cases has been that the foreign company
had a resident English agent who had authority to contract on behalf of
and thereby to bind the principal. In those circumstances the presence
or residence in England of the agent has been treated as the presence or
residence of the foreign company, the principal. In the *Dunlop* case    F
[1902] 1 K.B. 342, 349, Romer L.J. said:

> "The result of the authorities appears to me to be that, if for a
> substantial period of time business is carried on by a foreign
> corporation at a fixed place of business in this country, through
> some person, who there carries on the corporation's business as
> their representative and not merely his own independent business,    G
> then for that period the company must be considered as resident
> within the jurisdiction for the purpose of service of a writ."

In *Saccharin Corporation Ltd. v. Chemische Fabrik Von Heyden
Aktiengesellschaft* [1911] 2 K.B. 516 the defendant, a foreign company,
employed a sole agent who had business premises at Fenchurch Street,
London. From these premises he carried on the defendant company's    H
business as well as his own business. He had general authority to enter
into contracts in the defendant's name for the sale of the defendant's
goods. Vaughan Williams, L.J. said, at pp. 522–523:

A    "The question is whether on these facts it is true to say that the defendants carried on their own business at their own place of business in London. It cannot reasonably be suggested that they must necessarily be lessees or tenants of the place of business, though if they were, that would be a cogent piece of evidence against them. I have no doubt myself that a foreign corporation can carry on business at a place in this country within the meaning of the rule, if, although the corporation is not the lessee of the place, it is in any sense its own place of business."

B

Fletcher-Moulton L.J. cited the passage from Romer L.J.'s judgment in the *Dunlop* case [1902] 1 K.B. 342, 349, that I have cited and continued, at p. 524:

C    "The question before us therefore seems to me to be purely one of fact. We must look at all the evidence given by both parties and consider whether the plaintiffs have brought the case to such a point that if falls within the principle enunciated by Romer L.J. The question being one of fact, it is safer to decide it by looking at the things which are done rather than at the words which are used. For example, Blasius is called an agent. That may signify a variety of things. Let us see, therefore, what his position as agent of the defendants entitles him to do."

D

Having reviewed the evidence, Fletcher-Moulton L.J. said, at p. 525:

    "the result is that in my opinion a very strong case is made out . . . in . . . that the defendants do carry on business in England at Blasius' address by means of Blasius."

E

Farwell L.J. said, at p. 526:

    "These facts are in my opinion sufficient to prove that the defendants do carry on their business in England. Then, do they carry it on at a fixed place in England? It is said that for this purpose it is necessary they should be the owners or tenants of the place where their business is alleged to be carried on. To my mind that proposition is quite untenable. That the foreign corporation must have a fixed place of business in this country is quite clear, but the particular tenure on which it occupies that fixed place is quite immaterial."

F

He concluded, at p. 527: "the evidence shows that the defendants do carry on their business at the office of their agent in Fenchurch Street."

G    The *Saccharin Corporation* case [1911] 2 K.B. 516 may be contrasted with *Okura & Co. Ltd. v. Forsbacka Jernverks Aktiebolag* [1914] 1 K.B. 715. Here, too, a foreign company employed sole agents in London. But these agents had no general authority to contract on behalf of their principal. Special authority had to be obtained in the case of each proposed contract. It was held by the Court of Appeal, distinguishing the *Saccharin Corporation* case [1911] 2 K.B. 516, that the foreign company was not carrying on business at the agents' office in London. Buckley L.J. expressed the problem in this way [1914] 1 K.B. 715, 718–719:

H

470

Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                [1990]

> "It is not enough to show that the corporation has an agent here;  A
> he must be an agent who does the corporation's business for the
> corporation in this country. This involves the still more difficult
> question, what is meant exactly by the expression 'doing business'."

He said, at p. 721:

> "The agents have never sold any steel manufactured by the  B
> defendants except as agents and in the manner indicated. They have
> no control over the way in which the defendants do their business
> and have no general authority from them with regard to making
> contracts. . . . These being the facts, 101, Leadenhall Street is really
> only an address from which business is from time to time offered to
> the foreign corporation; the question whether any particular business
> shall or shall not be done is determined by the foreign corporation  C
> in Sweden and not by any one in London. In my opinion the
> defendants are not 'here' by an alter ego who does business for
> them here, or who is competent to bind them in any way. They are
> not doing business here by a person but through a person.
> That person has to communicate with them, and the ultimate
> determination, resulting in a contract, is made not by the agents in
> London, but by the defendants in Sweden. It follows from this that  D
> one of the essential elements which must be present before a writ
> can be served in this country on the agent of a foreign corporation
> is lacking in this case."

Phillimore L.J. said, at p. 724:

> "The important distinction between the two cases is that in the  E
> *Saccharin Corporation* case [1911] 2 K.B. 516, the agent in London
> had authority to enter into contracts on behalf of the defendants
> without submitting the orders to them for their approval; whereas in
> the present case the agents have not that authority, their duty being
> merely to submit the orders to the defendants; and until they have
> signified their approval no contract can be entered into. In these  F
> circumstances it seems to me impossible to say that the position of
> the defendants is in any way analogous to that of a person residing
> or a firm carrying on business in this country."

The significance of the manner in which and place at which contracts
with the foreign company, the principal, are made can be noticed also in
*Thames and Mersey Marine Insurance Co. v. Societa di Navigazione a*  G
*Vapore del Lloyd Austriaco* (1914) 111 L.T. 97 where it was held that
the foreign company was carrying on business at its agent's London
offices. Buckley L.J. treated the fact that contracts were made at the
London offices as the critical factor. In *The World Harmony* [1967]
P. 341 the foreign company was a Liberian shipping company which
owned a ship, *World Harmony*. An independent English company in
London acted as shipping agent and broker for the foreign company  H
and, in effect, operated and controlled *World Harmony*. It was held by
Hewson J. that the foreign company had a place of business in England
through the English agent.

A    In *The Lalandia* [1933] P. 56 on the other hand, the English agents did not make contracts for their foreign principal and it was held that the foreign principal was not carrying on business at the agent's London offices. To the same effect was *The Holstein* [1936] 2 All E.R. 1660 where Sir Boyd Merriman P. said, at p. 1664:

B       "When . . . you find that the agency is merely selling the foreign corporation's contract, then the foreign corporation is not carrying on the business in this country."

     In *F. & K. Jabbour v. Custodian of Israeli Absentee Property* [1954] 1 W.L.R. 139, 146, Pearson J. said:

        "A corporation resides in a country if it carries on business there at a fixed place of business, and, in the case of an agency, the principal test to be applied in determining whether the corporation
C       is carrying on business at the agency is to ascertain whether the agent has authority to enter into contracts on behalf of the corporation without submitting them to the corporation for approval."

     Most of the authorities to which I have referred were dealing with the question whether a foreign corporation had a sufficient presence or
D    residence in England to enable service of a writ on its agent in England to represent good service on the foreign corporation. That question turned upon the meaning to be attributed to sections of English statutes (e.g. section 412 of the Companies Act 1948) or of particular rules which prescribe the means by which service of process on corporations may be effected. The *Littauer Glove Corporation* case, 44 T.L.R. 746
E    and *Vogel v. R. and A. Kohnstamm Ltd.* [1973] Q.B. 133, on the other hand, were cases where the question was whether English common law would recognise the legitimacy of the jurisdiction taken by a foreign court. Both counsel before me have treated the statements of principle to be found in the authorities as applicable equally to both classes of cases. I am content to proceed on that footing although I confess to a feeling of a little unease. It does not seem to me self-evident that the
F    statutory provisions which enable service of English process to be effected in England on foreign corporations represent, without any material variation, the principles of common law that determine whether a corporation is to be regarded as resident or present in a foreign country so as to permit the courts of that country to exercise jurisdiction over it. I will assume, however, that the statements of principle in the
G    authorities do apply equally to both classes of case.
     The question in the present case is whether Cape and Capasco were, when the Tyler 2 actions were instituted, resident or present in Illinois. Reliance is placed by the plaintiffs on the activities and presence first of N.A.A.C. and later of C.P.C. at their respective Illinois offices at 150, North Wacker Drive, Chicago. I must describe the relevant facts and
H    then endeavour to apply to those facts the principles established by the authorities to which I have referred. The object of doing so is to decide whether the United States federal court was entitled, on a territorial basis, to assume jurisdiction over Cape and Capasco in the Tyler 2 actions.

472
Scott J.                     Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

I have already described the corporate structure of the Cape group    A
and the business activities of the various subsidiaries. Cape, the parent
company, was incorporated in 1893. The amosite mines at Penge, in the
Transvaal, were owned and worked by Egnep, a wholly owned subsidiary
of Casap. The first Tyler 2 action, the Ray action, was commenced in
April 1978. Since 1975 Casap had been a wholly owned subsidiary of
C.I.O.L. which, in turn, was a wholly owned subsidiary of Cape.
N.A.A.C. incorporated in 1953 as a wholly owned subsidiary of Cape,    B
and from November 1975 a wholly owned subsidiary of C.I.O.L. was
the marketing agent of the Cape group in the United States. Capasco,
incorporated in 1958 or 1959, was a wholly owned subsidiary of Cape
and was responsible for the supply, marketing and sales promotion
throughout the world of Cape asbestos and asbestos products.

On 1 December 1970 Mr. Morgan, a United States citizen and a    C
resident of Illinois, became vice-president of N.A.A.C. He became
president on 1 July 1974, an office he retained until the dissolution of
N.A.A.C. in 1978. At all times relevant to the Tyler actions, the vice-
president of N.A.A.C. was a Mr. Meyer, an attorney and a partner in
the firm Lord, Bissell & Brook of Chicago. Lord, Bissell & Brook were
the United States attorneys for the Cape group of companies. N.A.A.C.
had offices on the fifth floor of 150, North Wacker Drive, Chicago.    D
N.A.A.C. was the lessee and the rent was paid by N.A.A.C. The office
furniture and fittings were owned by N.A.A.C. N.A.A.C. maintained a
staff of some four people. Mr. Morgan was, of course, in charge. He
had, however, an imporant assistant, a Mrs. Holtze. In addition, there
were two or three other office staff.

N.A.A.C.'s dominant business purpose was to assist and encourage    E
sales in the United States of asbestos mined by the Cape subsidiaries,
one of which was Egnep. Contracts with United States customers for the
supply of asbestos were entered into by Egnep or Casap—I am not clear
which and it does not matter. The contracts tended to be long term but
did not usually specify the quantity of asbestos to be sold. The practice
was for the United States customer to specify from time to time the
quantity of asbestos it wished to purchase and the time when it desired    F
delivery to be made. This information would be conveyed via N.A.A.C.
to Casap and Egnep. Whether the information went directly from
N.A.A.C. to Casap and Egnep or whether it went via Capasco is not
clear. Shipping arrangements and delivery dates would be arranged by
Casap or Egnep and communicated to the United States customer via
N.A.A.C. The vagaries of production in the mines had the consequence    G
that Egnep was not always able to provide the United States customer
with the full amount of asbestos that had been ordered. When a
shortfall between the customers' requirements and Egnep's delivery
capacity emerged, N.A.A.C. would endeavour to fill the gap by
purchasing asbestos from United States Government stocks and selling
the asbestos to the United States customers.

These were the two main forms of business carried on by N.A.A.C.    H
First, it acted as intermediary in respect of contracts between the United
States customers and Egnep. For these services it received a commission
from Casap. Secondly, N.A.A.C. sold asbestos to United States

1 Ch.              Adams v. Cape Industries Plc. (Ch.D.)              Scott J.

A    customers in order from time to time to supplement sales from Egnep.
     In respect of these transactions N.A.A.C. contracted, both in purchasing
     the asbestos and in selling on to the United States customers, as
     principal. In addition, N.A.A.C. carried on business in purchasing
     asbestos textiles, mainly from Japan, and selling the textiles in the
     United States. In transacting this business, N.A.A.C. acted as principal
     on its own account. N.A.A.C. also, it seems from the evidence, from
B    time to time purchased asbestos from Egnep or Casap and sold on to
     United States customers. These purchases and sales it transacted as
     principal. For the purpose of storing asbestos which it had purchased,
     whether from United States Government stocks or from Egnep or
     Casap, N.A.A.C. rented warehousing facilities in the United States.
     These facilities were in N.A.A.C.'s name and were paid for by N.A.A.C.
C         Prior to 11 July 1975 the board of directors of N.A.A.C. included
     two senior officers of Cape. Until 1974 a Mr. Dent, chief executive of
     Cape, was chairman of N.A.A.C. In 1979, however, Mr. Higham
     succeeded Mr. Dent as chief executive of Cape and succeeded also to
     the chairmanship of N.A.A.C. The other Cape director of N.A.A.C.
     was Dr. Gaze who was, at all material times, chairman of Capasco and
     an executive director of Cape. In July 1975 Mr. Higham and Dr. Gaze
D    resigned from the board of N.A.A.C. This change was directly
     attributable to the involvement of Cape and Capasco in the Tyler 1
     actions and was explained thus by Mr. Morgan in a deposition he gave
     in the Tyler 1 actions. The intention, he said, was

          "to dissociate the parent company as fully as possible from the
          operating companies . . . It does not imply any change whatever in
E         the method of operation or the present responsibilities of individuals
          concerned . . ."

     The "method of operation" and "the present responsibilities" of, in
     particular, Mr. Morgan, did not permit either N.A.A.C. or Mr. Morgan,
     its chief executive, to bind Cape, Capasco, Casap or Egnep, or any
     other of the Cape subsidiaries to any contract for the supply or sale of
F    asbestos. It was suggested by Mr. Morison that Mr. Morgan's evidence
     given in depositions in the Tyler 1 actions showed that he considered he
     had authority to accept orders for asbestos to be supplied by Casap or
     one of the mining companies. I do not accept that the passage relied on
     justifies the suggestion. I think it clear from the evidence that N.A.A.C.
     and Mr. Morgan had no such authority.
G         There is no doubt, on the other hand, that N.A.A.C. did constitute
     the channel of communication between United States customers, such as
     P.C.C., and Capasco or Casap. There is undoubtedly a sense in which
     N.A.A.C. was, if the Cape group of companies is viewed as a whole,
     part of the selling organisation of the group and Cape's agent in the
     United States.
H         There is also evidence, as perhaps might be expected, that the
     corporate, as opposed to commercial, activities of N.A.A.C. were
     controlled by Cape. Thus, each year an indication would come from
     Cape as to the dividend that N.A.A.C. was to declare. The
     correspondence reveals some argument and representations from Mr.

A

Morgan regarding the amount of the suggested dividend but, in the last resort, and subject to compliance with Illinois law, the parent company was in a position to and did direct the level of the dividend. In addition, the financial controllers in London were consulted about the level of borrowing permitted to N.A.A.C. in each financial year. This corporate financial control exercised by a parent company over its subsidiary is, in my view, no more and no less than one would expect to find in a group of companies such as the Cape group. There is, however, no evidence of any like control exercised by Cape and Capasco over the conduct by N.A.A.C. of its commercial activities. Mr. Morgan was in executive control of N.A.A.C.'s conduct of its business. Both Dr. Gaze and, to a lesser extent, Mr. Higham, visited the United States from time to time, discussed with United States customers their asbestos supply requirements and dealt with their complaints in that regard. They did so, not as directors of N.A.A.C. but as directors and representatives of Cape or Capasco.

B

C

Mr. Morison argued that if N.A.A.C.'s offices at 150, North Wacker Drive, Chicago, had been a branch office belonging to Cape, the business transacted at that office would have been well sufficient to justify the conclusion that Cape was present in Illinois for jurisdiction purposes. This submission has support from *South India Shipping Corporation Ltd. v. Export-Import Bank of Korea* [1985] 1 W.L.R. 585 and is, in my view, probably right. But it is equally pertinent to observe that if the offices had been those of an independent Illinois corporation, the nature of the business transacted thereat would not have justified the conclusion that Cape was present in Illinois. The offices were not Cape's branch office. Nor were they the offices of an independent Illinois corporation. They were the offices of N.A.A.C., a wholly owned subsidiary in the Cape group of companies.

D

E

Mr. Morison argued that, on the facts of this case, N.A.A.C. should be treated as Cape's alter ego in Illinois or, alternatively, that the corporate veil distinguishing N.A.A.C. from Cape should be lifted. There is no reasonable basis, in my view, for regarding N.A.A.C. as the alter ego of Cape. N.A.A.C. was an Illinois corporation, carrying on business in the United States from which it earned profits and on which it paid United States taxes. Its debtors were *its* debtors, not Cape's debtors. Its creditors were *its* creditors, not Cape's creditors. Cape was not taxed in the United Kingdom or in the United States on N.A.A.C.'s profits. The return to N.A.A.C.'s shareholders took the form of an annual dividend passed by a resolution of N.A.A.C.'s board of directors. The corporate forms applicable to N.A.A.C. as a separate legal entity were observed. N.A.A.C. made its own warehousing arrangements for the storage of its own asbestos. It had its own pension scheme for its own employees. The expression "alter ego" when used to describe the relationship between a company and its shareholders is not a term of art and can bear a flexible meaning. But I do not think it is in the least apt to describe the relationship between N.A.A.C. and Cape.

F

G

H

The question whether the corporate veil should be lifted is more difficult. It is, I think, one which raises an issue of general importance. Is a parent company to be treated, for jurisdiction purposes, as resident

A    in a country in which its wholly owned subsidiary is resident and carries
on business? Should the answer be dependent on whether the subsidiary's
business is associated with and, in a group sense, a part of the business
of the parent company?

Mr. Morison argued the point by concentrating on the economic
unity of the asbestos trade carried on by the Cape group. N.A.A.C. was
a non-autonomous part of the Cape group which, as a unit, was mining
B    and marketing asbestos. So, he argued, N.A.A.C.'s presence and
business activity at 150, North Wacker Drive should be regarded as the
presence and business activity of Cape. He prayed in aid, by analogy,
*Firestone Tyre and Rubber Co. Ltd. v. Lewellin* [1957] 1 W.L.R. 464 in
which the House of Lords had upheld an assessment to tax on the
footing that the business of a subsidiary was carried on as agent for its
C    parent company and so was the business of its parent company. But that
case was not one in which the corporate veil was lifted. It turned on the
factual finding of agency. He referred also to E.E.C. cases in which the
question for decision had been whether actions of a subsidiary could, for
the purpose of article 86 of the E.E.C. Treaty, be attributed to the
parent company. In *Istituto Chemioterapico Italiano S.p.A. and
Commercial Solvents Corporation v. Commission of the European
D    Communities* (Cases 6 and 7/73) [1974] E.C.R. 223, 263, Advocate-
General Warner said:

"neither article 85 nor article 86 anywhere refers to 'persons.' In
both articles the relevant prohibitions are directed to 'undertakings,'
a much wider and looser concept. This indeed is what one would
expect, because it would be inappropriate to apply rigidly in the
E    sphere of competition law the doctrine referred to by English
lawyers as that of *Salomon v. Salomon & Co. Ltd.* [1897] A.C.
22—i.e. the doctrine that every company is a separate legal person
that cannot be identified with its members. Basically that doctrine
exists in order to preserve the principle of limited liability. It is
concerned with the rights of creditors in the context of company
F    law. It has been applied, with more or less happy results, in other
spheres, such as those of conveyancing, of contracts and of liability
for tort. But to export it blindly into branches of the law where it
has little relevance, could, in my opinion, serve only to divorce the
law from reality. Suppose, my Lords, that C.S.C. had traded in
Italy through a branch office. There could have been no doubt then
that it was amenable to the jurisdiction of the Commission and of
G    this court. Could it have made any difference if C.S.C. has chosen
to trade in Italy through a wholly owned subsidiary? The difference
would have been one only of legal form, not of reality. Why then
should it make any difference that it chose to trade in Italy through
a subsidiary that it controlled by a 51 per cent. majority rather than
by a 100 per cent. majority? What matters in this field, in my view,
is control, not extent of beneficial ownership."
H

He said, at p. 264:

"It is, my Lords, with these considerations in mind that I approach
the argument of C.S.C. in the present case. In my opinion those

476

Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

considerations import at least: 1. that there is a presumption that a
subsidiary will act in accordance with the wishes of its parent
because according to common experience subsidiaries generally do
so act; 2. that, unless that presumption is rebutted, it is proper for
the parent and the subsidiary to be treated as a single undertaking
for the purposes of articles 85 and 86 of the E.E.C. Treaty . . ."

    A

In my opinion, however, this approach is not suitable to a resolution of
the question with which I am faced. The question in the present case is
not whether the economic reality of the activities of the Cape group
justifies the conclusion that Cape, the parent, was trading in the United
States. Perhaps it was. But trading in a country is insufficient, by the
standards of English law, to entitle the courts of the country to take in
personam jurisdiction over the trader: see the *Littauer Glove Corporation*
case, 44 T.L.R. 746. The trading must be reinforced by some residential
feature, be it a branch office or a resident agent with power to contract.

    B

    C

   Mr. Morison pointed out that the economic function being discharged
by N.A.A.C. from its Illinois office served, in the context of the trading
activities of the Cape group as a whole, the same function as could have
been discharged by a branch office at the same address. Since in the
latter case Cape would have been resident in Illinois, why should it not
be held to be resident in the former case? In my opinion, however, this
argument overlooks the nature of the fundamental question at issue.
The fundamental question is whether the United States court was
entitled, on territorial grounds, to take jurisdiction over Cape. Cape was
entitled, if it wished, to organise its group activities so as to avoid being
present in the United States of America. The group traded in the
United States through subsidiaries, Egnep, Casap, N.A.A.C. and
Capasco. Each discharged a function relevant to the group business in
the United States, but N.A.A.C. was the only one with a United States
office. If Cape had been an individual, it would not, in my view, have
been arguable that in trading in such a fashion Cape had subjected itself
to the territorial jurisdiction of the United States' courts. Why should
Cape's corporate character justify any different conclusion?

    D

    E

    F

   The approach to be adopted to parent companies trading through
subsidiaries was considered by Roskill L.J. in *The Albazero* [1977] A.C.
774. He said, at p. 807:

"each company in a group of companies (a relatively modern
concept) is a separate legal entity possessed of separate legal rights
and liabilities so that the rights of one company in a group cannot
be exercised by another company in that group even though the
ultimate benefit of the exercise of those rights would enure
beneficially to the same person or corporate body irrespective of the
person or body in whom those rights were vested in law."

    G

He referred to this principle as one of the "fundamental principles of
English law long established." The decision of the Court of Appeal was
reversed by the House of Lords, but nothing was said to detract from
the principle referred to by Roskill L.J.

    H

   In *Bank of Tokyo Ltd. v. Karoon* [1987] A.C. 45, 53 Ackner L.J.
said:

A
"It is however quite fundamental to Mr. Hoffmann's submission, (and he readily accepts this) that the public policy on which he relied requires the court to overlook the corporate distinctions in law between B.T. and B.T.T.C. While accepting that B.T. and B.T.T.C. are separate legal entities, Mr. Hoffmann contends that from a practical point of view it makes no difference whether B.T.T.C. was a branch of B.T. or a subsidiary. He argues that if

B
one looks at the substance of the matter, B.T. are being sued in New York on account of the evidence which they gave in their own defence in proceedings brought against them by Mr. Karoon in London. The protection of B.T.'s own interests required the giving of this information and accordingly B.T., which must in practice be treated as having this information in their possession, was not in

C
breach of its implied obligation of secrecy: see *Tournier v. National Provincial and Union Bank of England* [1924] 1 K.B. 461. The reality of the matter is that B.T.T.C. is not a branch of B.T. That is not the way in which B.T. has chosen to organise its business as a bank."

Robert Goff L.J. said, at p. 64:

D
"Mr. Hoffmann suggested beguilingly that it would be technical for us to distinguish between parent and subsidiary company in this context; economically, he said, they were one. But we are concerned not with economics but with law. The distinction between the two is, in law, fundamental and cannot here be bridged."

E
These statements of principle seem to me to be an answer to the submission that in the present case the separate corporate identity of N.A.A.C. should be ignored and that the corporate veil should be lifted. On the facts of this case neither Cape nor Capasco had an office in Illinois. The 150, North Wacker Drive offices were N.A.A.C.'s offices. N.A.A.C.'s business was its own business, not the business of Cape or of Capasco. N.A.A.C. had no authority to contract on behalf

F
of Cape or Capasco or any other company in the Cape group. Accordingly, in my judgment, the presence of N.A.A.C. at 150, North Wacker Drive, Chicago, Illinois, did not constitute the presence in Illinois of Cape or of Capasco so as to subject them, on a territorial basis, to the jurisdiction of United States courts.

On 1 November 1977 Cape resolved to place N.A.A.C. in liquidation

G
and on 31 January 1978 a liquidating trust agreement for N.A.A.C. was signed. N.A.A.C. executed articles of dissolution on 18 May 1978 and a certificate of dissolution was issued on 19 May 1978. It was the intention of all concerned that N.A.A.C.'s functions in the United States in respect of the sale of Cape's amosite asbestos would come to an end on 31 January 1978. They did so. However, N.A.A.C. at that date was the owner of a quantity of asbestos held in United States warehouses. Over

H
the period of 31 January to 18 May 1978 sales of this asbestos took place. These sales were not made in the course of N.A.A.C. carrying on business as a going concern. They were made for the purposes of the intended liquidation of N.A.A.C.

478
Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

The decision to put N.A.A.C. into liquidation was a consequence of     A
the experience of Cape in the Tyler 1 actions. It had become apparent
to the senior management of Cape by, at latest, the summer of 1977 that
actions in the United States brought against Cape by plaintiffs
complaining of injury caused by exposure to asbestos dust presented a
very real problem. This had, perhaps, become apparent a good deal
earlier. It was in 1975 that Mr. Higham and Dr. Gaze had resigned from
the board of N.A.A.C., a step taken in order to reduce the appearance     B
of Cape involvement with N.A.A.C. But by 1977 Cape's motions on
jurisdiction had been dismissed by Judge Steger and in September 1977
Cape had agreed to pay some $5m. in order to dispose of the Tyler 1
actions. It was clear to all that a multitude of similar actions lay ahead.
It was in these circumstances that the decision to liquidate N.A.A.C.
was taken.                                                                C
Mr. Penna was the main witness for Cape as to the circumstances in
which N.A.A.C. was placed in liquidation and in which A.M.C. and
C.P.C. were formed. He was, in the period 1975 to 1979, employed by
Cape as its group solicitor. In 1982 he became company secretary, a
position he held until 1985 when he left to take up other employment.
He told me of meetings in Chicago and in London in November and        D
December 1977 at which discussions took place between senior executives
of the Cape group, including Mr. Morgan, and at which decisions were
taken to place N.A.A.C. in liquidation and to form A.M.C. and C.P.C.
as the corporate vehicles for the sale of Cape asbestos in the United
States. Mr. Penna was inclined to suggest that the decision to place
N.A.A.C. in liquidation and the decision by means of A.M.C. and
C.P.C. to create a new sales framework for the United States were       E
independent of one another. He also suggested that the idea of
incorporating C.P.C., a new and independent Illinois corporation, to
take over part of the selling function formerly discharged by N.A.A.C.
came from Mr. Morgan who, in effect, offered Cape the services of his
new company, C.P.C. This slant on the facts is one that I found myself
unable to accept. I am satisfied from the evidence that the arrangements
made regarding N.A.A.C., A.M.C. and C.P.C. were part of one           F
composite arrangement designed to enable Cape asbestos to continue to
be sold into the United States while reducing, if not eliminating, the
appearance of any involvement therein of Cape or its subsidiaries.
The decision to put into effect this composite arrangement was
associated with Cape's decision to take no part in any other asbestos
related action brought against it in the United States, whether in Tyler,
Texas, or elsewhere. Cape was prepared to let default judgments be      G
taken against it or its subsidiaries. Cape had no assets in the United
States apart from its shares in N.A.A.C., which, by reason of N.A.A.C.'s
own contingent liability to plaintiffs in asbestos related actions, were
worthless. Cape's intention and concern was to resist enforcement in
England of any default judgments. Enforcement was intended to be
resisted by contesting the legitimacy, under English common law, of the
jurisdiction taken by the United States courts over foreign companies. A     H
defence on these lines would require the trading connection between
Cape and its subsidiaries and the United States to be kept to a

A    minimum. Hence the need to liquidate N.A.A.C., Cape's United States subsidiary, and to allow at least some of N.A.A.C.'s trading functions to be assumed by an Illinois corporation that was not a subsidiary, i.e. C.P.C. If and to the extent that Mr. Penna's evidence suggests a different provenance or motive for the arrangements that were made, I do not accept it.

B    But the question whether C.P.C.'s presence in Illinois can, for jurisdiction purposes, be treated as Cape's presence, must, in my view, be answered by considering the nature of the arrangements that were implemented, not the motive behind them. The documentary evidence I have seen has made clear that the senior management of Cape, including Mr. Penna, were very anxious that Cape's connections with C.P.C. and with A.M.C. should not become publicly known. Some of the letters and memoranda have a somewhat conspiratorial flavour to them. But this too, although interesting to notice, is not, in my opinion, relevant to the main question.

C    The new trading arrangements involved these features: (i) A.M.C., a Liechtenstein corporation, was incorporated by a Dr. Ritter, a well-known Liechtenstein lawyer. The bearer shares in A.M.C. were held by Dr. Ritter upon trust for C.I.O.L. The cost of incorporating A.M.C. was, I think, borne by Capasco. It was certainly borne within the Cape group. The intention was that all sales of Cape asbestos to United States customers would be made by A.M.C. The exact nature of the arrangements with Egnep and Casap whereby A.M.C. became the owner of the asbestos has not been disclosed by the evidence adduced before me. This is not surprising since the relevant documentation has, since the sale of C.I.O.L. and Casap to Transvaal Consolidated Exploration Co. Ltd., been under the control of Transvaal Consolidated. It seems clear, however, that A.M.C. was no more than a corporate name. It was described by Mr. Penna as "an invoicing company" with no employees of its own. I would expect to find, if all the relevant documents were available, that A.M.C. acted through employees or officers of either Casap or Egnep.

F    (ii) C.P.C. was incorporated on 12 December 1977. The shares were issued to Mr. Morgan. The lawyers acting in the incorporation were Lord, Bissell & Brook. There is no clear evidence as to who paid the costs of incorporation. I am prepared to assume that, directly or indirectly, the funds came from Cape or Capasco. This assumption does not lead to the conclusion that Cape or Capasco was the beneficial owner of the C.P.C. shares. It was an essential feature of the new trading arrangements that the new Illinois corporation would be an independent corporation outside the Cape group owned as well as managed by Mr. Morgan. There would not, in these circumstances, be any equity in the shares that Cape could claim as against Mr. Morgan. In my opinion, the C.P.C. shares were, in equity as well as in law, owned by Mr. Morgan.

H    (iii) An agency agreement dated June 1978 was entered into. The parties were A.M.C., C.P.C. and Mr. Morgan. This is an important agreement. Under paragraph 1, A.M.C. appointed C.P.C.:

480
Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

"as its exclusive advice and consultancy bureau to assist the sale of    A
its asbestos fibre (the product) in the United States of America,
Canada and Mexico (hereinafter jointly called 'the territory') for a
period of 10 years from 1 February 1978 to 31 January 1988 . . ."

There was a proviso for termination on 12 months' notice. Paragraph 3
set out the duties of C.P.C. It provided:

"C.P.C. will carry out this appointment diligently exercising all    B
reasonable care and skill and will without limiting the generality
hereof (a) keep A.M.C. advised at regular intervals as to competitor
products market conditions and other commercial matters of mutual
interest; (b) perform such services as may be required to facilitate
or expedite the delivery of products contracted to be sold by
A.M.C. in the territory; (c) endeavour to seek out and promote    C
prospective business on behalf of A.M.C. and forward to A.M.C.
requests for supplies of products provided always that supplies shall
only be at prices and upon terms and conditions determined by
A.M.C."

Under paragraph 4, C.P.C. agreed to "use its best endeavours to
promote the sale of the product on behalf of A.M.C. within the    D
territory." Paragraph 4(d) provided inter alia:

"nothing herein shall be construed to give C.P.C. any authority to
accept any orders to make any sales or to conclude any contracts on
its behalf."

"Its behalf" in that context was a reference to A.M.C. Paragraph 5
coupled with paragraph 4(b) left C.P.C. free to sell material and    E
products other than asbestos fibre and to involve itself in other
commercial activities. Paragraph 6 required C.P.C.

"at its own cost and expense [to] provide proper office accommoda-
tion and staff for the purpose of running an efficient advice and
consultancy bureau and will pay all expenses incurred in maintaining
and operating the same."    F

Paragraph 7 provided for C.P.C. to be remunerated by a percentage
commission based on the cost of all asbestos sales by A.M.C. in the
territory. Paragraph 11 gave A.M.C. an option in certain circumstances
to acquire the C.P.C. shares:

"C.M. shall in such event offer all shares owned by him in C.P.C.
for sale to A.M.C. (or such nominee as it may appoint) at their net    G
book value excluding goodwill . . ."

Paragraph 12 contained an acknowledgement that beneficial ownership
of the name "Continental Products Corporation" belonged to A.M.C.
    I have endeavoured to give a broad indication of the contents of this
agency agreement. C.P.C. commenced business on 1 February 1978—in
order to dovetail with N.A.A.C.'s cesser of business on 31 January    H
1978—but there is no evidence that between 1 February and 5 June
1978, or for that matter thereafter, C.P.C. did any business inconsistent
with the terms of the agency agreement. I conclude, therefore, that the

1 Ch.                    Adams v. Cape Industries Plc. (Ch.D.)                    Scott J.

A   terms of the agreement are a reliable guide to the nature of the relationship between C.P.C. and A.M.C. and, hence between C.P.C. and Cape.

    (iv) C.P.C. leased offices on the 12th floor of 150, North Wacker Drive. N.A.A.C.'s offices had been on the fifth floor. A.M.C.'s employees became C.P.C.'s employees. A good deal, though not all, of the furniture and fittings in N.A.A.C.'s offices were removed to C.P.C.'s

B   offices. C.P.C. took over N.A.A.C.'s telephone number.

    (v) The financial agreements in connection with the commencement by C.P.C. of business are, on the evidence I have seen, somewhat obscure. It is clear that C.P.C. would have had an immediate need of funds. N.A.A.C.'s furniture and fittings had to be paid for. Rent had to be paid for the 12th floor offices at 150, North Wacker Drive. The

C   salaries of the employees, all ex-N.A.A.C. employees, had to be paid. There were, no doubt, other outgoings as well. But commission under the agreement with A.M.C. would not be payable immediately. There is evidence that a sum of $12,000 was paid to C.P.C. by N.A.A.C. In one of his depositions Mr. Morgan described this sum as made up of $10,000 severance pay due to him from N.A.A.C. and paid at his request to

D   C.P.C., and $2,000 as C.P.C.'s charge for storing various files. It seems likely that this sum of $12,000 was calculated to assist C.P.C. in meeting the cost of establishing itself at its new offices: see the letter of 23 November 1977, Mr. Morgan to Dr. Gaze, and Mr. Penna's memorandum of 2 December 1977. But, in addition, there is a mysterious sum of $160,000 that was paid to C.P.C. on 4 January 1978. The Cape documents that reveal this payment show it to have been a payment

E   from a bank account of Cape with Chase Manhattan Bank in London. Mr. Penna said that he thought it was a payment on account of future commission. He said he did not think it would have been a loan.

    In the absence of any clear alternative explanation of the payment of this $160,000 to C.P.C., I infer that it was intended to enable C.P.C. to meet its overheads until payment of commission began to come in.

F   Whether it was intended that the $160,000 should be set off against future commission is not clear. This is no evidence one way or the other. I shall assume that it was not so intended and that it was a payment made by Cape to enable C.P.C. to set up in business and to perform the agency obligations expected of it. Acting as agent in connection with sales of Cape asbestos was not C.P.C.'s only business

G   activity. In addition, it traded in asbestos textiles on its own account, buying and selling as principal.

    The conclusions of fact that I have set out above are not consistent with the contents of an affidavit sworn by Mr. Morgan on 16 March 1988 and introduced into evidence under the Civil Evidence Act 1968. In paragraph 5 of his affidavit, Mr. Morgan deposes:

H   "Prior to 6 January 1978 I had negotiated with a representative of an entity known as Associated Minerals Corporation (hereinafter called 'A.M.C.'). I understood that this company was an independent South African trading company which distributed asbestos for sale in international commerce."

482

Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

This evidence is, in my opinion, disengenuous and false. Negotiations          A
regarding the new trading arrangements in which Mr. Morgan took part
were negotiations, as he must have known, with Cape. I reject as false
his evidence that he understood A.M.C. to be an independent South
African trading company. I am satisfied that he knew very well it was a
creature of Cape. It follows from the falsity of paragraph 5 that I am
unable to place any reliance on the accuracy of the rest of the affidavit.
The conclusions I have expressed about the $160,000 derive from my          B
opinion as to the probabilities inherent in the incorporation of C.P.C.
and its commencement of business. They do not derive from Mr.
Morgan's evidence.

   C.P.C.'s conduct of its affairs was much the same as N.A.A.C.'s had
been. It paid the rent for its offices and paid its employees. It received
commission from A.M.C. as well as incurring expenditure and receiving          C
payments in connection with its independent trading activities.

   Does the manner in which C.P.C. was established and carried on
business justify the conclusion that C.P.C.'s presence in Illinois can, for
jurisdiction purposes, be treated as the residence or presence of Cape?
In my judgment, the answer is "No." I do not think, on analysis, that
the plaintiffs' case is any stronger than their case regarding N.A.A.C. If
anything, I think the case is weaker. N.A.A.C. was at least a wholly          D
owned subsidiary. C.P.C. even if incorporated and launched with Cape
money, was, on my reading of the facts, an independently owned
company. Like N.A.A.C., C.P.C. acted as agent for the purpose of
facilitating the sale in the United States of Cape's asbestos. The seller of
the asbestos in N.A.A.C.'s time was Egnep or Casap. The seller in
C.P.C.'s time was, nominally, A.M.C. but, in reality, still, I think,          E
Egnep or Casap. C.P.C., like N.A.A.C., had no authority to bind
Egnep, Casap or any other of the Cape subsidiaries to any contract.
C.P.C. like N.A.A.C. carried on its own business from its own offices at
150, North Wacker Drive. The provision by Cape of the $160,000 as a
starting-up fund does not make the offices Cape's offices or the business
Cape's business.

   Mr. Morison made a number of points on the evidence regarding          F
N.A.A.C. and C.P.C. with which I agree. He drew attention to the
paucity of documents dealing with and revealing the true nature of the
$160,000 and commented that there must be officers or ex-officers of
Cape who could have given evidence about this. I agree. He invited me
to infer that the $160,000 was a necessary payment to discharge the
initial running expenses of C.P.C. I do so infer. He criticised Mr.          G
Penna's evidence regarding A.M.C. and C.P.C. and pointed out that it
was Mr. Penna who had co-ordinated the setting up of A.M.C. I think
this criticism was well founded. But none of this is, in my opinion,
critical. What is critical is what C.P.C. and N.A.A.C. actually did on
behalf of Cape or Capasco. Each company, C.P.C. and N.A.A.C.,
assisted in the sale of Egnep's asbestos in the United States. That is not
enough. Mr. Morison invited me to infer from, in particular, Mr.          H
Penna's evidence that the corporate form of the Cape group was form
only. I am not prepared to infer this. The evidence does not, in my
view, justify it. Each corporate member of the Cape group had its own

A     well-defined commercial function designed to serve the over-all commercial purpose of mining and marketing asbestos. But that does not constitute a reason why Cape, the parent company, should be treated as present and amenable to be sued in each country in which a subsidiary was present and carrying on business.

     Finally, Mr. Morison submitted that the onus was on Cape to establish that it was not resident in the United States and that I should
B     hold that Cape had failed to discharge that onus. I am not satisfied that it is correct to say that the onus lies on Cape to establish that it was not resident in the United States. The position seems to me to be this. The plaintiffs sue Cape on a judgment given by a United States court. The judgment is an apparently regular one. Cape disputes jurisdiction on the ground that it is a foreign company with no place of business in the United States. The plaintiffs' answer is to assert that the presence
C     in the United States of N.A.A.C. and C.P.C. is to be treated as Cape's presence. But each of N.A.A.C. and C.P.C. is in law an individual legal persona. A contention that the presence in the United States of either is to be treated as the presence of Cape requires, in my opinion, he who so contends to establish facts sufficient to support the contention. This, in my judgment, the plaintiffs have failed to do.

D          The plaintiffs' main case on "presence" was based upon the presence in the United States of N.A.A.C. and C.P.C. In his reply, Mr. Morison raised a third possibility. He suggested that A.M.C. may have been present in Illinois at the relevant time and that, whatever the position regarding N.A.A.C. and C.P.C., A.M.C. was, in effect, Cape. This suggestion was based on the evidence of Mr. Summerfield who testified
E     that an inspection of 150, North Wacker Drive in August 1984 revealed a notice-board giving the names of both C.P.C. and A.M.C. as the occupants of the 12th floor offices. Whether this notice-board was in the same state in 1979 when the sale to Transvaal Consolidated Exploration Co. Ltd. took place is not known. There is an allegation in the pleadings that, when the Tyler 2 actions were commenced, A.M.C. was present at 150, North Wacker Drive and, if I understood Mr. Morison correctly,
F     his submission was that since the onus was on Cape to satisfy me that it was not present in the United States, it was for Cape to establish that A.M.C. was not present in the United States at any material time. I do not accept this approach. There is no positive evidence to suggest that A.M.C. was an occupant of the 150, North Wacker Drive offices at the time the Tyler 2 actions were commenced.

G          I should also mention, in connection with Mr. Morison's wielding of the onus argument, a point made by him arising out of evidence given by Mr. Penna that there had at one time been an agency agreement between Cape and Capasco under which all of Capasco's business had been carried on by Capasco as agent for Cape. In effect, Capasco's business was Cape's business. This agreement had, said Mr. Penna, been terminated in the mid 1970s. He said that he had never seen any like
H     agency agreement between Cape and N.A.A.C. and did not think there had been one, but that he could not exclude the possibility. Mr. Morison submitted that the burden lay on Cape to satisfy me that there was no agency agreement between Cape and N.A.A.C. comparable to that

484
Scott J.                          Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

between Cape and Capasco. I was so satisfied from, in particular, the      A
form of N.A.A.C.'s annual accounts. These were drawn on the footing
that N.A.A.C.'s business was its own business. There is nothing to
suggest that the accounts were drawn on a false footing. The
correspondence between N.A.A.C. and Cape concerning the amount of
the annual dividend to be declared by N.A.A.C. is entirely consistent
with the inferences to be drawn from the accounts. But, in any event,
there is no positive evidence to suggest that there was ever an agency      B
agreement between N.A.A.C. and Cape on the lines of that between
Cape and Capasco to which Mr. Penna had referred.

    In my judgment, therefore, neither the presence in Illinois of
N.A.A.C. nor the presence in Illinois of C.P.C. can be represented, for
jurisdiction purposes, as the presence in Illinois of Cape or Capasco. It
follows that there was, in my judgment, no territorial basis that entitled      C
the Tyler court, by English common law standards, to take jurisdiction
over Cape or Capasco.

*Issue 6*

    The question whether the residence or presence of Cape and Capasco
in Illinois entitled the Federal Court of Tyler, Texas, to take jurisdiction
over them does not, if my conclusions under 4 and 5 above are right,      D
arise. But it is clear that this case is likely to go further, and I think,
therefore, that I should deal with all the questions argued before me.
For the purpose of this question I must assume that Cape and Capasco
were present in Illinois when the Tyler 2 actions were commenced. I
must start by describing, in outline, the nature, function and jurisdiction
of a United States district court. To enable me to do so, I have had      E
great assistance from the eminent United States jurists who have given
evidence in this case.

    Section 1 of article III (the judicial article) of the United States
Constitution vests the judicial power of the United States in a Supreme
Court and such inferior courts as Congress may from time to time
establish. Federal circuit courts and federal district courts have been
established by Congress pursuant to this power. The procedure to be      F
observed by federal courts may be laid down either by Congress or the
Supreme Court.

    Judges of federal courts are appointed by the President of the United
States and confirmed by the Senate. They are appointed for life and can
be removed only by Congress. Their salaries and expenses are a charge
on federal funds. They take oaths of allegiance to the United States      G
Constitution. All this is in contrast to judges of state courts who are
appointed by a state authority, are paid for by the state and take oaths
of allegiance to the state. The federal court system is headed by the
Supreme Court. Below the Supreme Court are the circuit courts, the
courts of appeals. The United States is divided into 13 judicial circuits,
each of which has a court of appeals. The Fifth Circuit includes
Louisiana, Mississippi and Texas. Judges of the circuit courts of appeals      H
are the circuit judges. The federal courts of first instance are the district
courts. Each state is, according to its population, allocated a number of
districts. Each district is allocated a number of judges. Texas has four

A   districts, one of which is the eastern district. The eastern district of Texas comprises seven divisions, one of which is the Tyler Division and another of which is the Marshall Division. Judge Steger was a district judge of the eastern district of Texas. He sat both at Tyler and at Marshall, as well as at other venues in the eastern district.

   The subject matter jurisdiction of federal district courts established by Congress is set out in Chapter 85 of Title 28 of the United States

B   Code, entitled "Judicial Code and Judiciary." Section 1331 entitled "Federal question," provides: "The district courts shall have original jurisdiction of all civil actions arising under the constitution, laws or treaties of the United States." This is an exclusive jurisdiction. Actions of this character cannot be entertained by state courts unless specific statutory authorisation is given.

C   Section 1332 is headed "Diversity of citizenship." Paragraph (a) of the section provides:

     "(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between (1) citizens of different states . . ."

D   Diversity jurisdiction, unlike federal question jurisdiction, is not an exclusive jurisdiction. An action involving diversity of citizenship which could have been brought in a federal district court can be commenced, if the plaintiff so elects, in a state court. Any defendant, however, may apply to the federal district court for the removal of the action, as of right, to the district court. But in the absence of any such application

E   the case may be prosecuted to judgment in the state court.

   The necessity for Congress to have endowed federal district courts with federal question jurisdiction is, perhaps, obvious. Laws passed by Congress, treaties of the United States, the Constitution of the United States, may give rise to civil justiciable issues. Courts for the trial of such issues are necessary. Chapter 85 also gives district courts original jurisdiction over actions brought against foreign states (section 1330) or

F   brought by or against the United States itself (section 1345 and 1346). In addition, original jurisdiction over a number of specified types of actions is given to district courts. These include admiralty and maritime cases (section 1333), bankruptcy cases (section 1334), patent cases (section 1338), civil rights cases (section 1343) and many others. The explanation for the jurisdiction given to the federal courts can in all these cases be

G   found in the nature of the actions in question.

   Diversity of citizenship jurisdiction, however, has a different provenance from any of these. There is no obvious constitutional reason why diversity jurisdiction should have been conferred on federal courts. A breach of contract action between two citizens of the State of New York can be entertained by the courts of New York. So can an action in contract between a citizen of New York and a citizen of Illinois. The

H   need to have provided in the latter case for federal district courts to have an overriding jurisdiction is not in the least obvious. The explanation for diversity jurisdiction given by the commentators and accepted by the witnesses before me is, broadly, that at the time of

union there was not the same confidence as there would be today in the A
judicial qualities of state judges, and, in particular, in their impartiality
when trying an action between a citizen of their own state and a citizen
of another state. It was, so the explanation goes, thought necessary to
provide defendants with an opportunity, when sued by a citizen of
another state, to have the action heard in a federal court. Consistent
with this explanation for the conferring of diversity jurisdiction on
federal district courts is the opinion of some distinguished United States B
jurists that diversity jurisdiction has served its purpose and could with
no disadvantage now be abolished.

It is inherent in diversity of citizenship jurisdiction that it is the
identity of the parties, not the nature of the action, that confers
jurisdiction on the district court.

A federal district court exercising its diversity of citizenship jurisdiction C
does not, save as to matters of procedure, apply federal law to the
determination of the rights which are in issue. It applies state law. Thus,
in the case of a contract governed by the law of Illinois, a breach of
contract action may be brought by a citizen of Illinois against a citizen of
Texas in a federal district court in Illinois; the law applied will be the
law of Illinois. If there is a car accident in New York, the law of New
York will determine the rights of any injured persons. That will be so D
whether an action for redress is brought in a New York state court or in
a New York federal district court. That this is so was established by the
seminal decision of the United States Supreme Court in *Erie Railroad
Co. v. Tompkins* (1938) 304 U.S. 64. Justice Brandeis said, at p. 78:

> "Congress has no power to declare substantive rules of common law
> applicable in a state whether they be local in nature or "general," E
> be they commercial law or a part of the law of torts. And no clause
> in the Constitution purports to confer such a power upon the
> federal courts."

In a later Supreme Court case, *Prima Paint Corporation v. Flood &
Conklin Manufacturing Co.* (1967) 388 U.S. 395, 404, Justice Fortas
said: F

> "Since the decision in *Erie Railroad Co. v. Tompkins* . . . federal
> courts are bound in diversity cases to follow state rules of decision
> in matters which are 'substantive' rather than 'procedural,' or where
> the matter is 'outcome determinative.'"

The decision in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 is, I think, G
broadly accepted by U.S. jurists as resting

> "on the principle that the federal government as a whole, including
> Congress and the federal courts, has no more authority than that
> given to it by the Constitution. This principle, which is inherent in
> the political theory underlying the very concept and structure of the
> federal government, is reinforced by the 10th Amendment, which H
> reserves to the states or to the people those powers not delegated to
> the federal government by the Constitution": see *Federal Practice
> and Procedure* by Wright, Miller & Cooper, vol. 19, para. 4505.

**1 Ch.**                    Adams v. Cape Industries Plc. (Ch.D.)

A      Federal district courts sitting in diversity have, therefore, a dual character. In one sense they are national courts established and funded centrally; but they are applying state substantive law and, in that sense, may be regarded as state courts.

B      In order to entertain an action, a federal district court must not only have subject matter jurisdiction but also in personam jurisdiction over the defendants in the suit. It is an important and somewhat curious feature of the manner in which federal district courts are established that, save in cases specially provided for by Congress or the Supreme Court, each district court exercises the in personam jurisdiction permitted by the law of the state in which it sits: see Federal Rules of Procedure, rule 4. Thus, if an action for personal injuries is commenced in New York against a defendant resident in California, the jurisdiction of the

C     New York court over that defendant will depend upon the "long arm" statute of the state of New York. Each state has its own "long arm" statute serving, broadly, the purpose that R.S.C., Ord. 11 serves for our own jurisdiction. There is no separate federal "long arm" statute that Congress or the Supreme Court have enacted so as to confer special federal in personam jurisdiction on federal district courts. They must rely on the laws of the respective forum states. In *Point Landing Inc. v.*

D     *Omni Capital International Ltd.* (1986) 795 F. 2d 415, 419, a decision of the Court of Appeals for the Fifth Circuit, it was held:

> "Absent a rule or statute to the contrary, Federal Rule of Civil Procedure 4(e) permits a federal court to exercise jurisdiction over only those defendants who are subject to the jurisdiction of courts of the state in which the court sits."

E     This rule applies not only when the court is sitting in diversity but also when it is dealing with a federal question case or indeed any other type of case in which it has original jurisdiction.

      Accordingly, whether a federal district court is exercising federal question jurisdiction or whether it is exercising diversity jurisdiction, its entitlement to take jurisdiction over a particular defendant depends on

F     the "long arm" statute of the forum state. The jurisdiction objections taken by Cape in Tyler 1 were taken on the ground that the "long arm" statute of Texas did not entitle the federal district court at Tyler, Texas, to take jurisdiction over Cape.

      The effect of this rule and authority is that the Tyler court in the Tyler 2 actions was sitting in diversity, was applying to the causes of

G     action Texas state law and relied for its in personam jurisdiction over Cape on the Texas "long arm" statute.

      The question for me is whether presence in Illinois is, under English law, a sufficient foundation for jurisdiction to be taken by the federal district court sitting in Tyler, Texas.

      There is no doubt but that, for conflict of law purposes, each state

H     within the United States is a "country" and that for many conflicts of law purposes the United States is not a "country." Each state, for example, has its own common law. The United States has no common law. A person may be domiciled in a state. Domicile in the United States as a whole is a meaningless concept. The proper law of a contract

488
Scott J.                  **Adams v. Cape Industries Plc. (Ch.D.)**                  [1990]

or of a tort may be the law of a state, but cannot be the law of the    A
United States as a whole. In *Dicey's & Morris's Conflict of Laws*, 11th
ed. (1987), p. 26 there is this statement:

> "Meaning of 'country.' This word has from long usage become
> almost a term of art among English-speaking writers on the conflict
> of laws, and it is vitally important to appreciate exactly what it
> means. It was defined by Dicey as 'the whole of a territory subject    B
> under one sovereign to one body of law.' He suggested that a better
> expression might be 'law district': but this phrase has never found
> much favour with English-speaking writers, who prefer the more
> familiar word 'country.' England, Scotland, Northern Ireland, the
> Isle of Man, Jersey, Guernsey, Alderney, Sark, each British colony,
> each of the American and the Australian states and each of the
> Canadian provinces is a separate country in the sense of the conflict    C
> of laws, though not one of them is a state known to public
> international law."

As part of the discussion of the meaning of the word "state," the text
contains this statement, at p. 27:

> "A state may or may not coincide with a country in the sense of the    D
> conflict of laws. Unitary states like Sweden, the Netherlands and
> New Zealand, where the law is the same throughout the state, are
> 'countries' in this sense. But composite states like the United
> Kingdom, the United States, Australia and Canada are not."

I find it difficult to accept that for some private international law
purposes the United States may not be a "country." Take the case of a    E
federal district court hearing a federal anti-trust damages suit. The suit
would be a federal question case, not a diversity case. The law being
applied would be United States law, not state law. Professor Baade,
giving evidence for the defendants, said that in a federal anti-trust case
the "country" would be the United States. He accepted that this would
be so even though the in personam jurisdiction of the court was    F
determined by the forum state's "long arm" statute. This seems to me to
correspond with reality. Federal anti-trust law is the product of United
States statute, not state statute, and applies to the whole of the United
States. It is the United States Congress that has established the federal
courts in which anti-trust suits may be litigated. They are United States
courts. The in personam jurisdiction that enables a defendant in an anti-
trust suit to be brought before a federal district court sitting in Texas is    G
dependent upon the Texas "long arm" statute but that is because
Congress has not chosen to confer any specific federal in personam
jurisdiction upon federal district courts. I did not understand it to be
suggested that Congress could not, with constitutional propriety, do so if
it so desired.

It was suggested that when sitting in federal question jurisdiction a
federal district court was, on analysis, applying state law. The analysis    H
was based upon the provisions in the United States Constitution that
give federal legislation national efficacy. Federal legislation becomes, in
effect, it was argued, state law. Accordingly a federal district court in a

A    federal question case may be regarded as applying state substantive law just as a federal district court in a diversity case will be applying state substantive law.

This analysis is, in my opinion, little more than sophistry. The distinction between federal law derived from federal statute, on the one hand, and state law, whether derived from common law or state statute, on the other hand, seems to me a clear one. It must have seemed clear, B    too, to Congress in enacting paragraph 1331 of the United States Code which refers to "civil actions arising under the Constitution, laws or treaties of the United States." In my opinion, when a federal district court is dealing with a federal question case, it is applying federal substantive law, not state law.

Suppose then, in a federal question case, a defendant who did not appear or take any part in the case had a damages default judgment C    entered against him. If the federal district court was sitting in Texas and the defendant was resident in Illinois, would an English court decline to enforce the judgment against the defendant on the ground that the "country" of the court was Texas and the court, by the standards of English law, lacked jurisdiction over the defendant? I do not see any reason why it should do so. The court would be a United States court D    applying United States law. Why should not such a court in such a case command the obedience of a resident anywhere in the United States? I justify my reaction by relying on the fundamental principle underlying territoriality as a basis of jurisdiction. The sovereignty of the United States in its own territory is, of course, recognised by English law. The entitlement of the United States to establish in its territory courts in E    which issues arising under its laws may be adjudicated upon and disposed of is an attribute of its sovereignty. It is also an attribute of its sovereignty that the United States is entitled to invest its courts with jurisdiction over any persons resident in its territory. If Congress had chosen to establish a federal district court at Washington D.C. for the purpose of dealing with federal anti-trust cases, and with in personam F    jurisdiction over any persons resident in the United States, the proposition that, under English law, that jurisdiction was excessive, would, in my view, have been unarguable. Under English law a resident in Alaska would owe the same obligation of obedience to such a court as would a resident of Washington D.C. The "country" of the court would, unarguably, be the United States as a whole.

I have been discussing that which for present purposes is hypothetical. G    The Tyler court was sitting in diversity and was not dealing with a federal question case. But the arguments addressed to me by Sir Godfray Le Quesne on this issue have had at their core the proposition that the United States as a whole cannot be a "country" for private international law purposes nor, in particular, for the purpose of enforcement in England of a damages award made by a federal district court. I am unable to accept that proposition. In my judgment, where a H    federal district court is exercising federal question jurisdiction it is doing so as a court of the United States in circumstances in which the "country" of the court is, for English law purposes, the United States. I therefore decline to approach the question before me on the footing that

490

the United States cannot be a "country" for enforcement of foreign    A
judgment purposes.

The question before me is whether a federal district court sitting in
diversity in a tort case is to be regarded, for enforcement purposes, as a
court of the state in which it is sitting and whose law it is applying, or as
a court of the United States which established it. There is no authority
that provides an answer. A convenient starting point, however, is the
judgment of Blackburn J. in *Schibsby v. Westenholz*, L.R. 6 Q.B. 155.    B
He said, at p. 161—I have cited the passage before but I do so again:

> "If the defendants had been at the time of the judgment subjects of
> the country whose judgment is sought to be enforced against them,
> we think that its laws would have bound them. Again, if the
> defendants had been at the time when the suit was commenced
> resident in the country, so as to have the benefit of its laws    C
> protecting them, or, as it is sometimes expressed, owing temporary
> allegiance to that country, we think that its laws would have bound
> them."

How is this statement of principle to be applied where one sovereign
state has a number of different systems of law that apply in different
parts of its territory? Sir Godfray suggested that the critical question to    D
be asked was whether the defendant was present within the territorial
jurisdiction of the court which had given the judgment. He reminded me
of the statement by Lord Selborne L.C. in the *Rajah of Faridkote* case
[1894] A.C. 670, 683, that "all jurisdiction is properly territorial." If the
defendant was not within the territorial jurisdiction of the court
concerned, then, said Sir Godfray, it would be immaterial that he might    E
be resident in the jurisdiction of another court set up by the same
sovereign power. I do not find difficulty in accepting these submissions,
but they do not seem to me to point the way towards a solution to the
main problem. The question whether Cape was present within the
territorial jurisdiction of the federal district court at Tyler, Texas, is one
which must be answered by reference to English international law. It is
the attitude of English law to the territorial jurisdiction and competence    F
of a federal district court that I am trying to discover.

Sir Godfray submitted that the criterion to be applied in answering
the question depended on the function of the district court. If the
function of the court when sitting in diversity was the administration of
justice in Texas, then it should be regarded as a state court with a
territorial jurisdiction covering Texas. Unless its function was the    G
administration of justice in the United States as a whole, it should not
be regarded as a United States court with a territorial jurisdiction
covering the whole of the United States.

Sir Godfray then analysed the characteristics of a federal district
court and submitted that they showed the court, when sitting in diversity,
to be part of the system for the administration of justice in the state in    H
which it sat.

If Sir Godfray's approach is correct, I do not think his analysis or
conclusions can be faulted. But I am not satisfied that his approach is
correct. The question as to whether a foreign court has, in the eyes of

A    English law, jurisdiction over a defendant, may receive an affirmative
answer if a sufficient territorial connection between the defendant and
the court can be established. But the territorial basis of jurisdiction is
dependent upon and cannot, in my opinion, be divorced from, the
sovereignty of the "country" that has established the court in question.
It is, I think, recognition of the sovereignty of a foreign country that
leads to recognition of the entitlement of its courts to take jurisdiction
B    over persons resident in its sovereign territory. I do not regard the
United Kingdom with its constituent private international law "countries"
as inconsistent with this thesis. It would be open to Parliament, if it so
desired, to create a court structure for the whole of the United Kingdom
for a specified class of case. I can see no reason of principle why foreign
countries, with a private international law similar to ours, should decline
C    to recognise the jurisdiction of such a court over persons resident
anywhere in the United Kingdom. The United States is a sovereign
power with a territory over which its sovereignty extends. It has
established courts whose in personam jurisdiction, although subject to
limits and derived from state statutes, is capable of extending to
individuals anywhere in the United States.

D        As a matter of principle, in my view, if a United States court
exercises jurisdiction over a person resident in the United States, it is
exercising powers inherent in the sovereignty which adheres to the
United States. As a matter of principle, too, in my view, English law
should recognise the legitimacy of that exercise of jurisdiction.

         It follows that I agree with Mr. Morison that the answer to the
question which I must answer does not lie in investigating the function
E    discharged by the court but lies in investigating the source of the
authority of the court. Whatever the function of a federal district court
in a diversity case, the source of its authority is to be found in the
sovereign power which established it. For those reasons I conclude that
the exercise of jurisdiction by a federal district court over a person
resident in the United States is, by the standards of English law, a
legitimate and not an excessive exercise of jurisdiction. If I had felt able
F    to conclude that Cape and Capasco were, when the Tyler 2 actions were
commenced, present in Illinois, I would have held that to be a sufficient
basis, in English law, for the exercise by the Tyler court of jurisdiction
over them.

         There is one final point I wish to make before leaving this issue.
Cape and Capasco protested the jurisdiction in the Tyler 1 actions. They
G    contended that the Texas "long arm" statute did not entitle the Tyler
district court to exercise in personam jurisdiction over them. Their
objections were overruled by Judge Steger at an interlocutory stage but
were never the subject of a final ruling. The objections were not
renewed in the Tyler 2 actions for the obvious reason that Cape and
Capasco took no part therein. But it remains the contention of Cape
and Capasco that, under the Texas "long arm" statute, the Tyler district
H    court was not entitled to exercise in personam jurisdiction over them. In
the course of argument before me, I thought for a time, wrongly, that
the alleged absence of in personam jurisdiction of the Tyler court was
being advanced as a reason why the English courts should not recognise

the jurisdiction exercised over Cape and Capasco by the Tyler court. Sir Godfray made plain to me, however, that I was under a misapprehension and that the contention that under the Texas "long arm" statute the Tyler court lacked in personam jurisdiction was not being relied on as a defence. Nonetheless, evidence was given by, in particular, Mr. Bernays and Mr. Hall as to the consequences under United States law if that had been so. Their evidence satisfied me that if a default judgment against a defendant who has taken no part in the proceedings is given by a federal district court in circumstances in which the court has erroneously assumed in personam jurisdiction over the defendant, the defendant can raise the error in collateral proceedings in order to resist the enforcement of the judgment against him. In the instant case, Cape, if it owned assets in California against which the plaintiffs sought to enforce the default judgment, could, if its jurisdiction contention were a good one, resist enforcement by establishing in collateral proceedings in California the lack of jurisdiction of the Tyler court.

Mr. Morison submitted, and I think Sir Godfray agreed, that a domestic lack of jurisdiction was not a ground upon which enforcement of a foreign judgment in England could be resisted. *Pemberton v. Hughes* [1899] 1 Ch. 781 was cited as authority: see especially *per* Sir Nathaniel Lindley M.R. at p. 790. But *Pemberton v. Hughes* was a case dealing with status, where special considerations apply.

I am not for a moment suggesting that the merits of a foreign judgment can be re-examined in enforcement proceedings in this country. But where enforcement of a foreign money judgment is sought, it seems to me odd and anomalous that English courts should give to the judgment an efficacy denied it by the courts of the forum. If, as I think, the United States as a whole is the "country" of a federal district court and if, within that country, collateral objection to the enforcement of a default judgment is possible, I do not see, in principle, why that same collateral objection should not be raised to resist enforcement of the judgment in England. I need not and do not propose to express a final opinion on this point since it does not arise as an issue in the present case. But the matter has been touched on in argument as well as in evidence and I would not wish this judgment to be taken as tacit support for the view that, provided by English law standards the foreign court was not claiming excessive jurisdiction, the judgment of the foreign court would be enforceable in England notwithstanding that under the law of the forum the court had lacked jurisdiction. My present view is to the contrary.

## Summary of issue 7

It is at this point that the definitive part of my judgment comes to an end. I have still to deal with issue 7—fraud, natural justice and public policy. My conclusions and findings on this issue are, in summary, these:

(1) The allegations against Mr. Blake Bailey of dishonesty and of procuring the default judgment by fraud fail. (a) The several statements contained in the findings of fact in the default judgment that were based on the proposition that the Tyler 1 actions and the Tyler 2 actions could be treated as one composite unit of litigation were not untrue statements

A    of fact but were statements based upon a legal theory that Mr. Bailey, as counsel for the plaintiffs, was entitled to espouse in the interests of his clients. The theory was, in my view, misconceived but it was not, in my judgment, dishonest for Mr. Bailey to draft the default judgment on the basis of that legal theory. (b) Paragraph 11 of the findings of fact contains statements of fact that were, in my judgment, untrue in that the court did not review the medical records of any of the plaintiffs and did not make any determination in respect of any individual plaintiff of the amount of damages that would properly compensate that plaintiff for his or her medical treatment or pain and anguish or physical disability. But I do not find that in drafting the default judgment with paragraph 11 included therein or in submitting the draft to Judge Steger, Mr. Bailey was acting dishonestly. (c) Mr. Bailey did not, I find, dishonestly procure Judge Steger to award the damages sum of $15,654,000 or to award an average of $75,000 per plaintiff. The allegations of misrepresentation based on the contents of the conversations between Judge Steger and Mr. Bailey prior to 12 September 1983 fail. (d) Mr. Bailey did not, I find, mislead Judge Steger either in respect of the findings of fact in the default judgment or in respect of the quantum of damages awarded. (e) It was not dishonest for Mr. Bailey to procure Judge Steger to award the $15,654,000 whether or not that level of award can be categorised as exorbitant or as arbitrary.

    But: (2) the default judgment is not, in my judgment, a judgment that should be enforced in an English court. (a) No evidence of damage or injury to any of the plaintiffs, whether oral or in affidavit form, was placed before Judge Steger. (b) Medical records together with counsel's summary of each plaintiff's case were placed before the court on 12 September 1983 but the judgment was given before Judge Steger had had any sufficient opportunity to peruse them and, as I find, without him having done so. (c) The damages award was quantified either as a total figure to be divided among all the plaintiffs or on the basis of an average figure per plaintiff and, in either case, without any determination in respect of any individual plaintiff of the amount of damages that that plaintiff ought to recover from the defendants for the injuries he or she had received. (d) The classification of the plaintiffs into bands for damages purposes was carried out by the plaintiffs' counsel and did not represent any judicial assessment made by Judge Steger of the relative seriousness of the individual plaintiff's injuries. (e) In the circumstances, the individual awards of damages were arbitrary and did not follow upon a judicial determination of the quantum of damages that the individual plaintiffs were entitled to recover against the defendants.

    For these reasons, expressed in summary form, the default judgment was obtained, in my judgment, in circumstances that, by the standards of English law, were contrary to natural justice.

    In my view, a judgment obtained in the circumstances revealed by the evidence of this case does not give rise to any obligation of obedience enforceable in any English court.

    26 July.   SCOTT J. read the following conclusion to his judgment:

494

Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                    [1990]

*Issue 7: fraud, natural justice and public policy*

    If my conclusion that, under English law, the Tyler court did not have jurisdiction over Cape and Capasco is right, the issue whether enforcement of the default judgment should be refused on the ground that it was procured by fraud, or that its enforcement would offend principles of natural justice or public policy, does not arise. But the defendants' case under this head has involved allegations of dishonesty against Mr. Blake Bailey. He, it is alleged, dishonestly procured the default judgment. Allegations made against a professional man of dishonesty in the course of his profession are allegations which, once made, must be dealt with. Any other course would not be fair to Mr. Bailey. For this reason, in particular, I must, notwithstanding my conclusions on the other points in this case, deal in some detail with the allegations of professional dishonesty made against Mr. Bailey. I propose first to relate the circumstances in which, on my reading of the evidence, the default judgment came to take the form it did. [His Lordship then examined in detail the evidence as to the manner in which the default judgment given by Judge Steger on 12 September 1983 came to be delivered, concluded that the allegations against Mr. Bailey of dishonesty and fraud based on the contents of the judgment failed, and continued:] The defence that the default judgment was procured by fraud, therefore, fails. That leaves the question whether, in the circumstances in which the judgment was obtained its enforcement in England can be resisted on natural justice or public policy grounds.

    The circumstances in which the judgment was obtained involve these particular features. (i) The judgment was not based on evidence in the strict sense. There was none. Nor was it based on the unauthenticated medical records that Mr. Bailey and Mr. Clark had lodged on 12 September 1983. Judge Steger had not had time to peruse them. (ii) The medical material lodged by Mr. Bailey and Mr. Clark did not purport to establish that the medical condition of the respective plaintiffs had been caused by exposure to asbestos dust. Nor did the material deal with pain and suffering, present or future physical disability, past or future medical expenses or, indeed, any special damage of any kind. (iii) Judge Steger indicated his willingness to grant an average of $75,000 per plaintiff. This was his only contribution to the amount of the damages award. The $200,000-odd by which the total award of $15,654,000 exceeded the $75,000 average was simply the mathematical consequence of the appendix A amendments effected by Mr. Bailey and Mr. Clark. (iv) The provenance of the $75,000 average is uncertain. It is likely that it derived from Judge Steger's knowledge of the statistics regarding the level of current settlements in asbestos-related suits. It is possible that it owed something to the arguments that Mr. Bailey addressed to the judge at their third meeting. It could not, in my view, have owed anything to the medical material lodged with the court on 12 September 1983. (v) The decision as to the category of damages into which each plaintiff should be placed was made by counsel, Mr. Bailey and Mr. Clark, not by Judge Steger. The decision as to the level of the four categories and their relationship to one another was made by counsel, not by Judge Steger. Judge Steger required the average award to be

A   reduced from $120,000 to $75,000. It was counsel, not the judge, who
    decided how that should be achieved. It was counsel, not the judge,
    who decided to shift two plaintiffs from the respective categories in
    which they had originally been placed into new categories. The judge
    was not told that this had been done and could not have known that it
    had been done. (vi) The features that I have mentioned justify, in my
    judgment, these conclusions. First, no judicial hearing, worthy of the
B   name, at which quantum of damages was assessed took place. Second,
    the attribution of specific damages to the individual plaintiffs was not the
    result of a judicial assessment of the individual entitlements of the
    respective plaintiffs. Third, the total sum of damages awarded was based
    on the judge's opinion as to what would represent an appropriate
    average award.

C       The procedure adopted by Mr. Bailey and Judge Steger that led to
    the award of damages was not, in my judgment, in accordance with the
    requirements of the relevant federal rules. I base this conclusion on the
    evidence in particular of Mr. Hall and Mr. Bernays, but also on that of
    Mr. Brin and Mr. Davis, all of whom were critical of the procedure that
    had been adopted. Mr. Bailey and Mr. Patrick gave evidence to the
    effect that Judge Steger was not required to hold a judicial hearing for
D   the purpose of assessment of damages, was entitled to take into account
    unauthenticated medical reports, could inform himself by whatever
    means he chose of the significance of the plaintiffs' medical condition,
    did not require evidence causally connecting the plaintiffs' medical
    condition with the defendants' negligence, and did not require evidence
    of the plaintiffs' pain and suffering, medical expenses past and future, or
E   disability in order to award damages in respect of these items. In
    preferring the evidence to the contrary given by the defendants'
    witnesses, I am influenced by my own instinctive reaction as a judge in a
    common law jurisdiction. The United States is—with all respect to
    Louisiana and its civil law heritage—one of the great common law
    jurisdictions. The federal rules relating to default judgments and the
    federal rules of evidence seemed to me familiar. They embody in broad
F   substance rules of evidence and of procedure similar to those which
    apply in this country. The proposition that a judge assessing tortious
    damages where liability has been established against defendants in
    default can dispense with a judicial hearing or with the rules of evidence,
    or with the need of evidence, offends my understanding of the role and
    function of a judge in a common law jurisdiction. I found it easy to
G   accept the evidence of Mr. Bernays, Mr. Hall, Mr. Brin and Mr. Davis
    and to conclude therefrom that that proposition forms no part of United
    States law and procedure.
        Whether it is relevant to find, as I do, that the procedure leading to
    the damages award of 12 September 1983 was not in accordance with
    the federal rules is another matter. It may be that it is not. But I would
H   wish it to be clear that criticisms of that procedure are not criticisms of
    the procedure prescribed by the federal rules. It has not been suggested
    on the defendants' side, and could not have been suggested, that the
    content of the federal rules relating to the manner in which default
    judgments can be obtained and to the procedure for an assessment of

damages are in any respect offensive to natural justice. Indeed, the    A
contrary is the case. Those rules, like our own corresponding rules, are
designed to enable justice to be done and, from a procedural point of
view, are unimpeachable. Criticism in the present case has been directed
to what actually happened. If Mr. Bailey had been correct in representing
the procedure followed as being consistent with the federal rules, the
criticism would have been a criticism also of the federal rules. But Mr.
Bailey was not, in my judgment, correct. So that point of criticism does    B
not arise.

I must now consider the criteria to be applied in order to decide
whether or not a foreign judgment is impeachable on natural justice or
public policy grounds. I should say at once that, in my judgment,
natural justice and public policy cover, in the present case, the same
ground. If the judgment of 12 September 1983 is objectionable on    C
natural justice grounds, it is easy to conclude that it would be contrary
to public policy to permit its enforcement in this country. If it is not
objectionable on natural justice grounds, then, on the footing that no
jurisdictional objection can be taken, I cannot see any public policy
reason for not enforcing it.

Mr. Falconer submitted that since due notice of the default application
had been given, no natural justice objection to the default judgment    D
could be maintained. On the authorities, he submitted, the requirements
of natural justice, at least in the context of enforcement of foreign
judgments, amount to no more than that sufficient notice of the
proceedings must be given, together with an opportunity for the
defendant to have its case heard. He referred to the service on Cape
and Capasco of the notice of the plaintiffs' application for a default    E
judgment and submitted that the defendants' natural justice defence
must, accordingly, fail.

There are, I agree, authorities which give some support to this
approach. Thus in *Ochsenbein v. Papelier* (1873) L.R. 8 Ch. App. 695,
700, Mellish L.J. said:

"It was always held that a foreign judgment could be impeached at    F
law as contrary to the principles of natural justice, as, for instance,
on the ground of the defendant having had no notice of the foreign
action, or not having been summoned, or of want of jurisdiction, or
that the judgment was fraudulently obtained."

In *Robinson v. Fenner* [1913] 3 K.B. 835, 842–843, Channell J. said:

"It is not enough, therefore, to say that the result works injustice in    G
the particular case, because a wrong decision always does. So far as
I can see, all the instances given of what is 'contrary to natural
justice' for the purpose of preventing a foreign judgment being sued
on here are instances of injustice in the mode of arriving at the
result, such as deciding against a man without hearing him or
without having given him any notice or the like."    H

In *Jacobson v. Frachon* (1927) 138 L.T. 386, 390, Lord Hanworth M.R.
referred to Channell J.'s judgment in *Robinson v. Fenner* [1913] 3 K.B.
835 and said:

1 Ch.                    Adams v. Cape Industries Plc. (Ch.D.)            Scott J.

A    ". . . I am inclined to agree with the view that he presents there,
     that the question of natural justice is almost, if not entirely,
     comprised in considering whether there has been an opportunity of
     having had a hearing, and whether the procedure of the court has
     been in accordance with the instincts of justice whereby both parties
     are to be given a full opportunity of being heard."

B    In my view, however, the references in the dicta to service of notice of
     the hearing and to an opportunity to be heard are references, by way of
     examples, to circumstances which will constitute a want of natural
     justice and are not to be taken as exhaustive.
          In *Schibsby v. Westenholz*, L.R. 6 Q.B. 155, 159, Blackburn J.
     referred to the obligation on a defendant to obey an order of a foreign
C    court of competent jurisdiction but went on to say that "anything which
     negatives that duty, or forms a legal excuse for not performing it, is a
     defence to the action."
          In *Pemberton v. Hughes* [1899] 1 Ch. 781, 790–791, Lindley M.R.
     said:

D    "If a judgment is pronounced by a foreign court over persons within
     its jurisdiction and in a matter with which it is competent to deal,
     English courts never investigate the propriety of the proceedings in
     the foreign court, unless they offend against English views of
     substantial justice. Where no substantial justice, according to English
     notions, is offended, all that English courts look to is the finality of
     the judgment and the jurisdiction of the court, in this sense and to
     this extent—namely, its competence to entertain the sort of case
E    which it did deal with, and its competence to require the defendant
     to appear before it. If the court has jurisdiction in this sense and to
     this extent, the courts of this country never inquire whether the
     jurisdiction has been properly or improperly exercised, provided
     always that no substantial injustice, according to English notions,
     has been committed."

F    That passage expresses, in my judgment, the fundamental criterion for
     the success of a natural justice objection to the enforcement of a foreign
     judgment. The proceedings in the foreign court must "offend against
     English views of substantial justice."
          Atkin L.J. in *Jacobson v. Frachon*, 138 L.T. 386 referred to
     *Pemberton v. Hughes* [1899] 1 Ch. 781 and to Lindley M.R.'s judgment
G    and continued, at p. 392:

     "By that it is quite plain from the context that Lindley M.R. is
     dealing with proceedings offending against English views of
     substantial justice. He is not dealing with the merits of the case or
     the actual decision, because he goes on to say in the same case, at
     p. 792, 'A judgment of a foreign court having jurisdiction over the
     parties and subject matter—i.e., having jurisdiction to summon the
H    defendants before it and to decide such matters as it has decided—
     cannot be impeached in this country on its merits.' It is plain that
     the Master of the Rolls is dealing only with the proceeding, because
     it is obvious if a court gives judgment on the merits for the plaintiff,

498

Scott J.                    Adams v. Cape Industries Plc. (Ch.D.)                [1990]

when it is plain it ought to have given judgment for the defendant,        A
or vice versa, that is a judgment which offends against the English
views of substantial justice. Nevertheless as the Master of the Rolls
says, it cannot be impeached upon that ground, but it can be
impeached if the proceedings, the method by which the court comes
to a final decision, are contrary to English views of substantial
justice. The Master of the Rolls seems to prefer, and I can quite
understand the use of the expression, 'contrary to the principles of      B
natural justice;' the principles it is not always easy to define or to
invite everybody to agree about, whereas with our own principles of
justice we are familiar. Those principles seem to me to involve this,
first of all that the court being a court of competent jurisdiction, has
given notice to the litigant that they are about to proceed to
determine the rights between him and the other litigant; the other is     C
that having given him that notice, it does afford him an opportunity
of substantially presenting his case before the court.

   "Both those considerations appear to be essential if they are to
be in accordance with natural justice. I think the expression of
opinion of the late Professor Dicey in his great book on the *Conflict
of Laws*, dealing with this subject matter is a little narrowly
expressed. He says in rule 107 (4th ed., p. 444): 'A foreign judgment     D
may sometimes be invalid on account of the proceedings in which
the judgment was obtained being opposed to natural justice.' Then
he says that is owing to want of due notice. 'But, in such a case, the
court is generally not a court of competent jurisdiction.' It may be
that the court is generally not a court of competent jurisdiction, but
that seems to me by no means the whole of the rule. A court of
competent jurisdiction, as I have said, may very well, either in          E
accordance with its rules or in violence of them, refuse a substantial
hearing to the party, and, if so, it appears to me that the judgment
would be invalidated on the ground that it was contrary to natural
justice for the reasons I have already to give. That gives quite free
play for a variation between different countries and different
jurisprudences of the method in which they shall hear the parties         F
and the nature of the evidence to be given in the court. The case
here depends upon whether or not the procedure of this foreign
court did offend against our principles of substantial justice."

Despite Atkin L.J.'s particular reference to notice of the hearing being
given to the litigant and to an opportunity for the litigant to present his
case, he was not, in my view, purporting to limit natural justice
objections to objections based on the absence of one or other of those    G
features. He was limiting natural justice objections to objections based
upon the procedure that had been adopted, but that, in my opinion, is
the only limitation that can be spelled out of the judgment. The criterion
expressed by Atkin L.J. in the last sentence of the passage I have cited,
namely, whether "the procedure of this foreign court did offend against
our principles of substantial justice," is a broad one.                   H

   In my judgment, therefore, I must consider the procedure which led
to the 12 September 1983 default judgment and ask myself whether or
not it offends against English principles of substantial justice.

A      I must start with the important circumstance that Cape and Capasco were in default and were thereby taken to have admitted the pleaded allegations made against them save in relation to damage. They had forfeited any entitlement to a hearing save on the issue of damages. There is no injustice in that. Second, Cape and Capasco were given notice of the plaintiffs' application for a default judgment. They were given notice that the application would be heard on 12 September 1983.

B  Venue was not specified, but I do not think that omission can be regarded as material.

      It is important, however, to notice the nature of the relief which the plaintiffs were proposing to seek. Their application, according to the document served on Cape and Capasco, was to

C     "move the court to enter default judgment in favour of plaintiffs . . . and against defendants . . . and further, to hold hearing to determine the amount of relief entitled to plaintiffs."

This was notice to Cape and Capasco of a judicial hearing at which a judicial assessment of damages would take place.

      The effect of the notice given to Cape and Capasco cannot be divorced from the content of the federal rules regarding default

D  judgments. Under the federal rules, as under our own rules, a judicial assessment of damages where a defendant is in default is only necessary if the claim is for an unliquidated sum: see federal rule 55(*b*). If the claim is "for a sum certain or for a sum which can by computation be made certain," the court clerk is required "upon request of the plaintiff and upon affidavit of the amount due [to] enter judgment for that

E  amount . . . against the defendant." A default judgment on a claim for a liquidated sum can, therefore, be obtained without any judicial hearing or any judicial assessment of the amount of the claim. There is no injustice in that.

      The point can be taken further. It would be possible for procedural rules to provide, in the case of an unliquidated claim and a defendant in default, that the plaintiff be entitled, upon giving to the defendant a

F  written estimate of the recoverable damages, to enter judgment for the amount of the estimate, unless within some specified time the defendant gave notice of intention to dispute the amount. In that way an unliquidated claim could lead to a judgment against a defendant in default without any judicial hearing and without any judicial assessment of the damages. The case is hypothetical, but I do not think that a judgment so obtained could be described as offending against English

G  principles of substantial justice. The defendant would have received notice of the amount of the claim and would have been able to have disputed the quantum of damages and to have put the plaintiff to proof thereof if so advised.

      I conclude that neither the absence of a judicial hearing nor the absence of a judicial assessment of damages is per se a procedural

H  feature that is objectionable. The context is all-important.

      In the present case, the context is provided by the federal rules. The federal rules make provision, in actions for unliquidated damages where the defendant is in default, for a judicial process in the course of which

500

Scott J.          Adams v. Cape Industries Plc. (Ch.D.)          [1990]

evidence will be adduced and which will lead to due judicial consideration
by the judge, in the light of the pleadings and of the evidence, of the
amount of damages to which the plaintiff is entitled. A defendant in
default in an action for unliquidated damages is entitled to expect that
his liability to the plaintiff will be assessed by the judge in the light of
evidence which the judge has considered and which, in the judge's
opinion, justifies the award that is made.

The requirements of substantial justice in a particular case cannot, in
my judgment, be divorced from the legitimate expectation of both the
plaintiff and the defendant in the context of the procedural rules
applicable to the case.

Moving from the general to the particular, the defendants in the
present case, Cape and Capasco, were, in my view, entitled to expect
that their liability to the plaintiffs would be assessed by Judge Steger at
the hearing of which they had been given notice, in accordance with
evidence laid before and considered by the judge and in accordance with
the judge's assessment in the light of that evidence of the respective
plaintiffs' entitlements in damages. That is not what happened. There
was no consideration given by the judge to the medical material relating
to the individual plaintiffs and to the individual plaintiffs' entitlements in
the light of that medical material. If there had been, the judge would
not simply have said that he would award an average of $75,000 per
plaintiff. Damages calculated on an average-per-plaintiff basis may make
very good sense for the purposes of a settlement. The defendants who
pay are not concerned as to how the total sum is divided up among the
individual plaintiffs. But a judicial award so calculated is the antithesis
of an award based upon the individual entitlements of the respective
plaintiffs. Judge Steger's approach demonstrated, in my opinion, that he
was not considering the individual cases and how much the respective
individuals were entitled to recover against Cape and Capasco. The
judge purported to award sums for pain and suffering, for medical
expenses, for disability. But the judge's approach via an average sum
per plaintiff demonstrated that he was not giving any consideration to
these heads of damage in respect of plaintiffs individually.

Nor did Judge Steger have any material before him from which a
judicial estimate of pain and suffering or of medical expenses could have
been made. Nor did he, as opposed to counsel, determine the levels of
the four categories of damages or select the plaintiffs to be placed in
each of these categories. There was, in short, in my opinion, no judicial
assessment of damages.

In my judgment, the procedure adopted by Judge Steger offended
against English principles of substantial justice. The defendants were
entitled to a judicial assessment of their liability. They did not have one.
The award of damages was arbitrary in amount, not based on evidence
and not related to the individual entitlements of the plaintiffs. Many of
the features of the procedure to which I have drawn attention might,
taken singly, have been insufficient to meet the yardstick of substantial
injustice. Taken together, the criterion is, in my judgment, satisfied.

Mr. Falconer submitted that the procedural defects to which I have
drawn attention could have been the basis for an attack on the judgment

A   in the federal courts, whether by way of collateral action to have the judgment set aside or by way of appeal. This may well be right, although by now I suspect that such an attack or appeal would be time-barred. Mr. Falconer then submitted that where the foreign courts themselves provide a procedural remedy, the English courts should not entertain the objection. He referred me to *Cheshire and North's Private International Law*, 11th ed. (1987), p. 378, where it is stated that "the

B   defence will not succeed if the alleged unfairness consisted of something that might have been combatted and removed in the foreign action." *Jacobson v. Frachon*, 138 L.T. 386, is referred to in support of that proposition. But that case turned on the question whether the course of proceedings in the foreign court whereby the judgment was obtained offended English notions of substantial justice. It was held it did not.

C   The question whether, if the proceedings had offended, the defect would have been cured by the availability of an appeal procedure did not arise. As a matter of principle, in my opinion, Mr. Falconer's submission is unacceptable. If the procedure adopted by a foreign court offends English notions of substantial justice, whether or not the procedure be in accordance with the procedural rules of the foreign court, I cannot see any good reason why the resulting judgment should

D   be enforceable in England. It does not, in my view, create any obligation of obedience binding on the defendant that an English court should be required to recognise. So it is, in my judgment, with the default judgment of 12 September 1983. I do not accept that English law recognises any obligation on Cape or Capasco of obedience to a judgment so obtained, and I decline to enforce it.

E   It was argued, in addition, by Mr. Playford that the default judgment for $15,654,000 was exorbitant in amount, that the sums awarded to the individual plaintiffs were in a like state and that the default judgment should on that account, too, be rejected as offending against English notions of substantial justice. Mr. Playford reminded me of Dr. Bidstrup's evidence that had sought to establish that many of the plaintiffs were, judged by the medical records, suffering from no lung

F   injuries at all. Mr. Falconer justifiably pointed out that a defence on the merits is not a ground for declining to enforce a foreign judgment and that a complaint based on the allegedly excessive amount of the award was an attempt to re-open the merits. Mr. Playford's point about the amount of the award is not, in my view, a separate ground of complaint but is part and parcel of the complaint that there was no judicial

G   assessment.

   Judge Steger did not, in the present case, review the medical material relating to each individual plaintiff and then assess the damages to which that plaintiff was entitled. If he had done so and if he had awarded the same amounts as are contained in appendix A to the default judgment, Mr. Playford's complaint would, I agree, have represented an attempt to re-open the merits. I would then have had to decide whether there could

H   ever come a point at which an English court would feel so outraged by the excessive amount of a damages award that a refusal to enforce the award would be justified and, if so, whether that point had been reached in the present case. On the facts of the present case, however, I

502

Scott J.            Adams v. Cape Industries Plc. (Ch.D.)            [1990]

A   do not, in my view, have to answer those questions. The damages awarded to the individual plaintiffs were not assessed by reference to their respective individual circumstances. So the question whether by reference to those circumstances the damages awarded were outrageously excessive does not arise.

B   Nonetheless, Mr. Playford was, in my opinion, able to demonstrate, in relation to a number of plaintiffs and their respective medical records, inconsistencies in the levels of damages awarded to them. There were some in respect of whom it was difficult to accept that any real injury had been suffered at all. These examples served, in my view, to confirm that no consideration had been given to the individual deserts of the plaintiffs, to underline, in short, the arbitrariness of the awards, rather than to establish that the awards were exorbitant.

C   (vii) There are a few other minor matters that I should deal with. (1) The damages awarded to the plaintiffs in the action to which Capasco was not a party are not enforceable against Capasco. That is accepted. (2) There are some plaintiffs who were intervenors in one or other of the Tyler 2 actions but notice of whose intervention was never served on Cape or Capasco. Prima facie this failure represents a procedural defect of substance. Why should the default judgment in favour of these plaintiffs be enforced? Cape and Capasco were not in default and had

D   no opportunity to file an answer to the pleadings. Mr. Falconer's answer was that since Cape and Capasco had for tactical reasons decided to take no part in the Tyler 2 actions, the failure to give notice of the interventions did not prejudice them. They would, in any event, have taken no steps to defend the claim. I accept Mr. Falconer's premise but not his conclusion. I agree that it is as certain as anything can be certain

E   that, if served with notice of the interventions, Cape and Capasco would have done nothing. Nonetheless, notice to the defendants of the claims was, in my view, an essential preliminary to recognition of the default judgments. Substantial justice requires at least, and in all cases, that notice of the claims be given to the defendants. If that is not done, I do not think the resultant judgment is enforceable in this country.

F   Accordingly, I would, on this ground also, have dismissed the actions of those plaintiffs in respect of whom notice of intervention was not served on the defendants. (3) Finally, it is accepted by Mr. Morison that, if, contrary to my view, the default judgment is enforceable in England, the defendants are entitled to set off against their liability thereunder the sums recovered by the plaintiffs in the 1983 settlement. Otherwise

G   there would be double recovery. This point does not affect the Unarco plaintiffs.

I must conclude by expressing my indebtedness to counsel for their very great assistance in a case that has been for me of unprecedented interest both on the law and the facts and my regret that this final part of my judgment has been delayed.

H

*Action dismissed.*
*Plaintiffs to pay four-fifths*
*of defendants' costs.*

503

1 Ch.                  Adams v. Cape Industries Plc. (Ch.D.)              Scott J.

A       *Solicitors: Herbert Oppenheimer Nathan & Vandyk; Davies Arnold & Cooper.*

        APPEAL from Scott J.
        The plaintiffs appealed on the grounds, which were amended at the
        hearing, inter alia, that (1) the judge misdirected himself in law in
B       holding (a) that the defendants were not present in the United States of
        America at the relevant dates and (b) that it would be contrary to
        natural justice for the judgment of the United States Federal Court of
        the Tyler District, Texas, dated 12 September 1983 to be enforced in
        this country; (2) at the trial, the plaintiffs contended that the defendants
        were present at 150, North Wacker Drive, Chicago, Illinois, from where
        asbestos mined in South Africa by the Cape group was marketed
C       throughout the United States of America and that the defendants were
        present there (a) by their wholly owned subsidiary, North American
        Asbestos Corporation ("N.A.A.C."), (b) by a company called Continental
        Productions Corporation ("C.P.C."), which was set up to replace
        N.A.A.C. in such a way as to disguise the defendants' continued
        involvement in the marketing of the group's asbestos in the United
D       States of America; (3) the judge failed to apply the correct test to
        determine whether the presence of a third party might constitute the
        presence of the defendant and instead he asked himself the fundamental
        question whether the United States court was entitled, on territorial
        grounds, to take jurisdiction over Cape; (4) the judge erred in law in
        rejecting the approach of the European Court to the question of
        jurisdiction where a parent outside the market set up a subsidiary within
E       it; (5) the judge misdirected himself as to the burden of proof in holding
        that the plaintiffs had the burden of proving that Cape were present in
        the United States, whereas the burden was on the defendants to prove
        that the judgment of the federal court was not enforceable; (6) on the
        facts as found, in particular with regard to N.A.A.C. the judge ought to
        have held that the defendants were present through it, which was
F       carrying on the group's business and not, in any real sense, its own
        business; (7) as to C.P.C. the judge wrongly concluded that it was an
        independently owned company and even if that conclusion were correct,
        C.P.C. was Cape's presence in the United States of America and the
        judge was wrong to conclude that C.P.C. and N.A.A.C. were carrying
        on their own business rather than the business of Cape; (8) the judge
        erred in law in his approach to the question whether it would be
G       contrary to natural justice to enforce the judgment and having stated
        that "the fundamental criterion for the success of natural justice
        objection" was whether the proceedings offended "against English views
        of substantial justice," he wrongly concluded that that criterion permitted
        him to investigate and make findings in relation to (a) the procedural
        rules relevant to the entering of the judgment and (b) the circumstances
        in which the judgment was entered and then he applied that criterion,
H       without qualification or limit, to the facts. The correct approach was to
        treat the boundaries of natural justice as a defence to the enforcement
        of a foreign judgment as confined to an examination of whether the
        defendant had had notice of the hearing or of the intention to enter

504

Adams v. Cape Industries Plc. (C.A.)                    [1990]

judgment and a fair opportunity of presenting his case: *Jacobson v.* A
*Frachon* (1928) 138 L.T. 386, 392, *per* Atkin L.J. If the judge had
applied the correct test he would have been bound to conclude that the
natural justice defence failed and that a large part of the evidence on
behalf of the defendants was irrelevant on that issue. Any defects in the
manner in which the judgment was obtained or given were capable of
being corrected on appeal or by application to the federal judge at the
first instance.                                                          B

By a respondent's notice under R.S.C., Ord. 59, r. 6(1)(*b*) the
defendants gave notice of their intention of contending that the judgment
should be affirmed on additional grounds, inter alia, that the judge
misdirected himself in law in holding that if, contrary to his primary
findings, the defendants were resident or present in Illinois, then such
residence or presence was sufficient to give the Federal District Court
for the Eastern District of Texas, Tyler Division ("the Tyler court")     C
jurisdiction over the defendants recognisable according to English law.
The question which had to be decided was whether at the time each suit
was commenced the defendants were resident or present in the "country"
of the Tyler court. The judge misdirected himself in holding (a) that the
question had to be answered by investigating the source of the authority
of the court, (b) that a resident of Illinois was, according to English     D
private international law, subject by reason of that residence to the
jurisdiction of the Tyler court and (c) that a resident anywhere in the
United States was, according to English private international law, within
the jurisdiction of the Tyler court and that the United States was one
"country" or "law district." The Tyler court did not claim jurisdiction on
the grounds of the defendants' residence in Illinois. No American court     E
would regard a federal court sitting in one state as having jurisdiction
over a defendant resident in another state on the ground that that
defendant was resident within the United States. According to the
judge's decision, English rules of private international law would regard
as subject to the jurisdiction of the Tyler court many residents of the
United States whom no American court would hold to be so subject.
                                                                         F

*T. R. A. Morison Q.C.* and *Charles Falconer* for the plaintiffs.
*Sir Godfray Le Quesne Q.C., Jonathan Playford Q.C.* and *Adrian
Brunner* for the defendants.

The main submissions of counsel are dealt with in the judgment: see
post, pp. 514E–F, 518E–H, 519E–F, 528A–D, F—529C, 530B–C, 532B–E, F–G,
535D–F, 536C–H, 537E—538B, G—539C, 540G—541D, 544D—545A, 549F—    G
550C, 555B, F—557G, 561G—562D, 565D–H, 566D–E, 567E–F, 568H—569B,
570D.

*Cur. adv. vult.*

27 July 1989.  The following judgment of the court was handed  H
down.

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A     SLADE L.J.

I *Introduction*

This is the judgment of the court, to which all its members have contributed, on an appeal by the plaintiffs in 205 consolidated actions. On 27 July 1988, Scott J. dismissed all their claims. The trial in the court below lasted some 35 days and the argument before this court

B   extended over some 17 days. The case raises important points of law and some substantial issues of fact.

Having reserved judgment at the end of the argument on 3 May 1989, we subsequently came to the firm conclusion that the appeal must be dismissed and that in the particular circumstances of this case it was right that the parties should be informed of our decision at once, rather than having to wait for some more weeks before we were in a position

C   to give the reasons for our decision. On 24 May we accordingly announced that the appeal would be dismissed and that we would give the reasons for our decision in writing at a later date, at which date the order dismissing the appeal would be drawn up. This we now do.

The plaintiffs in these proceedings are persons, or the personal representatives of persons, in whose favour awards of damages were

D   made by the judgment, dated 12 September 1983, of Judge Steger, a United States Federal District Court judge, in the District Court for the Eastern District of Texas, United States of America ("the Tyler court"). The judgment was a default judgment against Cape Industries Plc. ("Cape") and Capasco Ltd. ("Capasco"), companies registered in England and the sole defendants in all the actions before this court. They had taken no part in the proceedings in which the judgment was

E   made. The judgment was for the specific sums payable to individual plaintiffs set out in an appendix to the judgment: $37,000 each for 67 plaintiffs; $60,000 each for 31 plaintiffs; $85,000 each for 47 plaintiffs and $12,000 each for 61 plaintiffs. The total of the individual awards was $15.654m. and the awards were directed to bear interest at 9 per cent. from judgment until payment.

F     The awards were made in respect of claims for damages for personal injuries and consequential loss allegedly suffered by each plaintiff as a result of exposure to asbestos fibres emitted from the premises of a primary asbestos insulation factory in Owentown, Smith County, Texas, which was operated from 1954 to 1962 by Unarco Industries Inc. ("Unarco") and from 1962 to 1972 by Pittsburgh Corning Corporation ("P.C.C."). The basis of liability of Cape and Capasco was alleged to be negligent acts and omissions

G   and breaches of implied and express warranties.

The relationship of Cape and Capasco to the emission of asbestos fibres fibres from the Owentown factory was, in summary, that Cape owned the shares in subsidiary companies in South Africa which had mined the asbestos and in its subsidiary Capasco. Capasco was concerned in organising the sale of asbestos, mined in South Africa, throughout the world to those who wished to use it in various industrial processes.

H   Between 1953 and 1978 when it was dissolved, another subsidiary of Cape, North American Asbestos Corporation ("N.A.A.C.") assisted in the marketing of asbestos of the Cape group in the United States of America. The plaintiffs' contention was that the defendants had been

506

responsible for the supply of asbestos fibres directly or indirectly to    A
Unarco and P.C.C. without giving proper warning of the dangers
thereof.

*Summary of the proceedings in the Tyler court*

Different sets of proceedings with reference to claims arising from
the processing of asbestos in the Owentown factory had extended over    B
many years. An account of what took place is unnecessary for a proper
understanding of the course of the present proceedings. The first action
was commenced in the Tyler court in January 1974 and was framed as a
"class" action in which the plaintiffs sued "on behalf of themselves and
all others similarly situated." A second action was commenced in the
same month. They were assigned to Judge Steger. Cape was one of the    C
defendants. Capasco was added as a defendant in 1976. Egnep
(Proprietary) Ltd. ("Egnep"), a wholly owned South African subsidiary
of Cape, engaged in mining asbestos, was also a defendant. All filed
motions to quash service on the ground of lack of jurisdiction.

By July 1974 it was apparent that hundreds of claimants, alleging
injury caused by the amosite asbestos used in the Owentown plant, were
intending to pursue claims. Judge Steger in December 1974 ruled that    D
the actions should not proceed as class actions; that they should be
conducted under the federal "Rules for Complex and MultiDistrict
Litigation;" and that intervention in the proceedings should be allowed
freely for those claimants who wished to join. In consequence a large
number of claimants were added. In December 1974 a third action with
reference to asbestos from the Owentown plant was commenced in the
Tyler court in which the only defendant was the United Sates of    E
America. All these proceedings together have been known as the Tyler 1
proceedings. They were separate and distinct from the proceedings in
which the plaintiffs, now before this court, obtained their judgment in
September 1983.

The motions by Cape, Capasco and Egnep to dismiss the Tyler 1
proceedings as against them on the ground of lack of jurisdiction were    F
dismissed by Judge Steger in August 1977. That dismissal was not final
and it was open to the Cape companies to take the jurisdicion point at
the trial of the action. They filed answers in which they pleaded to the
merits of the claim while maintaining their objection to jurisdiction.

The number of claimants in the Tyler 1 proceedings had by mid 1977
risen to more than 400 and was still increasing. Trial was set for 12
September 1977. The purpose of Judge Steger in fixing that date    G
included that of causing the parties to consider settlement. On 12
September 1977 settlement discussions proceeded in which Judge Steger
took part in a manner which would be unusual, if not impossible, in this
country but which was effective and normal under the United States
system of civil justice. By 28 September 1977 a settlement figure of
$20m. was agreed for all the claimants who then numbered 462. Upon    H
agreement of the settlement figure it was ordered that as from 28
September 1977 no further intervention in any of the Tyler 1 actions
would be permitted.

A         The sum of $20m. was provided by the defendants in agreed proportions: £5.2m. by N.A.A.C., Cape and Egnep; $1m. by Unarco (who had operated the Owentown plant from 1954 to 1962); $8.05m. by P.C.C. (who had operated the plant from 1962 to 1972) and its shareholders; and $5.75m. by the United States Government. The settlement was recorded and approved in a final judgment in the Tyler 1 actions dated 5 May 1978. The reference to shareholders in P.C.C. is to

B   Pittsburgh P.G. Industries Inc. ("P.P.G.") and to Corning Glassworks Inc. who had been joined as defendants on the basis that each had taken such part in the management decisions regarding the use of asbestos as to be liable for injuries arising from that use.

        Upon prohibition by the order of Judge Steger of further interventions in the Tyler 1 proceedings, new actions were commenced by claimants in what have been called the Tyler 2 proceedings. There were eight

C   separate actions. They were assigned to Judge Steger. The first was commenced on 19 April 1978 and the last on 19 November 1979. There followed intervention by a very large number of claimants. Cape, Egnep and N.A.A.C. were defendants in all the actions. Capasco was a defendant in three only. P.C.C., P.P.G., Corning Glassworks Inc. and O.C.A.W., a trade union to which some claimants had belonged, were

D   also defendants in all actions. The United States Government was a defendant in some actions and third party defendant in others.

        In December 1981 Judge Steger gave directions by which each claimant was required to provide specified information with reference to his claim "on personal knowledge and attested to under penalty of perjury." As a result of those directions, and of the response, or lack of response, thereto, a large number of claimants had their claims summarily

E   dismissed "without prejudice." The number of plaintiffs left in the Tyler 2 actions was about 206. It is to be assumed that each of those remaining claimants had responded to the order of December 1981 by alleging some physical condition that was capable of having been caused by exposure to asbestos dust and of constituting an injury.

        Cape, Capasco and Egnep took the decision to play no part in any of the Tyler 2 actions. They had initially regarded the Tyler 1 actions as

F   having little more than nuisance value. They could not understand how tortious liability to the Owentown workers could be imposed upon the Cape companies merely on the ground that Cape subsidiary companies had mined the asbestos and sold it into the United States of America. They had had expectations of success on their jurisdiction objection. They had, however, succumbed to the pressure for settlement. They

G   were unwilling to be left as the only defendants in a large and expensive jury trial. Having joined in the settlement of the Tyler 1 actions they decided, since they had no assets in the United States of America, to take no part in the Tyler 2 proceedings; to allow default judgments to be obtained against them; and to defend any actions brought in this country for enforcement of any such judgment on the ground that, under the law of this country, the Tyler court had no jurisdiction over

H   Cape, Capasco or Egnep with reference to the claims of the claimants.

*The settlement against some defendants of the Tyler 2 proceedings*

        In circumstances which will be considered in more detail later in this judgment, the Tyler 2 proceedings were in February 1983 settled, as

508

against the effective defendants other than the Cape companies, for a       A
sum of $1.33m. The figure of $1.33m. was based upon an average award
of $10,000 for each of 133 plaintiffs represented in the settlement
negotiations. The sum of $1.33m. was to be provided as to $900,000 by
P.C.C., the firm which had operated the Owentown factory from 1962
to 1972, and by P.P.G., one of the corporations owning shares in
P.C.C.; $130,000 by Corning Glassworks Inc., the other corporation
holding shares in P.C.C.; $150,000 by O.C.A.W., and $250,000 by       B
N.A.A.C. Such was the considered value of the claims, as it emerged
from the settlement process between the judge and the parties, as
against the parties which included those alleged to have had some direct
concern in connection with the emission of asbestos particles at or from
the Owentown factory. On payment of those sums the settling defendants
were to be released from all claims by the 133 plaintiffs.

    That settlement was complicated by a "device" devised by Mr.       C
Bailey, who was the attorney negotiating the settlement on behalf of the
claimants and which was intended, it was said, to give the claimants the
chance of additional recovery against the United States. The form of this
device, and the part which it was alleged to have played in the
formulation of the terms of the default judgment against the Cape
companies, was important to the allegations of fraud put forward against       D
Mr. Bailey, which, as stated below, were rejected by Scott J. It is
necessary to describe what happened to render intelligible some of the
matters discussed later in this judgment. The device was described by
Scott J., ante, p. 452C–F:

    "The device was this: the settlement figure would be expressed in
    the intended settlement agreement not as $1.33m. but instead as       E
    $6.65m., an average of $50,000 per plaintiff. The defendants would
    be obliged to pay only $1.33m. The balance of $5.32m. ($40,000 per
    plaintiff) would be payable only if and to the extent that the
    defendants' third party claims against the United States succeeded.
    The prosecution of those claims in the names of the defendants was
    to be the responsibility of the plaintiffs' counsel, no cost in respect       F
    thereof falling on any of the defendants. The $6.65m. was a figure
    proposed by Mr. Bailey. It was not a figure which mattered at all to
    the defendants since their obligation to pay was limited to the
    $1.33m. They did not bargain about the amount. They simply
    agreed to Mr. Bailey's proposal which would cost them nothing.
    Mr. Bailey told me that the figure was based upon what he thought
    might be awarded against the United States at the suit of the       G
    settling defendants. How it could have been supposed that the
    liability of the United States under the third party claims could
    exceed the $1.33m. that the settling defendants, the third party
    claimants, had agreed to pay the plaintiffs, defeats me."

    On 2 February 1983 Judge Steger approved the settlement of the
Tyler 2 proceedings as against the settling defendants, and that approval       H
extended to the fairness and reasonableness of the settlement in the case
of any minor claimants. The trial date for the outstanding Tyler 2 claims
against the United States was fixed for 20 June 1983. Settlement was

A    discussed. An agreement of compromise dated 15 June 1983 was signed. The United States Government contributed nothing directly to the claimants but, in settlement of their claims against the United States, it was agreed that the United States would bear the costs of enforcement of default judgments against Cape, Capasco and Egnep in the United Kingdom or in South Africa. It is in performance of that promise that these proceedings have been pursued in this country.

B    The default judgment in the Tyler court, upon which the present proceedings in this country are based, was, as stated above, signed on 12 September 1983. The nature of the process in which that judgment came to be signed will be examined in detail later in this judgment when the issue of natural justice is considered.

C    *The consolidated actions in this country*

There is no statutory provision for the registration in this country of the judgments of the federal or state courts of the United States of America. The plaintiffs, therefore, took proceedings in this country seeking to recover the amount of their judgments from Cape and Capasco. The writ in the lead action of Mr. Jimmy Adams was issued on

D    1 August 1984 and claimed the amount of his separate award with interest. In law the claims of all the plaintiffs are based upon the principle of common law that, subject to certain qualifications, the judgment in personam of a foreign court of competent jurisdiction may be sued on in this country as creating a debt between the parties to it.

It would have been open to the plaintiffs in the first place to sue the defendants in this country rather than the United States of America,

E    provided that they could have shown that the acts complained of were actionable as a tort both under English law and the law of the place or places where they were committed: see *Boys v. Chaplin* [1971] A.C. 356. However, they chose to bring the proceedings in the United States of America and then to seek to enforce them in this country, where presumably the defendants are believed to have substantial assets.

F    *The issues at the trial before Scott J. and his decision*

The circumstances in which our courts will recognise a foreign court as competent to give a judgment in personam capable of enforcement in this country are stated thus in *Dicey & Morris, The Conflict of Laws,* 11th ed. (1987), vol. 1, pp. 436–437, rule 37:

G        "*First Case*—If the judgment debtor was, at the time the proceedings were instituted, resident (or, perhaps, present) in the foreign country.
        "*Second Case*—If the judgment debtor was plaintiff in, or counterclaimed, in the proceedings in the foreign court.
        "*Third Case*—If the judgment debtor, being a defendant in the foreign court, submitted to the jurisdiction of that court by

H        voluntarily appearing in the proceedings.
        "*Fourth Case*—If the judgment debtor, being a defendant in the original court, had before the commencement of the proceedings agreed, in respect of the subject matter of the proceedings, to

510

submit to the jurisdiction of that court or of the courts of that                A
country."

At the trial the plaintiffs relied on three separate grounds for
enforcement of the judgment of the Tyler court in England, namely:
(i) that the defendants had voluntarily appeared in the proceedings
in the Tyler court; (ii) that the defendants had, before the proceedings
commenced, agreed to submit to the jurisdiction of the Tyler court;     B
(iii) that the defendants were resident in the United States of America
at the time of the commencement of the plaintiffs' proceedings in the
Tyler court. (A fourth pleaded ground, referred to as "comity or
reciprocity," was not in the event relied on at the trial.)

Scott J. concluded that the Tyler court had been competent to give a
judgment against Cape and Capasco on none of the three grounds relied
on (*Dicey & Morris'* First, Third and Fourth Cases). The plaintiffs'     C
claim, therefore, failed for this reason, if no other.

However, the judge proceeded to consider certain additional points
raised by the defendants by way of defence. The first point arose in this
way. According to the case made for the plaintiffs, the presence (if any)
of Cape and Capasco was in the State of Illinois where Cape's subsidiary,
N.A.A.C. had its office in Chicago ground from 1953 to 1978 when it was     D
wound up; and where in the same building from 1978 onwards
Continental Products Corporation ("C.P.C."), also an Illinois corporation
but not a subsidiary of Cape, carried out similar marketing functions in
the United States of America for the sale of asbestos produced by
Cape's South African subsidiaries. The plaintiffs did not contend that
Cape or Capasco had been present in Texas. In these circumstances, the
defendants contended that under English law presence in Illinois did not     E
suffice to give the Tyler court (a federal district court sitting in Texas)
jurisdiction to hear a claim in tort against the defendants governed by
the law of Texas. This argument, which we will call "the country issue,"
Scott J. rejected. He said, ante, p. 491F, that if he had felt able to
conclude that Cape and Capasco were present in Illinois when the Tyler
2 actions were commenced, he would have held that to be a sufficient     F
basis in English law for the exercise by the Tyler court of jurisdiction
over them.

The defendants further contended that, even if any grounds of
jurisdiction in the Tyler court had existed, yet the judgment should not
be enforced because (i) the judgment had been obtained by the fraud of
Mr. Blake Bailey, the attorney who had represented some of the     G
plaintiffs before Judge Steger in the proceedings upon the making of the
default judgment and who had drafted the terms in which the default
judgment was finally expressed; and (ii) it would be contrary to the
standards of natural justice required by our law, and contrary to
the principles of public policy applied by our law, to enforce the
judgment having regard to the circumstances in which, and the
procedures by which, it came to be made. Scott J. considered these     H
issues again on the assumption that, contrary to his conclusion, the
plaintiffs had made out a ground for jurisdiction in the Tyler court over
Cape and Capasco. He acquitted Mr. Bailey of having had any intention

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A   to deceive and of having deceived anyone with reference to the terms and form of the judgment. The allegations that the judgment had been obtained by fraud accordingly failed. However, the defendants succeeded before Scott J. on the natural justice point. The judge found that the judgment was not such that it could be enforced in the courts of this country. The primary ground of that finding was that the procedure adopted in this particular case by the judge of the Tyler court offended
B   against the principles of substantial justice contained in our law.

      Scott J. gave his judgment in two parts, which together covered 150 pages of transcript. On 17 June 1988 he announced that the claims of all the plaintiffs would be dismissed and he gave his reasons for rejecting each of the three grounds upon which the plaintiffs had claimed that their judgment in the Tyler court should be enforced in this country. He
C   also stated in summary form his reasons for rejecting the allegations of fraud against Mr. Bailey and for upholding the contentions of Cape/Capasco on the natural justice issue. On 26 July 1988 he gave his full reasons with reference to the issues of fraud and natural justice. The plaintiffs have invited this court to take a different view on some parts of the facts in this case, and to apply principles of law which the judge considered to be inapplicable. Mr. Morison, however, began his
D   submissions by rightly acknowledging the great care expended in, and the great accuracy and clarity of, the judgment of the judge, to which we also pay tribute.


      *The issues on this appeal*

E       On this appeal the plaintiffs do not seek to challenge those parts of Scott J.'s judgment by which he rejected their submissions based on the alleged voluntary appearance by the defendants in the Tyler court proceedings or their alleged agreement to submit to the jurisdiction of that court. The defendants do not challenge his rejection of their allegation of fraud against Mr. Bailey. The plaintiffs do, however, seek
F   to challenge those parts of his judgment by which (a) he rejected their submissions based on the alleged residence or presence of Cape and Capasco in the United States of America ("the presence issue"); (b) he accepted the defendants' submissions based on natural justice ("the natural justice issue").

      As part of their answer to the plaintiffs' case on presence, the defendants have cross-appealed on what we have described as "the
G   country issue."

      To sum up, the three issues which have been argued on this appeal are (a) the presence issue; (b) the country issue; and (c) the natural justice issue. A decision on any one of these issues in favour of the defendants would strictly render a decision on the other two issues unnecessary. However, we think it right to deal fully with all three issues, not only out of deference to the excellent arguments which have
H   been presented to us on both sides, but also because these issues are important and we suppose that the case could proceed to a higher court. Furthermore, at least the first two of the three issues are closely connected with one another.

512

II *The presence issue*                    A

[Their Lordships referred to the depositions placed before Scott J. at the hearing, listed the facts found by the judge relevant to the presence issue, and continued:]

*The plaintiffs' challenge to Scott J.'s finding of facts relevant to the "presence" issue*                    B

The plaintiffs' challenge to the judgment of Scott J. on the "presence" issue is based not so much on the findings of primary fact which were made, but on his supposed failure to find all the material facts and to draw the correct inferences and conclusions which should have been drawn from such facts. In their amended notice of appeal (which we gave leave to amend at the hearing) the plaintiffs included a "Schedule    C of facts which ought to have been found." This schedule included 25 paragraphs. For convenience we will set out and deal with the issues of fact raised by this schedule in an appendix to this judgment, which in our view would not need to be reported.* We observe at this point that, having been taken through the evidence relating to such of these 25 paragraphs as are disputed, we think that the majority of them (though    D by no means all) are in broad terms borne out by the evidence. However, we do not think that those which are substantiated add very much to the strength of the plaintiffs' case on the presence issue or that they suffice to invalidate the ultimate conclusion of the judge on that issue.

On the basis of the findings of fact made by Scott J. and the further facts which they submit he ought to have found, the plaintiffs in their    E amended notice of appeal submit that he was wrong to conclude:

"(1) N.A.A.C.'s business was its own business and not the business of Cape or Capasco;

"(2) C.P.C. . . . was . . . an independently owned company and carried on its own business;

"(3) As from 31 January 1978 N.A.A.C. ceased to act on behalf of    F any of the Cape companies or to carry on any business on its own account save for the purpose of liquidating its assets;

"(4) Mr. Morgan was in executive control of N.A.A.C.'s conduct of its business."

Two important inferences of fact made by the judge (numbers (1) and (2)) and two important findings of primary fact (numbers (3) and    G (4)) are thus challenged on this appeal. We shall consider contention (4) in the section of this judgment dealing with the "single economic unit" argument and in the appendix. We shall consider the contention that C.P.C. was "not an independently owned company" in the section dealing with the "corporate veil argument." We shall consider contention (3) and the contentions that N.A.A.C.'s business was not "its own    H business" and that C.P.C.'s business was not "its own business" in the section dealing with what we will call the "agency" argument.

* *Reporter's Note:* The appendix has not been included in this report.

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A    *Some leading authorities relevant to the presence issue*

Provision has been made by statute for the enforcement in this
country of the judgments of the courts of Commonwealth and foreign
countries in a number of different circumstances: see in particular
section 9 of the Administration of Justice Act 1920; section 4 of the
Foreign Judgments (Reciprocal Enforcement) Act 1933 and the Civil
B    Jurisdiction and Judgments Act 1982. However, none of these statutory
provisions applies in the present case. We are concerned solely with the
common law: *Dicey & Morris*, vol. 1, p. 436, "First Case."

So far as appears from the many cases cited to us, neither this court
nor the House of Lords has ever been called on to consider the
principles which should guide an English court in deciding whether or
not a foreign court was competent to assume jurisdiction over a
C    corporation (as opposed to an individual) on a territorial basis; and we
have seen only two decisions of courts of first instance in which these
principles fell to be considered. We will begin by mentioning some of
the leading cases relating to judgments given against individuals.

Two points at least are clear. First, at common law in this country
foreign judgments are enforced, if at all, not through considerations of
comity but upon the basis of a principle explained thus by Parke B. in
D    *Williams v. Jones* (1845) 13 M. & W. 628, 633:

"where a court *of competent jurisdiction* has adjudicated a certain
sum to be due from one person to another, a legal obligation arises
to pay that sum, on which an action of debt to enforce the judgment
may be maintained. It is in this way that the judgments of foreign
and colonial courts are supported and enforced . . . " (Emphasis
E    added.)

Blackburn J. stated and followed the same principle in delivering the
judgment of himself and Mellor J. in *Godard v. Gray* (1870) L.R. 6
Q.B. 139, 147, and the judgment of the Court of Queen's Bench in
*Schibsby v. Westenholz* (1870) L.R. 6 Q.B. 155, 159. In the latter case
F    he said, at p. 159:

"It is unnecessary to repeat again what we have already said in
*Godard v. Gray*. We think that, for the reasons there given, the
true principle on which the judgments of foreign tribunals are
enforced in England is that stated by Parke B. in *Russell v. Smith*
(1842) 9 M. & W. 810, 819, and again repeated by him in *Williams
G    v. Jones*, 13 M. & W. 629, 633, that the judgment of a court of
competent jurisdiction over the defendant imposes a duty or
obligation on the defendant to pay the sum for which judgment is
given, which the courts in this country are bound to enforce; and
consequently that anything which negatives that duty, or forms a
legal excuse for not performing it, is a defence to the action."

H    Secondly, however, in deciding whether the foreign court was one of
competent jurisdiction, our courts will apply not the law of the foreign
court itself but our own rules of private international law. As
Lindley M.R. put it in *Pemberton v. Hughes* [1899] 1 Ch. 781, 791:

514

"There is no doubt that the courts of this country will not enforce A
the decisions of foreign courts which have no jurisdiction in the
sense above explained—i.e., over the subject matter or over the
persons brought before them . . . But the jurisdiction which alone
is important in these matters is the competence of the court in an
international sense—i.e., its territorial competence over the subject
matter and over the defendant. Its competence or jurisdiction in
any other sense is not regarded as material by the courts of this B
country."

Subsequent references in this section of this judgment to the
competence of a foreign court are intended as references to its
competence under our principles of private international law, which will
by no means necessarily coincide with the rules applied by the foreign
court itself as governing its own jurisdiction. As the decision in C
*Pemberton v. Hughes* [1899] 1 Ch. 781 shows, our courts are generally
not concerned with those rules.

Under the plaintiffs' case as pleaded, the obligation of the defendants
to obey the judgment of the Tyler court is said to arise because "the
defendants were resident in the United States of America at the time
the plaintiffs' proceedings were commenced in the Tyler court." The
jurisdiction of the Tyler court is thus said to be founded on territorial D
factors.

Nearly 120 years ago in *Schibsby v. Westenholz*, L.R. 6 Q.B. 155,
the "residence" of an individual in a foreign country at time of
commencement of suit was recognised by the Court of Queen's Bench as
conferring jurisdiction on the court of that country to give a judgment in
personam against him. In that case the court declined to enforce a
judgment of a French tribunal obtained in default of appearance against E
defendants who at the time when the suit was brought in France were
neither subjects of nor resident in France. On these facts the court
decided, at p. 163, "there existed nothing in the present case imposing
on the defendants any duty to obey the judgment of a French tribunal."
However, it regarded certain points as clear on principle, at p. 161:
F

"If the defendants had been at the time of the judgment subjects of
the country whose judgment is sought to be enforced against them,
we think that its laws would have bound them. Again, if the
defendants had been at the time when the suit was commenced
resident in the country, so as to have the benefit of its laws
protecting them, or, as it is sometimes expressed, owing temporary
allegiance to that country, we think that its laws would have bound G
them."

In *Rousillon v. Rousillon* (1880) 14 Ch. D. 351, Fry J., after referring
to *Schibsby v. Westenholz* and in enumerating the cases where the courts
of this country regard the judgment of a foreign court as imposing on
the defendant the duty to obey it, at p. 371, similarly referred to one
such case as being "where he was resident in the foreign country when H
the action began."

In *Emanuel v. Symon* [1908] 1 K.B. 302, this court had to consider
whether the fact of possessing property situate in Western Australia or

A the fact of entering into a contract of partnership in that country was sufficient to give a Western Australian court jurisdiction (in the private international law sense) over a British subject not resident in Western Australia at the start of the action, who had neither appeared to the process nor expressly agreed to submit to the jurisdiction of that court. This question was answered in the negative. Buckley L.J. said, at p. 309:

B
"In actions in personam there are five cases in which the courts of this country will enforce a foreign judgment: (1) Where the defendant is a subject of the foreign country in which the judgment has been obtained; (2) where he was resident in the foreign country when the action began; (3) where the defendant in the character of plaintiff has selected the forum in which he is afterwards sued; (4) where he has voluntarily appeared; and (5) where he has contracted to submit himself to the forum in which the judgment was obtained. The question in the present case is whether there is yet another and a sixth case."

C

After referring to the principles established by, inter alia, *Godard v. Gray*, L.R. 6 Q.B. 139, and *Schibsby v. Westenholz*, L.R. 6 Q.B. 155, Buckley L.J. observed, at p. 310:

D
"In other words, the courts of this country enforce foreign judgments because those judgments impose a duty or obligation which is recognised in this country and leads to judgment here also."

E In agreement with the rest of the court, he considered that the factors relied on by the plaintiff mentioned above did not suffice to impose a duty on the defendant to obey the Western Australian judgment which should be recognised in this country.

We pause to observe that Buckley L.J.'s second, third, fourth and fifth cases mentioned in his statement broadly correspond with *Dicey & Morris'* respective four cases. It is doubtful whether the first case mentioned in his statement would still be held to give rise to jurisdiction: see *Dicey & Morris*, 11th ed., vol. 1, pp. 447–448, and the cases there cited. With this point we are not concerned.

F

Residence will much more often than not import physical presence. On the facts of the four cases last mentioned, any distinction between residence and presence would have been irrelevant. However, the brief statements of principle contained in the judgments left at least three questions unanswered. First, does the temporary presence of a defendant in a foreign country render the court of that country competent (in the private international law sense) to assume jurisdiction over him? Secondly, what is the relevant time for the purpose of ascertaining such competence? Thirdly, what is to be regarded as the "country" in the case of a political country, such as the United States of America comprising different states which have different rules of law and legal procedure?

G

H
We will have to revert to the third question in the section of this judgment dealing with the "country" issue; in the present section we will assume in favour of the plaintiffs that the United States of America,

516

*Adams v. Cape Industries Plc. (C.A.)*                                    [1990]

rather than the state of Texas, is to be regarded as the relevant country.    A
As to the first and second questions, we think that the most helpful
guidance is to be obtained from the decision of the Privy Council in
*Sirdar Gurdyal Singh v. Rajah of Faridkote* [1894] A.C. 670, the decision
of Lord Russell of Killowen in *Carrick v. Hancock* (1895) 12 T.L.R. 59
and the decision of the House of Lords in *Employers' Liability Assurance
Corporation Ltd. v. Sedgwick Collins & Co. Ltd.* [1927] A.C. 95.

   In the *Sirdar Gurdyal Singh* case the Privy Council on an appeal    B
from the Chief Court of the Punjab considered the question whether the
courts of British India ought to have enforced against the defendant two
judgments obtained against him ex parte in the native state of Faridkote,
which for this purpose fell to be regarded as foreign judgments. The
defendant had ceased to reside in the state before the actions were
brought, and though he had received notice of the proceedings, he had    C
never appeared in either of them or otherwise submitted to the
jurisdiction of the Faridkote court. The Privy Council held the judgments
to be a nullity under international law. Lord Selborne, delivering their
opinion, said, at pp. 683–684:

   "Under these circumstances there was, in their Lordships' opinion,
   nothing to take this case out of the general rule, that the plaintiff    D
   must sue in the court to which the defendant is subject at the time
   of suit ('Actor sequitur forum rei'); which is rightly stated by Sir
   Robert Phillimore (*International Law*, vol. 4, section 891) to 'lie at
   the root of all international, and of most domestic, jurisprudence on
   this matter.' All jurisdiction is properly territorial, and 'extra
   territorium jus dicenti, impune non paretur.' Territorial jurisdiction
   attaches (with special exceptions) upon all persons either permanently    E
   or temporarily resident within the territory while they are within it;
   but it does not follow them after they have withdrawn from it, and
   when they are living in another independent country. . . . no
   territorial legislation can give jurisdiction which any foreign court
   ought to recognise against foreigners, who owe no allegiance or
   obedience to the power which so legislates. In a personal action, to    F
   which none of these causes of jurisdiction apply, a decree
   pronounced in absentem by a foreign court, to the jurisdiction of
   which the defendant has not in any way submitted himself, is by
   international law an absolute nullity."

The Privy Council held, at p. 684, that the mere fact that the cause of
action had arisen in one country did not operate to confer jurisdiction    G
on the courts of that country over a defendant not otherwise subject to
it.

   In *Carrick v. Hancock*, 12 T.L.R. 59, the principle of territorial
dominion was again referred to. In that case an action was brought upon
a monetary judgment obtained in Sweden by an Englishman domiciled
in Sweden against a defendant who resided and carried on business at
Newcastle. The writ was served on the defendant during a short visit he    H
was paying to Sweden and he duly appeared to answer it. Though he
did not himself remain in Sweden, he was represented throughout the
subsequent proceedings. He put in a defence and counterclaim and on

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A  three separate occasions appealed to the Court of Appeal at Gota. It
may be that in those circumstances, notwithstanding his protestations
that he had "only appeared under pressure, duress and compulsion of
law," the English court could properly have enforced the foreign
judgment on the ground that the defendant had submitted to the
jurisdiction of the Swedish court. However, Lord Russell of Killowen
did not decide the case in favour of the plaintiff on that ground. After
B  reviewing the facts and arguments, he is reported as saying, at p. 60:

> "that the jurisdiction of a court was based upon the principle of
> territorial dominion, and that all persons within any territorial
> dominion owe their allegiance to its sovereign power and obedience
> to all its laws and to the lawful jurisdiction of its courts. In his
> opinion that duty of allegiance was correlative to the protection
C  > given by a state to any person within its territory. This relationship
> and its inherent rights depended upon the fact of the person being
> within its territory. It seemed to him that the question of the time
> the person was actually in the territory was wholly immaterial. This
> being so it was quite clear that under the facts of this case it was
> properly and lawfully initiated, and all its subsequent proceedings
D  > were lawful and valid, and that the Swedish courts had ample
> jurisdiction to enforce the plaintiff's claim against the defendant."

In the *Employers' Liability* case, Lord Parmoor said [1927] A.C. 95,
114–115:

> "My Lords, in the case of actions in personam, in which a writ has
> been regularly served on foreigners or foreign corporations, when
E  > present in this country, and a judgment has been obtained, it seems
> to be clear, as a general rule, that, under the obligations of that
> branch of international law, which governs the application of foreign
> judgments, other countries, whose governments have been recognised
> de jure and de facto by the government of this country, will accept
> the jurisdiction of the courts of this country, and regard their
> judgments as valid. In the case of such actions, it may also be stated
F  > negatively that, where a writ cannot be served on a defendant
> foreigner, or foreign corporation, when in this country, and no
> submission to jurisdiction is proved, any consequent judgment has
> no validity in any other country, on the ground that the courts of
> this country have no jurisdiction under international law over the
> person of an absent foreign defendant. In other words, the right to
> serve a writ, in an action in personam, on a foreign defendant, only
G  > becomes effective, as a source of jurisdiction, to be recognised in
> other countries when, at the date of service, such defendant is
> within the territorial jurisdiction of the English courts."

Lord Parmoor was in terms referring to the recognition by foreign
countries of judgments given by our courts, but he was speaking
generally in terms of private international law and would presumably
H  have regarded the same principles as applicable (mutatis mutandis) in a
case where our courts were asked to enforce a foreign judgment.

From the three last mentioned authorities read together, the following
principles can, in our judgment, be extracted. First, in determining the

518

jurisdiction of the foreign court in such cases, our court is directing its
mind to the competence or otherwise of the foreign court "to summon
the defendant before it and to decide such matters as it has decided:"
see *Pemberton v. Hughes* [1899] 1 Ch. 781, 790, *per* Lindley M.R.
Secondly, in the absence of any form of submission to the foreign court,
such competence depends on the physical presence of the defendant in
the country concerned at the time of suit. (We leave open the question
whether residence without presence will suffice.) From the last sentence
of the dictum of Lord Parmoor cited above, and from a dictum of
Collins M.R. in *Dunlop Pneumatic Tyre Co. Ltd. v. Actien-gesellschaft
für Motor und Motorfahrzeugbau vorm. Cudell & Co.* [1902] 1 K.B.
342, 346, it would appear that the date of service of process rather than
the date of issue of proceedings is to be treated as "the time of suit" for
these purposes. But nothing turns on this point in the present case and
we express no final view on it. Thirdly, we accept the submission of Sir
Godfray Le Quesne (not accepted by Mr. Morison) that the temporary
presence of a defendant in the foreign country will suffice provided at
least that it is voluntary (i.e. not induced by compulsion, fraud or
duress). Some further support for this submission is to be found in dicta
of Parke B. in *General Steam Navigation Co. v. Guillou* (1843) 11 M. &
W. 877.

The decision in *Carrick v. Hancock,* 12 T.L.R. 59, has been the
subject of criticism in *Cheshire & North's Private International Law,*
11th ed. (1987), p. 342, and in *Dicey & Morris,* 11th ed., vol. 1, where
it is said, at pp. 439–440:

"It may be doubted, however, whether casual presence, as distinct
from residence, is a desirable basis of jurisdiction if the parties are
strangers and the cause of action arose outside the country
concerned. For the court is not likely to be the forum conveniens,
in the sense of the appropriate court most adequately equipped to
deal with the facts or the law. Moreover, the English case referred
to above is open to the comment that the jurisdiction of the foreign
court might just as well have been based on the defendant's
submission as on his presence."

Our own courts regard the temporary presence of a foreigner in England
at the time of service of process as justifying the assumption of
jurisdiction over him: see *Colt Industries Inc. v. Sarlie* [1966] 1 W.L.R.
440 and *H.R.H. Maharanee Seethadevi Gaekwar of Baroda v. Wildenstein*
[1972] 2 Q.B. 283. However, *Cheshire & North,* 11th ed., comment, at
p. 342:

"any analogy based on the jurisdiction of the English courts is not
particularly convincing, since the rules on jurisdiction are operated
in conjunction with a discretion to stay the proceedings, and the
exercise of the discretion is likely to be an issue when jurisdiction is
founded on mere presence."

We see the force of these points. They highlight the possible
desirability of a further extension of reciprocal arrangements for the
enforcement (or non-enforcement) of foreign judgments by convention.

1 Ch.                     Adams v. Cape Industries Plc. (C.A.)

A     Nevertheless, while the use of the particular phrase "temporary
allegiance" may be a misleading one in this context, we would, on the
basis of the authorities referred to above, regard the source of the
territorial jurisdiction of the court of a foreign country to summon a
defendant to appear before it as being his obligation for the time being
to abide by its laws and accept the jurisdiction of its courts while present
in its territory. So long as he remains physically present in that country,
B     he has the benefit of its laws, and must take the rough with the smooth,
by accepting his amenability to the process of its courts. In the absence
of authority compelling a contrary conclusion, we would conclude that
the voluntary presence of an individual in a foreign country, whether
permanent or temporary and whether or not accompanied by residence,
is sufficient to give the courts of that country territorial jurisdiction over
C     him under our rules of private international law.
       In the forefront of his argument on this issue, Mr. Morison submitted
that the essential feature of this country's rules relating to the
enforcement of foreign judgments is "curial allegiance," which arises
"where there is sufficient connection between the debtor and the
rendering court at the date of suit so as to make it 'just' to enforce a
judgment of that court." The relevance of residence or presence, in his
D     submission, is that it provides the requisite connection. This, in our
judgment, is not quite the correct way to look at the matter. While
residence or presence will ex hypothesi give rise to a connection, it is
the residence or presence, not the connection as such, which gives rise
to the jurisdiction of the court. The question whether residence or
presence existed at the time of suit is determined by our courts not by
E     reference to concepts of justice or by the exercise of judicial discretion;
it is a question of fact which has to be decided with the help of the
guidance given by the authorities.
       However, none of the authorities so far referred to was concerned
with the question of enforcement of a foreign judgment against a
corporate body. The residence or presence of a corporation is a difficult
concept. A corporation is a legal person but it has no corporeal
F     existence. It can own property. It can by its agents perform acts. It is
clear that if an English corporation owns a place of business in a foreign
state from which it carries on its business that English corporation is,
under our law, present in that state for the purposes of in personam
jurisdiction. Those clear circumstances, however, may be varied in many
different ways. The corporation may not own the place of business but
G     have only the use of it or part of it. It may, instead of carrying on its
business by its own servants, cause its business to be done by an agent,
or through an agent, in the foreign state. The question will then arise
whether the commercial acts done are, for the purposes of our law, to
be regarded as done within the jurisdiction of the foreign state (a) by
the agent in the course of the agent's business or (b) by the corporation
itself. Further, and this is of central importance in this case, if the
H     English corporation causes to be formed under the law of the foreign
state a separate but wholly owned corporation to carry out the business
or commercial acts which it requires to be done, are those acts within
the jurisdiction of the foreign state to be regarded, for the purposes of

520

A  enforcement of a judgment of the courts of that state, as the acts of the
English corporation within that jurisdiction merely by reason that it
owns all the shares of its foreign corporation; and, if not, what degree of
power of control, or of exercise of control, and/or what other factors
will suffice, in our law, to cause the English corporation to be held to be
"present" within the jurisdiction of the foreign state?

B  The earliest case cited to us in which this court had to consider the
concept of residence or presence of a corporation in the context of a
claim to enforce a foreign judgment was *Littauer Glove Corporation v.
F. W. Millington (1920) Ltd.* (1928) 44 T.L.R. 746. In that case the
plaintiffs were manufacturers in the State of New York. The defendant
company, which conducted the business of clothiers' merchants, had its
principal place of business in Manchester. It bought from manufacturers
in various parts of the world and sold to wholesalers. On 17 March 1922
C  its managing director, Mr. Millington, arrived in New York on a
business visit with a view to seeing samples and making purchases. He
stayed in a New York hotel for four or five nights, where he did some
business for his company. Thereafter he visited various other states
where he also did business. On 1 April the plaintiffs took out a
summons against the defendant company. On 3 April Mr. Millington
D  returned to New York. On that date, while he was in the sale office in
New York of Union Mills Corporation, the defendant's principal United
States suppliers, he was served with process in the action. He entered no
appearance, took no steps in the proceedings and did not submit to the
jurisdiction of the American court. On 4 April he sailed for England.
The plaintiffs, having in due course obtained judgment against the
defendant company in default of appearance in New York, sought to
E  enforce the judgment against it in England. The defendant contended
that, under the rules of private international law, the New York court
had no jurisdiction to make the order against it. Many authorities were
cited to Salter J. From the report of the argument, it appears to have
been common ground that the question turned on the "residence" or
otherwise of the defendant company in the State of New York on 1
F  April 1922 when the proceedings were instituted. Salter J. identified the
question for his decision as being whether on 1 April 1922: "the
defendant company were resident in the State of New York so as to
have the benefit and be under the protection of the laws of that state."
The plaintiffs' counsel had contended that it was not necessary for them
to show that the defendant company was carrying on business at a fixed
place. In his submission, it was resident in New York because it carried
G  on business there: "the company is resident by its travellers and would
be subject to process of the country in which they happened to be."
Salter J. rejected this contention, saying, at p. 747:

"What was meant by saying that a business corporation was resident
in a foreign jurisdiction for that purpose? That depended on
whether, on the day in question, it was carrying on business in the
H  foreign state so that it could fairly and properly be said to be then
resident in that state. If the defendant company were resident in the
State of New York on 1 April 1922, where in that state were they
resident? Mr. Le Quesne said that they were resident in Broadway,

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A    New York, but there must be some place of residence on which one
could put a finger. There was no suggestion that the name of the
defendant company was in any way displayed at the address in
Broadway, or that any letter paper of the company was used there,
or that any business was done there except what the company did
with firms in other parts of the United States. If the defendant
company were resident in Broadway, it would follow that they were
B    resident wherever Mr. Millington did business. He was, however,
nothing more than a commercial traveller on that tour.

    "If the company had 40 or 50 travellers ranging all over the
world, was it to be said that the company were resident wherever
the travellers put up at an hotel and took orders? He (his Lordship)
did not rely on the expression 'fixed place,' but on what was the fair
C    meaning of 'residence.' The inference which he drew from the cases
cited was that there must be some carrying on of business at a
definite and, to some reasonable extent, permanent place. There
was no residence within the jurisdiction on the part of the defendant
company, and the action on that point must fail."

D        Thus, the effect of Salter J.'s decision was that if a foreign judgment
is to be enforced in this country against a corporation, it must be shown
that at the relevant time (a) the corporation was carrying on business,
and (b) it was doing so at a definite and "to some reasonable extent
permanent place." This test is significantly different from that applicable
in the case of judgments against individuals. *Littauer* does not bind this
court, but we see no reason to doubt the correctness of this test so far as
E    it goes. It seems to us consistent with authority and to represent a
common sense approach to the question of "presence" in the case of a
corporation. The difficulty may be to determine whether it can properly
be said in any given case that the corporation is itself carrying on
business in the country concerned.

    The other, and most recent, leading case relating to the enforcement
of foreign judgments against corporations is *Vogel v. R. and A.*
F    *Kohnstamm Ltd.* [1973] Q.B. 133. There the defendants were a company
registered in England. They sold leather skins to the plaintiffs through a
Mr. Kornbluth who had an office in Tel Aviv. The defendants had no
office of their own in Israel. All the material correspondence was
conducted with them in England. The contract of sale was not made in
Israel. The court in Israel gave judgment for the plaintiff on a claim for
breach of contract and the plaintiff sought to enforce it in England.
G    Ashworth J. dismissed the plaintiff's claim. In his judgment he described
the functions of Mr. Kornbluth vis-à-vis the defendants, at p. 136A–B:

    "Mr. Kornbluth's role was that of a person seeking customers who
would buy the defendants' goods. For this purpose he was provided
with samples for which he paid, and having found a potential
H    customer he would act as a go-between between that person and
the defendants. Correspondence would pass between the defendants
and Mr. Kornbluth regarding a proposed order and Mr. Kornbluth
would be in communication with the customer. If as a result a
contract was made it would be made between the defendants and

522

the customer and at no time had Mr. Kornbluth any authority to    A
make a contract on behalf of the defendants."

He said, at p. 136G:

> "in order to succeed the plaintiff here has to persuade me either
> that the defendants were resident in Israel through Mr. Kornbluth
> as their agent or that they were carrying on business through him in
> such a way as to give rise to an implied agreement on their part to    B
> submit to the jurisdiction of Israeli courts."

With reference to the first of these two points, he observed, at p. 141:

> "As has been said in many cases, residence is a question of fact and
> when one is dealing with human beings one can normally approach
> the matter on the footing that residence involves physical residence
> by the person in question. I keep open the possibility that even in    C
> regard to such a person he may be constructively resident in another
> country although his physical presence is elsewhere. But in the case
> of a corporation there is broadly speaking no question of physical
> residence. A corporation or company, if resident in another country,
> is resident there by way of agents."

He recognised that the *Littauer* case was distinguishable on the ground:    D

> "the person through whom the defendant corporation was said to
> have residence in the United States was not a person with any fixed
> or reasonably permanent place . . ."

However, Ashworth J. pointed out, at p. 142, that the defendants in the
case before him had no office of their own in Israel, and that "All the    E
material correspondence was conducted with them in England and their
connection with the State of Israel was limited . . . to their dealings
through Mr. Kornbluth." He continued:

> "In examining how far the presence of a representative or agent
> will, so to speak, impinge on the absent company so as to render
> that absent company subject to the relevant jurisdiction, I find help    F
> to be obtained from cases in which the converse situation has been
> considered: namely, where the English courts have been invited to
> allow process to issue to foreign companies on the footing that such
> foreign companies are 'here.'"

He expressed his ultimate conclusion, at p. 143:

> ". . . I have asked myself anxiously in this case whether in any real    G
> sense of the word the defendants can be said to have been there in
> Israel: and all that emerges from this case is that there was a man
> called Kornbluth who sought customers for them, transmitted
> correspondence to them and received it from them, had no authority
> whatever to bind the defendants in any shape or form. I have come
> to the conclusion really without any hesitation that the defendants    H
> were not resident in Israel at any material time."

On this appeal, in accordance with the approach of the courts in the
*Littauer* and *Vogel* cases, it has been common ground that the Tyler

1 Ch.                      Adams v. Cape Industries Plc. (C.A.)

A  court was competent to exercise jurisdiction over Cape and Capasco, if at all, only if they could properly be said to be resident or present in the United States of America at the relevant time. (In view of their contentions on the "country" issue, the defendants do not accept that the Tyler court would have been competent, even if the latter condition had been fulfilled.) The words "resident" or "present" or equivalent phrases have been used interchangeably in argument, just as they have

B  been used in the cases; we see no objection to this terminology if it is understood that in the case of a corporation the concept of "residence" or "presence" in any particular place must be no less of a legal fiction than the existence of the corporation itself. The argument has centred on the features which this concept embodies in the case of a corporation.

In considering these features, Salter J. in the *Littauer* case and

C  Ashworth J. in the *Vogel* case clearly attached great weight to a long line of cases where the English court has considered whether it should allow process to issue to foreign companies as being amenable to its jurisdiction. We will call this line "the *Okura* line of cases," because a leading example is the decision of this court in *Okura & Co. Ltd. v. Forsbacka Jernverks Aktiebolag* [1914] 1 K.B. 715.

D  The origin of this line requires some brief explanation. After it had been decided in *Newby v. Von Oppen & Colt's Patent Firearms Manufacturing Co.* (1872) L.R. 7 Q.B. 293 that in appropriate circumstances a foreign corporation was capable of being sued in this country, our courts in a number of cases had to consider (a) whether on the facts the foreign corporate defendant was amenable to the jurisdiction of the English court, and if so (b) whether it had been properly served

E  with the process. Most of these cases were concerned with the old Ord. 9, r. 8 of the Rules of the Supreme Court 1883, which provided:

"In the absence of any statutory provision regulating service of process, every writ of summons issued against a corporation aggregate may be served on the mayor or other head officer, or on the town clerk, clerk, treasurer or secretary of such corpora-

F  tion . . ."

The rule contained no such expressions as "reside" or "carry on business." However, as Ackner L.J. pointed out in *South India Shipping Corporation Ltd. v. Export-Import Bank of Korea* [1985] 1 W.L.R. 585, 589:

G  "Those expressions were used as convenient tests, to ascertain whether the corporation had a sufficient 'presence' within the jurisdiction, since 'generally,' courts exercised jurisdiction only over persons who 'are within the territorial limits of their jurisdiction.' Apart from statute 'a court has no power to exercise jurisdiction over anyone beyond its limits,' *per* Cotton L.J. in *In re Busfield* (1886) 32 Ch.D. 123, 131, quoted by Lord Scarman in *Bethlehem*

H  *Steel Corporation v. Universal Gas* (unreported), 17 July 1978, House of Lords."

Phrases referring to residence or presence within the jurisdiction, or equivalent phrases, have been used by way of shorthand reference to

524

the condition (or one of the conditions) which a foreign corporation has    A
to satisfy if it is to be amenable to the jurisdiction of the English court.
And indeed they have been used more or less interchangeably by the
courts. One typical example is the phraseology used by the Earl of
Halsbury L.C. in *La Compagnie Générale Transatlantique v. Thomas
Law & Co., La Bourgogne* [1899] A.C. 431, who said, at p. 433:

> "It appears to me that as a consequence of these facts the appellants    B
> are resident here in the only sense in which a corporation can be
> resident—to use the phrase which Mr. Joseph Walton has so
> constantly referred to, they are 'here;' and, if they are here, they
> may be served."

Perhaps the most helpful guidance in determining whether a foreign
corporation is "here" so as to be amenable to the jurisdiction of our    C
courts is the following passage from the judgment of Buckley L.J. in the
*Okura* case [1914] 1 K.B. 715, 718–719:

> "The point to be considered is, do the facts show that this
> corporation is carrying on its business in this country? In determining
> that question, three matters have to be considered. First, the acts
> relied on as showing that the corporation is carrying on business in    D
> this country must have continued for a sufficiently substantial period
> of time. That is the case here. Next, it is essential that these acts
> should have been done at some fixed place of business. If the acts
> relied on in this case amount to a carrying on of a business, there is
> no doubt that those acts were done at a fixed place of business. The
> third essential, and one which it is always more difficult to satisfy, is
> that the corporation must be 'here' by a person who carries on    E
> business for the corporation in this country. It is not enough to
> show that the corporation has an agent here; he must be an agent
> who does the corporation's business for the corporation in this
> country. This involves the still more difficult question, what is
> meant exactly by the expression 'doing business?'"

It is clear that (special statutory provision apart) a minimum    F
requirement which must be satisfied if a foreign trading corporation is to
be amenable at common law to service within the jurisdiction is that it
must carry on business at a place within the jurisdiction: see *The
Theodohos* [1977] 2 Lloyd's Rep. 428, 430, *per* Brandon J.
   (All the authorities cited to us have been directed, and all the
statements later in this judgment will be directed, to trading corporations.    G
In the case of non-trading corporations, the same principles would
presumably apply, with the substitution of references to the carrying on
of the corporation's corporate activities for references to the carrying
on of business.)
   The court will not find much difficulty in holding that a foreign
corporation is present in this country if it has a fixed place of business of
its own here (whether as owner, lessee or licensee) and for more than a    H
minimal period of time has carried on its own business from such
premises by its servants or agents. Typical example of such cases (which
we will call "branch office cases") which have been cited to us are

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A  (1) *Newby v. Von Oppen & Colt's Patent Firearms Manufacturing Co.,* L.R. 7 Q.B. 293; (2) *Haggin v. Comptoir d'Escompte de Paris* (1889) 23 Q.B.D. 519; (3) *La Bourgogne* [1899] P. 1; [1899] A.C. 431; (4) *Dunlop Pneumatic Tyre Co. Ltd. v. Actien-gesellschaft für Motor und Motorfahrzeugbau vorm. Cudell & Co.* [1902] 1 K.B. 342.

However, the cases also show that it may be permissible to treat a foreign corporation as resident in this country so as to be amenable to
B  the jurisdiction of our courts even if it has no fixed place of business here of its own, provided that an agent acting on its behalf carries on its business (as opposed to his own business) from some fixed place of business in this country. Typical examples of such cases are:

(1) *Saccharin Corporation Ltd. v. Chemische Fabrik Von Heyden Aktiengesellschaft* [1911] 2 K.B. 516 where the agent, Blasius, occupied
C  and paid rent for offices in London, and in the words of Fletcher Moulton L.J., at p. 524:

"He carries on business at a fixed place in London as sole agent for the defendants in the United Kingdom, though it is true that he is also agent for another firm. He has power to enter into contracts of sale for the defendants."

D
(2) *Thames and Mersey Marine Insurance Co. v. Societa di Navigazione a Vapore del Lloyd Austriaco* (1914) 111 L.T. 97, where Buckley L.J. began his judgment with the following statement of principle, at p. 98:

"If contracts have been habitually made for a reasonably sub-stantial period of time at a fixed place of business within the juris-
E  diction by a firm or a person there, without referring each time to the foreign corporation for instructions, and with the result that the foreign corporation has become bound to another party, then the foreign corporation for the present purpose carries on business at that place."

F  The ultimate problem in such cases may lie in determining whether the business carried on by the agent on behalf of the principal should properly be regarded on the one hand as his own business or on the other hand as the business of the foreign corporation. This must necessitate an investigation both of the activities of the agent and of the relationship between him and the corporation.

In a few of the *Okura* line of cases which have been cited to us, the
G  court has had to consider the question whether a foreign corporation was carrying on business in this country in a context other than that of the old Ord. 9, r. 8, but nevertheless the like investigation was necessary. In *Grant v. Anderson & Co.* [1892] 1 Q.B. 108 the context was the old Ord. 48A, r. 1, which provided that any two or more persons claiming or being liable as co-partners "and carrying on business within the jurisdiction" might sue or be owed in the name of the respective firms.
H  The defendants, who were a Scottish firm of manufacturers carrying on business in Glasgow, employed an agent in London to obtain orders for them in London. He occupied an office in London, the rent of which he paid himself, and received a commission if, but only if, he got an order

526

which the firm accepted. In rejecting the contention that the firm carried    A
on business in London, the Court of Appeal attached great weight to
the fact that, in the words of Lord Esher M.R., at p. 116 "when he gets
an order, he has no power himself to accept it." As he put it, at p. 117:
"One might as well say that the defendants carry on business in any
place through which their goods pass while being sent to their customers."

    *Sfeir & Co. v. National Insurance Co. of New Zealand Ltd.* [1964] 1
Lloyd's Rep. 330 concerned a claim covered by section 9(2) of the    B
Administration of Justice Act 1920, of which paragraph (*b*) precluded
the registration of a judgment under the section if the judgment debtor

> "being a person who was neither carrying on business nor ordinarily
> resident within the jurisdiction of the original court, did not
> voluntarily appear or otherwise submit or agree to submit to the
> jurisdiction of that court . . ."    C

The first question Mocatta J. had to determine (see, at p. 336) was
whether the defendants at any material time carried on business in
Ghana. If they did so, this could only have been through a Ghanaian
company called Glyndova. He expressed his conclusion on this point, at
p. 339:    D

> "In my judgment, Mr. Mustill was right in submitting that the
> decision of the court at the end of the day after considering the
> guidance contained in the authorities and their application to
> the facts of a particular case is one of impression. The conclusion I
> have reached is that the limited authority possessed by Glyndova to
> bind the defendants by settlements of claims arising in Ghana under
> the defendants' policies issued elsewhere, even when coupled with    E
> the other matters relied upon which I have recited, did not amount
> to a carrying on of business by the defendants in Ghana. The
> business carried on in Ghana by Glyndova was their own and not
> that of the defendants."

    At least in cases other than branch office cases it is obvious that the    F
activities of the agent by whom the foreign corporation is said to be
present in this country and the extent of the authority of that agent will
be of particular importance in determining whether or not the corporation
is amenable to our courts' jurisdiction. Counsel on both sides have
referred us to numerous examples from the *Okura* line of cases in which
a number of different aphorisms have been used to express the relevant
test. Buckley L.J. (later Lord Wrenbury) "who made this subject
particularly his own" (see *The Lalandia* [1933] P. 56, 62, *per* Langton J.)    G
himself used a variety of expressions to state it on the facts of particular
cases. In the *Thames and Mersey* case he stated it thus, 111 L.T. 97, 98–
99:

> "Does the agent in carrying on the foreign corporation's business
> make a contract for the foreign corporation, or does the agent, in    H
> carrying on the agent's own business, sell a contract with the foreign
> corporation? In the former case the corporation is and in the latter
> it is not carrying on business at that place."

A    In the *Okura* case itself, Buckley L.J. [1914] 1 K.B. 715, 721, summarised his reasons for concluding that the defendant corporation was not present in this country as follows:

"In my opinion the defendants are not 'here' by an alter ego who does business for them here, or who is competent to bind them in any way. They are not doing business here by a person but through a person."

B

At the trial of the present case a number of decisions from the *Okura* line of authorities were cited to Scott J. He said that counsel before him had treated the statements of principle to be found in the authorities as applicable equally to both classes of case. While expressing "a little unease" in this context, ante, p. 471F, he therefore assumed that C    the statements of principle applied equally to both classes of case.

Having made this assumption, he extracted the following propositions from the *Okura* line of cases:

(1) "The cases establish that jurisdiction on the territorial basis may be taken by an English court over a foreign company if the foreign company has business premises in England from which or at D    which its business is carried on:" ante, p. 468A.

(2) "There are, however, cases where residence or presence of a foreign company in England has been held established notwithstanding that the foreign company did not itself own or lease any business premises in England. A feature of these cases has been that the foreign company had a resident English agent who had authority to contract on behalf of and thereby to bind the principal. E    In those circumstances the presence or residence in England of the agent has been treated as the presence or residence of the foreign company, the principal:" ante, p. 468E–F.

(3) "trading in a country is insufficient, by the standards of English law, to entitle the courts of the country to take in personam jurisdiction over the trader: see the *Littauer* . . . case. . . . The F    trading must be reinforced by some residential feature, be it a branch office or a resident agent with power to contract:" ante, p. 476c.

These conclusions as to the law were of critical importance because the judge later found as facts, ante, p. 477E–F, that the 150, North Wacker Drive offices were N.A.A.C.'s offices and that N.A.A.C. had G    no authority to contract on behalf of Cape or Capasco or any other company in the Cape group. He also found as facts, ante, p. 482E "C.P.C., like N.A.A.C., had no authority to bind Egnep, Casap or any other of the Cape subsidiaries to any contract," and the offices at 150, North Wacker Drive were C.P.C.'s "own offices."

Mr. Morison did not challenge these particular findings of fact. H    However, he submitted that Scott J. erred in law in holding that, in cases other than branch office cases, "the trading must be reinforced by . . . a resident agent *with power to contract.*" This conclusion, he pointed out, was based primarily on the judge's analysis of the *Okura* line of cases. However, this line of cases, in Mr. Morison's submission,

528

while of some relevance and interest, does not provide the correct    A
yardstick to be applied in the present context. Contrary to the suggestion
made by Ashworth J. in the *Vogel* case [1973] Q.B. 133, he said, those
authorities do not represent the situation truly converse to the
enforcement of a foreign judgment; the true converse would be a
foreign court applying its own conflict rules, adjudicating on the
enforcement of an English judgment. Comity, as Blackburn J. pointed
out in *Schibsby v. Westenholz*, L.R. 6 Q.B. 155, 159, is not the basis    B
on which our courts enforce foreign judgments. Furthermore, the
circumstances in which an English court will assume jurisdiction over a
foreign corporation are closely bound up with our own rules of procedure
which are derived largely from statute or statutory instrument and will
be amended from time to time.

Pausing at this point, we would not go so far as to say that in every    C
case one can determine whether a foreign court was competent at
common law on territorial grounds to give a judgment against a
corporation merely by ascertaining whether in like circumstances, and
mutatis mutandis, our courts would have assumed jurisdiction over a
foreign corporation. Nevertheless, enough has been said to demonstrate
that in each case the same broad question falls to be answered by the
court under our own common law: "Was the corporation present in the    D
relevant jurisdiction at the relevant time?" In our judgment, Scott J. was
fully entitled to derive guidance from the *Okura* line of cases in deciding
whether Cape and Capasco were resident in the United States of
America at the relevant time.

Mr. Morison went on to submit that in any event the *Okura* line of
cases does not establish a universal rule that in cases where the foreign    E
corporation has no fixed place of business of its own "the trading must
be reinforced by . . . a resident agent *with power to contract*." There
are, it is true, many dicta which suggest that the existence of power in
the agent to bind his principal to contracts, without reference back to
the principal, is an important indication that the principal himself is
carrying on business by the agent. However, it has apparently never
been held that this is an essential feature of "presence" in cases where    F
the corporation has no branch office in this country. Many of the
reported cases were concerned with selling agencies, particularly in the
shipping field, which were usually not exclusive to the principal
concerned. It is therefore hardly surprising, Mr. Morison submitted, that
the courts concentrated on the question of authority to contract, because
the agency was in a real sense carrying on its own agency business. In    G
the present case it is not alleged that N.A.A.C. or C.P.C. had power to
enter into sales contracts on behalf of Cape or Capasco. However, it is
said, they were carrying out a recognised business activity for the
exclusive benefit of Cape and Capasco, that is to say, the function of
marketing agents. The question whether N.A.A.C. or C.P.C. were
properly to be described as doing their own business or that of their
principals was not to be determined by asking whether or not they had    H
authority to contract, but by asking whether they had authority to
market and were carrying out this function. Mr. Morison invited us to
follow the general approach adopted by the court in two Canadian

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A    cases, *Miller v. B. C. Turf Ltd.* (1969) 8 D.L.R. (3d) 383 and *Moore v. Mercator Enterprises Ltd.* (1978) 90 D.L.R. (3d) 590.

We would agree with Mr. Morison that the existence of a power in the resident agent to bind the foreign corporation to contracts can be neither an exclusive nor conclusive test of the residence of the corporation itself. As he pointed out, there are many cases in which the corporation has been held *not* to be carrying on business at the agency
B    notwithstanding the existence of authority of this kind: see for example *The Princesse Clementine* [1897] P. 18; *The Lalandia* [1933] P. 56 and *The Holstein* [1936] 2 All E.R. 1660. Conversely, we can conceive hypothetical cases in which it might be absurd to regard the test as conclusive. If in any given case all other factors indicate that the business carried on by the representative of a corporation in a particular
C    country was clearly the business of the corporation (rather than that of its representative), it could make no difference that the corporation required him to take its instructions before he actually concluded contracts on its behalf; the existence of such a requirement would not by itself prevent the corporation from being present in the country concerned and thus from being amenable to the jurisdiction of its courts.

D    Nevertheless, it is a striking fact that with one possible exception (*The World Harmony* [1967] P. 341) in none of the many reported English decisions cited to us has it been held that a corporation has been resident in this country unless either (a) it has a fixed place of business of its own in this country from which it has carried on business through servants or agents, or (b) it has had a representative here who has had the power to bind it by contract and who has carried on business at or
E    from a fixed place of business in this country.

We do not find this surprising as a matter of principle. Indubitably a corporation can carry on business in a foreign country by means of an agent. "It may be stated as a general proposition that whatever a person has power to do himself he may do by means of an agent:" *Halsbury's Laws of England*, 4th ed., vol. 1 (1973), p. 420, para. 703. However, though the terms "agency" and "agent" have in popular use a number of
F    different meanings:

"in law the word 'agency' is used to connote the relation[ship] which exists where one person has an authority or capacity to create legal relations between a person occupying the position of principal and third parties:" *Halsbury's Laws of England*, vol. 1, p. 418, para. 701.

G
Where the representative of an overseas corporation has general authority to create contractual relations between the corporation and third parties and exercises this authority, there may be little difficulty in applying the maxim "qui facit per alium facit per se." Where no such authority exists, there may be much greater difficulty. We were not persuaded by Mr. Morison's submission, based primarily on a dictum of
H    Verchere J. in *Miller v. B. C. Turf Ltd.*, 8 D.L.R. (3d) 383, 386, that the capacity (or possible capacity) of N.A.A.C. or C.P.C. to render Cape/Capasco vicariously liable for negligence (and thereby to create relations in tort between them and third parties) is of any weight in

530

deciding whether Cape/Capasco were present in the United States of    A
America. The mere authority given by Cape/Capasco to N.A.A.C. or
C.P.C. to convey a message to a third party could render Cape/Capasco
potentially liable in tort to a third party if that message was carelessly
transmitted. The existence of such potential liability would go no way
towards establishing the presence of Cape/Capasco in the United States
of America.

                                                                        B

*General principles derived from the authorities relating to the "presence"
issue*

    In relation to trading corporations, we derive the three following
propositions from consideration of the many authorities cited to us
relating to the "presence" of an overseas corporation.

    (1) The English courts will be likely to treat a trading corporation    C
incorporated under the law of one country ("an overseas corporation")
as present within the jurisdiction of the courts of another country only if
either (i) it has established and maintained at its own expense (whether
as owner or lessee) a fixed place of business of its own in the other
country and for more than a minimal period of time has carried on its
own business at or from such premises by its servants or agents (a
"branch office" case), or (ii) a representative of the overseas corporation    D
has for more than a minimal period of time been carrying on *the
overseas corporation's* business in the other country at or from some
fixed place of business.

    (2) In either of these two cases presence can only be established if it
can fairly be said that the *overseas corporation's* business (whether or
not together with the representative's own business) has been transacted    E
at or from the fixed place of business. In the first case, this condition is
likely to present few problems. In the second, the question whether the
representative has been carrying on the overseas corporation's business
or has been doing no more than carry on his own business will
necessitate an investigation of the functions which he has been performing
and all aspects of the relationship between him and the overseas
corporation.                                                            F

    (3) In particular, but without prejudice to the generality of the
foregoing, the following questions are likely to be relevant on such
investigation: (a) whether or not the fixed place of business from which
the representative operates was originally acquired for the purpose of
enabling him to act on behalf of the overseas corporation; (b) whether
the overseas corporation has directly reimbursed him for (i) the cost of    G
his accommodation at the fixed place of business; (ii) the cost of his
staff; (c) what other contributions, if any, the overseas corporation
makes to the financing of the business carried on by the representative;
(d) whether the representative is remunerated by reference to
transactions, e.g. by commission, or by fixed regular payments or in
some other way; (e) what degree of control the overseas corporation
exercises over the running of the business conducted by the representative;    H
(f) whether the representative reserves (i) part of his accommodation,
(ii) part of his staff for conducting business related to the overseas
corporation; (g) whether the representative displays the overseas

A    corporation's name at his premises or on his stationery, and if so, whether he does so in such a way as to indicate that he is a representative of the overseas corporation; (h) what business, if any, the representative transacts as principal exclusively on his own behalf; (i) whether the representative makes contracts with customers or other third parties in the name of the overseas corporation, or otherwise in such manner as to bind it; (j) if so, whether the representative requires specific authority in advance before binding the overseas corporation to contractual obligations.

B    This list of questions is not exhaustive, and the answer to none of them is necessarily conclusive. If the judge, ante, p. 476B–C, was intending to say that in any case, other than a branch office case, the presence of the overseas company can never be established unless the representative has authority to contract on behalf of and bind the principal, we would regard this proposition as too widely stated. We accept Mr. Morison's submission to this effect. Every case of this character is likely to involve "a nice examination of all the facts, and inferences must be drawn from a number of facts adjusted together and contrasted:" *La Bourgogne* [1899] P. 1, 18, *per* Collins L.J.

C    Nevertheless, we agree with the general principle stated thus by Pearson J. in *F. & K. Jabbour v. Custodian of Israeli Absentee Property* [1954] 1 W.L.R. 139, 146:

D       "A corporation resides in a country if it carries on business there at a fixed place of business, and, in the case of an agency, the principal test to be applied in determining whether the corporation is carrying on business at the agency is to ascertain whether the agent has authority to enter into contracts on behalf of the corporation without submitting them to the corporation for approval . . ."

E    On the authorities, the presence or absence of such authority is clearly regarded as being of great importance one way or the other. A fortiori the fact that a representative, whether with or without prior approval, never makes contracts in the name of the overseas corporation or otherwise in such manner as to bind it must be a powerful factor pointing against the presence of the overseas corporation.

*The plaintiffs' submissions on the "presence" issue*

G    Ordinarily the three propositions set out above will fall to be applied in the same way whether or not the representative is an individual or itself a corporate body. However, the present case has the peculiar feature that one of the representatives in the United States of America, whose acts are relied on as the carrying on of business by Cape, was itself a subsidiary of Cape—a feature which has not been present in any of the directly relevant authorities cited to us. We will make some further observations on the legal relevance, if any, of this feature when we come to consider the second of Mr. Morison's main submissions on the presence issue.

H    These three main submissions were substantially as follows: (1) Cape and Capasco were present and carrying on business in the United States

532

A

of America, namely, marketing and selling the Cape group's asbestos, through N.A.A.C. until May 1978, and through C.P.C. (or Associated Mineral Corporation ("A.M.C."), a Liechtenstein corporation) until June 1979 from a place of business in Illinois because N.A.A.C. and C.P.C. were the agents of Cape. (We will call this "the agency argument"). (2) Cape/Capasco and N.A.A.C. constituted a single commercial unit and for jurisdictional purposes, N.A.A.C.'s presence in Illinois therefore sufficed to constitute the presence of Cape/Capasco.

B

Likewise, Cape/Capasco and C.P.C., which performed the same functions as those previously carried on by N.A.A.C., constituted a single economic unit, and C.P.C.'s presence in Illinois sufficed to constitute the presence of Cape/Capasco. (We will call this "the single economic unit argument"). (3) In relation to C.P.C./A.M.C., the corporate veil should be lifted so that C.P.C.'s and A.M.C.'s presence in the United States of America should be treated as the presence of Cape/Capasco. (We will call this argument, which does not extend to N.A.A.C., "the corporate veil" argument.)

C

We find it convenient to deal with the second and third of these arguments before coming to the first.

D

*The "single economic unit" argument*

There is no general principle that all companies in a group of companies are to be regarded as one. On the contrary, the fundamental principle is that "each company in a group of companies (a relatively modern concept) is a separate legal entity possessed of separate legal rights and liabilities:" *The Albazero* [1977] A.C. 774, 807, *per* Roskill L.J.

E

It is thus indisputable that each of Cape, Capasco, N.A.A.C. and C.P.C. were in law separate legal entities. Mr. Morison did not go so far as to submit that the very fact of the parent-subsidiary relationship existing between Cape and N.A.A.C. rendered Cape or Capasco present in Illinois. Nevertheless, he submitted that the court will, in appropriate circumstances, ignore the distinction in law between members of a group of companies treating them as one, and that broadly speaking, it will do

F

so whenever it considers that justice so demands. In support of this submission, he referred us to a number of authorities.

In *The Roberta* (1937) 58 Ll.L.R. 159 agents, acting on behalf of the Dordtsche Co., had signed bills of lading. It was conceded at the trial that in so doing the agents had made Walford Lines Ltd., the parent company of Dordtsche Co., responsible for the bills of lading. Langton J., who described the concession as properly made, said, at p. 169:

G

"The Dordtsche Co. are a separate entity from Walford Lines Ltd., in name alone, and probably for the purposes of taxation. Walford Lines Ltd. own all the issued shares of the Dordtsche Co., and in fact supply two out of the three directors."

In *Harold Holdsworth & Co. (Wakefield) Ltd. v. Caddies* [1955] 1 W.L.R. 352 the question arose whether the respondent company, which had entered into a service agreement with Mr. Caddies under which he was appointed managing director of the company, was entitled to require him to devote his whole time to duties in relation to subsidiaries of the

H

533

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A    company. It was argued that the subsidiary companies were separate
     legal entities each under the control of its own board of directors, that
     in law the board of the appellant company could not assign any duties to
     anyone in relation to the management of the subsidiary companies, and
     that therefore the agreement could not be construed as entitling them to
     assign any such duties to Mr. Caddies. Lord Reid, in agreement with the
     majority, rejected this argument, saying, at p. 367:

B
         "My Lords, in my judgment this is too technical an argument. This
         is an agreement in re mercatoria and it must be construed in light of
         the facts and realities of the situation."

     In *Scottish Co-operative Wholesale Society Ltd. v. Meyer* [1959] A.C.
     324 the respondent based his complaint on section 210 of the Companies
C    Act 1948, which provided:

         "(1) Any member of a company who complains that the affairs of
         the company are being conducted in a manner oppressive to some
         part of the members (including himself) . . . may make an
         application to the court by petition for an order under this section."

D    The appellant society had formed a subsidiary company, of which the
     respondent was a member. It was submitted on behalf of the society that
     even if it had acted in an oppressive manner, yet it had not conducted
     the affairs *of the company* in an oppressive manner within the meaning
     of the section. The House of Lords unanimously rejected this submission.
     Lord Simonds said, at p. 342:

E        "My Lords, it may be that the acts of the society of which complaint
         is made could not be regarded as conduct of the affairs of the
         company if the society and the company were bodies wholly
         independent of each other, competitors in the rayon market, and
         using against each other such methods of trade warfare as custom
         permitted. But this is to pursue a false analogy. It is not possible to
         separate the transactions of the society from those of the company.
         Every step taken by the latter was determined by the policy of the
F        former."

     A little later, at p. 343, Lord Simonds expressly approved words which
     had been used by Lord President Cooper on the first hearing of the
     case:

         "In my view, the section warrants the court in looking at the
         business realities of a situation and does not confine them to a
G        narrow legalistic view."

     In *D.H.N. Food Distributors Ltd. v. Tower Hamlets London Borough
     Council* [1976] 1 W.L.R. 852 a group of three companies, "D.H.N.,"
     "Bronze" and "Transport," all in voluntary liquidation at the relevant
     time, were seeking compensation under the Land Compensation Act
     1961 following a compulsory purchase made by the respondent council.
H    D.H.N. held all the shares in Bronze and Transport. The business of the
     group was owned by D.H.N. The land was owned by Bronze. The
     vehicles were owned by Transport. The Lands Tribunal held that
     D.H.N. were licensees of Bronze and had no claim to compensation for

534

disturbance beyond that which could be allowed under section 20 of the    A
Compulsory Purchase Act 1965, which was negligible. This court allowed
D.H.N.'s appeal on three separate grounds. We are concerned with only
one of them, which Lord Denning M.R. explained, at p. 860:

> "Third, lifting the corporate veil. A further very interesting point
> was raised by Mr. Dobry on company law. We all know that in
> many respects a group of companies are treated together for the    B
> purpose of general accounts, balance sheet, and profit and loss
> account. They are treated as one concern. Professor Gower in
> *Modern Company Law*, 3rd ed. (1969), p. 216 says: 'there is
> evidence of a general tendency to ignore the separate legal entities
> of various companies within a group, and to look instead at the
> economic entity of the whole group.' This is especially the case
> when a parent company owns all the shares of the subsidiaries—so    C
> much so that it can control every movement of the subsidiaries.
> These subsidiaries are bound hand and foot to the parent company
> and must do just what the parent company says. A striking instance
> is the decision of the House of Lords in *Harold Holdsworth & Co.
> (Wakefield) Ltd. v. Caddies* [1955] 1 W.L.R. 352. So here. This
> group is virtually the same as a partnership in which all the three    D
> companies are partners. They should not be treated separately so as
> to be defeated on a technical point. They should not be deprived of
> the compensation which should justly be payable for disturbance.
> The three companies should, for present purposes, be treated as
> one, and the parent company D.H.N. should be treated as that one.
> So D.H.N. are entitled to claim compensation accordingly. It was
> not necessary for them to go through a conveyancing device to get    E
> it."

Goff L.J. said at p. 861:

> "this is a case in which one is entitled to look at the realities of the
> situation and to pierce the corporate veil. I wish to safeguard myself
> by saying that so far as this ground is concerned, I am relying on    F
> the facts of this particular case. I would not at this juncture accept
> that in every case where one has a group of companies one is
> entitled to pierce the veil, but in this case the two subsidiaries were
> both wholly owned; further, they had no separate business operations
> whatsoever; thirdly, in my judgment, the nature of the question
> involved is highly relevant, namely, whether the owners of this
> business have been disturbed in their possession and enjoyment of    G
> it."

In *Revlon Inc. v. Cripps & Lee Ltd.* [1980] F.S.R. 85 the question
(among many other questions) arose as to whether the goods in question
were "connected in the course of trade with the proprietor . . . of the
trade mark" within the meaning of section 4(3) of the Trade Marks Act
1938." The proprietor of the trade mark was Revlon Suisse S.A., a    H
subsidiary of Revlon Inc. Buckley L.J., in the course of deciding that
the goods were connected in the course of trade with Revlon Suisse
S.A., said, at p. 105:

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A    "Since, however, all the relevant companies are wholly owned
     subsidiaries of Revlon, it is undoubted that the mark is, albeit
     remotely, an asset of Revlon and its exploitation is for the ultimate
     benefit of no one but Revlon. It therefore seems to me to be
     realistic and wholly justifiable to regard Suisse as holding the mark
     at the disposal of Revlon and for Revlon's benefit. The mark is an
     asset of the Revlon group of companies regarded as a whole, which
B    all belongs to Revlon. This view does not, in my opinion, constitute
     what is sometimes called 'piercing the corporate veil;' it recognises
     the legal and factual position resulting from the mutual relationship
     of the various companies."

         Principally, in reliance on those authorities and the case next to be
     mentioned, Mr. Morison submitted that in deciding whether a company
C    had rendered itself subject to the jurisdiction of a foreign court it is
     entirely reasonable to approach the question by reference to "commercial
     reality." The risk of litigation in a foreign court, in his submission, is
     part of the price which those who conduct extensive business activities
     within the territorial jurisdiction of that court properly have to pay. He
     invited us to follow the approach of Advocate General Warner in
D    *Istituto Chemioterapico Italiano S.p.A. and Commercial Solvents
     Corporation v. Commission of the European Communities* (Cases 6 and
     7/73) [1974] E.C.R. 223 when considering whether a parent company
     and subsidiary were separate "undertakings" within the meaning of
     articles 85 and 86 of the E.E.C. Treaty. He said, at p. 263:

E        "One starts to my mind from this, that neither article 85 nor article
         86 anywhere refers to 'persons.' In both articles the relevant
         prohibitions are directed to 'undertakings,' a much wider and looser
         concept. This indeed is what one would expect, because it would be
         inappropriate to apply rigidly in the sphere of competition law the
         doctrine referred to by English lawyers as that of *Salomon v. A.
         Salomon & Co. Ltd.* [1897] A.C. 22—i.e. the doctrine that every
F        company is a separate legal person that cannot be identified with its
         members. Basically that doctrine exists in order to preserve the
         principle of limited liability. It is concerned with the rights of
         creditors in the context of company law. It has been applied, with
         more or less happy results, in other spheres, such as those of
         conveyancing, of contracts and of liability for tort. But to export it
         blindly into branches of the law where it has little relevance, could,
G        in my opinion, serve only to divorce the law from reality.
         "Suppose my Lords, that C.S.C. had traded in Italy through a
         branch office. There could have been no doubt then that it was
         amenable to the jurisdiction of the Commission and of this court.
         Could it have made any difference if C.S.C. has chosen to trade in
         Italy through a wholly owned subsidiary? The difference would
         have been one only of legal form, not of reality. Why then should it
H        make any difference that it chose to trade in Italy through a
         subsidiary that it controlled by a 51 per cent. majority rather than
         by a 100 per cent. majority? What matters in this field, in my view,
         is control . . . "

536

Advocate General Warner said, at p. 264:                                    A

> "(1) that there is a presumption that a subsidiary will act in accordance with the wishes of its parent because according to common experience subsidiaries generally do so act; (2) that, unless that presumption is rebutted, it is proper for the parent and the subsidiary to be treated, as a single undertaking for the purposes of articles 85 and 86 of the E.E.C. Treaty . . ."

B

We have some sympathy with Mr. Morison's submissions in this context. To the layman at least the distinction between the case where a company itself trades in a foreign country and the case where it trades in a foreign country through a subsidiary, whose activities it has full power to control, may seem a slender one. Mr. Morison referred us to *Bulova Watch Co. Inc. v. K. Hattori & Co. Ltd.* (1981) 508 F. Supp. 1322,    C
where the United States District Court held that it had jurisdiction over a Japanese corporation which was expanding into a new market by setting up subsidiaries and dealing with competition, both on the theory that the corporation was "doing business" in New York and under the New York "long-arm statute." In the course of his judgment, Weinstein C.J. said, at p. 1342: "these subsidiaries almost by definition are doing    D
for their parent what their parent would otherwise have to do on its own." It is not surprising that in many cases such as *Holdsworth* [1955] 1 W.L.R. 352, *Scottish Co-operative* [1959] A.C. 324, *Revlon* [1980] F.S.R. 85 and *Commercial Solvents* [1974] E.C.R. 223, the wording of a particular statute or contract has been held to justify the treatment of parent and subsidiary as one unit, at least for some purposes. The relevant parts of the judgments in the *D.H.N.* case [1976] 1 W.L.R. 852    E
must, we think, likewise be regarded as decisions on the relevant statutory provisions for compensation, even though these parts were somewhat broadly expressed, and the correctness of the decision was doubted by the House of Lords in *Woolfson v. Strathclyde Regional Council*, 1978 S.L.T. 159 in a passage which will be quoted below.
Mr. Morison described the theme of all these cases as being that where legal technicalities would produce injustice in cases involving    F
members of a group of companies, such technicalities should not be allowed to prevail. We do not think that the cases relied on go nearly so far as this. As Sir Godfray submitted, save in cases which turn on the wording of particular statutes or contracts, the court is not free to disregard the principle of *Salomon v. A. Salomon & Co. Ltd.* [1897] A.C. 22 merely because it considers that justice so requires. Our law,    G
for better or worse, recognises the creation of subsidiary companies, which though in one sense the creatures of their parent companies, will nevertheless under the general law fall to be treated as separate legal entities with all the rights and liabilities which would normally attach to separate legal entities.
In deciding whether a company is present in a foreign country by a subsidiary, which is itself present in that country, the court is entitled,    H
indeed bound, to investigate the relationship between the parent and the subsidiary. In particular, that relationship may be relevant in determining whether the subsidiary was acting as the parent's agent and, if so, on

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A   what terms. In *Firestone Tyre and Rubber Co. Ltd. v. Lewellin* [1957] 1
W.L.R. 464 (which was referred to by Scott J.) the House of Lords
upheld an assessment to tax on the footing that, on the facts, the
business both of the parent and subsidiary were carried on by the
subsidiary as agent for the parent. However, there is no presumption of
any such agency. There is no presumption that the subsidiary is the
parent company's alter ego. In the court below the judge, ante, p. 484B,

B   refused an invitation to infer that there existed an agency agreement
between Cape and N.A.A.C. comparable to that which had previously
existed between Cape and Capasco and that refusal is not challenged on
this appeal. If a company chooses to arrange the affairs of its group in
such a way that the business carried on in a particular foreign country is
the business of its subsidiary and not its own, it is, in our judgment,
entitled to do so. Neither in this class of case nor in any other class of

C   case is it open to this court to disregard the principle of *Salomon v. A.
Salomon & Co. Ltd.* [1897] A.C. 22 merely because it considers it just
so to do.

In support of the single commercial unit argument, Mr. Morison
made a number of factual submissions to the following effect: the
purpose of N.A.A.C.'s creation was that it might act as a medium

D   through which goods of the Cape group might be sold. The purpose of
the liquidation of N.A.A.C. was likewise to protect Cape. Any major
policy decisions concerning N.A.A.C. were taken by Cape. Cape's
control over N.A.A.C. did not depend on corporate form. It exercised
the same degree of control both before and after the removal of the
Cape directors from the N.A.A.C. board. The functions of N.A.A.C.'s

E   directors were formal only. Dr. Gaze effectively controlled its activities.
Cape represented N.A.A.C. to its customers as its office in the United
States of America. In broad terms, it was submitted, Cape ran a single
integrated mining division with little regard to corporate formalities as
between members of the group in the way in which it carried on its
business.

The plaintiffs further submitted in their notice of appeal that

F   N.A.A.C. "did not deal and was not permitted to deal with Egnep or
Casap, but had to go through Cape or Capasco." It seems clear that
N.A.A.C., as principal, made direct purchases of raw asbestos from
Egnep. On the balance of probabilities, we accept the plaintiffs'
submission that it made similar direct purchases from Casap. In referring
to the absence of dealing with Egnep or Casap, the plaintiffs were, we

G   understand, intending to submit that as a matter of group policy, which
Cape could and did enforce by its power of control over the boards of
Egnep, Capasco and N.A.A.C., the transmission of information and
orders to or from customers had to be effected and was effected by
N.A.A.C. through Capasco. We accept that submission. We also accept
that the matters referred to in this paragraph lend some broad support
to the submission that Cape ran a single integrated mining division with

H   little regard to corporate formalities as between members of the group.
However, there has been no challenge to the judge's finding that the
corporate forms applicable to N.A.A.C. as a separate legal entity were
observed.

538

As to the plaintiffs' other factual submissions in this context we will A
deal with the purpose of N.A.A.C.'s creation and existence in considering
the "agency" argument. As to the relationship between Cape and
N.A.A.C., it is of the very nature of a parent company-subsidiary
relationship that the parent company is in a position, if it wishes, to
exercise overall control over the general policy of the subsidiary. The
plaintiffs, however, submitted that Cape's control extended to the day-
to-day running of N.A.A.C. They challenged the finding of fact made by B
Scott J. that "Mr. Morgan was in executive control of N.A.A.C.'s
conduct of its business." We explore further the facts relative to this
finding and to the extent of Cape's control over N.A.A.C.'s activities in
the appendix to this judgment. Our conclusion, shortly stated, is that the
finding was justified by the evidence. A degree of overall supervision,
and to some extent control, was exercised by Cape over N.A.A.C. as is C
common in the case of any parent-subsidiary relationship—to a large
extent through Dr. Gaze. In particular, Cape would indicate to N.A.A.C.
the maximum level of expenditure which it should incur and would
supervise the level of expenses incurred by Mr. Morgan. Mr. Morgan
knew that he had to defer in carrying out the business activities of
N.A.A.C. to the policy requirements of Cape as the controlling
shareholders of N.A.A.C. Within these policy limits, such as Cape's D
requirement that N.A.A.C.'s orders for asbestos for sale by N.A.A.C.
in the United States of America be placed through Capasco on behalf of
Egnep and Casap, the day-to-day running of N.A.A.C. was left to him.
There is no challenge to the judge's findings that (a) the corporate
financial control exercised by Cape over N.A.A.C. in respect of the
level of dividends and the level of permitted borrowing was no more and E
no less than was to be expected in a group of companies such as the
Cape group, ante, p. 474A–B; (b) the annual accounts of N.A.A.C. were
drawn on the footing that N.A.A.C.'s business was its own business and
there was nothing to suggest that the accounts were drawn on a false
footing, ante, p. 484A–B.

In the light of the set up and operations of the Cape group and of
the relationship between Cape/Capasco and N.A.A.C. we see the F
attraction of the approach adopted by Lord Denning M.R. in the
*D.H.N.* case [1976] 1 W.L.R. 852, 860c, which Mr. Morison urged us to
adopt: "This group is virtually the same as a partnership in which all the
three companies are partners." In our judgment, however, we have no
discretion to reject the distinction between the members of the group as
a technical point. We agree with Scott J. that the observations of Robert
Goff L.J. in *Bank of Tokyo Ltd. v. Karoon (Note)* [1987] A.C. 45, 64, G
are apposite:

"[Counsel] suggested beguilingly that it would be technical for us to
distinguish between parent and subsidiary company in this context;
economically, he said, they were one. But we are concerned not
with economics but with law. The distinction between the two is, in
law, fundamental and cannot here be bridged." H

As to C.P.C., in Mr. Morison's submission, the replacement of
N.A.A.C. by C.P.C. was simply a substitute arrangement. The creation

**1 Ch.**                    Adams v. Cape Industries Plc. (C.A.)

A    of C.P.C. was affected and paid for by Cape so that it could perform the same functions on behalf of Cape as N.A.A.C. had previously performed. C.P.C., on behalf of A.M.C. (and thus Cape) made payment arrangements with third parties and received moneys for A.M.C. (Cape). While Mr. Morgan held all the shares in C.P.C. for his own benefit, the rights of pre-emption reserved to A.M.C. by the agency agreement of 5 June 1978 left him with little substantial financial interest in C.P.C.'s
B    business, save for the office furniture and a right to an account which would be of little value; effectively, it was submitted, C.P.C.'s business was owned by A.M.C. (Cape).

Our reasons for rejecting the "single economic unit" argument in relation to N.A.A.C. apply a fortiori in relation to C.P.C., because C.P.C. was not Cape's subsidiary and its shares were held by Mr.
C    Morgan for his own benefit. We give our reasons in the next section of this judgment for agreeing with the judge that C.P.C. was an independently owned company.

*The "corporate veil" point*

D    Quite apart from cases where statute or contract permits a broad interpretation to be given to references to members of a group of companies, there is one well-recognised exception to the rule prohibiting the piercing of "the corporate veil." Lord Keith of Kinkel referred to this principle in *Woolfson v. Strathclyde Regional Council*, 1978 S.L.T. 159 in the course of a speech with which Lord Wilberforce, Lord Fraser of Tullybelton and Lord Russell of Killowen agreed. With reference to
E    the *D.H.N.* decision [1976] 1 W.L.R. 852, he said, at p.161:

"I have some doubts whether in this respect the Court of Appeal properly applied the principle that it is appropriate to pierce the corporate veil only where special circumstances exist indicating that it is a mere façade concealing the true facts."

F    The only allegation of a façade in the plaintiffs' pleadings was that the formation and use of C.P.C. and A.M.C. in the

"alternative marketing arrangements of 1978 were a device or sham or cloak for grave impropriety on the part of Cape or Capasco, namely to ostensibly remove their assets from the United States of America to avoid liability for asbestos claims whilst at the same time continuing to trade in asbestos there."

G    In their notice of appeal (paragraph 2(b)) the plaintiffs referred to their contention made at the trial that C.P.C. "was set up to replace N.A.A.C. in such a way as to disguise the defendants' continued involvement in the marketing of the group's asbestos in the United States of America."

Scott J. more or less accepted this contention. He found as a fact,
H    ante, p. 478F:

"the arrangements made regarding N.A.A.C., A.M.C. and C.P.C. were part of one composite arrangement designed to enable Cape asbestos to continue to be sold into the United States while

540

Adams v. Cape Industries Plc. (C.A.)                    [1990]

reducing, if not eliminating, the appearance of any involvement    A
therein of Cape or its subsidiaries."

However, he went on to say, ante, p. 479B–C:

"But the question whether C.P.C.'s presence in Illinois can, for
jurisdiction purposes, be treated as Cape's presence, must, in my
view, be answered by considering the nature of the arrangements
that were implemented, not the motive behind them. The    B
documentary evidence I have seen has made clear that the senior
management of Cape, including Mr. Penna, were very anxious that
Cape's connections with C.P.C. and with A.M.C. should not
become publicly known. Some of the letters and memoranda have a
somewhat conspiratorial flavour to them. But this too, although
interesting to notice, is not, in my opinion, relevant to the main    C
question."

If and so far as the judge intended to say that the motive behind the
new arrangements was irrelevant as a matter of law, we would
respectfully differ from him. In our judgment, as Mr. Morison submitted,
whenever a device or sham or cloak is alleged in cases such as this, the
motive of the alleged perpetrator must be legally relevant, and indeed    D
this no doubt is the reason why the question of motive was examined
extensively at the trial. The decision in *Jones v. Lipman* [1962] 1
W.L.R. 832 referred to below was one case where the proven motive of
the individual defendant clearly had a significant effect on the decision
of Russell J.

The judge's finding of fact quoted above as to the motives of Cape
behind the new arrangements is accepted (no doubt welcomed) by the    E
plaintiffs, so far as it goes. They submit, rightly in our judgment, that
any such motives are relevant to the "corporate veil" point. They further
submit that the judge (a) erred in concluding that C.P.C. was an
"independently owned company;" and (b) failed to make a number of
findings of fact which are relevant in the context of the "corporate veil"
point.

Mr. Morison has taken us through the arrangements which led to the    F
extinction of N.A.A.C. and the emergence of A.M.C. and C.P.C. with
care and in considerable detail. The additional facts which the plaintiffs
say the judge ought to have found, and which are set out in the
appendix to this judgment, all relate to these arrangements. It is true
that, as the judge said, some of the letters and memoranda have a
"somewhat conspiratorial flavour to them." Since, contrary to the judge's    G
view, we think motive is relevant in this context, we have thought it
right to investigate these contentions in some detail in the appendix.

On analysis, much of the new material does little more than amply
support the judge's finding quoted above as to the purpose of the
composite arrangement. In this court Mr. Morison made it clear that the
plaintiffs were not alleging any unlawful purpose or impropriety on
the part of Cape in the sense of any intention to deceive or to do any    H
unlawful act, either in Illinois or in this country. It was, however,
asserted for the plaintiffs that A.M.C. and C.P.C. together constituted a
façade which concealed the real activities of Cape. We understand that

A   to mean that the purpose of Cape was to conceal, so far as it lawfully could having regard to the requirements of the law in Illinois and this country, any connection of Cape with A.M.C. or C.P.C.

    Before expressing our own views as to Cape's purpose, we will state our conclusions as to Mr. Morgan's position. It is, in our judgment, right to infer, substantially as submitted by Mr. Morison, that the assistance derived from the presence of Mr. Morgan in Illinois,

B   undertaking the task through C.P.C. of marketing agent for the Cape subsidiaries in the United States, was regarded as being at least of great importance to the general purposes of the Cape group, and possibly essential for those purposes, because, if it was not so regarded, there is no apparent reason why Cape should assume the cost and such risk as might have arisen from setting up C.P.C. Sir Godfray, however, was in

C   our view plainly right in submitting that the agreement of Mr. Morgan was required for the creation of the alternative marketing arrangements by means of a new independent Illinois company and that his agreement, when given, was real. Cape had obligations of a moral nature to Mr. Morgan and to the long serving staff of N.A.A.C. Cape also, for its own purposes, wanted Mr. Morgan and Mrs. Holtze to continue with the

D   work previously done by them for N.A.A.C. If Mr. Morgan decided to take on the task of providing services to the subsidiaries of the Cape group through C.P.C., on the terms available to him as owner of the shares in C.P.C., Cape would get the benefit of his knowledge and experience as the person in charge of C.P.C. Nothing in the material to which our attention was drawn under these headings, however, causes

E   us to doubt the correctness of Scott J.'s conclusion that the shares in C.P.C. belonged both at law and in equity to Mr. Morgan. It is clear that Cape intended C.P.C. to be in reality Mr. Morgan's company because that was part of their purpose. Such as it was, and dependent for almost all of its business on the Cape subsidiaries, C.P.C. was Mr. Morgan's company. We therefore reject the challenge to the judge's finding that C.P.C. was an independently owned company.

F     As to Cape's purpose in making the arrangements for the liquidation of N.A.A.C. and the creation of A.M.C. and C.P.C., we think that the extracts from the evidence set out in the appendix to this judgment (particularly under item (17)), sufficiently reveal both the substance of what the officers of Cape were doing and what they were trying to achieve. The allegation of impropriety was, in our view, rightly abandoned. The inference which we draw from all the evidence was that

G   Cape's intention was to enable sales of asbestos from the South African subsidiaries to continue to be made in the United States while (a) reducing the appearance of any involvement therein of Cape or its subsidiaries, and (b) reducing by any lawful means available to it the risk of any subsidiary or of Cape as parent company being held liable for United States taxation or subject to the jurisdiction of the United

H   States courts, whether state or federal, and the risk of any default judgment by such a court being held to be enforceable in this country. Inference (a) was also made by the judge. Inference (b) is our own addition.

542

The question of law which we now have to consider is whether the    A
arrangements regarding N.A.A.C., A.M.C. and C.P.C. made by Cape
with the intentions which we have inferred constituted a façade such as
to justify the lifting of the corporate veil so as that C.P.C.'s and
A.M.C.'s presence in the United States of America should be treated as
the presence of Cape/Capasco for this reason if no other.

In *Merchandise Transport Ltd. v. British Transport Commission*
[1962] 2 Q.B. 173, 206–207, Danckwerts L.J. referred to certain    B
authorities as showing:

> "where the character of a company, or the nature of the persons
> who control it, is a relevant feature the court will go behind the
> mere status of the company as a legal entity, and will consider who
> are the persons as shareholders or even as agents who direct and
> control the activities of a company which is incapable of doing    C
> anything without human assistance."

The correctness of this statement has not been disputed, but it does not
assist in determining whether "the character of a company or the nature
of the persons who control it" will be relevant in the present case.

Rather greater assistance on this point is to be found in *Jones v.
Lipman* [1962] 1 W.L.R. 832. In that case the first defendant had agreed    D
to sell to the plaintiffs some land. Pending completion the first defendant
sold and transferred the land to the defendant company. The evidence
showed that this company was at all material times under the complete
control of the first defendant. It also showed that the acquisition by him
of the company and the transfer of the land to the company had been
carried through solely for the purpose of defeating the plaintiff's right to
specific performance: see at p. 836. Russell J. made an order for specific    E
performance against both defendants. He held that specific performance
cannot be resisted by a vendor who, by his absolute ownership and
control of a limited company in which the property is vested, is in a
position to cause the contract to be completed. As to the defendant
company, he described it, at p. 836, as being

> "the creature of the first defendant, a device and a sham, a mask    F
> which he holds before his face in an attempt to avoid recognition by
> the eye of equity."

Following *Jones v. Lipman,* we agree with Mr. Morison that, contrary to
the judge's view, where a façade is alleged, the motive of the perpetrator
may be highly material.

Other cases were cited to us in which the court, on interlocutory    G
applications, has to a greater or lesser extent been prepared to look
behind the corporate veil and have regard to the persons ultimately
interested in a company under a group's company structure. For
example, it did so in exercising its *Mareva* injunction in *X Bank Ltd. v.
G.* (1985) 82 L.S.G. 2016 and in considering stays of execution in
*Canada Enterprises Corporation Ltd. v. MacNab Distillers Ltd. (Note)*
[1987] 1 W.L.R. 813 and *Burnet v. Francis Industries Plc.* [1987] 1    H
W.L.R. 802. The two last-mentioned decisions contain no statement of
relevant principle and the report of *X Bank Ltd. v. G.* is so brief that
we think it would not be safe to rely on it for present purposes.

A    We were referred to certain broad dicta of Lord Denning M.R. in *Wallersteiner v. Moir* [1974] 1 W.L.R. 991, 1013, and in *Littlewoods Mail Order Stores Ltd. v. Inland Revenue Commissioners* [1969] 1 W.L.R. 1241, 1254. In both these cases he expressed his willingness to pull aside the corporate veil, saying in the latter:

B    "I decline to treat the [subsidiary] as a separate and independent entity. . . . The courts can and often do draw aside the veil. They can, and often do, pull off the mask. They look to see what really lies behind. The legislature has shown the way with group accounts and the rest. And the courts should follow suit. I think that we should look at the Fork Manufacturing Co. Ltd. and see it as it really is—the wholly-owned subsidiary of Littlewoods. It is the creature, the puppet, of Littlewoods, in point of fact: and it should

C    be so regarded in point of law."

However, in *Wallersteiner v. Moir* [1974] 1 W.L.R. 991 Buckley L.J., at p. 1027, and Scarman L.J., at p. 1032, expressly declined to tear away the corporate veil. In the *Littlewoods* case [1969] 1 W.L.R. 1241, 1255, Sachs L.J. expressly dissociated himself from the suggestion that the subsidiary was not a separate legal entity and Karminski L.J. refrained

D    from associating himself with it. We therefore think that the plaintiffs can derive little support from those dicta of Lord Denning M.R.

From the authorities cited to us we are left with rather sparse guidance as to the principles which should guide the court in determining whether or not the arrangements of a corporate group involve a façade within the meaning of that word as used by the House of Lords in

E    *Woolfson*, 1978 S.L.T. 159. We will not attempt a comprehensive definition of those principles.

Our conclusions are these. In our judgment, the interposition of A.M.C. between Cape and C.P.C. was clearly a façade in the relevant sense. Scott J., ante, p. 479E, said it seemed clear that A.M.C. was "no more than a corporate name" and that he would expect to find, if all the relevant documents were available, that "A.M.C. acted through

F    employees or officers of either Casap or Egnep." He rejected, ante, p. 482A, Mr. Morgan's evidence that he understood A.M.C. to be an independent South African trading company, and was satisfied that he knew very well that it was a "creature of Cape." "The seller in C.P.C.'s time was, nominally, A.M.C. but in reality still, I think, Egnep or Casap:" ante, p. 482E. In our judgment, however, the revelation of

G    A.M.C. as the creature of Cape does not suffice to enable the plaintiffs to show the presence of Cape/Capasco in the United States of America, since on the judge's undisputed findings, A.M.C. was not in reality carrying on any business in the United States of America.

The relationship between Cape/Capasco and C.P.C. is the crucial factor, since C.P.C. was undoubtedly carrying on business in the United States of America. We have already indicated our acceptance of the judge's findings that C.P.C. was a company independently owned by

H    Mr. Morgan and that the shares therein belonged to him in law and in equity. These findings by themselves make it very difficult to contend that the operation of C.P.C. involved a façade which entitles the court

544

to pierce the corporate veil between C.P.C. and Cape/Capasco and treat     A
them all as one. Is the legal position altered by the facts that Cape's
intention, in making the relevant arrangements (as we infer), was to
enable sales of asbestos from the South African subsidiaries to be made
while (a) reducing if not eliminating the appearance of any involvement
therein of Cape or its subsidiaries, and (b) reducing by any lawful means
available to it the risk of any subsidiary or of Cape as parent company
being held liable for United States taxation or subject to the jurisdiction     B
of the United States courts and the risk of any default judgment by such
a court being held to be enforceable in this country?

We think not. Mr. Morison submitted that the court will lift the
corporate veil where a defendant by the device of a corporate structure
attempts to evade (i) limitations imposed on his conduct by law; (ii) such
rights of relief against him as third parties already possess; and (iii) such     C
rights of relief as third parties may in the future acquire. Assuming that
the first and second of these three conditions will suffice in law to justify
such a course, neither of them apply in the present case. It is not
suggested that the arrangements involved any actual or potential illegality
or were intended to deprive anyone of their existing rights. Whether or
not such a course deserves moral approval, there was nothing illegal as
such in Cape arranging its affairs (whether by the use of subsidiaries or     D
otherwise) so as to attract the minimum publicity to its involvement in
the sale of Cape asbestos in the United States of America. As to
condition (iii), we do not accept as a matter of law that the court is
entitled to lift the corporate veil as against a defendant company which
is the member of a corporate group merely because the corporate
structure has been used so as to ensure that the legal liability (if any) in     E
respect of particular future activities of the group (and correspondingly
the risk of enforcement of that liability) will fall on another member of
the group rather than the defendant company. Whether or not this is
desirable, the right to use a corporate structure in this manner is
inherent in our corporate law. Mr. Morison urged on us that the
purpose of the operation was in substance that Cape would have the
practical benefit of the group's asbestos trade in the United States of     F
America without the risks of tortious liability. This may be so. However,
in our judgment, Cape was in law entitled to organise the group's affairs
in that manner and (save in the case of A.M.C. to which special
considerations apply) to expect that the court would apply the principle
of *Salomon v. A. Salomon & Co. Ltd.* [1897] A.C. 22 in the ordinary
way.

The plaintiffs submitted (paragraph 7 of their notice of appeal) that     G
the motive of the defendants in setting up the arrangements regarding
N.A.A.C., A.M.C. and C.P.C. as revealed in the documentary evidence
were "consistent only with an acceptance by Cape that they were
present in the United States through N.A.A.C. and C.P.C." We think
there is no substance in this point. These arrangements at most indicated
an apprehension on the part of the defendants that they might be held     H
to be so present and a desire that they should not be. They involved no
admission or acceptance of such presence.

We reject the "corporate veil" argument.

**1 Ch.**                    Adams v. Cape Industries Plc. (C.A.)

A    *The "agency argument" in relation to N.A.A.C.*

We now proceed to consider the agency argument in relation to N.A.A.C. on the footing, which we consider to be the correct one, that N.A.A.C. must for all relevant purposes be regarded as a legal entity separate from Cape/Capasco. In an earlier section of this judgment we summarised three propositions which we derived from the authorities relating to the "presence" of an overseas corporation. There we stated
B    that, save in a "branch office" case (which the instant case is not), the English court will be likely to treat an overseas trading corporation as present within the jurisdiction of the courts of another country only if a representative of the overseas corporation has for more than a minimal period of time been carrying on the *overseas corporation's* business in the other country at or from some fixed place of business. In the present
C    case N.A.A.C., as representative of Cape/Capasco, unquestionably carried on business at a fixed place of business in the United States of America, 150, North Wacker Drive, for a substantial period of time. So no difficulty arises on that score. The crucial question is whether it can fairly be said that *Cape's* business has been transacted by N.A.A.C. at or from 150, North Wacker Drive. The judge's answer to it was that
D    "N.A.A.C.'s business was its own business and not the business of Cape or Capasco:" ante, p. 477E–F. The plaintiffs challenge the correctness of this answer to the question.

This question, as we said earlier, will necessitate an investigation of the functions which N.A.A.C. performed and all aspects of the relationship between it and Cape.

The factual material which we have principally in mind in considering
E    whether Cape's business was being transacted at or from 150, North Wacker Drive is to be found in the section of this judgment headed, "The facts on 'presence' as found by Scott J.," and in our observations in the appendix to this judgment. We summarise below what we consider the most material facts in context, having regard to the list of potentially relevant factors set out in an earlier section of our judgment.

We accept that the intention of Cape in procuring the incorporation
F    of N.A.A.C. in the State of Illinois was that N.A.A.C. should assist in the marketing of asbestos in the United States of America upon sales by Egnep or Casap to purchasers in the United States of America and that it was to be the marketing agent of the Cape group in the United States of America. Nevertheless, in our judgment, it is indisputable that at very least a substantial part of the business carried on by N.A.A.C at all
G    material times was in every sense its own business. In these contexts we draw attention in particular to the following facts.

(1) Though we were referred to no evidence relating to the original acquisition by N.A.A.C. of its premises at 150, North Wacker Drive, we know that N.A.A.C. itself was the lessee of the premises and paid the rent for them. Furthermore, it owned the office furniture and employed
H    there its own staff of four persons for whom it ran its own pension scheme.

(2) From time to time it conducted the following activities as principal on its own account: (a) it bought asbestos from United States government stocks or from Egnep or Casap and sold it to United States

546

customers, such purchases representing about 25 per cent. of N.A.A.C.'s **A**
business in terms of tonnage; (b) it imported asbestos goods from Japan
and sold them to United States customers. (While we accept that the
purchase by N.A.A.C. of asbestos goods was subordinate to its business
with or for Cape's subsidiaries, we do not accept the plaintiffs' submission
that such sales were trivial, having regard to the turnover of N.A.A.C.)

(3) For storing the asbestos which it has purchased from United
States Government stocks or Egnep or Casap, N.A.A.C. rented in its **B**
own name and paid for warehousing facilities.

(4) N.A.A.C. earned profits and paid United States taxes thereon.

(5) N.A.A.C.'s creditors and debtors were its own (not those of
Cape).

(6) The return to Cape as N.A.A.C.'s shareholder took the form of
an annual dividend passed by a resolution of N.A.A.C.'s board of
directors. **C**

(7) In other respects also the corporate forms applicable to N.A.A.C.
as a separate entity were observed.

In the face of these facts, now unchallenged, it is in our judgment
clear beyond argument that N.A.A.C. was carrying on business of its
own. The only question is whether, in performing the functions which it
performed on behalf of Cape/Capasco, it was carrying on its own **D**
business or their business. What, then, were these functions? As we see
the position from the findings of the judge and the evidence put before
us, its functions were to assist in the marketing of asbestos in the United
States of America upon sales by Egnep or Casap and generally to assist
and encourage sales in the United States of America of asbestos of the
Cape group. It acted as the channel of communication between **E**
Cape/Capasco and United States customers, such as P.C.C. It organised
and arranged the performance of contracts between United States
customers and Egnep. It had a co-ordinating role, particularly in
arranging delivery. The United States customer would specify to
N.A.A.C. from time to time the quantity of asbestos which it wished to
purchase and the time when it desired delivery to be made. This
information would be conveyed through N.A.A.C. to Casap and Egnep. **F**
Shipping arrangements and delivery dates would be arranged by Casap
or Egnep and communicated to the United States customers via
N.A.A.C. N.A.A.C. would receive documents and pass them on to the
customers. It also received requests and complaints which it would
normally pass on to Capasco. Generally it assisted in "nursing" the
group's customers for asbestos and ensuring that they were satisfied. For **G**
its services N.A.A.C. was remunerated by way of a commission paid to
it by Casap on sales effected by Egnep or Casap. There was no evidence
that N.A.A.C. reserved any part of its office premises or any part of its
staff exclusively for performing its agency functions.

Our further findings as to the functions which N.A.A.C. performed
and as to its relationship between N.A.A.C. and Cape are to be found
set out in the appendix. We bear in mind particularly the submissions **H**
contained in item (9) that (i) when corresponding with United States
customers, Cape referred to N.A.A.C. as "our Chicago office" and
N.A.A.C. referred to Cape and Capasco as "our London office;"

**1 Ch.**                    Adams v. Cape Industries Plc. (C.A.)

A    (ii) N.A.A.C. held itself out to a large United States customer as being part of the Cape selling organisation, and (iii) N.A.A.C. was treated by the major customer "as the channel between them and Cape and Capasco." However, in the appendix we give our reasons for concluding that the matters shown in the evidence considered under this heading do not by themselves show anything inconsistent with the findings of Scott J. as to N.A.A.C.'s role and functions.

B    There is no doubt that the services rendered by N.A.A.C. in acting as intermediary in respect of contracts between the United States customers and Egnep or Casap were active and important services which were of great assistance to Cape/Capasco in arranging the sales of their group's asbestos in the United States of America. Nevertheless, for all the closeness of the relationship between Cape/Capasco and N.A.A.C.,

C    strictly defined limits were imposed on the functions which N.A.A.C. were authorised to carry out or did carry out as their representative. First, N.A.A.C. had no general authority to bind Cape/Capasco to any contractual obligation. Secondly, as Mr. Morison expressly accepted, there is no evidence that N.A.A.C., whether with or without prior authority from Cape/Capasco, ever effected any transaction in such manner that Cape/Capasco thereby became subject to contractual

D    obligations to any person. This significant factor renders the arguments in favour of "presence," at least in some respects, even less strong than they were in cases such as *The Lalandia* [1933] P. 56 and *The Holstein* [1936] 2 All E.R. 1660 where the argument failed. Having regard to the legal principles stated earlier in this judgment, and looking at the facts of the case overall, our conclusion is that the judge was right to hold

E    that the business carried on by N.A.A.C. was exclusively its own business, not the business of Cape or Capasco, and that Cape and Capasco were not present within the United States of America, through N.A.A.C. at any material time. We see no sufficient grounds for disturbing this finding of fact.

F    Under this section of our judgment we should mention one further point. The plaintiffs challenged the judge's finding that as from 31 January 1978, N.A.A.C. ceased to act on behalf of any of the Cape companies or to carry on any business on its own account save for the purpose of liquidating its assets. The object of the challenge was to refute the suggestion that Cape could not be regarded as present in the United States of America through N.A.A.C. during the period between 31 January 1978 and N.A.A.C.'s formal dissolution on 19 May 1978.

G    (They accepted that after 19 May Cape could not be said to be present in the United States of America, by or through N.A.A.C.) The plaintiffs regard this point as having potential legal relevance, since two of the eight actions which comprise Tyler 2 were begun before 18 May 1978. In the appendix we give our reasons for rejecting the challenge to the judge's finding of fact.

H    *The agency argument in relation to C.P.C.*

We now consider whether Cape/Capasco were present in the United States of America by or through C.P.C. In dealing with the "corporate veil" point we have stated our inferences as to Cape's purpose in making

548

the arrangements for the liquidation of N.A.A.C. and the creation of
A.M.C. and C.P.C. Part of the very purpose of these arrangements was
to enable sales of asbestos from the Cape group to continue to be made
in the United States of America while creating a greater distance both in
appearance and reality between Cape and the company (C.P.C.) which
was intended to carry out the functions on its behalf in the United States
of America which had previously been carried out by N.A.A.C. Having
dealt with the "corporate veil" point, we agree with the following
passage in Scott J.'s judgment, ante, p. 482D–F:

> "I do not think, on analysis, that the plaintiffs' case is any stronger
> than their case regarding N.A.A.C. If anything, I think the case is
> weaker. N.A.A.C. was at least a wholly owned subsidiary. C.P.C.,
> even if incorporated and launched with Cape money, was, on my
> reading of the facts, an independently owned company. Like
> N.A.A.C., C.P.C. acted as agent for the purpose of facilitating the
> sale in the United States of America of Cape's asbestos. The seller of the
> asbestos in N.A.A.C.'s time was Egnep or Casap. The seller in
> C.P.C.'s time was, nominally, A.M.C. but, in reality, still, I think,
> Egnep or Casap. C.P.C., like N.A.A.C., had no authority to bind
> Egnep, Casap or any other of the Cape subsidiaries to any contract.
> C.P.C., like N.A.A.C., carried on its own business from its own
> offices at 150, North Wacker Drive. The provision by Cape of the
> $160,000 as a starting-up fund does not make the offices Cape's
> offices or the business Cape's business."

The interposition of A.M.C. in the new arrangements made in 1978
cannot one way or the other affect the question whether Cape/Capasco
were present in the United States of America thereafter. For all relevant
purposes, as we have already indicated, we are prepared to treat Cape
and A.M.C. as one. The functions performed by C.P.C. and its
relationship with Cape through A.M.C. are the relevant considerations
for present purposes. Since Mr. Morgan held all the shares in C.P.C.
beneficially, Cape had no control as a shareholder over the activities of
C.P.C. similar to the control which it had exercised over N.A.A.C. Mr.
Morison did not dispute the judge's finding that the terms of the agency
agreement of 5 June 1978 were a reliable guide to the nature of the
relationship between C.P.C. and A.M.C. and hence between C.P.C.
and Cape. Under the terms of this agreement, C.P.C. were left free to
sell materials and products other than asbestos fibre and to involve itself
in other commercial activities. It is clear that it did so. While there is no
evidence that it followed N.A.A.C. in buying raw asbestos from Egnep
or Casap or the United States Government, it undoubtedly bought and
sold manufactured textiles on its own behalf as principal.

It is thus quite plain that at least a substantial part of C.P.C.'s
business was in every sense its own business. As with N.A.A.C. the only
question is whether, in performing the functions which it performed on
behalf of Cape/Capasco, it was carrying on its own business or their
business. As the terms of the agency agreement show, these functions
were very similar to those which had been performed by N.A.A.C. The
services rendered by C.P.C. to Cape/Capasco were similarly active and

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A    important. Again, however, strictly defined limits were imposed on the functions which C.P.C. was authorised to carry out or did carry out as the representative of Cape/Capasco (through A.M.C.). C.P.C. had no authority to bind A.M.C. or Cape or Capasco to any contractual obligation. Again too, there is no evidence that C.P.C., whether with or without prior authority from any of those three companies, ever carried out any transaction in such manner as to subject any of them to
B    contractual obligations to any person. In the light of the legal principles stated above and of the facts of the case looked at as a whole, we see no sufficient grounds for disturbing the judge's finding that the business carried on by C.P.C. was exclusively its own business and that Cape and Capasco were not present within the Unites States of America through C.P.C. (or A.M.C.) at any material time.

C        Under this heading, we refer to one further matter. The plaintiffs, on the evidence of Mr. Summerfield (that in August 1984 A.M.C.'s name was given as one of the occupants of the offices on the 12th floor at 150, North Wacker Drive), invited us to infer that A.M.C. had their plate up on those offices in 1978–79. Scott J. declined to draw any such inference. In our judgment, he was right to do so for the reasons given in the next section of this judgment dealing with burden of proof and under item
D    (25) in the appendix.


*The onus of proof*

    The plaintiffs submitted to Scott J. that the onus was on Cape to establish that it was not resident in the United States of America and
E    that he should hold that the defendants had failed to discharge that onus. He rejected that argument, saying, ante, p. 483c–D:

    "The plaintiffs sue Cape on a judgment given by a United States court. The judgment is an apparently regular one. Cape disputes jurisdiction on the ground that it is a foreign company with no place of business in the United States. The plaintiffs' answer is to assert that the presence in the United States of N.A.A.C. and C.P.C. is to
F    be treated as Cape's presence. But each of N.A.A.C. and C.P.C. is in law an individual legal persona. A contention that the presence of the United States of either is to be treated as the presence of Cape requires, in my opinion, he who so contends to establish facts sufficient to support the contention. This, in my judgment, the plaintiffs have failed to do."

G        Mr. Morison submitted that the judge misdirected himself as to the burden of proof. A foreign judgment, in his submission, prima facie gives rise to a legal obligation on the part of the defendant to obey the judgment and is thus prima facie enforceable in England. In support of this submission he invoked *Dicey & Morris*, 11th ed., vol. 1, p. 465,
H    where it is said:

    "the statement of claim in an action upon such a judgment need not specifically assert that the foreign court was competent in terms either of the relevant foreign law or of the English rules of conflict of laws, though it is usual to insert an allegation of this sort."

550

We agree that generally no specific assertion need be made that the
foreign court was competent *in terms of the foreign law*, not because of
any question of burden of proof, but because such assertion is irrelevant.
As is stated in *Dicey & Morris*, 11th ed., vol. 1, pp. 464–465, a foreign
judgment cannot, in general, be impeached on the ground that the court
which gave it was not competent to do so according to the law of the
foreign country concerned.

However, as all the authorities show, it is only the judgment of a
foreign court recognised as competent by English law which will give
rise to an obligation on the part of the defendant to obey it. As a matter
of principle it seems to us that in the first place the onus must fall on the
plaintiff seeking to enforce the judgment of a foreign court to prove the
competence (in this sense) of such court to assume jurisdiction over him.
None of the authorities cited to us establish the contrary.

No doubt, in any case, the evidentiary burden may shift at the trial.
However, we agree with the judge that the presence of A.M.C.'s name
on a notice board at the office at 150, North Wacker Drive in 1984 did
not give rise to any presumption that it had been there in 1979.

More generally we should state that if, contrary to our view, the
onus fell on the defendants to disprove the competence of the Tyler
court to give judgment against them, they have discharged that onus by
showing that they were not "present" in any part of the United States of
America, at the time of commencement of the various suits between
April 1978 and November 1979.

This conclusion as to the presence issue means that this appeal must
fail on this account if no other. However, for reasons already stated,
and in case our conclusion on the "presence" issue is wrong, we think it
right to proceed to consider the "country" issue and the "natural justice"
issue. (As to the latter issue, there is no dispute that the onus of proof
falls on the defendants.)

### III *The country issue*

Thus far we have been considering the criteria for ascertaining
whether a defendant was present in a particular place, and whether on
the facts of this case the criteria were satisfied by Cape and Capasco.
For this purpose, it was unnecessary to decide how to identify the place
in the United States at which the defendant must have been present,
when the action commenced, in order to make the judgment enforceable
against him here, since if Cape and Capasco were not present in
Chicago, they were not present anywhere else in the United States. If,
however, the conclusion expressed in the preceding section of this
judgment were to be incorrect, so that the companies were present in
Chicago, Illinois, it would become necessary to decide whether that
presence was sufficient to render enforceable in the United Kingdom the
judgment given by the District Court in Tyler, Texas.

This question may conveniently be labelled the "country" issue,
echoing the language of *Schibsby v. Westenholz*, L.R. 6 Q.B. 155, and
several of the later cases. We should, however, observe that this
terminology must be used with caution, lest it beg the very question
under consideration, and lead the reader to assume that the political

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A   entity provides the geographical test. This point was not in issue in any of the cases from which we have already quoted, and no assumption as to the relevant principle can be drawn from the language in which the courts chose to express their opinions on the question of "presence."

    [Their Lordships summarised the evidence concerning the organisation of the federal courts, their jurisdiction and the law which they enforced; referred to *Mississippi Publishing Corporation v. Murphree* (1946) 326 U.S. 438, *Omni Capital International v. Rudolph Wolff & Co. Ltd.* (1987) 108 S. Ct. 404, *Erie Railroad Co. v. Tompkins* (1938) 304 U.S. 64, *Guaranty Trust Co. v. York* (1945) 326 U.S. 99; and continued:]

B     Against this background we may now trace the reasoning by which the judge arrived at his conclusion that, if Cape and Capasco had been present in Illinois when the Tyler 2 actions were commenced, this would have been a sufficient basis in English law for the exercise by the Tyler court of jurisdiction over them. He began, by citing a passage from *Dicey & Morris,* 11th ed., vol. 1, pp. 26–27, which we may usefully repeat:

C

    "Meaning of 'country.' This word has from long usage become almost a term of art among English speaking writers on the conflict of laws, and it is vitally important to appreciate exactly what it means. It was defined by Dicey as 'the whole of a territory subject under one sovereign to one body of law.' He suggested that a better expression might be 'law district;' but this phrase has never found much favour with English speaking writers, who prefer the more familiar word 'country.' England, Scotland, . . . the Isle of Man, Jersey, Guernsey, Alderney, Sark, each British colony, each of the American and the Australian states and each of the Canadian provinces is a separate country in the sense of the conflict of laws, though not one of them is a state known to public international law. . . . A state may or may not coincide with a country in the sense of the conflict of laws. Unitary states like Sweden, the Netherlands and New Zealand, where the law is the same throughout the state, are 'countries' in this sense. But composite states like the United Kingdom, the United States, Australia and Canada are not."

D

E

F

    The judge differed from this opinion. He did not accept that for some private international purposes the United States might not be a "country;" and he went on to develop an analysis of the position which would exist if the district court were sitting in a "federal question" matter such as an anti-trust damages suit. In the result, the judge concluded that the "court would be a United States court applying United States law;" that it would command the obedience of a resident anywhere in the United States; and that the sovereign from which the district court derived its jurisdiction was the United States. The judge continued this line by stating that, if Congress had chosen to establish a Federal District Court at Washington D.C. with in personam jurisdiction in respect of anti-trust cases, "the 'country' of the court would unarguably be the United States as a whole."

G

H

    Thus far, as the judge acknowledged, the discussion had been hypothetical, since the Tyler court was sitting in diversity not in a

federal question case. Nevertheless, the judge attached great weight to the rebuttal of what he saw as the main plank of the defendants' case, namely, that the United States could not be a "country" for private international law purposes. Having concluded that it could, he went on to consider and reject the argument which he attributed to the defendants, namely that the district court when sitting in diversity was part of the system for the administration of justice in the state in which it sat.

The judge then stated his own view as to the basis on which the English court recognises the judgment of a foreign court, ante, p. 491A–B:

"the territorial basis of jurisdiction is dependent upon and cannot, in in my opinion, be divorced from, the sovereignty of the 'country' that has established the court in question. It is, I think, recognition of the sovereignty of a foreign country that leads to the recognition of the entitlement of its courts to take jurisdiction over persons resident in its sovereign territory."

Founding on this principle, the judge concluded, ante, p. 491D–F:

"As a matter of principle, in my view, if a United States court exercises jurisdiction over a person resident in the United States, it is exercising powers inherent in the sovereignty which adheres to the United States. As a matter of principle, too, in my view, English law should recognise the legitimacy of that exercise of jurisdiction. It follows that I agree with Mr. Morison that the answer to the question which I must answer does not lie in investigating the function discharged by the court but lies in investigating the source of authority of the court. Whatever the function of a federal district court in a diversity case, the source of its authority is to be found in the sovereign power which established it. For those reasons I conclude that the exercise of jurisdiction by a federal district court over a person resident in the United States is, by the standards of English law, a legitimate and not an excessive exercise of jurisdiction."

Any attempt to weigh up the soundness of this or any other account of the rules governing the recognition of foreign judgments should, as it seems to us, begin with an exploration of the reasons why such judgments are recognised at all. Unfortunately, the cases give virtually no guidance on this essential question. Underlying it all must be some notion of comity, but this cannot be comity on an individual nation-to-nation basis, for our courts have never thought it necessary to investigate what reciprocal rights of enforcement are conceded by the foreign country, or to limit their exercise of jurisdiction to that which they would recognise in others. The most one can say is that the duty of positive law first identified in *Schibsby v. Westenholz*, L.R. 6 Q.B. 155, must stem from an acknowledgement that the society of nations will work better if some foreign judgments are taken to create rights which supersede the underlying cause of action, and which may be directly enforced in countries where the defendant or his assets are to be found.

1 Ch.                    Adams v. Cape Industries Plc. (C.A.)

A  But this tells one nothing of practical value about how to identify the foreign judgments which have this effect.

One possibility is to explain the principle in terms of allegiance. This idea, of which traces are found in the earliest cases, may have provided at least a moral underpinning for the concept that a foreigner who has chosen to establish himself within the territory of a sovereign owes to him, in exchange for an obligation to ensure the stranger's personal

B  safety and well-being, a personal duty to pay the sovereign due respect, an obligation which involves an obligation to respect the sovereign's law as enforced by his courts. This concept may have served well enough in the case of an individual established in long-term residence, but the idea that the Dunlop Company, a foreign company of manufacturers, present in the United Kingdom for a few days only through having set up a stall

C  at an exhibition, thereby incurred a duty of fealty to the King-Emperor is surely fanciful.

Nor in our judgment can this concept be made to seem more persuasive by re-writing it in modern terminology. A foreigner who is physically present in a country does thereby acquire rights and duties expressed in terms of the local law, although not necessarily the same as those which apply to the local citizens; but these are not rights and

D  duties which in any sensible way can be described as arising reciprocally with the sovereign. The foreigner does not owe duties to the Queen, or to the United States of America. Rather, by making himself present he contracts-in to a network of obligations, created by the local law and by the local courts.

This is not to say that sovereignty is immaterial to the present

E  problem, in the sense that an identification of the source from which the local laws and the agencies which enforce them derive their powers must be part at least of the task of delineating the obligations, stemming from the judgments of those agencies, which a foreign court ought to regard as binding. Thus, we entirely accept the conclusion, flowing from the judge's premise, that if we had here been concerned with the enforcement of a judgment given by a state court in Texas, we should have been

F  obliged to have regard to the territory of Texas alone, so that if the judgment now in suit had been given (say) by a Texas Supreme Court sitting in Austin, it would not (on the hypothesis of Cape and Capasco's presence in Illinois) have been enforceable. For neither the states outside Texas, nor the federal organs established by or on the authority of the constitution, played any part in giving the State of Texas the right

G  and power to establish its own courts of local jurisdiction. But the converse need not be true. Merely to identify X as the ultimate law giver and creator of the agencies through which those laws are enforced, and then move on to the proposition that a judgment given anywhere in the territory governed by X against someone present anywhere else in those territories should be enforced by foreign courts, seems a large step. Even today, Scotland and England are not the same jurisdictions,

H  and if one looks to the past, it is hard indeed to acknowledge that in Imperial times, all persons present in one part of the Empire could properly be regarded as present everywhere else in the Empire, notwithstanding the immense variety of laws, courts and constitutional

554

systems which then prevailed, simply because as the ultimate source of    A
power there was to be found a single sovereign.

Another aspect of this idea is to be found in the functional test
propounded by the judge. We take this to invoke an inquiry as to the
task which the Tyler court was performing—a local or a national task.
We would not dissent from this approach, but we would venture to ask
whether the judge was not approaching it solely in terms of constitutional
theory. Because Congress could have created a single "Federal Court"    B
of which every court and every judge was a manifestation, it is assumed
that this is what has really happened, notwithstanding the cessation of a
state contribution in the sphere of substantive law and personal
amenability to service. On the evidence, we cannot accept that this
hypothesis is made out, any more than it is possible to say that the
Queen in Parliament has chosen, whatever powers may exist in reserve,    C
actually to give England and Scotland a unified judicial system applying
a unified law.

It is convenient to mention at this stage three suggested anomalies,
relied upon as pointing to one answer rather than another. The first is
that the need for the Tyler court in this case to have recourse to the
Texan long-arm statute in order to entertain the suit demonstrates that
the overseas defendants were not within the "country." We do not think    D
that this helps. The use of the long-arm statute shows no more than we
already know, namely, that the direct personal jurisdiction of a district
court is not for American purposes recognised as extending beyond the
boundaries of the state within which that particular court happens to sit.
The same can be said of another apparent anomaly on which stress was
laid, namely that, if the plaintiffs' submissions are correct, a judgment
which would be unenforceable in some other state such as Illinois might    E
nevertheless be effective to give recourse against the defendants' assets
in England. We do not regard this as a surprising result, or one which
points to any particular solution of the present problem, for if (contrary
to the defendants' contentions) the whole of the United States is to be
regarded as the territory within which the district court had jurisdiction,
the infraction of what must on this view be regarded as an internal    F
procedural rule is not something of which the English court should take
account.

The third suggested anomaly is this. On the judge's own analysis, the
jurisdiction of the Texas State Court, as recognised by the English court,
would not extend beyond the Texan borders. Thus if the judge's view is
right, the enforceability of the judgment in a case such as this would
depend upon whether the action was removed by the defendants into    G
the district court: and this notwithstanding that the courts would sit in
the same place and apply the same law. This is certainly a striking
result, but it must we believe follow from any tenable view of the law.
As we understand the arguments, Sir Godfray would have been disposed
to accept that if there were a single federal court of unitary jurisdiction,
applying a single law, a defendant could be present anywhere in the    H
United States and still have the judgment enforceable against him: and
we should ourselves be of this opinion. All this shows, however, is that
a person may be present in two different "countries" at the same time.

**A**    This is a good reason for discarding the word "country" as a useful test, and discarding with it the simple and attractive argument that the United States is a country, the Tyler court was a court of that country, the defendants were present in the United States, and hence they must necessarily have been within the jurisdiction of the country for the purpose of enforcement in England. Further than this, the argument does not run.

**B**    If these ideas are rejected as inconclusive, where should we look for the test? To our minds, the only way to find an answer is to consider why a person who goes abroad thereby incurs a duty to abide in England by a foreign judgment. The only reason that we can see is that by going to a foreign place he invests himself by tacit consent with the rights and obligations stemming from the local laws as administered by **C**   the local court: those laws including, of course, the local rules on the conflicts of laws.

   Thus far we have experienced no great difficulty. What has raised very real problems is to apply the principle just suggested to the facts of the present case. It may be helpful to summarise the way in which the respective arguments might run.

**D**    For the defendants, one might begin with the example of a foreigner who has set himself up in Scotland. Such a person could properly be regarded as having done so, and having been allowed to do so, on terms that his rights and duties were to be governed by the laws of Scotland. But not by English law, or by decisions of the English courts, even though the latter might without procedural impropriety purport to exercise a jurisdiction over him. Equally, an Englishman who has gone **E**   to live in France and engaged in transactions there, might find himself sued on those transactions in Texas. Any resulting judgment would be unenforceable here, not because the Texas court had broken its own rules, or indeed had broken any rules of international comity, but simply because the Englishman had done nothing to bring himself into a relationship with the court in Texas and the law which it administered.

**F**    Now if these examples are sound, they may be transformed into something nearer the present case. If the Englishman had established himself in Chicago, would he be treated as having put himself into a relationship with the State Court in Austin, Texas? Surely not, the defendants could argue. The fact that Chicago is in the United States does not make Texas any the less a foreign court for a resident in Illinois than if Chicago were in France; and the fact that the long arm of **G**   the Texas court does not have to reach out to another continent should not make any difference. This would be so, the defendants could argue, even if the laws of Illinois and Texas were identical in the minutest respect; and on the evidence before us it seems that this is not so.

   Let us now make the one alteration necessary to bring the example home to the present case: namely by assuming the court in Texas to be a federal district court of the Tyler Division of the Eastern Division of **H**   the State of Texas. This is not a state court, but (so the defendants can argue) a local court in a real sense, administering local law. The juridical identity of the Tyler court might have been different if those invested with constitutional powers had chosen to exercise them differently, but

556

A

we must take the facts as they are. On these facts, the defendants can submit, there was no sufficient connection between the defendants, resident as for present purposes we assume they were in Chicago, and the federal court in Tyler, to justify the inference that by establishing their residence there they had consented to the administration of Texan laws as administered by the Tyler court.

B

For the plaintiffs, two preliminary points may be made. In the first place, the decision to join Cape as defendant in the proceedings in the Tyler court, as contrasted with the institution of separate proceedings against Cape in a federal court in Illinois, was no doubt influenced by the wish to rely upon the arguments about submission and consent, based upon Cape's participation in the Tyler 1 proceedings (which arguments were rejected by Scott J. and not renewed in this court). But the joining of Cape in the proceedings in the Tyler court had, as we understand it, no other element of forum shopping about it: no advantage was gained, or present to be gained, as to the substantive law which would be applicable in proceedings in the Tyler court as compared with that applicable in a federal court sitting in Illinois. The joining of Cape in the Tyler court proceedings was, in short, a normal and appropriate course of proceeding viewed solely from the point of view of United States law, whether federal or state law. If a default judgment obtained in such circumstances is not enforceable according to our law it is because the relevant rule of our law requires our courts thus to discriminate between a judgment given in default by a federal district court sitting in Illinois and a default judgment given by a federal district court sitting in Texas.

C

D

Secondly, it is true that the definition of facts, which justified the taking by the Tyler court of in personam jurisdiction over any person or corporation throughout the United States, which is said to constitute legitimate jurisdiction for the purposes of our private international law, would also justify the taking of jurisdiction over any person or corporation outside the territories of the United States, which, as is common ground, would not be regarded as a legitimate jurisdiction for our private international law. Nevertheless, there seems no doubt that Congress has established a system of federal courts of which each one has jurisdiction, in the terms defined by the various long arm statutes of the forum states (where no specific federal statute provides otherwise) to exercise in personam jurisdiction over any person or corporation present in any state of the Union.

E

F

More detailed arguments available in support of the plaintiffs' proposition may be summarised.

G

(i) The concept of "contracting in" by presence means that, in the unitary state, the foreign resident is put in the same position, whether the visitor be an individual or a corporation, as any other person or corporation within that state so far as concerns obligations enforceable by in personam judgments (i.e. not including matters dependent upon domicile as opposed to mere presence).

H

(ii) Our law sets no standard with which the network of local law is required to comply other than that of natural justice and public policy. Within those limits, the foreign law, substantive and procedural, may be

1 Ch.                        Adams v. Cape Industries Plc. (C.A.)

A    harsh, antiquated and unskilfully operated by the foreign court but the
     foreign resident must put up with the consequences.
         (iii) Our law, faced with a federal system of two networks of local
     laws as administered by two sets of local courts, should, if it is to be
     consistent, favour that court which will leave the resident visitor in
     Illinois subject to the two local networks, both state and federal, to the
     same extent as any other resident of Illinois so far as concerns the
B    validity of judgments rendered in the courts of either system, unless
     there is some clear reason to do otherwise.
         (iv) The limitations of the federal judicial system as it has in fact
     been established, which cause the present system to fall short of a fully
     realised national judicial system, arise from the history and political
     principles which produced them. In other words, a national judicial
C    system has been devised and established in terms in accordance with the
     political and social views of the peoples of the states which form the
     Union. The checks and limitations are available for the protection and
     convenience of the foreign resident as much as for the resident citizen.
         (v) In particular, the decision that federal courts shall apply the law
     of the forum state does not necessarily alter the fact that the federal
     court, in so doing, is doing what it is commanded to do by federal law.
D    Equally, the fact that choice of law rules are not the same in all of the
     states, does not necessarily alter the fact that the Supreme Court of
     Congress, as the effective authority under the Constitution, has directed
     or caused federal courts to continue to apply local choice of law rules as
     the law to be applied to cases in the national courts.
         (vi) Finally, if in personam jurisdiction is given by United States law
     to federal courts to be exercised, within the circumstances stated, over
E    any person or corporation present within the territories of the United
     States, the effectiveness of that jurisdiction for the purposes of our
     private international law, is not necessarily reduced by the fact that the
     jurisdiction is expressed in terms of and limited to the long arm
     jurisdiction statutes of the forum state. There is no reason to regard the
     in personam jurisdiction of the federal court of any federal state as
F    necessarily impaired, or as relegated to a local status within one state of
     the Union, because the federal authorities have seen fit to so express
     and limit that jurisdiction.
         We have set out the facts and arguments on the country issue at
     some considerable length, notwithstanding that our conclusion on the
     presence issue is sufficient to dispose of the appeal, because they serve
     to illuminate a question of general importance which may well arise for
G    decision in the future. In the event, as we have said, it is unnecessary to
     express a final decision on the country issue and in all the circumstances
     we think it better not to do so. All we should say is that we all incline to
     favour, albeit with varying degrees of doubt, the view that if the
     plaintiffs had not failed at the first hurdle, they would on the country
     issue have been entitled to succeed.
H

                        IV  *The natural justice issue*

         The assumptions upon which we consider this defence are that our
     decision on the presence issue is wrong and that the assumed presence

of Cape/Capasco in Illinois at the commencement of the Tyler 2 proceedings rendered them subject to the jurisdiction of the Tyler court in those proceedings for the purpose of our law of enforcement of foreign judgments.

The conclusion of Scott J. on the issue of natural justice was expressed, ante, p. 500G–H:

"There was, in short, in my opinion, no judicial assessment of damages. In my judgment, the procedure adopted by Judge Steger offended against English principles of substantial justice. The defendants were entitled to a judicial assessment of their liability. They did not have one. The award of damages was arbitrary in amount, not based on evidence and not related to the individual entitlements of the plaintiffs. Many of the features of the procedure to which I have drawn attention might, taken simply, have been insufficient to meet the yardstick of substantial injustice. Taken together, the criterion is, in my judgment, satisfied."

The facts relevant to the defence of breach of natural justice were stated in detail by Scott J. and no issue of primary fact has been raised by either side. [Their Lordships referred to the material facts concerning the procedure which led to the default judgment of 12 September 1983, substantially in the words of Scott J., and continued:]

*The law applied by Scott J.*

In the view of Scott J. the fundamental criterion for the success of a natural justice objection to the enforcement of a foreign judgment was to be found in the judgment of Lindley M.R. in *Pemberton v. Hughes* [1899] 1 Ch. 781, 790, where he said:

"If a judgment is pronounced by a foreign court over persons within its jurisdiction and in a matter with which it is competent to deal, English courts never investigate the propriety of the proceedings in the foreign court, unless they offend against English views of substantial justice. Where no substantial justice, according to English notions, is offended, all that English courts look to is the finality of the judgment and the jurisdiction of the court, in this sense and to this extent—namely, its competence to entertain the sort of case which it did deal with, and its competence to require the defendant to appear before it. If the court had jurisdiction in this sense and to this extent, the courts of this country never inquire whether the jurisdiction has been properly or improperly exercised, provided always that no substantial injustice, according to English notions, has been committed."

Thus in the opinion of Scott J. if the natural justice objection were to succeed, the proceedings in the foreign court must "offend against English views of substantial justice:" ante, p. 497F–G. With reference to that broad criterion he considered the procedure which led to the default judgment of 12 September 1983. The route which led him to his conclusion on this issue was very briefly as follows: (i) Cape/Capasco were in default and had forfeited any entitlement to a hearing save on

A   the issue of damages. There was no injustice in that. (ii) Cape/Capasco were given sufficient notice of the application for the default judgment but the application for relief of which notice was given was for a judicial assessment of damages at a judicial hearing. (iii) The effect of the notice given to Cape/Capasco could not be divorced from the context of the Federal Rules for default judgments. Having regard to that context a defendant in default in an action for unliquidated damages in the Tyler

B   court was entitled to expect that his liability to the plaintiff would be assessed by the judge in the light of evidence which the judge had considered and which, in the judge's opinion, justified the award which was made: ante, p. 500A–B.

C   (iv) "The requirements of substantial justice in a particular case cannot . . . be divorced from the legitimate expectation of both the plaintiff and the defendant in the context of the procedural rules applicable to the case:" ante, p. 500B

   (v) Since there was no judicial assessment of the damages the proceedings offended our principles of substantial justice: ante, p. 500D.

D   (vi) The fact that the default judgment might have been set aside on application to the judge, or an appeal, because of the breaches of local rules of procedure, did not as a matter of principle make the judgment enforceable notwithstanding the breach of natural justice: ante, p. 501c–E.

*Principles not in issue on this appeal: some general observations*

E   In the context of the natural justice issue certain principles are common ground and appear to us to be indisputable. The first is that, upon proof of private international law jurisdiction in the Tyler court, Cape/Capasco would have come under an obligation to obey that judgment unless they should be able to impeach it on the ground of fraud, or breach of natural justice, or breach of the requirements of public policy. For the proof of these grounds of defence, all are to be

F   judged in the courts of this country according to the law in force in England and Wales and to the principles of that law. Further, whether any alleged breach of natural justice based on procedural irregularity is such as to render the foreign judgment unenforceable, the courts of this country must have regard to fundamental principles of justice and not to the letter of the rules which, either in our system, or in the relevant

G   foreign system, are designed to give effect to those principles.

   The basis of the obligation, which our law would enforce against Cape/Capasco upon proof of jurisdiction in the Tyler court, is that, because Cape/Capasco were present within the territorial jurisdiction of that court at the date of service of the proceedings, the command contained in the document or process served upon them is regarded by

H   our law as validly and effectively made. It would regard Cape/Capasco as obliged to make such answer as they could put forward against the claims of the plaintiffs, and to make it in the Tyler court. If they chose not to make any answer, they would not be permitted to dispute in our courts the judgment of the Tyler court *upon the merits*. Subject to the

560

defences of fraud, breach of natural justice, and public policy,    A
Cape/Capasco would be liable upon the judgment.

It is clear that a corporate defendant, and those called upon to
advise it, may thus be placed in great difficulty by the working of our
rules of private international law. The directors of a defendant
corporation may reasonably believe, upon competent advice, that the
corporation was not, at the date of service of the proceedings present
within the jurisdiction of the foreign court. If they are right, they can    B
safely ignore the proceedings so far as concerns the assets of the
corporation within the jurisdiction of our courts. If they are wrong—and
the judgments of Scott J. and of this court show that the question may
be of considerable complexity—they may be sued in this country upon a
judgment which cannot be questioned as to the merits and substance of
the decision upon which the judgment is based. In particular, with    C
reference to the quantum of a judgment, whether for damages for tort
or for breach of contract, the corporate defendant is placed in difficulty.
Not infrequently plaintiffs, who are claiming damages, exaggerate their
injuries and their losses. When the defendant does not appear, and no
evidence is presented to answer the plaintiff's case, the court, which has
the task of assessing damages, can normally do no more than consider
the evidence put before it and base the assessment upon that evidence.    D
In adversarial systems, the court cannot normally do more in investigation
of the claims, or call for further evidence, and it is under no obligation
to do so. In particular, according to our law, a defendant corporation
which denies that it is subject to the jurisdiction of the foreign court,
could not effectively continue to dispute that jurisdiction while taking
part in the assessment of a damages claim because, if it did so take part,    E
it would thereby normally submit to the jurisdiction of the foreign court
and render itself liable to be sued in this country upon that judgment. In
the result, if the corporation is to be able effectively to maintain its
contention that it was not subject to the jurisdiction of the foreign court,
it must leave the plaintiff there to present a wholly uncontested claim
(as the defendants did in the present case). It will have no defence to an
action upon the ensuing judgment, if it is held by the courts of this    F
jurisdiction to have been in fact subject to the jurisdiction of the foreign
court, unless it can rely upon fraud, breach of natural justice or public
policy.

The plaintiff, too, in such a case may face the risk of an unjust
result. The defendant may have no answer on the merits to the plaintiff's
claim, and the judgment as entered in default may be in amount wholly    G
in accordance with substantial justice. Yet if, through no personal fault
of the plaintiff, the defendant can point to a sufficient breach of our
principles of natural justice simply in the procedure by which the
judgment was obtained, the plaintiff can recover nothing on the
judgment. He may, if the procedure of the foreign court permits him to
do so, start again at some point in the existing proceedings and continue
in a way which avoids the procedural defect. If the wrong is actionable    H
in this country, and the claim is not statute-barred here, he could sue
here. What he cannot do is to enforce the foreign judgment here to the
extent that it is unobjectionable and claim the assistance of our courts as

A    to the rest, unless, perhaps, some part of the judgment is clearly severable and unaffected by the defect in procedure. Thus, in these proceedings, upon the assumption that Cape/Capasco were present within the jurisdiction of the Tyler court, it would not be open to this court to enter judgment for the plaintiffs for damages to be assessed under the procedures of our court, although such an order would, if the plaintiffs cannot effectively start again in the Tyler court, get closer to substantial justice than dismissal of their claims. Nor was it suggested

B    that this court could direct that judgment be entered for the plaintiffs on liability, with a direction that the plaintiffs be at liberty to apply to enter judgment for such amount as may hereafter be assessed by the Tyler court. These are partial or alternative remedies which could only be provided by the terms of a statute, presumably to be based upon a

C    treaty or convention. The position therefore is that, if through the adoption of the procedure by which Judge Steger directed judgment to be entered for these 206 plaintiffs, there occurred a denial of the requirements of substantial justice, the plaintiffs would fail entirely although (as we assume for present purposes) Cape/Capasco were properly subject to the jurisdiction of the Tyler court. If, on the other

D    hand, there was no such denial according to the established principles of our law, then Cape/Capasco (on the same assumption) would be held liable for the full amount of the judgment notwithstanding the forceful objections of Cape/Capasco to the manner in which the Tyler court left so much of the assessment of the plaintiffs' claims to counsel acting for those plaintiffs.

E    *The plaintiffs' submissions on natural justice*

    Mr. Falconer's submissions for the plaintiffs may be summarised as follows.

    1. The natural justice defence has been limited by authority binding upon this court to lack of notice and denial of proper opportunity to be heard: see *Jacobson v. Frachon* (1928) 138 L.T. 386. The underlying

F    basis or reason for this limitation is that our law requires only that the judgment debtor be afforded by the foreign court a fair trial or the opportunity for a fair trial if the defendant chooses to take it. If the defendant is shown to have been deprived irremediably of a fair trial then the judgment is unenforceable here.

    2. The defendant will be held to have been irremediably deprived of a fair trial by reason of defective procedure in two cases: (i) if the rules

G    of procedure of the foreign court are themselves by our standards unfair, because, in that case, there can be no prospect of the foreign court correcting what has been done under its rules; and, (ii) if the rules of procedure of the foreign court are by our standards fair; and the defective procedure was caused by departure from those rules, but it is impossible or impracticable for the defect to have been corrected within

H    the foreign system: e.g. because the defendant only learned of the judgment too late to advance an effective appeal or procedure for setting the judgment aside.

    3. If the procedural defect was reasonably capable of remedy within the procedure of the foreign court, whether by application to set aside

562

the judgment, or by appeal, the defendant is not released from the    A
obligation to obey the judgment by reason of the procedural defect
because, being subject to the jurisdiction of the foreign court, he may
properly be required to have resort to the remedies provided by the
foreign system.

4. The basis and substance of those submissions for the plaintiffs
were said to be in accordance with justice, with practicality and with the
principles of our law in that (i) our law recognises that all courts make    B
procedural mistakes: the fact that a mistake is made, for which the
foreign court's procedure provides a remedy, should not release the
defendant who chooses not to avail himself of the remedy; (ii)
the argument is based upon the connection between the foreign court
and the defendant created by the voluntary act of the defendant in being
present within the foreign jurisdiction, or by submission thereto, etc.;    C
(iii) it is desirable that our courts should not be required to act as a
court of error for the examination and assessment of procedural defects
within the foreign system for which that system provides an effective
remedy; (iv) the submissions provide a framework of reasonable certainty
and clarity for the decision of pleas of breach of natural justice. By
contrast, the "broad criterion" applied by the judge, is too wide and too
uncertain a test.    D

5. The reliance placed by Scott J. on "legitimate expectation" was
unjustified. There had been no actual expectation on the part of
Cape/Capasco nor any reliance upon any expected form of procedure.
Nothing to that effect had been pleaded or proved. This concept of
legitimate expectation amounted, it was said, to no more than the
assertion that a defendant is entitled to expect that, in the conduct of    E
the proceedings in the foreign court, that court will correctly apply its
own procedure and that, if it does not, a sufficient breach of natural
justice is demonstrated. (We will refer to the submissions summarised in
this paragraph as "the legitimate expectation point.")

6. Upon the evidence and upon the findings of Scott J. the procedural
rules applicable in the Tyler court were fair and just. The defendants
could have applied to set aside the judgment on the grounds that the    F
procedure for the assessment of damages was irregular under the
relevant rules and such application would have been allowed if made in
due time. Further, an appeal to the Circuit Court was open to
Cape/Capasco. Since they took no step to correct the procedural defect,
and the consequences of it, they cannot rely upon it as a defence in
these proceedings.
    G

*The defendants' submissions on natural justice*

To these submissions Mr. Playford for Cape/Capasco replied by
contending that Scott J. was right in his conclusion for the reasons which
he gave. Further, if it should appear to this court that the defendants
could not impeach the judgment on the ground of a procedural defect
which was capable of remedy within the system of the federal courts,    H
then it was said that the defendants did not know in time of the
procedural defects and could not reasonably be required or expected to
have sought such remedy there.

A       *The decision in Jacobson v. Frachon*

A number of decisions were cited to us in the context of the natural justice issue. However, the most important of them was *Jacobson v. Frachon*, 138 L.T. 386, because it was said on behalf of the plaintiffs to establish legal principles which are binding on this court and render the natural justice defence unsustainable on the present facts by limiting that

B       defence to lack of notice and denial of proper opportunity to be heard. Furthermore, it was common ground that this is the only case in which the Court of Appeal has considered points relevant to the questions raised in this case under the heading of the natural justice issue.

In *Jacobson v. Frachon,* this court applied rigorously the principle that our courts will not impeach the judgment of a foreign court having competent jurisdiction on its merits. However, the crucial passage in

C       that case particularly relied upon by Mr. Falconer was a statement of Atkin L.J., who, after referring to the judgment of Lindley M.R. in *Pemberton v. Hughes* [1899] 1 Ch. 781, 790, said, at p. 392, that a judgment could be impeached "if the proceedings, the method by which the court comes to a final decision" are contrary to English views of substantial justice, and continued:

D           "The Master of the Rolls seems to prefer, and I can quite understand the use of the expression, 'contrary to the principles of natural justice;' the principles it is not always easy to define or to invite everybody to agree about, whereas with our own principles of justice we are familiar. *Those principles seem to me to involve this, first of all that the court being a court of competent jurisdiction, has*

E           *given notice to the litigant that they are about to proceed to determine the rights between him and the other litigant; the other is that having given him that notice, it does afford him an oportunity of substantially presenting his case before the court.* Both those considerations appear to be essential if they are to be in accordance with natural justice." (Emphasis added.)

F       We have had the benefit of very careful and detailed analyses in argument of the judgments in *Jacobson v. Frachon.* We intend no disrespect to such arguments if we do not prolong an already very long judgment (in which we have already decided that the defendants succeed on the presence issue) by recapitulating these analyses. We will summarise our conclusions in relation to *Jacobson v. Frachon,* 138 L.T.

G       386, as follows.

(1) Atkin L.J. in his judgment was not attempting to make an exclusive or comprehensive statement of the circumstances in which our courts will treat the procedure adopted by a foreign court in reaching its decision as offending against the principles of natural justice.

(2) Lord Hanworth M.R. was clearly of the view, at p. 390, which

H       we share, that the requirements of due notice and proper opportunity to be heard will, in the majority of cases which can be expected to arise, sufficiently comprise the concept of natural justice in a procedural context, but he prudently qualified his statement by saying that they "almost, if not entirely" comprise it.

564

(3) We therefore reject the contention that the decision of this court in *Jacobson v. Frachon* restricted the defence of breach of procedural natural justice to the requirements of due notice and opportunity to put a case. Scott J. was entitled, in our view, to direct himself by reference to the test stated by Lindley M.R. in *Pemberton v. Hughes* [1899] 1 Ch. 781, 790, and to consider whether the procedural defect alleged by Cape was such as to constitute a breach of an English court's views of substantial justice. The point was not concluded against the defendants merely because they had been given proper notice of the application for default judgment and would, if they had attended, have been allowed full opportunity to put their case.

(4) However, this court in *Jacobson v. Frachon*, 138 L.T. 386, was not required to consider the relevance, if any, of any remedy which might have been available to Jacobson under the French legal system, whether by way of appeal or by application for the judgment to be set aside, if the hearing in the French court had itself constituted a breach of natural justice.

*"No judicial assessment of damages"*

The next question is whether, as Scott J. considered, the "method by which the Tyler court came to its final decision," to use Atkin L.J.'s words, was contrary to our views of substantial justice on the grounds that there had been no judicial assessment of damages.

We have found this to be a matter of difficulty. We have, although well aware of its limited nature, some general knowledge of the working of the system of civil justice in the federal courts of the United States; and we are aware that it is a system which has been developed by judges of great distinction and learning, and subjected to continuous and searching examination and comment both by the legal profession and by academic lawyers of similar distinction and learning. Scott J. expressed his view that the system of civil justice evidenced by the Federal Rules and explained by the witnesses was an unimpeachable system of justice within one of the great common law jurisdictions of the world and was plainly in accordance with the requirements of natural justice. We make the same respectful acknowledgement. But, as Scott J. pointed out, the defendants made no criticism of that system of justice. Their complaint was that, at the invitation of the plaintiffs' counsel, Judge Steger did not proceed in accordance with it.

We recognise, further, that the federal courts have been required to determine, and to develop methods for the effective control and management of, civil litigation in product liability cases in which large numbers of plaintiffs have made claims against numerous defendants arising out of similar classes of injury and having broadly similar consequences but with differing degrees of severity. We have had some experience in this country of such litigation but in smaller volume. Our own procedures have to an extent been modified to deal with the preparation and settlement of such cases but we have not, to the same extent, developed the techniques of a class action or the role of the judge in procuring settlements. We are aware that our present system

A     has been subjected to criticism in having failed, as it has been said, to respond sufficiently to the requirements of such litigation.

The circumstances of 206 plaintiffs making claims based upon a common cause of injury were, as it seems to us, directly relevant to the method of decision adopted by Judge Steger without objection by the plaintiffs' counsel. The purpose was, as we infer, to avoid the private costs and public expenditure of court time which would have been

B     necessary if there had been either individual judicial assessments or judicial assessment by reference to groups based upon evidence directed to the individual cases. The method was adopted for proper purposes. We accept, as submitted by Mr. Falconer, that Judge Steger had knowledge and experience of Mr. Bailey and the other counsel and that Judge Steger must have reposed trust in those counsel to act properly in

C     the matters left by the judge to them. Mr. Falconer submitted that there was nothing inherently objectionable, according to our standards of substantial justice, in a court leaving to the plaintiffs' lawyers the fixing of figures for individual plaintiffs after the court has indicated an average basis of award for all plaintiffs.

In reply to that contention Mr. Playford pointed out that the indication by Judge Steger of an average basis of award for all plaintiffs

D     was based on nothing in the way of evidence as to the fair sums due for compensation for any of them. It may be that an average figure for settlement of such claims was known by the judge to be $75,000 but that provided no basis for a holding that the condition of these 206 plaintiffs was such as to justify a total award of $15.45m. or any other total award. If the judge had had before him, and had considered, evidence,

E     perhaps from one expert, to the effect that, by reference to the listed apparent injuries suffered by the plaintiffs, they properly belonged in certain categories of gravity of injury; and if he had, by reference thereto, estimated a figure for general damages for each category; and, then, by reference to the numbers of plaintiffs in each category calculated a total award which would be fair to the defendants, we could see no valid objection, which the defendants could have put forward, if the

F     judge had then left it to plaintiffs' counsel to allocate precise sums within the total award to individual plaintiffs. But we agree with Mr. Playford's submission that that was not what happened. The defect in the procedure adopted was, as Scott J. found, that the total award was not in any real sense based upon an objective assessment by the judge upon evidence as to the condition of these plaintiffs.

G     It seems to us that, in truth, Judge Steger was applying to the process of assessment of damages in default, when only the plaintiffs were represented before him, the process and technique appropriate to a settlement negotiated between both the plaintiffs and defendants with the intervention of the judge. If we understand the position properly, the only basis upon which Judge Steger, as the judge responsible for assessment of the damages, could assert, without knowledge of the

H     evidence relating to the 206 plaintiffs, that $120,000 average, $24.72m. total, was too high a figure, and that $75,000 average, $15.45m. total, was a proper figure, was that, if the defendants had been present and taking part, they would in probability have refused to settle for $24.72m.,

566

so as to avoid the risk of having to pay more after individual assessment,    A
but would, in probability, have agreed to pay $15.45m. so as to avoid
that risk. If that was the basis of his decision, there is nothing to show
that he was in fact wrong upon the hypothesis upon which he acted and
nothing to show that he was right; but, as Scott J. observed, ante,
p. 56xxx, while damages calculated on an average per plaintiff basis may
make very good sense for the purposes of a settlement, because
defendants are not concerned with how the total will be divided up, a    B
judicial award so calculated is the antithesis of an award based upon the
individual entitlements of the respective plaintiffs.

Mr. Playford referred us to authority in order to demonstrate what
he said should be regarded as the essential requirements of a court
"acting judicially," and, in support of the proposition that it is part of
the requirements of natural justice that the judgment of a foreign court,
which is rendered for enforcement, be reached by that court "acting    C
judicially." He referred in particular to *Local Government Board v.
Arlidge* [1915] A.C. 120 and in particular to passages in the speech of
Viscount Haldane L.C. at p. 132, of Lord Shaw of Dunfermline, at
p. 138, of Lord Parmoor, at p. 142, and of Lord Moulton, at p. 150.
That case was concerned with the validity of a closing order under
section 17 of the Housing, Town Planning etc. Act 1909 and with the    D
procedure on appeal to the Local Government Board. An example of
the statements relied upon is that of Lord Parmoor, at p. 142:

> "Whether the order of the Local Government Board is to be
> regarded as of an administrative or of a quasi-judicial character
> appears to me not to be of much importance, since, if the order is
> one which affects the rights and property of the respondent, the    E
> respondent is entitled to have the matter determined in a judicial
> spirit, in accordance with the principles of substantial justice."

In our view, no significant assistance is to be derived from this case,
or other decisions upon the requirements of natural justice in
administrative law cases, where the requirements of substantial fairness
depend upon the subject matter and the context. It is sufficient, in our    F
view, to derive the requirements of natural justice for the purposes of
enforcement of a foreign judgment and the special defence thereto of
breach of natural justice from the principles stated in *Pemberton v.
Hughes* [1899] 1 Ch. 781 and relied upon by Scott J., namely: did the
proceedings in this foreign court offend against our views of substantial
justice?

The notion of substantial justice must be governed in a particular    G
case by the nature of the proceedings under consideration. The purpose
of an in personam monetary judgment is that the power of the state
through the process of execution will take the defendant's assets in
payment of the judgment. In cases of debt and in many cases of contract
the amount due will have been fixed by the acts of the parties and in
such cases a default judgment will not be defective for want of judicial    H
assessment. When the claim is for unliquidated damages for a tortious
wrong, such as personal injury, both our system and the federal system
of the United States require, if there is no agreement between the

A    parties, judicial asessment. That means that the extent of the defendant's obligation is to be assessed objectively by the independent judge upon proof by the plaintiff of the relevant facts. Our notions of substantial justice include, in our judgment, the requirement that in such a case the amount of compensation should not be fixed subjectively by or on behalf of the plaintiff.

B    We do not find it necessary to decide whether, if the local rules provide for service by the plaintiff of notice of a specific sum claimed for damages, a default judgment may be entered for such a sum without proof of judicial assessment and without there being breach of any requirement of natural justice. Scott J. thought that there could be no objection to such procedure and we think that in most cases that would be right. The matter does not arise for decision in this case and we express no concluded view. We would however not exclude the possibility

C    of a defence being upheld if the facts justified the conclusion that, making due allowance for different levels of awards and of substantive law, the amount of the actual award was irrational.

   Mr. Falconer relied upon Scott J.'s finding that there would be no breach of natural justice in proceedings for a default judgment for unliquidated damages if judgment were entered for the specific sum

D    claimed by the plaintiff. It was submitted that such a claim had in effect been made by the 205 plaintiffs in these proceedings because their pleading placed a limit upon the damages claimed in the sum of $100m. We see no force in that point. The maximum of $100m. would, as we understand it, prevent the court from entering judgment for any larger sum but there is nothing to show that the limit was intended to mean, or would be understood by any person familiar with procedure in the

E    federal courts as meaning, that the $100m. represented a sum which the plaintiffs asserted to be the total of their estimated claims and for which the court would be empowered to give judgment without proof of the amount of injury and loss suffered.

F    *The "legitimate expectation" point*

   At first sight there appeared to us to be some force in Mr. Falconer's criticism of the relevance of this concept in this case. It was accepted by Mr. Playford that reliance by the defendants had not been pleaded or proved with reference to any subjective expectation on their part that the assessment of damages on the application for the default judgment would proceed according to any particular method. We would also

G    accept that the adoption of a particular method of assessment of damages by the foreign court, would not per se amount to an effective defence, as a breach of natural justice under our law, merely because it was shown that, by reference to the procedural rules of the foreign court, the defendant might (on an objective basis) reasonably have expected that a different method would be used. So to hold would be to

H    introduce, under the concept of reasonable expectation, a rule that breach by the foreign court of its own rules of procedure renders the foreign judgment unenforceable as offending our concepts of substantial justice. It is clear law that mere procedural irregularity, on the part of the foreign court and according to its own rules, is not such a ground of

568

defence. *Pemberton v. Hughes* [1899] 1 Ch. 781 itself was an example of      A
mere procedural irregularity.

In our view, however, Scott J. did not so regard or use the point of
reasonable expectation. He made reference to it in dealing with the
question whether what had happened amounted to a breach of the
requirements of substantial justice, and after reference to the fact that
the rules of a court might, in his view, without offending those
requirements, provide for the giving of notice of the plaintiffs' estimate      B
of the recoverable damages and the entry of a default judgment for that
amount in the absence of opposition on the part of the defendant. The
question was to be decided, in the view of Scott J., by reference to the
context in which the alleged procedural defect had occurred. He was, in
our view, not in error in this regard. The fact was that the system of
legal procedure in which Judge Steger had signed the default judgment      C
had not contained any provision for converting an unliquidated damages
claim to a potentially fixed sum for the entry of a default judgment. His
reference to the fact that the defendant in a default action was entitled
to expect that his liability to the plaintiff would be assessed by the judge
on the evidence was not a reference to actual expectation on the part of
these defendants but to the requirements of natural justice against the
background of a system which contains no such provision.      D

We therefore conclude that the defendants have demonstrated, as
Scott J. held, that the method by which Judge Steger came to a decision
as to the amount of the default judgment was by itself contrary to the
requirements of substantial justice contained in our law. If that fact is
regarded as a sufficient and conclusive description of the proceedings of
the Tyler court then, according to the judgment of Atkin L.J. in
*Jacobson v. Frachon*, 138 L.T. 386, 390, that finding would serve to      E
invalidate the judgment. But, as noted above, the Court of Appeal in
*Jacobson v. Frachon* was not required to consider whether, as Mr.
Falconer submits, an opportunity to correct such a defect, provided by
the foreign system of procedure, may either cause such a defect to cease
to be in our law an effective breach of natural justice or, if there is any
difference, cause the defendant to be unable to rely upon it for purposes      F
of impeaching the judgment.

*Requirement of use of remedy in foreign court*

Mr. Playford submitted that proof of this defect in the proceedings of
the Tyler court is a conclusive defence for the defendants, and he
submitted that it is just that it should be so. It is not exorbitant, he said,      G
to require that a default judgment, designed and intended for enforcement
in this country, should comply with so basic a principle as that the
amount of a judgment for personal injuries be fixed in substance by the
court upon the evidence and not in substance by the plaintiff. No
authority establishes, he said, the requirement of use by a defendant of
any local remedy.

We accept that no authority binding this court has been cited to us      H
establishing the proposition for which Mr. Falconer has contended. It is
at least clear that our law does not oblige a defendant who can show
that a foreign judgment has been obtained by fraud to have used any

A    available remedy in the foreign court with reference to that fraud if he is successfully to impeach that judgment in our courts: see *Abouloff v. Oppenheimer & Co.* (1882) 10 Q.B.D. 295 and *Jet Holdings Inc. v. Patel* [1990] 1 Q.B. 335. The position may well be the same in cases where there has been a breach of natural justice of the two primary kinds considered by Atkin L.J. in *Jacobson v. Frachon*, 138 L.T. 386, 392, namely, absence of notice of the proceedings or failure to afford the
B    defendant an opportunity of substantially presenting his case.

In this judgment, however, we are dealing with a case where, although there was in our view a departure from the basic principles of natural justice in the assessment of the amount of a default judgment, nevertheless (a) the error which led to this departure was an honest error on the part of all concerned; (b) the defendants had proper notice
C    of the proceedings and could have presented their case on its merits if they had chosen to do so, but chose not to do so; (c) the procedural rules applicable in the Tyler court were themselves fair and just; (d) the defendants had the right to apply to set aside the judgment on the grounds that the procedure for the assessment of damages was irregular under the relevant rules and such application would presumably have been allowed if made in due time.

D    Against this background, we are not persuaded that possession of and failure to exercise this right by the defendants can be disregarded as being wholly irrelevant in determining whether the proceedings in the Tyler court, which we think must be viewed as a whole, offend against English views of substantial justice, within the principles stated by Lindley M.R. in *Pemberton v. Hughes* [1899] 1 Ch. 781, 790, as the
E    plaintiffs would submit.

It is well established that a defendant, shown to have been subject to the jurisdiction of a foreign court, cannot seek to persuade our court to examine the correctness of the judgment whether on the facts, or as to the application by the foreign court of its own law or, when relevant, of the law of this country. A foreign judgment is not impeachable merely because it is "manifestly wrong:" *Godard v. Gray*, L.R. 6 Q.B.
F    139; *Castrique v. Imrie* (1870) L.R. 4 H.L. 414 and *Robinson v. Fenner* [1913] 3 K.B. 835, 842. In any such case it could be said that there has been a breach of natural justice, but it is not a type of breach which our courts will consider relevant. In effect, their attitude is that the only way in which the defendant can seek to correct an error of substance made by the foreign court is by using such means for correction of error as
G    may be provided under the foreign system.

This being the position where there has been an error of substance, it would, in our judgment, be anomalous if our courts were obliged wholly to disregard the existence of a perfectly good remedy under a foreign system of procedure in considering whether the defective operation of that procedure has led to a breach of natural justice. And, indeed, from some of the cases on procedural defects, support can be
H    derived from the proposition that, at least with reference to defects known to the defendant before judgment, the defendant can be required to have made use of any remedy available in the foreign court: see, for example, *Reynolds v. Fenton* (1846) 16 L.J.C.P. 15 and *Crawley v.*

570

*Isaacs* (1867) 16 L.T. 529, see particularly at p. 531, where Bramwell B. said (obiter):

> "If the proceedings be in accordance with the practice of the foreign court, but that practice is not in accordance with natural justice, this court will not allow itself to be concluded by them, but on the other hand, if the procedure be in accordance with natural justice, the foreign court itself will interfere to prevent the plaintiff taking advantage of the judgment irregularly and improperly obtained."

Mr. Falconer relied strongly not only on that passage but on dicta of Fry J. in *Rousillon v. Rousillon*, 14 Ch.D. 351, 370, and of Bray J. in *Jeannot v. Fuerst* (1909) 100 L.T. 816, 818.

Since the ultimate question is whether there has been proof of substantial injustice caused by the proceedings, it would, in our opinion, be unrealistic in fact and incorrect in principle to ignore entirely the possibility of the correction of error within the procedure of a foreign court which itself provides fair procedural rules and a fair opportunity for remedy. The court must, in our judgment, have regard to the availability of a remedy in deciding whether in the circumstances of any particular case substantial injustice has been proved. However, the relevance of the existence of the remedy and the weight to be attached to it must depend upon factors which include the nature of the procedural defect itself, the point in the proceedings at which it occurred and the knowledge and means of knowledge of the defendants of the defect and the reasonableness in the circumstances of requiring or expecting that they made use of the remedy in all the particular circumstances.

We return then to the circumstances of this case, of which the most relevant seem to us to be the following. First, the defendants who, for present purposes, we assume were subject to the jurisdiction of the Tyler court, were duly served with the proceedings; they chose to take no part in them; they were given notice of the application for the default judgment; they chose not to attend the hearing of that application; and they were thereafter served with the default judgment.

Secondly, on service of the judgment, the defendants knew the amount of the award to each plaintiff. It seems that they could have obtained access to the medical records as to each plaintiff referred to in the judgment, and advice as to the question whether, upon such material, the awards appeared excessive according to the law in the Tyler court.

Thirdly, by not attending the application for the default judgment, the defendants deprived themselves of information as to what occurred before the court. If they had attended before Judge Steger, the nature of the proceedings would have been largely apparent. The proceedings took place in public before the judge, and, at least so far as concerned the facts that there was no evidence received by the judge in court on the hearing and no arguments presented to the court, the defendants would have discovered those facts.

Fourthly, it would have been open to them to apply for the judgment to be set aside if they had formed an intention to contest the amount of

1 Ch.                     Adams v. Cape Industries Plc. (C.A.)

A    the awards. It seems to us to be probable at least that, since the method
of assessment adopted by Judge Steger was contrary to the Federal
Rules, an application of this nature made promptly to the Tyler court
would have succeeded.

Fifthly, however, when the judgment was served
upon them, could not and did not know the method by which damages
had been assessed from anything stated in the judgment. The recitals in
B    the judgment were, as Scott J. held, false and misleading: there had
been no hearing at which damages had been assessed. The facts as to
what happened in the Tyler court became known to the defendants at
latest when evidence was given in the proceedings before Scott J. There
was, as we understand it, no evidence from the defendants directed to
the question when they first had knowledge of the method adopted by
C    Judge Steger for assessing damages. There is, however, nothing to
indicate that they were aware of the method adopted at any time before
the date when, after claims were made on them in this country on the
basis of the default judgment, the circumstances in which the judgment
was made were investigated for the purposes of these proceedings.

D    *Conclusion on the natural justice issue*

Giving full force to all these facts, we find it impossible to say that,
because the defendants did not apply to set the default judgment aside,
they could not rely upon the substantial injustice in the proceedings
constituted by the failure of the court to assess the damages judicially upon
the evidence. They did not wish to dispute the amount of the damages
E    award by presenting a case to the Tyler court. We cannot have regard, as
an excuse available to them, to the reason why they chose not to appear,
namely their unwillingness to submit to the jurisdiction of the Tyler court.
However, it cannot, in our view, be required of them that they should
have applied to the Tyler court to contest the amount of damages awarded
when they were necessarily content to leave the amount of the damages to
be assessed by the court. The only complaint which the defendants could
F    thereafter make would be as to procedural irregularity. As to that, as we
have stated, they had at the time of service of the judgment no knowledge.
The defendants were not told before the application for the default
judgment that plaintiffs' counsel intended to invite Judge Steger to accept
the view of plaintiffs' counsel as to the total value of the claim, based upon
an average of $120,000 per plaintiff, and that the plaintiffs would accept in
G    substitution for the assessment of the damages by the judge, such counter-
proposal based upon an average sum per plaintiff as the judge might be
minded to make, from his general knowledge of the proceedings and of the
settlement in the Tyler 2 proceedings to that date and from his knowledge
of national average settlement figures in asbestosis cases.

The fact that information as to the procedural defect would probably
have emerged if Cape had made an application to set the default judgment
H    aside on other grounds, seems to us to be of no relevance. Cape are not to
be treated as having information which they did not have because, if they
had made an application which they had no reason to make, they could
have obtained that information.

572

A harsh but accurate summary of what happened is, in our judgment, that those acting for the plaintiffs failed to give prior notice to the defendants of the unusual course which they intended to pursue; they chose not to try to prevent Judge Steger from adopting that method of assessment; and they drew up and served a form of judgment which did not reveal what had taken place. That was all done in good faith. There was no dishonest purpose. But the effect upon the defendants was, in our view, that they had at no material time knowledge of any basis for seeking relief from the Tyler court in respect of the defect which Scott J. rightly held to have been demonstrated by them to have occurred in the proceedings in the Tyler court.

The only basis for attributing to the defendants constructive knowledge of the defect, upon which they could reasonably be required to have used any available remedy in the Tyler court, would be that a defendant who has been given notice of the proceedings will be fixed with knowledge of everything which he would have learned if he had attended those proceedings. That, in our judgment, is not an acceptable basis for considering proof of procedural injustice. Plaintiffs can, we think fairly be left to avoid such procedural errors as will prevent enforcement of a judgment in this country.

Accordingly, on the natural justice issue, although for somewhat different reasons, we would uphold the decision of Scott J.

### V Conclusion

In the result, while we have some doubts as to whether the judge reached the right conclusion on the country issue, we are satisfied that he reached the right conclusions on the presence issue and the natural justice issue. He was accordingly right, in our judgment, to dismiss the plaintiffs' claims and this appeal likewise must be dismissed.

Finally, we acknowledge our debt to all counsel on both sides for the great assistance which they have given us in this interesting but exceptionally difficult case.

*Appeal dismissed with costs.*
*Leave to appeal refused.*

24 October 1989. The Appeal Committee of the House of Lords (Lord Keith of Kinkel, Lord Griffiths and Lord Ackner) dismissed a petition by the plaintiffs for leave to appeal.

*Solicitors: Nabarro Nathanson; Davies Arnold & Cooper.*

A. R.

Exhibit 2

486

# Re Polly Peck International plc.
# Barlow & Ors v Polly Peck International Finance Ltd & Anor.

Chancery Division.
Robert Walker J.
Judgment delivered 6 December 1995.

*Administration – Scheme of arrangement – Application for directions – Bond issues by subsidiary secured by holding company – Subsidiary on-lending to holding company – Rule against double proof – Corporate personality – Status of subsidiary – Whether agent or nominee – Whether cipher or façade – Whether group single economic unit.*

This was an application seeking directions to decide a preliminary issue on the rule against double proof in a scheme of arrangement concerning a company in administration.

Polly Peck International plc ('PPI') was the holding company in a group containing subsidiaries in many countries with a diversified range of interests. In 1987 a new wholly-owned subsidiary, Polly Peck International Finance Ltd ('PPIF'), was incorporated in the Cayman Islands which in eight bond issues guaranteed by PPI raised over £400m which it on-loaned to PPI for the group's business activities. The directors of PPIF were directors of PPI and although registered in the Caymans PPIF was resident in the UK and run from PPI's then head office in London. The group ran into severe financial difficulties in 1990 and an administration order was granted over PPL In 1995 the administration purposes were extended to include a scheme of arrangement which provided for the collection, realisation and distribution of PPI's assets. PPIF went into creditors' voluntary liquidation in the Caymans.

Directions were sought whether admission of a claim by PPIF on PPI for return of the on-lending of the bond issues proceeds and the bondholders' claims against PPI as guarantor of the issues would infringe the rule against double proof. The scheme supervisors argued that only one proof could be admitted since PPIF was acting as nominee or agent for PPI or by lifting the corporate veil PPIF was a cipher or façade for it; alternatively that the group situation be regarded as a single economic unit.

*Held,* both claims to be admitted in full as scheme liabilities:

1. The bond issues were conducted between PPIF, PPI and lead managers on behalf of banks, there was a guarantee between PPI, the lead managers and the banks, and PPIF issued a 42-page prospectus. The bond issue was made by PPIF and the above documentation indicted that it did not do so as agent or nominee for PPI.

2. PPIF was not a mere cipher or façade for PPI. The submission that PPIF was a cipher only added colour and force to the submission of agency or nomineeship which had been rejected. The courts may lift the corporate veil where a company is a façade as an unconscionable attempt to avoid existing obligations or to practice some deception; PPIF was more than a mere façade. (*Adams v Cape Industries plc* [1990] Ch 433; [1990] BCC 786 distinguished.)

3. Although the bondholders must have intended to rely on the credit-rating and covenant as guarantor or principal obligor (after substitution) of PPI, and even if PPIF acted as an independent principal and the on-lending within the group was so much a composite transaction as not to rank in substance as a separate debt, nevertheless to accede to the argument that a closely-integrated group be considered a single economic unit for the purpose before the court would be to add to the exceptions provided in *Adams v Cape Industries plc* by the Court of Appeal after full consideration and was not open to the court in this instance.

© 1996 CCH Editions Limited

bcp98 bcp · 184 Mp · 486 · bcp19455

**1or.**

.The following cases were referred to in the judgment:

*Adams v Cape Industries plc* [1990] Ch 433; [1990] BCC 786 (CA).
*AG Securities v Vaughan* [1990] 1 AC 417.
*Aslan v Murphy* [1990] 1 WLR 766.
*Bank of Tokyo Ltd v Karoon Ltd* [1987] AC 45.
*Barclays Bank Ltd v TOSG Trust Fund Ltd* (1984) 1 BCC 99,017; [1984] AC 626.
*Canada Rice Mills Ltd v R* [1939] 3 All ER 991.
*Ellis v Emmanuel* (1876) 1 ExD 157.
*Firestone Tyre & Rubber Co Ltd v Llewellin* [1957] 1 WLR 464.
*Ford & Carter v Midland Bank* (1979) NLJ 543.
*Gilford Motor Co Ltd v Horne* [1933] Ch 935.
*Helby v Matthews* [1895] AC 471.
*Hoey, Re* (1918) 88 LJKB 273.
*IR Commrs v Duke of Westminster* [1936] AC 1.
*Jones v Lipman* [1962] 1 WLR 83.
*Liverpool (No. 2), The* [1963] P 64.
*McEntire v Crossley Brothers Ltd* [1895] AC 457.
*Melton, Re* [1918] 1 Ch 37.
*Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] BCC 942; [1995] 2 AC 500.
*Moss, Re* [1905] 2 KB 307.
*Oriental Commercial Bank, Re* (1871) 7 Ch App 99.
*Prudential Assurance Co Ltd v Newman Industries Ltd (No. 2)* [1982] Ch 204.
*Salomon v Salomon & Co Ltd* [1897] AC 22.
*Sass, Re* [1896] 2 QB 12.
*Welsh Development Agency v Export Finance Co Ltd* [1992] BCC 270.
*Woolfson v Strathclyde Regional Council* 1978 SLT 159.

Leslie Kosmin QC and David Chivers (instructed by Cameron Markby Hewitt) for the applicants.

Gabriel Moss QC (instructed by Lovell White Durrant) for the respondents.

JUDGMENT

**Robert Walker J: Polly Peck: the scheme of arrangement**

In the late 1980s Polly Peck International plc ('PPI') was the holding company of a fast-growing group with a diversified range of interests. The group's core activities were agriculture and food production but they extended to electrical consumer goods, textiles, pharmaceuticals, cosmetics and tourism. PPI had subsidiaries in many countries including England, North Cyprus, Turkey, Hong Kong, the US, Switzerland and Liberia.

PPI ran into severe financial difficulties in 1990 and on 25 October 1990 it went into administration. The purposes of the administration order made by Morritt J were those specified in s. 8(3)(a) and (d) of the *Insolvency Act* 1986, but it is now clear that PPI is not going to be able to trade out of its difficulties. The purposes of the administration have been extended to seeking approval of a scheme of arrangement, and after a creditors' meeting on 26 April 1995 a scheme of arrangement was approved on 11 May and took effect on 18 May.

The scheme provides (para. 2) for the usual moratorium and (para. 3) for the collection and realisation of PPI's assets. Scheme claims were to be notified to the scheme supervisors who could admit or reject them in whole or part, or refer them to the court. Paragraph 7(i) provides that the supervisors are not to admit any claim which would not be admissible in a liquidation if PPI had gone into compulsory liquidation on the date when the scheme took effect.

**488**                      Re Polly Peck International plc                    [1996] BCC
                                   *(Robert Walker J)*

Paragraph 9 of the scheme provides for the distribution of the scheme assets (after provision for costs and preferential claims and subject to some special provisions as to the so-called club banks) rateably between scheme creditors whose claims have been admitted. Paragraph 9.9 is in these terms:

'No scheme creditor shall be entitled to receive an amount in the scheme which exceeds the amount of his scheme claim nor to prove more than once in respect of any scheme claim, and for the avoidance of doubt the rule against double proof shall apply in respect of all distributions and reserves made in the scheme.'

The scheme is therefore on familiar lines, providing for a sort of notional liquidation in advance of any actual liquidation, with a view to saving costs.

The matter which I have to decide is a preliminary issue (ordered by Mr Registrar Buckley on 5 September 1995) on a summons seeking directions under the scheme. The issue is as to the application of the rule against double proof. The circumstances in which the issue arises are connected with a subsidiary of PPI, Polly Peck International Finance Ltd ('PPIF') which was incorporated in the Cayman Islands on 20 May 1987.

### The bond issues

Between June 1987 and February 1990 there were no fewer than eight bond issues which raised a total of SFr 665m and DM 100m – a total of over £400m at current exchange rates – for the PPI group. Except for some points of difference summarised below, all eight issues were arranged on the same general lines: they comprised unsecured, unsubordinated fixed-rate bearer bonds issued by PPIF and guaranteed by PPI. The lead manager for the Swiss franc issues was SG Warburg Soditic SA ('Warburg SA') and for the single DM issue, Arab Banking Corporation-Daus & Co GmbH ('ABC-Daus'). ABC-Daus assumed the position of trustee for the bondholders under the DM issue. Each of these lead managers also acted as principal paying agent.

The eight bond issues were as follows:

| | Amount | Payment date | Rate | Redemption |
|---|---|---|---|---|
| 1 | SFr 65m | 7 July '87 | 3% | 1997 |
| 2 | SFr 75m | 13 Aug '87 | 6% | 1992 |
| 3 | SFr 50m | 19 Nov '87 | 6¼% | 1990 |
| 4 | SFr 100m | 7 Apr '88 | 5¼% | 1993 |
| 5 | DM 100m | 20 Apr '88 | 6% | 1993 |
| 6 | SFr 125m | 20 Sept '89 | 5½% | 1994 |
| 7 | SFr 100m | 1 Mar '89 | 6¼% | 1996 |
| 8 | SFr 200m | 1 Mar '90 | 8¼% | 1997 |

In the event only SFr 150m was raised under the last issue.

There were two main differences between the issues. The first issue was convertible into ordinary shares of PPI (a right reflected in the interest rate) and the whole issue was in fact converted into PPI ordinary shares, or (as to a small balance) redeemed, before PPI crashed. The first issue is nevertheless significant because in other respects it set the pattern for later issues. The DM issue was established with ABC-Daus as a trustee – a feature not found in the SFr issues – and it did not in terms provide for PPI to be liable as a principal obligor (although PPI's obligations as guarantor were stated in cl. 3 of the guarantee agreement to be 'autonomous and independent'). It is however common ground that nothing turns on any difference between PPI's obligations under the SFr. issues (which were governed by Swiss law) and its obligations under the DM issue (which was governed by German law).

The first issue was discussed at a meeting at 42 Berkeley Square, London W1 (then PPI's head office) on 5 May 1987. It was chaired by Mr David Fawcus, then PPI's finance

© 1996 CCH Editions Limited

director, and attended by representatives of Warburg SA, two firms of London solicitors, and Stoy Hayward (PPI's auditors) as well as by PPI personnel. It considered a board paper (prepared by Mr Wood, the group treasurer) which proposed:

> 'that the bonds be issued in the name of a new Cayman Islands subsidiary under the guarantee of [PPI]'

in order to avoid onerous listing requirements in London, and achieve certain tax advantages. The board paper estimated the costs of the issue:

> 'In simple terms, front end costs are likely to be about £1.6m or just under four per cent of total raised. Annual costs will be about 3.3 per cent or 6.0 per cent, inclusive of hedging expenses, for tranche A and B respectively.'

(The two tranches had different coupons and conversion terms.) The board paper assumes, but does not refer to the proceeds of the issue being lent on to PPI.

PPI, through its London solicitors, then took advice from Cayman attorneys as to the formation and use of a Cayman financial vehicle. The Cayman attorneys gave full written advice in a faxed letter dated 11 May 1987. Their advice included the following advice as to the on-loan from PPIF (as it was named on its incorporation) to PPI:

> 'It is usually the case that commercial paper issues and traditional forms of Eurocurrency financing can be structured so as not to constitute "banking business". However, some care needs to be paid to the manner in which funds are raised and are then on-lent to the parent or other companies within the relevant group. Thus, the on-lending arrangements should be evidenced by appropriate documentation (which can of course be relatively brief given the in-house nature of the transactions). In particular those on-lending arrangements should be structured so that the repayment of the loans is not simply on a demand basis. Other clients at this firm have not met any difficulty meeting these parameters.
>
> Cayman Islands' Companies Law follows English legal principles. Thus a company should only enter into transactions intended for its benefit and the directors must act in good faith in the interests of the company. As a result, the financing arrangements should be structured so as to produce a profit (albeit small) for the Cayman Islands' company. Generally speaking this is achieved by the company charging a rate of interest when on-lending these funds which is higher than the rate it pays on the borrowed funds or by the company charging a fee.'

On 13 May 1987 there was a board meeting of PPI at 42 Berkeley Square attended by Mr Asil Nadir (the chairman and chief executive of PPI), Mr Ellis (a senior executive), Mr Fawcus (the finance director) and others. The board considered the paper on the convertible SFr issue and approved it, subject to approval by certain other interests. PPIF was then incorporated with Mr Moon (a Cayman attorney), Mr Nadir, Mr Ellis and Mr Fawcus as its directors. It had an authorised capital of SFr 1m, divided into shares of SFr 1; 25,000 of them were issued and credited as fully paid. PPIF has always been a wholly-owned subsidiary of PPL. Mr Moon resigned as a director at the first board meeting of PPIF held on 28 May 1987. Thereafter the board of PPIF consisted solely of individuals who were also PPI directors, meeting at 42 Berkeley Square. There was never any attempt to argue that PPIF's directing mind was outside the UK or that the company was non-resident for UK tax purposes (indeed, its residence in the UK was necessary for purposes of group relief).

There are some features common to all the bond issues which call for mention, because they were relied on by counsel in their submissions. Each of the bond issues stated in its prospectus that the proceeds of the issue were to be used for refinancing and development of the Polly Peck group's business activities. The form of words used varied to some extent (the exact words of each prospectus are quoted in para. 16 of an affidavit sworn

on 27 September 1995 by Mr David Kidd, a partner in the solicitors acting for the scheme supervisors); but the general effect did not vary much.

Each of the Swiss bond issues also included in its conditions a provision for PPI or another non-Swiss subsidiary of PPI to be substituted for PPIF as the principal obligor, with the consent of Warburg SA, such consent not to be unreasonably withheld so long as the bondholders' interests were adequately protected (especially as regards tax). The DM bond issue contained a similar provision for substitution in a manner satisfactory to ABC-Daus.

### The on-loan from PPIF to PPI

The Cayman attorneys' advice that the on-lending arrangements should be evidenced by appropriate (if brief) documentation was not carried through, so far as the administrators' scrutiny of PPI's papers has revealed. In October 1987 London solicitors sent instructions to tax counsel to settle a draft loan agreement for the on-loan from PPIF to PPI. That was after the second SFr issue had been completed and when the third issue was about to be completed. After some supplementary instructions had been sent and a consultation had been held in January 1988, tax counsel settled the draft agreement on 29 February 1988 in a form which recited an on-loan from PPIF to PPI of approximately SFr 135.15m, the balance of SFr 4.85m (representing the costs of the first two SFr issues totalling SFr 140m) being treated as an arrangement fee payable by PPI to PPIF. The draft provided in advance for similar treatment of future costs of the first two issues. (The lawyers were in fact being rather overtaken by events, because by the time the draft was settled the third SFr issue had also been completed and the fourth SFr issue, and the DM issue, must have been in the pipeline.) The draft loan agreement provided for the on-loan to carry interest:

'payable half-yearly at the rate of ¹⁄₄ per cent above the rate of interest payable by PPIF in respect of the corresponding tranche of the bonds [viz. the first two issues] or at such other rate or rates as shall from time to time be agreed between the parties.'

As I have said, no executed loan agreement between PPIF and PPI (either in the above or in any other form) has been found and there is no evidence (either in the form of board minutes or in any other form) that any such loan agreement ever existed. The draft settled by tax counsel provides some evidence at least as to the transaction having had the character of a loan.

In practice, once PPIF had formally joined in a bond issue, its involvement in the subsequent management of the issue seems to have been minimal. It had no current account at a bank (though the proceeds of each issue do seem to have been held briefly to an account in PPIF's name at the lead manager's bank.) In practice all payments of interest, fees and costs in connection with the bonds seem to have been made by PPI, and the state of account between PPI and PPIF can be determined only by internal accounting records kept at PPI's offices and from PPIF's financial statements. There are financial statements of PPIF for the accounting period to 31 December 1988, signed by Mr Nadir and Mr Fawcus and audited by Stoy Hayward which show PPIF as having a revenue reserve of SFr 696,000 at 31 December 1988. This appears to reflect the ¹⁄₄ per cent turn (provided for in the draft loan agreement) on outstanding bonds to the amount of about SFr 435m; this was on the basis that PPI had borne initial costs of bond issues which by then amounted to SFr 10m. PPI's practical responsibility for servicing the bonds was also reflected in communications from the principal paying agents: Warburg SA sent demands for interest direct to PPI, and ABC-Daus sent them to PPIF 'care of' PPI.

Another scrap of evidence is a letter that Mr Spencer of Stoy Hayward wrote to Mr Fawcus (the financial director of PPI) on 29 September 1987. Mr Spencer referred to an

© 1996 CCH Editions Limited

bcp96 bcp    184 Mp  490   —bcp18455

A    election under the *Income and Corporation Taxes Act* 1970, s. 256 (group relief) which
was outstanding and advised that:

> 'if you are funding the interest payment from PPI it is important initially that this
> will be in the form of an interest-free advance which can be set off against the
> interest payment due and payable once we have formally received clearance from
> the Inland Revenue.'

B    Mr Fawcus wrote on the letter a manuscript note to Mr Wood:

> 'A lot of garbage. Just note that PPI should not pay *interest* to PPIF until tax
> status of PPI is cleared. Until then payments should take the form of an *advance*.'

So despite his initial comment Mr Fawcus seems to have understood and accepted the
essential point of the advice.

Apart from its involvement in the bond issues PPIF was a party to two other group
C    transactions. On 4 November 1987 it provided security to Banque Paribas (Suisse) SA
for an advance of SFr 15m. On or about 19 October 1987 it joined with PPI in a joint
and several guarantee to a Hong Kong group creditor, BSR International plc. Both these
seem to have been short-term transactions which give rise to no continuing liability.

I have gone into these factual matters at what would be, in other circumstances,
D    excessive detail because of the submission made to me by Mr Leslie Kosmin QC (who
appears with Mr David Chivers for the supervisors) that PPIF was, in relation to the
bond issues, a cipher, agent or nominee. That submission is controverted by Mr Gabriel
Moss QC, who appears for both the respondents, PPIF and ABC-Daus. They have a
common interest in resisting the conclusion that this is a case of double proof (if they fail
in that their interests will diverge as to which claim should be rejected; but the order for
a preliminary issue recognises that that second stage may not be reached).

E    Before making any finding on the secondary issues of fact (that is whether PPIF was a
cipher, agent or nominee) I must summarise the claims that have been put in, and then
turn to the questions of law that have been argued before me.

**The notices of claim**

PPIF was placed in creditors' voluntary liquidation in the Cayman Islands on 23
F    March 1995. It has two chartered accountants as joint liquidators, one practising in the
Cayman Islands and one in London. On 24 May 1995 the London-based liquidator, Mr
Beirne, submitted to the scheme supervisors a notice of claim (as at 15 May 1995)
approximately as follows:

| | SFr | DM | Total (£) |
|---|---|---|---|
| principal | 600m | 100m | 361m |
| interest | 209m | 32m | 124m |
| total | 809m | 132m | 485m |

The claim for interest was based on the bond rates, plus $\frac{1}{4}$ per cent, for periods starting
in late 1989 or in 1990.

On 9 June 1995 ABC-Daus gave notice of a claim (as at 15 May 1995) for about
£64.65m, about £44m of which represented principal (the rest was for interest, including
£7m default interest under the German civil code, and £170,000 legal costs). It has been
agreed that Warburg SA should act as agent for the Swiss bondholders, who have claims
against both PPIF and PPI. The total claims against PPI so far notified by Warburg SA
amount to about £421m.

When Mr Kidd swore his affidavit on 27 September 1995 the position was that the
bulk of the ABC-Daus claim had been admitted by the scheme supervisors, apart from
the default interest, and the Warburg SA claim had been admitted almost in its entirety.

Mr Moss tells me, no doubt correctly, that the default interest has since been admitted.  A
Bondholders' admitted claims against PPI as guarantor are therefore of the order of
£485m. PPIF's unadmitted claim is approximately the same size. Apart from these claims
and the 'club bank' claims, there are other scheme claims against PPI amounting to a
sum of the order of £1 billion. The double proof point does therefore have a significant
effect on the distribution of assets.

A dividend of 1.1p in the £ has already been paid under compromise arrangements      B
approved by Mr Registrar Buckley on 19 October 1995. The scale of further dividends
will, I understand, depend on the outcome of pending litigation.

The issue which I have to decide is put this way in para. 44 of Mr Kidd's affidavit:

> 'Having investigated PPIF's claim in the scheme, the supervisors have become
> concerned that, due to what appeared to them to be the lack of separate corporate   C
> personality on the part of PPIF, the court might hold that the corporate veil should
> be lifted so preventing PPIF from maintaining a claim separate from the
> bondholders' claims against PPI. Alternatively, even if PPIF is entitled to a
> separate claim, such a claim might be held to arise out of what is, in substance, the
> same debt (being the debt to the bondholders), so that PPIF would be barred from
> receiving a dividend in addition to that payable to the bondholders by the rule
> against double proof. In these circumstances the supervisors have decided, on the   D
> basis of legal advice, that they should seek directions from the court before paying
> any dividends to both the bondholders and PPIF.'

### The rule against double proof

The rule against double proof is a long-standing principle of the law of bankruptcy,
and has applied in the winding up of companies since the *Companies Act* 1862: see *Re
Oriental Commercial Bank* (1871) 7 Ch App 99. It has often been described in terms of   E
straightforward and obvious fairness, depending on substance, not form. Thus in the
last-mentioned case Mellish LJ said (at pp. 103–104):

> 'The principle itself – that an insolvent estate, whether wound up in Chancery or
> in bankruptcy, ought not to pay two dividends in respect of the same debt –
> appears to me to be a perfectly sound principle. If it were not so, a creditor could
> always manage, by getting his debtor to enter into several distinct contracts with   F
> different people for the same debt, to obtain higher dividends than the other
> creditors, and perhaps get his debt paid in full. I apprehend that is what the law
> does not allow; the true principle is, that there is only to be one dividend in respect
> of what is in substance the same debt, although there may be two separate
> contracts.'

See also *Re Moss* [1905] 2 KB 307 at p. 312; *Re Melton* [1918] 1 Ch 37 at p. 60; *Re Hoey*   G
(1918) 88 LJKB 273 at p. 274; *The Liverpool (No. 2)* [1963] P 64 at p. 84; and *Barclays
Bank Ltd v TOSG Trust Fund Ltd* (1984) 1 BCC 99,017; [1984] AC 626 at p. 99,023; 636
(Oliver LJ), pp. 99,039–99,040; 659–660 (Slade LJ). In the last case Kerr LJ said (at
p. 99,032; 649A):

> 'The rule against double proof is highly technical in some facets of its application,
> but ultimately it is based on what the court regards as justice between all the      H
> creditors.'

It appears that the most technical facet which Kerr LJ had in mind was the distinction
(discussed in the judgment of Oliver LJ at p. 99,028; pp. 643–644), between the guarantee
of a part of a debt, and the guarantee of the whole debt subject to a limitation on the
guarantor's liability. I will call this the *Ellis v Emmanuel* distinction (see *Ellis v Emmanuel*
(1876) 1 ExD 157; also *Re Sass* [1896] 2 QB 12). In *Barclays Bank v TOSG Trust Fund*

the Court of Appeal had the difficult task of applying the *Ellis v Emmanuel* distinction, by analogy, to unusual and complicated facts (on which the House of Lords ((1984) 1 BCC 99,081) then took a different view, so that no question of double proof arose).

Much the commonest situation in which the rule against double proof applies is that of suretyship. Indeed it has been said that it applies only in a situation which actually is, or is analogous to, that of suretyship (the latter category includes the old cases on negotiable instruments considered in *Re Oriental Commercial Bank* (1871) 7 Ch App 99). It is therefore convenient to set out some very elementary rules as to suretyship, shorn of complications arising from the provision of security or from the *Ellis v Emmanuel* distinction. In what follows C is the principal creditor, D the principal debtor, and S the surety (and all are companies).

(1)  So long as any money remains due under the guaranteed loan, C can proceed against either D or (after any requisite notice) S.

(2)  If D and S are both wound up, C can prove in both liquidations and hope to receive a dividend in both, subject to not recovering in all more than 100p in the £.

(3)  S's liquidator can prove in D's liquidation (under an express or implied right of indemnity) only if S has paid C in full (so that C drops out of the matter and S stands in its place).

(4)  As a corollary of (3) above, S's liquidator cannot prove in D's liquidation in any way that is in competition with C; though S has a contingent claim against D (in the event of C being paid off by S) S may not make that claim if it has not in fact paid off C.

The situation in (2) above is what insolvency practitioners call a 'double-dip', which is permissible; the situation in (4) above is the simplest case of what would be double proof, which is not permissible.

So far as the basis of the rule needs (or indeed allows of) further explanation it is that the surety's contingent claim is not regarded as an independent, free-standing debt, but only as a reflection of the 'real' debt – that in respect of the money which the principal creditor had loaned to the principal debtor. Similarly in the cases analogous to a suretyship situation: in *Re Hoey* the only true debt, in substance, was to the mortgagee, Mr O'Brien, and Dr Hoey's covenant with his wife (when he conveyed the mortgaged property to her) to pay off the mortgage was merely a reflection of his existing liability to Mr O'Brien, and of his aspiration that he (Dr Hoey) would bear it, in exoneration of the mortgaged property. Similarly in *The Liverpool (No 2)* (the most distant analogy for application of the rule, since it was an admiralty case) the Court of Appeal concluded that the only true liability, in substance, was that arising from the negligent navigation of the tanker, and that the claim against the owners of the beached coaster (which the Mersey Docks and Harbour Board had under its statutory powers) was in substance a partial reflection of the primary liability – in short, part of the same debt.

In *Barclays Bank v TOSG Trust Fund* (where the Court of Appeal were also ready to extend the suretyship analogy some way, though on a view of the facts which the House of Lords held to be mistaken) Oliver LJ said in a passage which I have referred to but not yet set out ((1984) 1 BCC 99,017 at p. 99,023; [1984] 1 AC 626 at p. 636D), that it was a fallacy to argue:

'that because overlapping liabilities result from separate and independent contracts with the debtor, that, by itself, is determinative of whether the rule can apply. The test is in my judgment a much broader one which transcends a close jurisprudential analysis of the persons by and to whom the duties are owed. It is simply whether the two competing claims are, in *substance*, claims for payment of the same debt twice over.'

**494**               Re Polly Peck International plc          [1996] BCC
                         (Robert Walker J)

**'Substance', corporate personality and the corporate veil**

Mr Kosmin relied strongly on this passage in contending that the bond issues by PPIF (guaranteed by PPI) and PPIF's on-lending to PPI were so closely connected as to result in the bondholders' claim against PPI as guarantor and PPIF's claim against PPI as principal creditor being 'in substance, claims for payment of the same debt twice over'. Mr Kosmin developed his argument in various ways which naturally involved some overlap; but I hope I can fairly summarise the way he put his case as follows:

(1)   that on a correct view of the facts, PPIF was in effecting the bond issues:

    (a)  an agent or nominee for PPI, or alternatively

    (b)  a cipher or façade for PPI;

(2)   that even if PPIF acted as an independent principal, the on-lending within the Polly Peck group was still so much a part of the same composite transaction as not to rank, in substance, as a separate debt.

Mr Kosmin accepted that there is no authority illustrating the application of the rule against double proof in this sort of situation (that is, indebtedness within a group of companies) but called in aid the words of Kerr LJ in *Barclays Bank v TOSG Trust Fund* (1984) 1 BCC 99,017 at p. 99,034; [1984] 1 AC 626 at p. 652C,

    'sometimes, in new situations, the court has to find a just solution which stems simply from the nature of the transaction, the relationship between the parties and their presumed common intention'.

Mr Moss for his part says, rightly, that this sort of transaction of guaranteed borrowing and on-lending by a special-purpose financial vehicle is a commonplace occurrence in capital markets (this point is borne out by the letter from the Cayman attorneys, which seems to be giving fairly standard advice in a fairly standard situation). Mr Moss goes on to submit that the double proof point, if sound, would introduce a new and alarming element of uncertainty into capital markets. I think this argument *in terrorem* may be a bit overstated, since investors in unsecured bonds issued in this way must be relying on the credit rating of the guarantor, and not on some calculation of the chances of a 'double-dip' against the guarantor and the financial subsidiary in the event of default. Nevertheless the point raised is a novel point of some commercial importance.

Before I examine more closely the different ways in which Mr Kosmin puts his case it may be helpful to make some preliminary points. First, as to substance. In *Welsh Development Agency v Export Finance Co Ltd* [1992] BCC 270 at p. 300G Staughton LJ said (in the context of deciding whether a commercial document effected a sale or a charge):

    'The problem is not made easier by the variety of language that has been used: substance, truth, reality, genuine are good words; disguise, cloak, mask, colourable device, label, form, artificial, sham, stratagem and pretence are "bad names", to adopt the phrase quoted by Dixon J in *Palette Shoes Proprietary Ltd v Krohn* (1937) 58 CLR 1 at p. 28. It is necessary to discover, if one can, the ideas which these words are intended to convey.

One can start from the position that statute law in this country, when it enacts rules to be applied to particular transactions, is in general referring to the legal nature of a transaction and not to its economic effect. The leading authority on this point, albeit in a case from Malaya, is the advice of Lord Devlin in *Chow Yoong Hong v Choong Fah Rubber Manufactory* [1962] AC 209 at p. 216:

    "There are many ways of raising cash besides borrowing . . . If in form it is not a loan, it is not to the point to say that its object was to raise money for

© 1996 CCH Editions Limited

one of them or that the parties could have produced the same result more conveniently by borrowing and lending money." '

Those were statutory contexts (registration of charges and regulation of moneylending) but I think they also support the general proposition that when the law is looking for the substance of a matter, it is normally looking for its legal substance, not its economic substance (if different). As Goff LJ put it in *Bank of Tokyo Ltd v Karoon Ltd* [1987] AC 45 at p. 64, we are concerned not with economics but with law.

Secondly, the House of Lords' affirmation in *Salomon v Salomon & Co Ltd* [1897] AC 22 of the separate legal personality of even a one-man company does not of course mean that registered companies have all the characteristics of, and no characteristics not shared by, natural persons. One aspect of this has recently been explained by Lord Hoffmann in giving the opinion of the Privy Council in *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] BCC 942; [1995] 2 AC 500. Another aspect is that whereas natural persons do not (since the abolition of slavery and the passing of the Married Women's Property Acts) own the persons or property of other human beings, commercial companies do have owners. Their shareholders have an economic interest in their commercial success. Although the shareholders do not own their company's assets, a wrong to the company (if uncompensated) may cause them economic loss. But in general the shareholders will have no direct right of action in respect of such loss: see *Prudential Assurance Co Ltd v Newman Industries Ltd (No. 2)* [1982] Ch 204 at p. 223. This point was not mentioned in argument, being neither controversial nor directly relevant; but I think it worth mentioning both in order to identify and distinguish another corporate 'double recovery' problem which does not arise here, and because it leads on to the topic of intra-group indebtedness, which is directly relevant in this case.

The third point is that where there is a group of companies and they are all solvent, a claim by one group company against another, even though sound in law, is likely to have only marginal economic effects (it may have some, for instance in connection with taxation). But as soon as both companies go into insolvent liquidation, any claim between them assumes much greater importance (unless by an extraordinary coincidence both have identical creditors with identical claims, which is certainly not the case here). That is, I think, the point that Lord Wilberforce must have had in mind when he said in *Ford & Carter v Midland Bank* (1979) NLJ 543 at p. 544,

'When creditors become involved, as they do in the present case, the separate legal existence of the constituent companies of the group has to be respected.'

This important effect of group insolvency needs to be underlined because it has sometimes been suggested (for instance by Oliver LJ in *Barclays Bank v TOSG Trust Fund* (1984) 1 BCC 99,017 at pp. 99,023; [1984] AC 626 at pp. 636–637) that it is useful to test a disputed case of double proof by reference to the situation as it would be if all parties were solvent. In circumstances of all-round group insolvency that may not be a wholly reliable test. It is not now open to PPI's administrators to pay off the bondholders in full and, by doing so, to discharge its obligation to PPIF (and, simultaneously, PPIF's obligation to the bondholders).

### Issue 1(a): Was PPIF an agent or nominee?

In *Salomon v Salomon & Co Ltd* [1897] AC 22 the House of Lords roundly rejected the conclusion of the lower courts that Salomon & Co was a 'mere nominee or agent' of Mr Aron Salomon, or his 'alias', or that his fellow shareholders were 'dummies' (see at pp. 35, 42, 43). There are of course many cases in which it has been held, on the facts, that a company has acted as an agent or nominee, either for its principal shareholder or for some other party, and several of them were cited to me (for instance *Canada Rice Mills*

**496**

Re Polly Peck International plc
(Robert Walker J)

[1996] BCC

ChD

*Ltd v R* [1939] 3 All ER 991 and *Firestone Tyre & Rubber Co Ltd v Llewellin* [1957] 1 WLR 464). But neither agency nor nomineeship – nor, still less, sham or something akin to sham – is to be inferred simply because a subsidiary company has a small paid-up capital and has a board of directors all or most of whom are also directors or senior executives of its holding company.

Mr Kosmin does not, as I understand his submissions, contend that the arrangements between PPI, PPIF and the lead mangers were a sham (I will return below to 'cipher' and 'façade'). He does contend that a variety of factors lead to an inference of agency or nomineeship. The most important of these factors (which are all set out in the detailed skeleton argument prepared by Mr Kosmin and Mr Chivers) are the following: (i) PPIF was incorporated solely for the purpose of the bond issues; (ii) it had no separate, independent management; (iii) it had a very small paid-up capital; (iv) it did not pay the costs of the transactions and could not have done so; (v) it had no normal bank account and no separate financial records (in practice PPI saw to everything and acted as PPIF's banker and bookkeeper); (vi) the terms of the on-loan were not independently negotiated, did not serve any commercial purpose and in any case were never finally agreed, nor was the ¼ per cent turn paid otherwise than as a paper transaction; and (vii) no lender could or would have relied on PPIF's covenant, as opposed to PPI's (which could substitute itself as principal debtor if it got the approval of the principal paying agents).

In short, Mr Kosmin submits that PPIF had only a nominal role in the arrangements, and that as a matter of substance PPI should be recognised as having borrowed direct from the original bondholders, so depriving the on-loan of any legal significance (or indeed existence). To come to that conclusion I would have to find that that was the effect, not merely of what was informally arranged in the boardroom at 42 Berkeley Square, but also of the formal legal documents which were entered into on the occasion of each bond issue. On the second SFr issue (which is typical since it was the first issue of non-convertible bonds) the formal documents consisted of (i) a public bond issue agreement between PPIF, PPI and Warburg SA as lead mangers on behalf of a consortium including 26 other banks (the agreement annexed the form of the bearer bonds and the terms of their issue); (ii) a guarantee agreement between PPI, Warburg SA and the consortium; and (iii) a 42-page prospectus. All these documents made clear that the bond issue was to be made by PPIF and that PPIF's obligations were to be guaranteed by PPI, subject to the provision for substitution which I have already mentioned. The documentation on the later loans was essentially similar, subject to small variations (already mentioned) on the DM issue.

In the face of these documents I find it impossible to conclude that the factors that Mr Kosmin relies on establish a relationship of agency or nomineeship. Mr Moss referred me to some passages from the speeches in *McEntire v Crossley Brothers Ltd* [1895] AC 457 at pp. 463, 467 quoted by Dillon LJ in *Welsh Development Agency v Export Finance Co Ltd* [1992] BCC 270 at p. 280. Lord Herschell said,

'there is no such thing, as seems to have been argued here, as looking at the substance, apart from looking at the language which the parties have used. It is only by a study of the whole of the language that the substance can be ascertained.'

Similarly Lord Watson said,

'the substance of the agreement must ultimately be found in the language of the contract itself. The duty of the Court is to examine every part of the agreement, every stipulation which it contains, and to consider their mutual bearing upon each other; but it is entirely beyond the function of a Court to discard the plain meaning of any term in the agreement unless there can be found within its four corners other language and other stipulations which necessarily deprive such term of its primary significance.'

© 1996 CCH Editions Limited

**Re Polly Peck International plc**
*(Robert Walker J)*

A  (It is interesting to note that less than three weeks after judgment was given in *McEntire v Crossley Brothers*, Lord Herschell said almost exactly the same thing in another well-known case, *Helby v Matthews* [1895] AC 471 at p. 475; and it was his observations in the latter case that were cited to and discussed by the House of Lords in the leading tax case on the substance of a transaction, *IR Comrs v Duke of Westminster* [1936] AC 1 at p. 20. The on-loan in this case might be thought to have at least a passing resemblance to the on-transfer that was considered by the House of Lords in another leading tax case, *Furniss v Dawson* [1984] AC 474. But neither counsel suggested that I could get any guidance from that specialised and difficult area of authority, and probably they were right not to do so.)

Some of the factors on which Mr Kosmin relies do tend to show that the Polly Peck personnel who were concerned with the matter at 42 Berkeley Square were (to say the least) less than meticulous in their administrative procedures. I make no specific finding about that. But even blatant and reprehensible 'cutting of corners' (if it occurred) could not, it seems to me, retroactively alter the character of the transactions embodied in the formal documents by which the bond issues were effected. The factors which Mr Kosmin relies on cannot and do not in my judgment establish PPIF's role as that of agency or nomineeship, and so they do not eliminate the on-loan as a significant part of the composite transaction.

### Issue 1(b): Sham, pretence, cipher, façade

My conclusion that there was no conventional relationship of agency or nomineeship is not conclusive of the case, because Mr Kosmin had further submissions. On what I have called his point (1)(b) and his point (2) I was referred to quite a lot of authority touching on what is sometimes called lifting (or piercing) the corporate veil. That is a vivid but imprecise metaphor which has possible application in several different contexts, some far removed from this case. The most relevant, it seems to me, is where corporate personality is (in the words of Lord Keith in *Woolfson v Strathclyde Regional Council* 1978 SLT 159 at p. 161) used as 'a mere façade concealing the true facts.'

Sham, pretence, cipher and façade are all (as was said by Dixon J in the passage already quoted) 'bad names' implying a value judgment of disapprobation. 'Sham' was at least half way to becoming a term of art (requiring an intention common to all parties) but has now, it seems, been supplanted (at least in the context of licence or tenancy) by 'pretence' (see *Aslan v Murphy* [1990] 1 WLR 766 at p. 770 and *AG Securities v Vaughan* [1990] 1 AC 417 at pp. 462–465). Mr Kosmin did not rely on sham or pretence. He did submit (orally) that PPIF was a 'cipher' and (in his skeleton argument) that it was a 'façade'. I think that his use of 'cipher' was to add colour and force to his submission on agency or nomineeship (which I have already considered). 'Façade' (or 'cloak' or 'mask') is perhaps most aptly used where one person (individual or corporate) uses a company either in an unconscionable attempt to evade existing obligations (*Gilford Motor Co Ltd v Horne* [1933] Ch 935; *Jones v Lipman* [1962] 1 WLR 83) or to practice some other deception (a sort of unilateral sham, since the corporate façade has no independent mind). In *Adams v Cape Industries plc* [1990] Ch 433; [1990] BCC 786 (CA) the establishment and interposition of the Liechtenstein corporation referred to as AMC was a façade in this sense, and 'no more than a corporate name' (see [1990] Ch 433 at pp. 479 and 482 in the judgment of Scott J and [1990] Ch 433 at p. 543; [1990] BCC 786 at p. 825 in the judgment of the Court of Appeal), though the new Illinois corporation, CPC, was not. But the notion that regular sales of large volumes of South African asbestos to a US purchaser were being effected through a lawyer's office in Vaduz is to my mind of a quite different order of artificiality from the function of PPIF as a single-purpose financial vehicle (I am not overlooking the two other isolated transactions entered into by PPIF;

**Re Polly Peck International plc**
*(Robert Walker J)*                                    **[1996] BCC**

but they add little to its independent reality). In my judgment PPIF was more than a mere façade.

### Issue (2): Single economic unit

It is on this part of the case that I have found Mr Kosmin's submissions most persuasive, though I am not ultimately persuaded by them. The arguments for considering a closely-integrated group of companies as a single economic unit were fully considered (principally in the context of corporate presence as founding jurisdiction) in *Adams v Cape Industries plc* [1990] Ch 433; [1990] BCC 786, both by Scott J (in a passage at pp. 476–477) and, with a full citation of authority, in the judgment of the Court of Appeal (in a long passage at pp. 532–537; 817–821). Both passages merit careful study. The Court of Appeal concluded (at p. 536G; 820E) that:

'save in cases which turn on the wording of particular statutes or contracts, the court is not free to disregard the principle in *Salomon v Salomon & Co Ltd* [1897] AC 22 merely because it considers that justice so requires.'

Mr Kosmin seeks to add to these exceptions (turning on particular statutes or contracts) a further exception where a rule of law founded in public policy (the rule against double proof) would be frustrated by ignoring the economic reality of the single group. In that submission Mr Kosmin can and does call in aid the words of Oliver LJ in *Barclays Bank Ltd v TOSG Trust Fund* (1984) 1 BCC 99,017; [1984] AC 626 at p. 99,023; 636 that the test is,

'a much broader one which transcends a close jurisprudential analysis of the persons by and to whom the duties are owed.'

Nevertheless I am not persuaded by the argument. I can accept that as a matter of economic reality the bondholders (whose presumed intentions may be material) must have intended to rely on the credit-rating and covenant of PPI, whether as guarantor or (after substitution) as principal obligor. It is doubtful whether even the most far-sighted of them can have calculated that in the event of a crash, PPIF might have fewer unsecured creditors than PPI, and a claim against PPI under an on-loan. It was perfectly possible, consistently with each prospectus, that the proceeds of some or all of the bond issues would be loaned on, not to PPI, but to other group subsidiaries. It is also possible, though less likely, to imagine a situation in which PPIF lent on to another subsidiary, with PPI guaranteeing that borrowing also, and the second subsidiary then lending on to PPI. Each of those sequences of events would be likely to produce a different result in the event of a crash of the whole group, whether or not the rule against double proof has any application. The possibility of there being subsidiaries which were not wholly-owned subsidiaries adds to the range of imaginable variations.

Were I to accede to Mr Kosmin's submission it would create a new exception unrecognised by the Court of Appeal in *Adams v Cape Industries plc*, and that is not open to me. Moreover I think that Mr Kosmin is in one sense assuming what he seeks to prove, since the unjust or inequitable result which he asserts does not occur unless the group is recognised as being in substance a single economic entity, whose constituent members' internal rights and obligations are to be disregarded. But the authorities to which I have already referred show that substance means legal substance, not economic substance (if different), and that (as Lord Wilberforce said in *Ford & Carter v Midland Bank*) the separate legal existence of group companies is particularly important when creditors become involved. Injustice may be in the eye of the beholder, but I do not perceive any obvious injustice – certainly not such as the court can remedy – in the unpredictable consequences that may follow from the unforeseen insolvency of a large international group of companies such as the Polly Peck group.

© 1996 CCH Editions Limited
bcp96 bcp   184 Mp   498   —bcp18466

ChD                          Re Polly Peck International plc                          **499**
                                     *(Robert Walker J)*

### Conclusion

For these reasons I will answer the question posed in para. (1) of the preliminary issue in terms of subpara. (i) – that is, that both claims should be admitted in full as scheme liabilities.

As I understand it, para. (2) then also falls to be answered in terms of subpara. (i) – that is, that a dividend should be paid on both claims. But I do not recall any submissions specifically directed to para. (2), and if there is some subtlety that I have missed counsel will no doubt explain it to me.

*(Order accordingly)*

Exhibit 3

[HOUSE OF LORDS.]

DUNLOP PNEUMATIC TYRE COMPANY, } APPELLANTS;    H. L. (E.)*
LIMITED . . . . . . . . . . . .

AND                                              1915

SELFRIDGE AND COMPANY, LIMITED  .  RESPONDENTS.   April 26.

*Contract—Construction—Principal and Agent—Undisclosed Principal—Want
of Consideration moving from Principal.*

In 1911 D. & Co., who were motor accessory factors, agreed with the plaintiffs, who were motor tyre manufacturers, in consideration of the plaintiffs' allowing them certain discounts off their list prices, to buy a given quantity of the plaintiffs' goods within a specified time; also not to sell or offer the plaintiffs' goods to any person at less than the plaintiffs' list prices, except that D. & Co. were to be at liberty to allow to genuine trade customers a limited discount off such list prices, and in case of any such sale they agreed, as the plaintiffs' agents, to obtain from the trader a similar undertaking that he would observe the plaintiffs' list prices and to forward such undertaking to the plaintiffs. The plaintiffs exacted similar agreements from all their trade purchasers, and this was known to the defendants, who were large storekeepers and sold tyres by retail to the public.

In January, 1912, the defendants ordered tyres of the plaintiffs' make from D. & Co., and by an agreement purporting to be made between the defendants and D. & Co., in consideration of D. & Co.'s allowing them certain discounts off the plaintiffs' list prices, they agreed (inter alia) not to sell or offer any motor tyres of the plaintiffs' make to any private customer at less than the list prices. The plaintiffs sued the defendants for breach of this contract:—

*Held,* assuming that the plaintiffs were undisclosed principals, that no consideration moved from them to the defendants, and that the contract was unenforceable by them.

*Per* Lord Parmoor: The claim of the plaintiffs to be treated as undisclosed principals was inconsistent with the terms of the contract.

Decision of the Court of Appeal [1914] W. N. 59 affirmed.

APPEAL from an order of the Court of Appeal (1) reversing a judgment of Phillimore J.

The appellants were manufacturers of motor tyres, covers, and tubes, and substantially the whole of their business in these articles was done through the trade. The system of business

* *Present:* VISCOUNT HALDANE L.C., LORD DUNEDIN, LORD ATKINSON, LORD PARKER OF WADDINGTON, LORD SUMNER, and LORD PARMOOR.

(1) [1914] W. N. 59.

H. L. (E.)
1915
⸻
DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
v.
SELFRIDGE
AND
COMPANY,
LIMITED.
⸻

adopted by the appellants was as follows: They allowed trade purchasers from them certain trade discounts off the list prices of the goods and in consideration thereof they insisted that such trade purchasers should enter into contracts with them whereby the said trade purchasers agreed not to sell to private customers at less than the appellants' current list prices or to trade customers at less than the current list prices after deducting certain discounts, and further agreed, as agents of the appellants, to obtain from sub-purchasers, being trade customers, similar undertakings to observe the appellants' list prices.

The respondents were retailers and storekeepers in Oxford Street, and part of their business consisted in retailing to the public motor tyres, covers, and tubes of various manufacturers (including the appellants). The respondents were aware of the appellants' system of conducting business.

Messrs. A. J. Dew & Co. carried on business in Endell Street, London, as factors and dealers in motor tyres and tubes and other motor accessories.

By an agreement in writing dated October 12, 1911, between Messrs. A. J. Dew & Co. and the appellants, Messrs. A. J. Dew & Co., in consideration of the appellants' allowing them a trade discount of 10 per cent. for prompt monthly payments off their list prices for motor tyres, covers, tubes, and repairs current from time to time, and 25 per cent. off their list prices current from time to time for motor tyre sundries, agreed to purchase Dunlop motor tyres, covers, tubes, and sundries to the net value of 2000l. before the expiration of September, 1912, and if the net value of Messrs. A. J. Dew & Co.'s purchases during the above named period amounted to 2000l. they were to be allowed a rebate of 9 per cent. on the net amount of cash paid by them. And Messrs. A. J. Dew & Co. further agreed as follows :—

Not to sell or offer any Dunlop motor tyres, covers, tubes, or sundries to any private customer or to any co-operative society at prices below the appellants' list prices current at the time of sale nor give to any such customer or society any cash or other discounts or advantage reducing the same.

Not to sell or offer any Dunlop motor tyres, covers, tubes, or sundries to any other person, firm, or company at prices less

AND PRIVY COUNCIL.

H. L. (E.)
1915
DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
v.
SELFRIDGE
AND
COMPANY,
LIMITED.

than the said list prices, but they were to be at liberty to allow to persons legitimately engaged in the motor trade (other than co-operative societies and persons included in the next succeeding clause) a discount not exceeding 10 per cent. off such list prices plus the appellants' authorized scale of rebates on the net value of purchases of such goods, and in the case of any sale of such tyres, covers, or tubes by A. J. Dew & Co. to any such trader they agreed, as agents for the appellants in that behalf, to obtain from such trader a written undertaking that he would similarly observe the appellants' list prices, terms, and conditions of sale current at the time of sale in any resales by him, and they further agreed to forward all such undertakings to the appellants on demand and not to allow such trade discounts to any such person without previously obtaining such written undertaking.

Not to supply any Dunlop goods to any person whose supplies the appellants requested them to suspend.

To pay the sum of 5*l.* for each tyre, cover, or tube sold or offered in breach of the conditions of the contract as liquidated damages and not as penalty and without prejudice to any other rights of the appellants under the contract.

On December 22, 1911, the respondents accepted an order from Captain Eustace Jameson for a Dunlop grooved cover at the price of 5*l.* 10*s.*, and on January 1, 1912, they accepted an order from a Mr. Strauss for a Dunlop steel studded cover at the price of 4*l.* 10*s.* These prices were below the prices mentioned in the appellants' current price list. On January 2 the respondents ordered these covers from Messrs. A. J. Dew & Co., who obtained them from the appellants and delivered them to the respondents on the same day. Together with the covers Messrs. A. J. Dew & Co. sent to the respondents a letter enclosing a price maintenance agreement which they requested the respondents to sign. This agreement provided (so far as material) as follows:—

"PRICE MAINTENANCE AGREEMENT

To be entered into by Trade Purchasers of Dunlop Motor Tyres.

"Messrs. Selfridge & Co. to Messrs. A. J. Dew & Co.

"2nd Jan. 1912.

"Dear Sir,

"In consideration of your allowing us a trade discount

H. L. (E.)
1915
DUNLOP
PNEUMATIC
TYRE
COMPANY
LIMITED
*v.*
SELFRIDGE
AND
COMPANY,
LIMITED.

of 10 per cent. for prompt monthly payments off the list prices for motor tyres, covers, tubes and repairs contained in the Dunlop Pneumatic Tyre Co.'s list current from time to time . . . .

" (2.) We will not sell or offer any Dunlop motor tyres, covers or tubes to any private customers or to any co-operative society at prices below those mentioned in the said price list current at the time of sale, nor give to any such customer or society any cash or other discounts or advantages reducing the same. We will not sell or offer any Dunlop motor tyres, covers or tubes to any other person, firm or company at prices less than those mentioned in the said price list.

" (5.) We agree to pay to the Dunlop Pneumatic Tyre Co., Ltd., the sum of 5*l.* for each and every tyre, cover or tube sold or offered in breach of this agreement, as and by way of liquidated damages and not as a penalty, but without prejudice to any other rights or remedies you or the Dunlop Pneumatic Tyre Co., Ltd., may have hereunder."

The agreement was signed about a week later by the respondents' manager and returned to Messrs. A. J. Dew & Co.

In the meantime, namely, on January 3, the respondents delivered to Captain Jameson the cover he had ordered at the price agreed upon.

The respondents subsequently informed Mr. Strauss that they were unable to deliver the cover ordered by him except at the list price of 4*l.* 17*s.* 3*d.*, and this cover was debited by the respondents to him at that price on January 22, 1912, and delivered to him on or about that date.

On February 9, 1912, the appellants commenced an action against the respondents for an injunction and damages in respect of the breach of the agreement of January 2, which they claimed to be an agreement made between the respondents and the appellants through Messrs. A. J. Dew & Co. as their agents.

The respondents by their re-amended defence alleged inter alia that the agreement was made between the respondents and A. J. Dew & Co. on their own account and not as agents for the appellants, and that the respondents never contracted with the appellants at all.

Case 1:08-cv-02065-JGK    Document 20-8    Filed 05/16/2008    Page 6 of 20

Phillimore J. gave judgment for the appellants for 10*l*., the liquidated damages in respect of the two breaches above mentioned, and granted an injunction restraining the respondents from selling Dunlop motor tyres, covers, or tubes below the appellants' current list prices.

The Court of Appeal (Vaughan Williams, Kennedy, and Swinfen Eady L.JJ.) reversed this decision and gave judgment for the respondents. They held that the contract of January 2 was not a contract between the appellants and the respondents at all, but was a contract between Messrs. A. J. Dew & Co. and the respondents only, and that Messrs. A. J. Dew & Co. were not legally competent at one and the same time to make a contract with the respondents by themselves as principals and as agents of the appellants. They therefore held that the action was not sustainable.

1915. March 23, 25. *Younger, K.C.*, and *Disturnal, K.C.*, for the appellants. 1. The appellants are undisclosed principals. Although the agreement sued on was addressed to A. J. Dew & Co. they were acting as agents of the appellants and were known by the respondents to be so acting. The fact that the expressed consideration is to be paid by A. J. Dew & Co. does not preclude them from saying that they are agents. An agent may make a payment under a contract out of his own pocket without losing his character as agent : *Phelps* v. *Prothero.* (1)

2. There was in fact a consideration moving from the appellants to the respondents, and this consideration may be proved by parol evidence. These price maintenance agreements deal with proprietary articles, and A. J. Dew & Co., as the respondents well knew, were under contract to the appellants not to supply these articles to trade customers on trade terms except on condition of exacting from those customers an undertaking to observe the appellants' list prices.

The consideration moving from the appellants to the respondents is that the appellants, with the knowledge of the respondents, permit A. J. Dew & Co. to sell tyres to the respondents on favourable terms and that the respondents take advantage of

(1) (1855) 16 C. B. 370.

H. L. (E.)

1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
*v.*
SELFRIDGE
AND
COMPANY,
LIMITED.

H. L. (E.)
1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
*v.*
SELFRIDGE
AND
COMPANY,
LIMITED.

those terms. But for the intervention of the appellants the respondents could not have got the goods on those terms at all. And if there is this additional consideration in fact parol evidence of it is admissible, for such evidence does not contradict the contract: *Frith* v. *Frith* (1), approving *Clifford* v. *Turrell.* (2)

Sir Robert Finlay, K.C., Sanderson, K.C., and Herbert L. Tebbs, for the respondents, were not called on.

The House took time for consideration.

April 26. VISCOUNT HALDANE L.C. My Lords, in my opinion this appeal ought to fail.

Prior to January 2, 1912, Messrs. Dew had entered into a contract with the appellants to purchase a quantity of tyres and other goods from them at the prices in their list, in consideration of receiving certain discounts. As part of their contract Messrs. Dew undertook, among other things, not to sell to certain classes of customer at prices below the current list prices of the appellants. They were, however, to be at liberty to sell to a class of customer that included the respondents at a discount which was substantially less than the discount they were themselves to receive from the appellants, but in the case of any such sale they undertook, as the appellants' agents in this behalf, to obtain from the customer a written undertaking that he similarly would observe the terms so undertaken to be observed by themselves. This contract was embodied in a letter dated October 12, 1911.

On January 2 the respondents contracted with Messrs. Dew, in terms of a letter of that date addressed to them, that, in consideration of the latter allowing them discounts on goods of the appellants' manufacture which the respondents might purchase from Messrs. Dew, less, in point of fact, than the discount received by the latter from the appellants, the respondents, among other things, would not sell the appellants' goods to private customers at prices below those in the appellants' current list, and that they would pay to the appellants a penalty for every article sold in breach of this stipulation.

The learned judge who tried the case has held that the respon-

(1) [1906] A. C. 254.    (2) (1841) 1 Y. & C. Ch. 138.

dents sold goods of the appellants' manufacture supplied through Messrs. Dew at less than the stipulated prices, and the question is whether, assuming his finding to be correct, the appellants, who were not in terms parties to the contract contained in the letter of January 2, can sue them.

My Lords, in the law of England certain principles are fundamental. One is that only a person who is a party to a contract can sue on it. Our law knows nothing of a jus quaesitum tertio arising by way of contract. Such a right may be conferred by way of property, as, for example, under a trust, but it cannot be conferred on a stranger to a contract as a right to enforce the contract in personam. A second principle is that if a person with whom a contract not under seal has been made is to be able to enforce it consideration must have been given by him to the promisor or to some other person at the promisor's request. These two principles are not recognized in the same fashion by the jurisprudence of certain Continental countries or of Scotland, but here they are well established. A third proposition is that a principal not named in the contract may sue upon it if the promisee really contracted as his agent. But again, in order to entitle him so to sue, he must have given consideration either personally or through the promisee, acting as his agent in giving it.

My Lords, in the case before us, I am of opinion that the consideration, the allowance of what was in reality part of the discount to which Messrs. Dew, the promisees, were entitled as between themselves and the appellants, was to be given by Messrs. Dew on their own account, and was not in substance, any more than in form, an allowance made by the appellants. The case for the appellants is that they permitted and enabled Messrs. Dew, with the knowledge and by the desire of the respondents, to sell to the latter on the terms of the contract of January 2, 1912. But it appears to me that even if this is so the answer is conclusive. Messrs. Dew sold to the respondents goods which they had a title to obtain from the appellants independently of this contract. The consideration by way of discount under the contract of January 2 was to come wholly out of Messrs. Dew's pocket, and neither directly nor

H. L. (E.)

1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
v.
SELFRIDGE
AND
COMPANY,
LIMITED.

Viscount
Haldane L.C.

H. L. (E.)
1915
——
DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
v.
SELFRIDGE
AND
COMPANY,
LIMITED.
——
Viscount
Haldane L.C.
——

indirectly out of that of the appellants. If the appellants enabled them to sell to the respondents on the terms they did, this was not done as any part of the terms of the contract sued on.

No doubt it was provided as part of these terms that the appellants should acquire certain rights, but these rights appear on the face of the contract as jura quaesita tertio, which the appellants could not enforce. Moreover, even if this difficulty can be got over by regarding the appellants as the principals of Messrs. Dew in stipulating for the rights in question, the only consideration disclosed by the contract is one given by Messrs. Dew, not as their agents, but as principals acting on their own account.

The conclusion to which I have come on the point as to consideration renders it unnecessary to decide the further question as to whether the appellants can claim that a bargain was made in this contract by Messrs. Dew as their agents; a bargain which, apart from the point as to consideration, they could therefore enforce. If it were necessary to express an opinion on this further question, a difficulty as to the position of Messrs. Dew would have to be considered. Two contracts— one by a man on his own account as principal, and another by the same man as agent—may be validly comprised in the same piece of paper. But they must be two contracts, and not one as here. I do not think that a man can treat one and the same contract as made by him in two capacities. He cannot be regarded as contracting for himself and for another uno flatu.

My Lords, the form of the contract which we have to interpret leaves the appellants in this dilemma, that, if they say that Messrs. Dew contracted on their behalf, they gave no consideration, and if they say they gave consideration in the shape of a permission to the respondents to buy, they must set up further stipulations, which are neither to be found in the contract sued upon nor are germane to it, but are really inconsistent with its structure. That contract has been reduced to writing, and it is in the writing that we must look for the whole of the terms made between the parties. These terms cannot, in my opinion consistently with the settled principles of English law, be

construed as giving to the appellants any enforceable rights as against the respondents.

I think that the judgment of the Court of Appeal was right, and I move that the appeal be dismissed with costs.

H. L. (E.)

1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
v.
SELFRIDGE
AND
COMPANY,
LIMITED.

LORD DUNEDIN. (1) My Lords, I confess that this case is to my mind apt to nip any budding affection which one might have had for the doctrine of consideration. For the effect of that doctrine in the present case is to make it possible for a person to snap his fingers at a bargain deliberately made, a bargain not in itself unfair, and which the person seeking to enforce it has a legitimate interest to enforce. Notwithstanding these considerations I cannot say that I have ever had any doubt that the judgment of the Court of Appeal was right.

My Lords, I am content to adopt from a work of Sir Frederick Pollock, to which I have often been under obligation, the following words as to consideration : " An act or forbearance of one party, or the promise thereof, is the price for which the promise of the other is bought, and the promise thus given for value is enforceable." (Pollock on Contracts, 8th ed., p. 175.)

Now the agreement sued on is an agreement which on the face of it is an agreement between Dew and Selfridge.  But speaking for myself, I should have no difficulty in the circumstances of this case in holding it proved that the agreement was truly made by Dew as agent for Dunlop, or in other words that Dunlop was the undisclosed principal, and as such can sue on the agreement. None the less, in order to enforce it he must show consideration, as above defined, moving from Dunlop to Selfridge.

In the circumstances, how can he do so ?  The agreement in question is not an agreement for sale.  It is only collateral to an agreement for sale ; but that agreement for sale is an agreement entirely between Dew and Selfridge. The tyres, the property in which upon the bargain is transferred to Selfridge, were the property of Dew, not of Dunlop, for Dew under his agreement with Dunlop held these tyres as proprietor, and not as agent. What then did Dunlop do, or forbear to do, in a question with Selfridge ?  The answer must be, nothing.  He did not do

(1) Read by Lord Atkinson.

H. L. (E.)

1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
v.
SELFRIDGE
AND
COMPANY,
LIMITED.

Lord Dunedin.

anything, for Dew, having the right of property in the tyres, could give a good title to any one he liked, subject, it might be, to an action of damages at the instance of Dunlop for breach of contract, which action, however, could never create a vitium reale in the property of the tyres. He did not forbear in anything, for he had no action against Dew which he gave up, because Dew had fulfilled his contract with Dunlop in obtaining, on the occasion of the sale, a contract from Selfridge in the terms prescribed.

To my mind, this ends the case. That there are methods of framing a contract which will cause persons in the position of Selfridge to become bound, I do not doubt. But that has not been done in this instance; and as Dunlop's advisers must have known of the law of consideration, it is their affair that they have not so drawn the contract.

I think the appeal should be dismissed.

LORD ATKINSON. My Lords, the action out of which this appeal arises was brought by the appellants against the respondents to restrain the latter from selling or offering for sale certain goods manufactured by the appellants, on terms other than those specified in a certain agreement dated January 2, 1912, alleged to have been entered into between the respondents and the appellants through Messrs. A. J. Dew & Co. as the agents of the latter; and to recover the liquidated damages made recoverable by the terms of this agreement in respect of the breaches thereof complained of, and for an account of the goods sold in violation of the same.

The main facts of the case are undisputed. The appellants are large and well-known manufacturers of motor tyres, covers, and tubes, which are sold to the users of motor cars and other vehicles through their factors, and also through manufacturers of motor cars. Messrs. A. J. Dew & Co. were one of these agents or factors. They, like all the appellants' other agents or factors, entered into an agreement with them styled a price maintenance agreement. The particular agreement in the case of Dew & Co. bore date October 12, 1911. It, in substance, provided that in consideration of being allowed 10 per cent.

discount off the appellants' list prices for motor tyres, covers, and tubes current from time to time, for prompt monthly payment, and a discount of 25 per cent. off appellants' price list for certain other goods therein named, Dew & Co. agreed to purchase from them before the expiration of the month of September, 1912, goods of the above-mentioned character of the net value of 2000l., with a further provision that if these purchases should, during the above-mentioned period, amount to 2000l. and all the conditions of the contract be observed by Dew & Co., the appellants should allow them a rebate of 9 per cent. on the net amount of cash paid by them.

H. L. (E.)

1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
v.
SELFRIDGE
AND
COMPANY,
LIMITED.

Lord Atkinson.

The only conditions of the contract necessary to refer to are first, a provision that Dew & Co. should not sell or offer for sale any Dunlop motor tyres, covers, or tubes to any other person, firm, or company at prices less than these list prices; but should be at liberty to allow to persons legitimately engaged in the motor trade (other than co-operative societies) a discount not exceeding 10 per cent. off such list prices, plus the authorized scale of rebates on the net values of the purchases of the aforesaid goods, and further, that in case of any sale of any of the said goods to any such traders as aforesaid, Dew & Co. should, as the appellants' agents, obtain from each trader a written undertaking that he would similarly observe the list prices, terms, and conditions of sale on any resales made by him, whether to private customers or other traders, would forward these undertakings to the appellants on demand, and would not allow such trade discounts to any of the persons aforesaid without previously obtaining such a written undertaking; and, second, a condition that Dew & Co. should pay 5l. for every tyre, cover, or tube sold or offered for sale in breach of the conditions of the contract.

Now this agreement was an agreement for the sale and purchase of the appellants' goods, with certain contractional restrictions on the purchaser's right of resale. Dew & Co., unless restrained by injunction, could sell the goods they had purchased from the appellants to any sub-vendee on any terms they pleased, subject to this, that they exposed themselves to an action for breach of contract at the appellants' suit if they did not observe the terms of the agreement. But they did not

H. L. (E.)
1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
*v.*
SELFRIDGE
AND
COMPANY,
LIMITED.

Lord Atkinson.

require the special consent of the appellants to any particular resale made in conformity with the terms of the agreement. That consent was given in anticipation the moment the agreement was entered into. Dew & Co. were then clothed with absolute authority to resell on the terms specified in the agreement. The appellants had no power to prohibit or restrain them from doing so. I think it may be fairly assumed that the respondents were aware of the nature of this agreement between Dew & Co. and the appellants.

When one turns to the contract relied upon, namely, the letter dated January 2, 1912, drawn up by Dew & Co., and signed on behalf of the respondents by A. Horsfield, it is clear that Dew & Co. did introduce into it, in substance, all the stipulations they were bound by their contract with their principals to introduce. They did nothing which that contract did not authorize. They merely exercised their right to resell on the terms prescribed. It was contended by the appellants' counsel, as I understood them, that the discount of 10 per cent. having been given to the respondents, it must be taken that the appellants gave a specific and special consent to this particular contract with the respondents, and that that special consent constituted a consideration, moving from the appellants to the respondents, sufficient to support the contract contained in the letter of January 2, 1912 as a contract between the appellants and the respondents. In my opinion that contention is entirely unsustainable.

It was also urged on behalf of the appellants that it was competent for the latter to show that Dew & Co. entered into this contract of January 2, 1912, as agents for undisclosed principals, namely, the appellants in the present action.

Even if that were so, and the appellants were to be treated as parties to the contract contained in this letter, it does not get over the difficulty. The contract is as to them a nudum pactum, since no consideration moves from them to the respondents, or to any other person or body at the respondents' request.

I confess that the inclination of my opinion is that this case comes within the principle of the decision in *Humble* v. *Hunter* (1), and that consistently with the terms of the letter itself the

(1) (1848) 12 Q. B. 310.

appellants cannot claim to be principals on whose behalf Dew & Co. contracted as their agents. Kennedy L.J. has pointed out in his judgment the different stipulations in the contract which are irreconcilable with the supposition that Dew & Co. did not contract as principals. But however this may be, it is, I think, clear that no consideration moved from the appellants to support any contract made with them and the respondents, and I prefer to base my judgment on that ground.

I think, therefore, that the judgment appealed from was right, and this appeal should be dismissed with costs here and below.

LORD PARKER OF WADDINGTON. (1) My Lords, even assuming that the undertaking upon which this action is founded was given by the respondents to Messrs. A. J. Dew & Co. as agents for the appellants, and was intended to enure for their benefit, the appeal cannot succeed unless the undertaking was founded on a consideration moving from the appellants, and in my opinion there was no such consideration. The appellants did not give or give up anything on the strength of the undertaking. They had sold tyres to Messrs. A. J. Dew & Co. on the terms that the latter should not resell them at prices less than those specified in the appellants' price list, except that Messrs. A. J. Dew & Co. were to be at liberty to allow to persons legitimately engaged in the motor trade a certain discount off such price list, if they, as agents for the appellants, obtained from such persons a written undertaking such as that upon which this action is founded. In reselling these tyres to the respondents, and obtaining from the respondents the undertaking in question, Messrs. A. J. Dew & Co. admittedly committed no breach of contract. The sale was, of course, a good consideration for the undertaking moving from Messrs. A. J. Dew & Co., but the appellants, in whose favour the undertaking was given, being in the position of volunteers not parties to the contract of sale, cannot sue on it. The case was argued on behalf of the appellants as though what was done by Messrs. A. J. Dew & Co. would have been unlawful but for the leave and licence of the

H. L. (E.)

1915

DUNLOP PNEUMATIC TYRE COMPANY, LIMITED
v.
SELFRIDGE AND COMPANY, LIMITED.

Lord Atkinson.

(1) Read by Lord Sumner.

3       3 L 2

H. L. (E.)
1915
———
DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
*v.*
SELFRIDGE
AND
COMPANY,
LIMITED.

Lord Parker of
Waddington.

appellants, and that such leave and licence, though general in form, must be taken as given on the occasion of each sale, in consideration of the undertaking. I cannot accept this contention. In the first place, it is wrong to speak of an exception from a restrictive contract as importing any leave or licence at all. But for any contract to the contrary, Messrs. A. J. Dew & Co. were entitled to resell the goods supplied to them by the appellants upon any terms they might think fit, and in reselling as they did there was no breach of any restrictive contract. Even, however, if the sale can be considered as lawful only by licence of the appellants, the licence was given once for all in their contract to Messrs. A. J. Dew & Co., and was not given as part of the terms upon which any particular sale was allowed.

The appeal fails on this ground and should be dismissed with costs.

LORD SUMNER. My Lords, there are two instances of sale and delivery complained of in this case. The steps in the Jameson transaction are as follows. Those in the other, the Strauss transaction, are similar, and need not be analysed. On October 12, 1911, Messrs. Dew & Co., motor accessory factors, contracted with the appellants, the Dunlop Pneumatic Tyre Company, in terms of the latter's price maintenance agreement then current. By this contract Messrs. Dew & Co. became bound, inter alia, to buy from the Dunlop Company motor tyres, covers, tubes, and sundries to the net value of 200l. before the expiration of September, 1912, and the appellants became bound, if the contract continued to subsist, as it did, to sell and deliver such goods up to that value, whenever reasonably required to do so.

On December 21, 1911, a Captain Jameson thought fit to ask the respondents, Messrs. Selfridge & Co., Limited, who are described as wholesale and retail merchants, for their lowest price for a Dunlop motor tyre, grooved and non-skid, 815 by 105. Their answer was that, on receipt of his order, such a tyre would be procured and the price would be 5l. 18s. 2d., which was the appellants' list price, less 7½ per cent.

On January 1, 1912, Captain Jameson sent to the respondents

an order for the tyre, and also the money for it, and on the same day the order was accepted, and delivery of the tyre was promised for the following day. In fact, on January 2 the respondents ordered this tyre from Messrs. Dew & Co. by telephone. Messrs· Dew & Co., in turn, ordered it by telephone from the appellants; it was delivered by them to Messrs. Dew & Co., and they sent it to the respondents. These were the events of January 2. On the next day the respondents delivered it to Captain Jameson· Of course the respondents did not mention Captain Jameson to Messrs. Dew & Co., nor did Messrs. Dew & Co. mention the respondents to the appellants.

So far the respondents had signed no price maintenance agreement. They had been pressed to do so, and no doubt knew that the reason why they were being pressed by Messrs. Dew & Co. was because the appellants, in turn, strictly required them to obtain these agreements from those of their customers to whom they sold. Within two or three days of January 3 they did sign such an agreement, dating it January 2, and delivering it to Messrs. Dew & Co., to whom it was addressed, a week or so afterwards. It is for breach of this agreement that the appellants sued.

The parties have been desirous of knowing their reciprocal rights and duties, if any, arising out of this agreement, and have accordingly raised two broad questions : (1.) Is there any agreement between these parties at all? (2.) If so, is there any consideration moving from the appellants to support it and make it bind the respondents to them? But for this there would have been a good deal to be said for the proposition that a bargain and sale, clearly complete before this agreement was signed or dated, could be no breach of it, and that the performance of that bargain by delivery of the goods after the price maintenance agreement was made could hardly be a ground for the grant of an injunction.

My Lords, let it be assumed without discussion that the agreement which the respondents signed speaks from its date, January 2. Let it be assumed also that evidence was admissible to add an unexpressed consideration moving from the appellants to the expressed consideration moving from Messrs. Dew & Co. Let it be assumed further (though this is a large assumption) that

H. L. (E.)

1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
v.
SELFRIDGE
AND
COMPANY
LIMITED.

Lord Sumner.

H. L. (E.)

1915

DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
v.
SELFRIDGE
AND
COMPANY,
LIMITED.

Lord Sumner.

the terms of the instrument do not so designate Messrs. Dew & Co. as the principals and the only contracting parties as to shut out proof that the appellants were their undisclosed principals. After all, what consideration moved from the appellants?

As the point is not insisted on that Messrs. Dew & Co. sold and delivered to the respondents first, and procured their written undertaking only afterwards, I think that Messrs. Dew & Co. exactly performed the conditions of their agreement with the appellants. The firm of Selfridge & Co. was the "trader" within that agreement, and Messrs. Dew & Co. duly obtained that firm's written undertaking to the intent therein described. The undertaking was in the appellants' own form, and Messrs. Dew & Co. did not contract even by implication that the undertaking which they would obtain should be binding.

The respondents signed what they were asked to sign, but nothing precluded them from saying afterwards that it was nudum pactum. At first they thought and said that they were bound, but this did not alter their position or the appellants', or supply a consideration where none existed before. They made no request for the tyre to the appellants, for they did not know that Messrs. Dew & Co. had not got it in stock, or, if they knew, they did not constitute Messrs. Dew & Co. their agents to ask the appellants for it. Messrs. Dew & Co. asked for it by virtue of their agreement to buy up to 2000l. worth of goods, and so it was that the appellants delivered it.

Messrs. Dew & Co. did not mention to the appellants that so far no written undertaking had been signed by their customer, and the appellants, knowing nothing, waived nothing. The appellants, as alleged promisees, neither did nor suffered nor forbore anything, nor promised to do any of these things or anything at all, in exchange for the undertaking purporting to be given by the respondents. It was contended that consideration might be found in the fact that the appellants, who could sell or not sell their own proprietary products, as they chose, only enabled the respondents to get the tyres by agreeing to supply Messrs. Dew & Co., and only agreed to supply them on the restrictive terms in question. This breaks down as soon as it is examined. To this transaction the respondents were

strangers. It happened before they received or gave any order. The delivery of the tyres by the appellants was in performance of an obligation unknown to the respondents (though I daresay they could have surmised it if it had been any business of theirs) and prior to their appearance on the scene. In this transaction nothing moved from the appellants to the respondents. It would have been the same if the other firm had not existed. The appellants have sued on a nudum pactum.

My Lords, the appellants' "distributing organization" has been before your Lordships' House before, and I do not suppose you have heard the last of it now. I think it better, accordingly, to express no opinion on any of the other questions that have been raised, since this one decides the case, and the others may occur again. Much may be said both ways on the right of the appellants to come forward as undisclosed principals upon the contract in question. I express no opinion except that I do not wish to be supposed entirely to assent to the broad proposition, apparently suggested in some of the judgments of the Lords Justices, that a contract, in which one and the same party contracts both on his own behalf and for an undisclosed principal, is a legal impossibility. So stated I think the proposition somewhat too wide. If no more is meant than what Swinfen Eady L.J. puts, " where a party contracts in his own name, an undisclosed principal cannot sue on the contract, if the terms are such as import that the person so signing is the real and only principal," it is not open to objection.

I think that the appeal should be dismissed.

Lord Parmoor. My Lords, the main question in this appeal is whether it is competent for the appellants to bring an action to enforce certain conditions in a contract made between the respondents and Messrs. A. J. Dew & Co. The appellants are manufacturers and Messrs. A. J. Dew & Co. are factors and dealers in motor tyres, covers, or tubes. It is the object of the appellants to enforce and maintain certain general conditions and prices in the sale of their motor tyres, covers, or tubes, and it may be assumed that it is important for their business to attain this object.

H. L. (E.)

1915

Dunlop Pneumatic Tyre Company, Limited

v.

Selfridge and Company, Limited.

Lord Sumner.

H. L. (E.)
1915
—
DUNLOP
PNEUMATIC
TYRE
COMPANY,
LIMITED
v.
SELFRIDGE
AND
COMPANY,
LIMITED.
—
Lord Parmoor.
—

The appellants are not in form parties to the contract which they seek to enforce. They claim to be undisclosed principals. If they can prove this, they get over the first difficulty. Unless the appellants can prove that they are undisclosed principals, they fail at the outset, since the stipulations which they seek to enforce are not of such a character that a person, not a party to the contract, has a right to bring an action to enforce them.

There is no question that parol evidence is admissible to prove that the plaintiff in an action is the real principal to a contract ; but it is also well established law that a person cannot claim to be a principal to a contract, if this would be inconsistent with the terms of the contract itself.

Kennedy L.J. in his judgment in the Court of Appeal states his conclusion that it would be inconsistent with the terms of the contract itself to admit the claim of the appellants to be regarded as undisclosed principals with a consequent right to bring an action to enforce certain of its conditions. I agree with this conclusion, and it is sufficient to dispose of the case. A further difficulty in the way of the appellants is that, apart from any question of form, they cannot show that there is any consideration sufficient to support a contract as between themselves and the respondents. On October 12, 1911, the appellants entered into a contract with Messrs. A. J. Dew & Co. that in consideration of discounts and rebates being allowed off the appellants' current price list they would purchase from the appellants goods to the quantity therein mentioned. There were several conditions attached to the contract, among them the following : " We will, as your agents in this behalf, in the case of any sale of your tyres, covers, or tubes to a trader obtain from such trader a written undertaking that he will similarly observe your list prices, terms, and conditions of sale current at the time of sale in any resales by him."

In accordance with this obligation, Messrs. A. J. Dew & Co. did make a contract with the respondents that they would similarly observe the appellants' prices, terms, and conditions of sale current at the time of any sale by them. There is no dispute that the respondents did not observe the conditions attached to their contract with Messrs. A. J. Dew & Co. The

appellants, in their action, claimed an injunction and damages at the rate of 5*l.* for each and every tyre, cover, or tube sold by the respondents in breach of the said agreement.

I understood Mr. Younger, in his argument on behalf of the appellants, to say that the appellants, under the contract between themselves and Messrs. A. J. Dew & Co. of October 12, 1911, reserved some control over the sale of their goods by Messrs. A. J. Dew & Co. to third parties, and that in this respect there was consideration moving from the appellants to the respondents sufficient to support a contract.

I am of opinion that no such control was reserved to the appellants, and that Messrs. A. J. Dew & Co., without any further authority or licence from the appellants, had a full right, as factors or dealers in the appellants' goods, to sell them to the respondents. It may well be that the appellants under their contract with Messrs. A. J. Dew & Co. have the power to prevent the supply of the appellants' goods to any person whose supplies the appellants request Messrs. A. J. Dew & Co. to suspend, but this is a wholly different proposition from a claim to be entitled to bring an action against the purchasers of goods sold by Messrs. A. J. Dew & Co. in the course of their business.

If Messrs. A. J. Dew & Co. had full power to sell the goods in question to the respondents, as factors or dealers, it is, I think, clear that the appellants were not in a position to give, and did not give, any consideration which could support a contract between themselves and the respondents, and that the action fails.

I abstain from discussing what remedy Messrs. A. J. Dew & Co. might have on their contract with the respondents, or whether the appellants might not have attained their object in some other way; it is sufficient to say that the appellants cannot succeed in their present action and that the appeal fails.

*Order of the Court of Appeal affirmed and appeal dismissed with costs.*

*Lords' Journals,* April 26, 1915.

Solicitors for appellants: *John B. & F. Purchase.*
Solicitors for respondents: *Nunn, Popham & Starkie.*

*Margin notes:*

H. L. (E.)

1915

DUNLOP PNEUMATIC TYRE COMPANY, LIMITED
*v.*
SELFRIDGE AND COMPANY, LIMITED.

Lord Parmoor.

# Exhibit 4

Case 1:08-cv-02065-JGK    Document 20-9    Filed 05/16/2008    Page 2 of 38

H. L. (E.)

1896

LORD
SUDELEY
v.
ATTORNEY-
GENERAL.

by an action for the purpose, but had no right virtute officii to have any part of the New Zealand mortgages appropriated to the estate of their testatrix in specie.

*Order appealed from affirmed and appeal dismissed with costs.*

*Lords' Journals,* November 13, 1896.

Solicitor for appellants: *J. A. Bertram.*
Solicitor for respondent: *Solicitor of Inland Revenue.*

---

[HOUSE OF LORDS.]

H. L. (E.)

1896

*Nov.* 16.

ARON SALOMON (PAUPER) . . . . . APPELLANT;

AND

A. SALOMON AND COMPANY, LIMITED RESPONDENTS.

BY ORIGINAL APPEAL.

AND

A. SALOMON AND COMPANY, LIMITED APPELLANTS;

AND

ARON SALOMON . . . . . . . . RESPONDENT.

BY CROSS APPEAL.

*Company—Private Company—One Man Company—Limited Liability—Wind-
ing-up—Fraud upon Creditors— Liability to indemnify Company in
respect of Debts—Rescission—Companies Act* 1862 (25 & 26 *Vict. c.* 89)
ss. 6, 8, 30, 43.

It is not contrary to the true intent and meaning of the Companies Act 1862 for a trader, in order to limit his liability and obtain the preference of a debenture-holder over other creditors, to sell his business to a limited company consisting only of himself and six members of his own family, the business being then solvent, all the terms of sale being known to and approved by the shareholders, and all the requirements of the Act being complied with.

A trader sold a solvent business to a limited company with a nominal capital of 40,000 shares of 1*l.* each, the company consisting only of the vendor, his wife, a daughter and four sons, who subscribed for one share each, all the terms of sale being known to and approved by the shareholders.

In part payment of the purchase-money debentures forming a floating security were issued to the vendor. Twenty thousand shares were also issued to him and were paid for out of the purchase-money. These shares gave the vendor the power of outvoting the six other shareholders. No shares other than these 20,007 were ever issued. All the requirements of the Companies Act 1862 were complied with. The vendor was appointed managing director, bad times came, the company was wound up, and after satisfying the debentures there was not enough to pay the ordinary creditors :—

*Held,* that the proceedings were not contrary to the true intent and meaning of the Companies Act 1862 ; that the company was duly formed and registered and was not the mere "alias" or agent of or trustee for the vendor ; that he was not liable to indemnify the company against the creditors' claims ; that there was no fraud upon creditors or shareholders ; and that the company (or the liquidator suing in the name of the company) was not entitled to rescission of the contract for purchase.

The decisions of Vaughan Williams J. and the Court of Appeal ([1895] 2 Ch. 323) reversed.

THE following statement of the facts material to this report is taken from the judgment of Lord Watson :—

The appellant, Aron Salomon, for many years carried on business, on his own account, as a leather merchant and whole-sale boot manufacturer. With the design of transferring his business to a joint stock company, which was to consist exclusively of himself and members of his own family, he, on July 20, 1892, entered into a preliminary agreement with one Adolph Anholt, as trustee for the future company, settling the terms upon which the transfer was to be made by him, one of its conditions being that part payment might be made to him in debentures of the company. A memorandum of association was then executed by the appellant, his wife, a daughter, and four sons, each of them subscribing for one share, in which the leading object for which the company was formed was stated to be the adoption and carrying into effect, with such modifications (if any) as might be agreed on, of the provisional agreement of July 20. The memorandum was registered on July 28, 1892 ; and the effect of registration, if otherwise valid, was to incorporate the company, under the name of "Aron Salomon and Company, Limited," with liability limited by shares, and having a nominal capital of 40,000*l.*, divided into 40,000 shares of 1*l.* each. The company adopted

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

the agreement of July 20, subject to certain modifications which are not material; and an agreement to that effect was executed between them and the appellant on August 2, 1892. Within a month or two after that date the whole stipulations of the agreement were fulfilled by both parties. In terms thereof, 100 debentures, for 100*l.* each, were issued to the appellant, who, upon the security of these documents, obtained an advance of 5000*l.* from Edmund Broderip. In February 1893 the original debentures were returned to the company and cancelled; and in lieu thereof, with the consent of the appellant as beneficial owner, fresh debentures to the same amount were issued to Mr. Broderip, in order to secure the repayment of his loan, with interest at 8 per cent.

In September 1892 the appellant applied for and obtained an allotment of 20,000 shares; and from that date until an order was made for its compulsory liquidation, the share register of the company remained unaltered, 20,001 shares being held by the appellant, and six shares by his wife and family. It was all along the intention of these persons to retain the business in their own hands, and not to permit any outsider to acquire an interest in it.

Default having been made in the payment of interest upon his debentures, Mr. Broderip, in September 1893, instituted an action in order to enforce his security against the assets of the company. Thereafter a liquidation order was made, and a liquidator appointed, at the instance of unsecured creditors of the company. It has now been ascertained that, if the amount realised from the assets of the company were, in the first place, applied in extinction of Mr. Broderip's debt and interest, there would remain a balance of about 1055*l.*, which is claimed by the appellant as beneficial owner of the debentures. In the event of his claim being sustained there will be no funds left for payment of the unsecured creditors, whose debts amount to 7733*l.* 8*s.* 3*d.*

The liquidator lodged a defence, in name of the company, to the debenture suit, in which he counter-claimed against the appellant (who was made a party to the counter-claim), (1.) to have the agreements of July 20 and August 2, 1892 rescinded,

(2.) to have the debentures already mentioned delivered up and cancelled, (3.) judgment against the appellant for all sums paid by the company to the appellant under these agreements, and (4.) a lien for these sums upon the business and assets. The averments made in support of these claims were to the effect that the price paid by the company exceeded the real value of the business and assets by upwards of 8200*l*.; that the arrangements made by the appellant for the formation of the company were a fraud upon the creditors of the company; that no board of directors of the company was ever appointed, and that in any case such board consisted entirely of the appellant, and there never was an independent board. The action came on for trial on the counter-claim before Vaughan Williams J., when the liquidator was examined as a witness on behalf of the company, whilst evidence was given for the appellant by himself, and by his son, Emanuel Salomon, one of the members of the company, who had been employed in the business for nearly twenty years.

The evidence shews that, before its transfer to the new company, the business had been prosperous, and had yielded to the appellant annual profits sufficient to maintain himself and his family, and to add to his capital. It also shews that at the date of transfer the business was perfectly solvent. The liquidator, whose testimony was chiefly directed toward proving that the price paid by the company was excessive, admitted on cross-examination that the business, when transferred to the company, was in a sound condition, and that there was a substantial surplus. No evidence was led tending to support the allegation that no board of directors was ever appointed, or that the board consisted entirely of the appellant. The non-success and ultimate insolvency of the business, after it came into the hands of the company, was attributed by the witness Emanuel Salomon to a succession of strikes in the boot trade, and there is not a tittle of evidence tending to modify or contradict his statement. It also appears from the evidence that all the members of the company were fully cognisant of the terms of the agreements of July 20 and August 2, 1892, and that they were willing to accept and did accept these terms.

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

H. L. (E.).

1896

SALOMON
*v.*
SALOMON.
& Co.

SALOMON
& Co.
*v.*
SALOMON.

At the close of the argument Vaughan Williams J. announced that he was not prepared to grant the relief craved by the company. He at the same time suggested that a different remedy might be open to the company; and, on the motion of their counsel, he allowed the counter-claim to be amended. In conformity with the suggestion thus made by the Bench, a new and alternative claim was added for a declaration that the company or the liquidator was entitled (1.) to be indemnified by the appellant against the whole of the company's unsecured debts, namely, 7733*l.* 8*s.* 3*d.*; (2.) to judgment against the appellant for that sum; and (3.) to a lien for that amount upon all sums which might be payable to the appellant by the company in respect of his debentures or otherwise until the judgment was satisfied. There were also added averments to the effect that the company was formed by the appellant, and that the debentures for 10,000*l.* were issued in order that he might carry on the business, and take all the profits without risk to himself; and also that the company was the "mere nominee and agent" of the appellant.

Vaughan Williams J. made an order for a declaration in the terms of the new and alternative counter-claim above stated, without making any order on the original counter-claim.

Both parties having appealed, the Court of Appeal (Lindley, Lopes and Kay L.JJ.) being of opinion that the formation of the company, the agreement of August 1892, and the issue of debentures to the appellant pursuant to such agreement, were a mere scheme to enable him to carry on business in the name of the company with limited liability contrary to the true intent and meaning of the Companies Act 1862, and further to enable him to obtain a preference over other creditors of the company by procuring a first charge on the assets of the company by means of such debentures, dismissed the appeal with costs, and declined to make any order on the original counter-claim. (1)

Against this order the appellant appealed, and the company brought a cross-appeal against so much of it as declined to make any order upon the original counter-claim. Broderip having been paid off was no party to this appeal or cross-appeal.

(1) Reported as *Broderip* v. *Salomon*, [1895] 2 Ch. 323.

Case 1:08-cv-02065-JGK    Document 20-9    Filed 05/16/2008    Page 7 of 38

June 15, 22, 29. °*Cohen Q.C.* and *Buckley Q.C.* (*McCall Q.C.* and *Muir Mackenzie* with them), for the appellant in the original appeal. The view of Vaughan Williams J. that the company was the mere alias or agent of the appellant so as to make him liable to indemnify the company against creditors, was not adopted by the Court of Appeal, who seem to have considered the company as the appellant's trustee. There is no evidence in favour of either view. The sale of the business was bonâ fide: the business was genuine and solvent, with a substantial surplus. All the circumstances were known to and approved by the shareholders. All the requirements of the Companies Act, 1862, were strictly complied with: the purpose was lawful, the proceedings were regular. How could the registrar refuse to register such a company? What objection is it that the vendor desires to convert his unlimited into a limited liability? That is the prime object of turning a private business into a limited company, practised every day by banks and other great firms. And what difference to creditors could it make whether the debentures were held by the vendor or by strangers? Whoever held them had the preference over creditors—that is the future creditors—all the old creditors having been paid off by the vendor. There was no misrepresentation of fact, and no one was misled: where is "the fraud upon creditors" spoken of in the Court of Appeal? The creditors were under no obligation to trust the company; they might, if they had desired, have found out who held the shares, and in what proportion, and who held the debentures. There is not a word in ss. 6, 8, 30, 43, or any other section of the Companies Act, 1862, forbidding or even pointing against such a company so formed and for such objects. Then, if the company was a real company, fulfilling all the requirements of the Legislature, it must be treated as a company, as an entity, consisting indeed of certain corporators, but a distinct and independent corporation. The Court of Appeal seem to treat the company sometimes as substantial and sometimes as shadowy and unreal: it must be one or the other, it cannot be both. A Court cannot impose conditions not imposed by the Legislature, and say that the shareholders must not be related

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

H. L. (E.)

1896

SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

to each other, or that they must hold more than one share each. There is nothing to prevent one shareholder or all the shareholders holding the shares in trust for some one person. What is prohibited is the entry of a trust on the register : s. 30. If all the shares were held in trust that would not make the company a trustee. The authorities relied upon below (which all turn upon some one being deceived or defrauded) do not touch the present case and do not support the judgment below.

[They referred to *Reg.* v. *Arnaud* (1) ; *In re Ambrose Lake Tin and Copper Mining Co.* (2) ; *In re British Seamless Paper Box Co.* (3) ; *Farrar* v. *Farrars, Limited* (4) ; *North-West Transportation Co.* v. *Beatty* (5) ; *In re National Debenture and Assets Corporation* (6) ; *In re George Newman & Co.* (7) ]

As to the cross-appeal, there being no fraud, misrepresentation or deceit, not even any failure of consideration, there is no ground for rescission. Moreover, the company's assets having been sold the company is not in a position to ask for it.

*Farwell Q.C.* and *H. S. Theobald*, for the respondents. The question is one of fact rather than law, and the true inferences from the facts are these : The appellant incorporated the company to carry on his business without risk to himself and at his creditors' expense. The business was decaying when the company was formed, and though carried on as before, nay with more (borrowed) money, it failed very soon after the sale. To get an advantage over creditors the vendor took debentures and concealed the fact from them. The purchase-money was exorbitant, the price dictated solely by the vendor, and there was no independent person acting for the company. Though incorporated under the Acts the company never had an independent existence : it was in fact the appellant under another name ; he was the managing director, the other directors being his sons and under his control. The shareholders other than himself were his own family, and his vast preponderance of shares made him absolute master.

(1) (1846) 9 Q. B. 806.
(2) (1880) 14 Ch. D. 390, 394, 398.
(3) (1881) 17 Ch. D. 467, 476, 479.
(4) (1888) 40 Ch. D. 395.
(5) (1887) 12 App. Cas. 589.
(6) [1891] 2 Ch. 505.
(7) [1895] 1 Ch. 674, 685.

Case 1:08-cv-02065-JGK    Document 20-9    Filed 05/16/2008    Page 9 of 38

He could pass any resolution, and he would receive all the profits—if any. Whether therefore the company is considered as his agent, or his nominee or his trustee, matters little. The business was solely his, conducted solely for him and by him, and the company was a mere sham and fraud, in effect entirely contrary to the intent and meaning of the Companies Act. The liquidator is therefore entitled to counter-claim against him for an indemnity. As to the cross-appeal and the claim for rescission the decision in *Erlanger* v. *New Sombrero Phosphate Co.* (1) and the observations of Lord Cairns are precisely applicable and conclusive in favour of rescission. See also *Adam* v. *Newbigging.* (2)

[LORD WATSON referred to *Western Bank of Scotland* v. *Addie* (3), following *Clarke* v. *Dickson.* (4) ]

[They also referred to *Ex parte Cowen* (5) ; *In re Smith.* (6)]

H. L. (E.)
1896
—
SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.
—

The House took time for consideration.

*Nov.* 16. LORD HALSBURY L.C. My Lords, the important question in this case, I am not certain it is not the only question, is whether the respondent company was a company at all—whether in truth that artificial creation of the Legislature had been validly constituted in this instance; and in order to determine that question it is necessary to look at what the statute itself has determined in that respect. I have no right to add to the requirements of the statute, nor to take from the requirements thus enacted. The sole guide must be the statute itself.

Now, that there were seven actual living persons who held shares in the company has not been doubted. As to the proportionate amounts held by each I will deal presently; but it is important to observe that this first condition of the statute is satisfied, and it follows as a consequence that it would not

(1) (1878) 3 App. Cas. 1218, 1236, 1238.
(2) (1888) 13 App. Cas. 308.
(3) (1867) L. R. 1 H. L., Sc. 145.
(4) (1858) E. B. & E. 148.
(5) (1867) L. R. 2 Ch. 563.
(6) (1890) 25 Q. B. D. 536, 541.

H. L. (E.)
1896

SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

Lord Halsbury
L.C.

be competent to any one—and certainly not to these persons themselves—to deny that they were shareholders.

I must pause here to point out that the statute enacts nothing as to the extent or degree of interest which may be held by each of the seven, or as to the proportion of interest or influence possessed by one or the majority of the shareholders over the others. One share is enough. Still less is it possible to contend that the motive of becoming shareholders or of making them shareholders is a field of inquiry which the statute itself recognises as legitimate. If they are shareholders, they are shareholders for all purposes; and even if the statute was silent as to the recognition of trusts, I should be prepared to hold that if six of them were the cestuis que trust of the seventh, whatever might be their rights inter se, the statute would have made them shareholders to all intents and purposes with their respective rights and liabilities, and, dealing with them in their relation to the company, the only relations which I believe the law would sanction would be that they were corporators of the corporate body.

I am simply here dealing with the provisions of the statute, and it seems to me to be essential to the artificial creation that the law should recognise only that artificial existence—quite apart from the motives or conduct of individual corporators. In saying this, I do not at all mean to suggest that if it could be established that this provision of the statute to which I am adverting had not been complied with, you could not go behind the certificate of incorporation to shew that a fraud had been committed upon the officer entrusted with the duty of giving the certificate, and that by some proceeding in the nature of scire facias you could not prove the fact that the company had no real legal existence. But short of such proof it seems to me impossible to dispute that once the company is legally incorporated it must be treated like any other independent person with its rights and liabilities appropriate to itself, and that the motives of those who took part in the promotion of the company are absolutely irrelevant in discussing what those rights and liabilities are.

I will for the sake of argument assume the proposition that

the Court of Appeal lays down—that the formation of the company was a mere scheme to enable Aron Salomon to carry on business in the name of the company. I am wholly unable to follow the proposition that this was contrary to the true intent and meaning of the Companies Act. I can only find the true intent and meaning of the Act from the Act itself; and the Act appears to me to give a company a legal existence with, as I have said, rights and liabilities of its own, whatever may have been the ideas or schemes of those who brought it into existence.

H. L. (E.)
1896
——
SALOMON
v.
SALOMON
& Co.
——
SALOMON
& Co.
v.
SALOMON.
——
Lord Halsbury
L.C.
.....

I observe that the learned judge (Vaughan Williams J.) held that the business was Mr. Salomon's business, and no one else's, and that he chose to employ as agent a limited company; and he proceeded to argue that he was employing that limited company as agent, and that he was bound to indemnify that agent (the company). I confess it seems to me that that very learned judge becomes involved by this argument in a very singular contradiction. Either the limited company was a legal entity or it was not. If it was, the business belonged to it and not to Mr. Salomon. If it was not, there was no person and no thing to be an agent at all; and it is impossible to say at the same time that there is a company and there is not.

Lindley L.J., on the other hand, affirms that there were seven members of the company; but he says it is manifest that six of them were members simply in order to enable the seventh himself to carry on business with limited liability. The object of the whole arrangement is to do the very thing which the Legislature intended not to be done.

It is obvious to inquire where is that intention of the Legislature manifested in the statute. Even if we were at liberty to insert words to manifest that intention, I should have great difficulty in ascertaining what the exact intention thus imputed to the Legislature is, or was. In this particular case it is the members of one family that represent all the shares; but if the supposed intention is not limited to so narrow a proposition as this, that the seven shareholders must not be members of one family, to what extent may influence or authority or intentional purchase of a majority among the shareholders be carried so as

32 HOUSE OF LORDS [1897]

H. L. (E.)
1896
———
SALOMON
v.
SALOMON
& Co.
———
SALOMON
& Co.
v.
SALOMON.
———
Lord Halsbury
L.C.
———

to bring it within the supposed prohibition? It is, of course, easy to say that it was contrary to the intention of the Legislature—a proposition which, by reason of its generality, it is difficult to bring to the test; but when one seeks to put as an affirmative proposition what the thing is which the Legislature has prohibited, there is, as it appears to me, an insuperable difficulty in the way of those who seek to insert by construction such a prohibition into the statute.

As one mode of testing the proposition, it would be pertinent to ask whether two or three, or indeed all seven, may constitute the whole of the shareholders? Whether they must be all independent of each other in the sense of each having an independent beneficial interest? And this is a question that cannot be answered by the reply that it is a matter of degree. If the Legislature intended to prohibit something, you ought to know what that something is. All it has said is that one share is sufficient to constitute a shareholder, though the shares may be 100,000 in number. Where am I to get from the statute itself a limitation of that provision that that shareholder must be an independent and beneficially interested person?

My Lords, I find all through the judgment of the Court of Appeal a repetition of the same proposition to which I have already adverted—that the business was the business of Aron Salomon, and that the company is variously described as a myth and a fiction. Lopes L.J. says: "The Act contemplated the incorporation of seven independent bonâ fide members, who had a mind and a will of their own, and were not the mere puppets of an individual who, adopting the machinery of the Act, carried on his old business in the same way as before, when he was a sole trader." The words "seven independent bonâ fide members with a mind and will of their own, and not the puppets of an individual," are by construction to be read into the Act. Lopes L.J. also said that the company was a mere nominis umbra. Kay L.J. says: "The statutes were intended to allow seven or more persons, bonâ fide associated for the purpose of trade, to limit their liability under certain conditions and to become a corporation. But they were not intended to legalise a pretended association for the purpose of

enabling an individual to carry on his own business with limited liability in the name of a joint stock company."

My Lords, the learned judges appear to me not to have been absolutely certain in their own minds whether to treat the company as a real thing or not. If it was a real thing; if it had a legal existence, and if consequently the law attributed to it certain rights and liabilities in its constitution as a company, it appears to me to follow as a consequence that it is impossible to deny the validity of the transactions into which it has entered.

Vaughan Williams J. appears to me to have disposed of the argument that the company (which for this purpose he assumed to be a legal entity) was defrauded into the purchase of Aron Salomon's business because, assuming that the price paid for the business was an exorbitant one, as to which I am myself not satisfied, but assuming that it was, the learned judge most cogently observes that when all the shareholders are perfectly cognisant of the conditions under which the company is formed and the conditions of the purchase, it is impossible to contend that the company is being defrauded.

The proposition laid down in *Erlanger* v. *New Sombrero Phosphate Co.* (1), (I quote the head-note), is that " Persons who purchase property and then create a company to purchase from them the property they possess, stand in a fiduciary position towards that company, and must faithfully state to the company the facts which apply to the property, and would influence the company in deciding on the reasonableness of acquiring it." But if every member of the company—every shareholder—knows exactly what is the true state of the facts (which for this purpose must be assumed to be the case here), Vaughan Williams J.'s conclusion seems to me to be inevitable that no case of fraud upon the company could here be established. If there was no fraud and no agency, and if the company was a real one and not a fiction or a myth, every one of the grounds upon which it is sought to support the judgment is disposed of.

My Lords, the truth is that the learned judges have never allowed in their own minds the proposition that the company

(1) 3 App. Cas. 1218.

A. C. 1897.                                              3        D

H. L. (E.)

1896

SALOMON
v.
SALOMON
& CO.

SALOMON
& CO.
v.
SALOMON.

Lord Halsbury
L.C.

H. L. (E.)

1896

SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

Lord Halsbury
L.C.

has a real existence. They have been struck by what they have considered the inexpediency of permitting one man to be in influence and authority the whole company; and, assuming that such a thing could not have been intended by the Legislature, they have sought various grounds upon which they might insert into the Act some prohibition of such a result. Whether such a result be right or wrong, politic or impolitic, I say, with the utmost deference to the learned judges, that we have nothing to do with that question if this company has been duly constituted by law; and, whatever may be the motives of those who constitute it, I must decline to insert into that Act of Parliament limitations which are not to be found there.

I have dealt with this matter upon the narrow hypothesis propounded by the learned judges below; but it is, I think, only justice to the appellant to say that I see nothing whatever to justify the imputations which are implied in some of the observations made by more than one of the learned judges. The appellant, in my opinion, is not shewn to have done or to have intended to do anything dishonest or unworthy, but to have suffered a great misfortune without any fault of his own.

The result is that I move your Lordships that the judgment appealed from be reversed, but as this is a pauper case, I regret to say it can only be with such costs in this House as are appropriate to that condition of things, and that the cross-appeal be dismissed with costs to the same extent.

LORD WATSON. My Lords, this appeal raises some questions of practical importance, depending upon the construction of the Companies Acts, which do not appear to have been settled by previous decisions. As I am not prepared to accept without reservation all the conclusions of fact which found favour with the Courts below, I shall, before adverting to the law, state what I conceive to be the material facts established by the evidence before us. [His Lordship stated the facts above set out.]

The allegations of the company, in so far as they have any relation to the amended claim, their pith consisting in the aver-

ments made on amendment, were meant to convey a charge of fraud; and it is unfortunate that they are framed in such loose and general terms. A relevant charge of fraud ought to disclose facts necessitating the inference that a fraud was perpetrated upon some person specified. Whether it was a fraud upon the company and its members, or upon persons who had dealings with the company, is not indicated, although there may be very different considerations applicable to those two cases. The res gestæ which might imply that it was the appellant, and not the company, who actually carried on its business, are not set forth. Any person who holds a preponderating share in the stock of a limited company has necessarily the intention of taking the lion's share of its profits without any risk beyond loss of the money which he has paid for, or is liable to pay upon his shares; and the fact of his acquiring and holding debentures secured upon the assets of the company does not diminish the risk of that loss. What is meant by the assertion that the company "was the mere nominee or agent" of the appellant I cannot gather from the record; and I am not sure that I understand precisely in what sense it was interpreted by the learned judges whose decisions we have to consider.

No additional proof was led after the amendment of the counter-claim. The oral testimony has very little, if any, bearing upon the second claim; and any material facts relating to the fraudulent objects which the appellant is said to have had in view, and the alleged position of the company as his nominee or agent, must be mere matter of inference derived from the agreements of July 20 and August 2, 1892, the memorandum and articles of association, and the minute-book of the company.

On rehearing the case Vaughan Williams J., without disposing of the original claim, gave the company decree of indemnity in terms of their amended claim. I do not profess my ability to follow accurately the whole chain of reasoning by which the learned judge arrived at that conclusion; but he appears to have proceeded mainly upon the ground that the appellant was in truth the company, the other members being either his trustees or mere "dummies," and consequently that

H. L. (E.)

1896

SALOMON
v.
SALOMON
& CO.

SALOMON
& CO.
v.
SALOMON.

Lord Watson.

3      D 2

H. L. (E.)

1896

SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

Lord Watson.

the appellant carried on what was truly his own business under cover of the name of the company, which was nothing more than an alias for Aron Salomon. On appeal from his decision, the Court of Appeal, consisting of Lindley, Lopes, and Kay L.JJ., made an order finding it unnecessary to deal with the original claim, and dismissing the appeal in so far as it related to the amended claim. The ratio upon which that affirmance proceeded, as embodied in the order, was: "This Court being of opinion that the formation of the company, the agreement of August, 1892, and the issue of debentures to Aron Salomon pursuant to such agreement, were a mere scheme to enable him to carry on business in the name of the company, with limited liability, contrary to the true intent and meaning of the Companies Act, 1862, and further to enable him to obtain a preference over other creditors of the company by procuring a first charge on the assets of the company by means of such debentures." The opinions delivered by the Lords Justices are strictly in keeping with the reasons assigned in their order. Lindley L.J., observing " that the incorporation of the company cannot be disputed," refers to the scheme for the formation of the company, and says (1): " the object of the whole arrangement is to do the very thing which the Legislature intended not to be done " ; and he adds that " Mr. Salomon's scheme is a device to defraud creditors."

Assuming that the company was well incorporated in terms of the Act of 1862, an assumption upon which the decisions appealed from appear to me to throw considerable doubt, I think it expedient, before considering the amended claim, to deal with the original claim for rescission, which was strongly pressed upon us by counsel for the company, under their cross-appeal. Upon that branch of the case there does not appear to me to be much room for doubt. With this exception, that the word " exorbitant " appears to me to be too strong an epithet, I entirely agree with Vaughan Williams J. when he says: " I do not think that where you have a private company, and all the shareholders in the company are perfectly cognisant of the conditions under which the company is formed, and the conditions

(1) [1895] 2 Ch. 337, 339.

of the purchase by the company, you can possibly say that purchasing at an exorbitant price (and I have no doubt whatever that the purchase here was at an exorbitant price) is a fraud upon those shareholders or upon the company." The learned judge goes on to say that the circumstances might have amounted to fraud if there had been an intention on the part of the original shareholders "to allot further shares at a later period to future allottees." Upon that point I do not find it necessary to express any opinion, because it is not raised by the facts of the case, and, in any view, these considerations are of no relevancy in a question as to rescission between the company and the appellant.

Mr. Farwell argued that the agreement of August 2 ought to be set aside upon the principle followed by this House in *Erlanger* v. *New Sombrero Phosphate Co.* (1) In that case the vendor, who got up the company, with the view of selling his adventure to it, attracted shareholders by a prospectus which was essentially false. The directors, who were virtually his nominees, purchased from him without being aware of the real facts ; and on their assurance that, in so far as they knew, all was right, the shareholders sanctioned the transaction. The fraud by which the company and its shareholders had been misled was directly traceable to the vendor ; and it was set aside at the instance of the liquidator, the Lord Chancellor (Earl Cairns) expressing a doubt whether, even in those circumstances, the remedy was not too late after a liquidation order. But in this case the agreement of July 20 was, in the full knowledge of the facts, approved and adopted by the company itself, if there was a company, and by all the shareholders who ever were, or were likely to be, members of the company. In my opinion, therefore, *Erlanger* v. *New Sombrero Phosphate Co.* (1) has no application, and the original claim of the liquidator is not maintainable.

The Lords Justices of Appeal, in disposing of the amended claim, have expressly found that the formation of the company, with limited liability, and the issue of 10,000*l.* worth of its debentures to the appellant, were "contrary to the true intent

(1) 3 App. Cas. 1218.

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord Watson.

H. L. (E.)
1896
SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

Lord Watson.

and meaning of the Companies Act, 1862." I have had great difficulty in endeavouring to interpret that finding. I am unable to comprehend how a company, which has been formed contrary to the true intent and meaning of a statute, and (in the language of Lindley L.J.) does the very thing which the Legislature intended not to be done, can yet be held to have been legally incorporated in terms of the statute. "Intention of the Legislature" is a common but very slippery phrase, which, popularly understood, may signify anything from intention embodied in positive enactment to speculative opinion as to what the Legislature probably would have meant, although there has been an omission to enact it. In a Court of Law or Equity, what the Legislature intended to be done or not to be done can only be legitimately ascertained from that which it has chosen to enact, either in express words or by reasonable and necessary implication. Accordingly, if the words "intent and meaning," as they occur in the finding of the Appeal Court, are used in their proper legal sense, it follows, in my opinion, that the company has not been well incorporated; that, there being no legal corporation, there can be no liquidation under the Companies Acts, and that the counter-claim preferred by its liquidator must fail. In that case its creditors would not be left without a remedy, because its members, as joint traders without limitation of their liability, would be jointly and severally responsible for the debts incurred by them in the name of the company.

The provisions of the Act of 1862 which seem to me to have any bearing upon this point lie within a very narrow compass. Sect. 6 provides that any seven or more persons, associated for a lawful purpose, such as the manufacture and sale of boots, may, by subscribing their names to a memorandum of association and otherwise complying with the provisions of the Act in respect of registration, form a company with or without limited liability; and s. 8, which prescribes the essentials of the memorandum in the case of a company limited by shares, inter alia, enacts that "no subscriber shall take less than one share." The first of these enactments does not require that the persons subscribing shall not be related to each other; and the second

H. L. (E.)

1896

SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

Lord Watson.

plainly imports that the holding of a single share affords a sufficient qualification for membership; and I can find no other rule laid down or even suggested in the Act. Nor does the statute, either expressly or by implication, impose any limit upon the number of shares which a single member may subscribe for or take by allotment. At the date of registration all the requirements of the Act had been complied with; and, as matters then stood, there does not appear to have been any room for the pleas now advanced by the liquidator. The company was still free to modify or reject the agreement of July 20; and the fraud of which the appellant has been held guilty by the Court of Appeal, though it may have existed in animo, had not been carried into execution by the acceptance of the agreement, the issue of debentures to the appellant in terms of it, and by his receiving an allotment of shares which increased his interest in the company to $\frac{20000}{20007}$ of its actual capital. I have already intimated my opinion that the acceptance of the agreement is binding on the company; and neither that acceptance, nor the preponderating share of the appellant, nor his payment in debentures, being forbidden by the Act, I do not think that any one of these things could subsequently render the registration of the company invalid. But I am willing to assume that proceedings which are permitted by the Act may be so used by the members of a limited company as to constitute a fraud upon others, to whom they in consequence incur personal liability. In this case the fraud is found to have been committed by the appellant against the creditors of the company; but it is clear that if so, though he may have been its originator and the only person who took benefit from it, he could not have done any one of those things, which taken together are said to constitute his fraud, without the consent and privity of the other shareholders. It seems doubtful whether a liquidator as representing and in the name of the company can sue its members for redress against a fraud which was committed by the company itself and by all its shareholders. However, I do not think it necessary to dwell upon that point, because I am not satisfied that the charge of fraud against creditors has any foundation in fact.

H. L. (E.)

1896

SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

Lord Watson.

The memorandum of association gave notice that the main object for which the company was formed was to adopt and carry into effect, with or without modifications, the agreement of July, 1892, in terms of which the debentures for 10,000l. were subsequently given to the appellant in part payment of the price. By the articles of association (art. 62 (e)) the directors were empowered to issue mortgage or other debentures or bonds for any debts due, or to become due, from the company; and it is not alleged or proved that there was any failure to comply with s. 43 or the other clauses (Part III. of the Act) which relate to the protection of creditors. The unpaid creditors of the company, whose unfortunate position has been attributed to the fraud of the appellant, if they had thought fit to avail themselves of the means of protecting their interests which the Act provides, could have informed themselves of the terms of purchase by the company, of the issue of debentures to the appellant, and of the amount of shares held by each member. In my opinion, the statute casts upon them the duty of making inquiry in regard to these matters. Whatever may be the moral duty of a limited company and its shareholders, when the trade of the company is not thriving, the law does not lay any obligation upon them to warn those members of the public who deal with them on credit that they run the risk of not being paid. One of the learned judges asserts, and I see no reason to question the accuracy of his statement, that creditors never think of examining the register of debentures. But the apathy of a creditor cannot justify an imputation of fraud against a limited company or its members, who have provided all the means of information which the Act of 1862 requires; and, in my opinion, a creditor who will not take the trouble to use the means which the statute provides for enabling him to protect himself must bear the consequences of his own negligence.

For these reasons I have come to the conclusion that the orders appealed from ought to be reversed, with costs to the appellant here and in both Courts below. His costs in this House must, of course, be taxed in accordance with the rule applicable to pauper litigants.

LORD HERSCHELL. My Lords, by an order of the High Court, which was affirmed by the Court of Appeal, it was declared that the respondent company, or the liquidator of that company was entitled to be indemnified by the appellant against the sum of 7733*l.* 8*s.* 3*d.*, and it was ordered that the respondent company should recover that sum against the appellant.

On July 28, 1892, the respondent company was incorporated with a capital of 40,000*l.* divided into 40,000 shares of 1*l.* each. One of the objects for which the company was incorporated was to carry out an agreement, with such modifications therein as might be agreed to, of July 20, 1892, which had been entered into between the appellant and a trustee for a company intended to be formed, for the acquisition by the company of the business then carried on by the appellant. The company was, in fact, formed for the purpose of taking over the appellant's business of leather merchant and boot manufacturer, which he had carried on for many years. The business had been a prosperous one, and, as the learned judge who tried the action found, was solvent at the time when the company was incorporated. The memorandum of association of the company was subscribed by the appellant, his wife and daughter, and his four sons, each subscribing for one share. The appellant afterwards had 20,000 shares allotted to him. For these he paid 1*l.* per share out of the purchase-money which by agreement he was to receive for the transfer of his business to the company. The company afterwards became insolvent and went into liquidation.

In an action brought by a debenture-holder on behalf of himself and all the other debenture-holders, including the appellant, the respondent company set up by way of counter-claim that the company was formed by Aron Salomon, and the debentures were issued in order that he might carry on the said business, and take all the profits without risk to himself; that the company was the mere nominee and agent of Aron Salomon; and that the company or the liquidator thereof was entitled to be indemnified by Aron Salomon against all the debts owing by the company to creditors other than Aron Salomon. This counter-claim was not in the pleading as

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

H. L. (E.)
1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord Herschell.

originally delivered; it was inserted by way of amendment at the suggestion of Vaughan Williams J., before whom the action came on for trial. The learned judge thought the liquidator entitled to the relief asked for, and made the order complained of. He was of opinion that the company was only an " alias " for Salomon; that, the intention being that he should take the profits without running the risk of the debts, the company was merely an agent for him, and, having incurred liabilities at his instance, was, like any other agent under such circumstances, entitled to be indemnified by him against them. On appeal the judgment of Vaughan Williams J. was affirmed by the Court of Appeal, that Court " being of opinion that the formation of the company, the agreement of August, 1892, and the issue of debentures to Aron Salomon pursuant to such agreement were a mere scheme to enable him to carry on business in the name of the company with limited liability contrary to the true intent and meaning of the Companies Act, 1862, and further to enable him to obtain a preference over other creditors of the company by procuring a first charge on the assets of the company by means of such debentures."

The learned judges in the Court of Appeal dissented from the view taken by Vaughan Williams J., that the company was to be regarded as the agent of the appellant. They considered the relation between them to be that of trustee and cestui que trust; but this difference of view, of course, did not affect the conclusion that the right to the indemnity claimed had been established.

It is to be observed that both Courts treated the company as a legal entity distinct from Salomon and the then members who composed it, and therefore as a validly constituted corporation. This is, indeed, necessarily involved in the judgment which declared that the company was entitled to certain rights as against Salomon. Under these circumstances, I am at a loss to understand what is meant by saying that A. Salomon & Co., Limited, is but an " alias " for A. Salomon. It is not another name for the same person; the company is ex hypothesi a distinct legal persona. As little am I able to adopt the view

H. L. (E.)

1896

SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

Lord Herschell.

that the company was the agent of Salomon to carry on his business for him. In a popular sense, a company may in every case be said to carry on business for and on behalf of its shareholders; but this certainly does not in point of law constitute the relation of principal and agent between them or render the shareholders liable to indemnify the company against the debts which it incurs. Here, it is true, Salomon owned all the shares except six, so that if the business were profitable he would be entitled, substantially, to the whole of the profits. The other shareholders, too, are said to have been "dummies," the nominees of Salomon. But when once it is conceded that they were individual members of the company distinct from Salomon, and sufficiently so to bring into existence in conjunction with him a validly constituted corporation, I am unable to see how the facts to which I have just referred can affect the legal position of the company, or give it rights as against its members which it would not otherwise possess.

The Court of Appeal based their judgment on the proposition that the formation of the company and all that followed on it were a mere scheme to enable the appellant to carry on business in the name of the company, with limited liability, contrary to the true intent and meaning of the Companies Act, 1862. The conclusion which they drew from this premiss was, that the company was a trustee and Salomon their cestui que trust. I cannot think that the conclusion follows even if the premiss be sound. It seems to me that the logical result would be that the company had not been validly constituted, and therefore had no legal existence. But, apart from this, it is necessary to examine the proposition on which the Court have rested their judgment, as its effect would be far reaching. Many industrial and banking concerns of the highest standing and credit have, in recent years, been, to use a common expression, converted into joint stock companies, and often into what are called "private" companies, where the whole of the shares are held by the former partners. It appears to me that all these might be pronounced "schemes to enable" them "to carry on business in the name of the company, with limited liability," in the very sense in which those words are used in

HOUSE OF LORDS [1897]

H. L. (E.)

1896

SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

Lord Herschell.

the judgment of the Court of Appeal. The profits of the concern carried on by the company will go to the persons whose business it was before the transfer, and in the same proportions as before, the only difference being that the liability of those who take the profits will no longer be unlimited. The very object of the creation of the company and the transfer to it of the business is, that whereas the liability of the partners for debts incurred was without limit, the liability of the members for the debts incurred by the company shall be limited. In no other respect is it intended that there shall be any difference: the conduct of the business and the division of the profits are intended to be the same as before. If the judgment of the Court of Appeal be pushed to its logical conclusion, all these companies must, I think, be held to be trustees for the partners who transferred the business to them, and those partners must be declared liable without limit to discharge the debts of the company. For this is the effect of the judgment as regards the respondent company. The position of the members of a company is just the same whether they are declared liable to pay the debts incurred by the company, or by way of indemnity to furnish the company with the means of paying them. I do not think the learned judges in the Court below have contemplated the application of their judgment to such cases as I have been considering; but I can see no solid distinction between those cases and the present one.

It is said that the respondent company is a "one man" company, and that in this respect it differs from such companies as those to which I have alluded. But it has often happened that a business transferred to a joint stock company has been the property of three or four persons only, and that the other subscribers of the memorandum have been clerks or other persons who possessed little or no interest in the concern. I am unable to see how it can be lawful for three or four or six persons to form a company for the purpose of employing their capital in trading, with the benefit of limited liability, and not for one person to do so, provided, in each case, the requirements of the statute have been complied with and the company has been validly constituted. How does it concern the creditor

whether the capital of the company is owned by seven persons in equal shares, with the right to an equal share of the profits, or whether it is almost entirely owned by one person, who practically takes the whole of the profits? The creditor has notice that he is dealing with a company the liability of the members of which is limited, and the register of shareholders informs him how the shares are held, and that they are substantially in the hands of one person, if this be the fact. The creditors in the present case gave credit to and contracted with a limited company; the effect of the decision is to give them the benefit, as regards one of the shareholders, of unlimited liability. I have said that the liability of persons carrying on business can only be limited provided the requirements of the statute be complied with; and this leads naturally to the inquiry, What are those requirements?

The Court of Appeal has declared that the formation of the respondent company and the agreement to take over the business of the appellant were a scheme "contrary to the true intent and meaning of the Companies Act." I know of no means of ascertaining what is the intent and meaning of the Companies Act except by examining its provisions and finding what regulations it has imposed as a condition of trading with limited liability. The memorandum must state the amount of the capital of the company and the number of shares into which it is divided, and no subscriber is to take less than one share. The shares may, however, be of as small a nominal value as those who form the company please: the statute prescribes no minimum; and though there must be seven shareholders, it is enough if each of them holds one share, however small its denomination. The Legislature, therefore, clearly sanctions a scheme by which all the shares except six are owned by a single individual, and these six are of a value little more than nominal.

It was said that in the present case the six shareholders other than the appellant were mere dummies, his nominees, and held their shares in trust for him. I will assume that this was so. In my opinion, it makes no difference. The statute forbids the entry in the register of any trust; and it certainly

H. L. (E.)

1896

SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

Lord Herschell.

Case 1:08-cv-02065-JGK     Document 20-9     Filed 05/16/2008     Page 26 of 38

H. L. (E.)

1896

SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

Lord Herschell.

contains no enactment that each of the seven persons subscribing the memorandum must be beneficially entitled to the share or shares for which he subscribes. The persons who subscribe the memorandum, or who have agreed to become members of the company and whose names are on the register, are alone regarded as, and in fact are, the shareholders. They are subject to all the liability which attaches to the holding of the share. They can be compelled to make any payment which the ownership of a share involves. Whether they are beneficial owners or bare trustees is a matter with which neither the company nor creditors have anything to do: it concerns only them and their cestuis que trust if they have any. If, then, in the present case all the requirements of the statute were complied with, and a company was effectually constituted, and this is the hypothesis of the judgment appealed from, what warrant is there for saying that what was done was contrary to the true intent and meaning of the Companies Act?

It may be that a company constituted like that under consideration was not in the contemplation of the Legislature at the time when the Act authorizing limited liability was passed; that if what is possible under the enactments as they stand had been foreseen a minimum sum would have been fixed as the least denomination of share permissible; and that it would have been made a condition that each of the seven persons should have a substantial interest in the company. But we have to interpret the law, not to make it; and it must be remembered that no one need trust a limited liability company unless he so please, and that before he does so he can ascertain, if he so please, what is the capital of the company and how it is held.

I have hitherto made no reference to the debentures which the appellant received in part-payment of the purchase-money of the business which he transferred to the company. These are referred to in the judgment as part of the scheme which is pronounced contrary to the true intent and meaning of the Companies Act. But if apart from this the conclusion that the appellant is bound to indemnify the company against its debts cannot be sustained, I do not see how the circumstance

Case 1:08-cv-02065-JGK     Document 20-9     Filed 05/16/2008     Page 27 of 38

that he received these debentures can avail the respondent company. The issue of debentures to the vendor of a business as part of the price is certainly open to great abuse, and has often worked grave mischief. It may well be that some check should be placed upon the practice, and that, at all events, ample notice to all who may have dealings with the company should be secured. But as the law at present stands, there is certainly nothing unlawful in the creation of such debentures. For these reasons I have come to the conclusion that the appeal should be allowed.

It was contended on behalf of the company that the agreement between them and the appellant ought, at all events, to be set aside on the ground of fraud. In my opinion, no such case has been made out, and I do not think the respondent company are entitled to any such relief.

LORD MACNAGHTEN. My Lords, I cannot help thinking that the appellant, Aron Salomon, has been dealt with somewhat hardly in this case.

Mr. Salomon, who is now suing as a pauper, was a wealthy man in July, 1892. He was a boot and shoe manufacturer trading on his own sole account under the firm of "A. Salomon & Co.," in High Street, Whitechapel, where he had extensive warehouses and a large establishment. He had been in the trade over thirty years. He had lived in the same neighbourhood all along, and for many years past he had occupied the same premises. So far things had gone very well with him. Beginning with little or no capital, he had gradually built up a thriving business, and he was undoubtedly in good credit and repute.

It is impossible to say exactly what the value of the business was. But there was a substantial surplus of assets over liabilities. And it seems to me to be pretty clear that if Mr. Salomon had been minded to dispose of his business in the market as a going concern he might fairly have counted upon retiring with at least 10,000*l.* in his pocket.

Mr. Salomon, however, did not want to part with the business. He had a wife and a family consisting of five sons and a

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& CO.

SALOMON
& CO.
*v.*
SALOMON.

Lord Herschell.

Case 1:08-cv-02065-JGK    Document 20-9    Filed 05/16/2008    Page 28 of 38

H. L. (E.)
1896
SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

Lord
Macnaghten.

daughter.  Four of the sons were working with their father. The eldest, who was about thirty years of age, was practically the manager.  But the sons were not partners: they were only servants.  Not unnaturally, perhaps, they were dissatisfied with their position.  They kept pressing their father to give them a share in the concern.  " They troubled me," says Mr. Salomon, " all the while."  So at length Mr. Salomon did what hundreds of others have done under similar circumstances.  He turned his business into a limited company.  He wanted, he says, to extend the business and make provision for his family. In those words, I think, he fairly describes the principal motives which influenced his action.

All the usual formalities were gone through; all the require- ments of the Companies Act, 1862, were duly observed.  There was a contract with a trustee in the usual form for the sale of the business to a company about to be formed.  There was a memorandum of association duly signed and registered, stating that the company was formed to carry that contract into effect, and fixing the capital at 40,000l. in 40,000 shares of 1l. each. There were articles of association providing the usual machinery for conducting the business.  The first directors were to be nominated by the majority of the subscribers to the memo- randum of association.  The directors, when appointed, were authorized to exercise all such powers of the company as were not by statute or by the articles required to be exercised in general meeting; and there was express power to borrow on debentures, with the limitation that the borrowing was not to exceed 10,000l. without the sanction of a general meeting.

The company was intended from the first to be a private company; it remained a private company to the end.  No prospectus was issued; no invitation to take shares was ever addressed to the public.

The subscribers to the memorandum were Mr. Salomon, his wife, and five of his children who were grown up.  The sub- scribers met and appointed Mr. Salomon and his two elder sons directors.  The directors then proceeded to carry out the proposed transfer.  By an agreement dated August 2, 1892, the company adopted the preliminary contract, and in accord-

ance with it the business was taken over by the company as from June 1, 1892. The price fixed by the contract was duly paid. The price on paper was extravagant. It amounted to over 39,000*l.*—a sum which represented the sanguine expectations of a fond owner rather than anything that can be called a businesslike or reasonable estimate of value. That, no doubt, is a circumstance which at first sight calls for observation; but when the facts of the case and the position of the parties are considered, it is difficult to see what bearing it has on the question before your Lordships. The purchase-money was paid in this way: as money came in, sums amounting in all to 30,000*l.* were paid to Mr. Salomon, and then immediately returned to the company in exchange for fully-paid shares. The sum of 10,000*l.* was paid in debentures for the like amount. The balance, with the exception of about 1000*l.* which Mr. Salomon seems to have received and retained, went in discharge of the debts and liabilities of the business at the time of the transfer, which were thus entirely wiped off. In the result, therefore, Mr. Salomon received for his business about 1000*l.* in cash, 10,000*l.* in debentures, and half the nominal capital of the company in fully paid shares for what they were worth. No other shares were issued except the seven shares taken by the subscribers to the memorandum, who, of course, knew all the circumstances, and had therefore no ground for complaint on the score of overvaluation.

The company had a brief career: it fell upon evil days. Shortly after it was started there seems to have come a period of great depression in the boot and shoe trade. There were strikes of workmen too; and in view of that danger contracts with public bodies, which were the principal source of Mr. Salomon's profit, were split up and divided between different firms. The attempts made to push the business on behalf of the new company crammed its warehouses with unsaleable stock. Mr. Salomon seems to have done what he could: both he and his wife lent the company money; and then he got his debentures cancelled and reissued to a Mr. Broderip, who advanced him 5000*l.*, which he immediately handed over to the company on loan. The temporary relief only hastened

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord
Macnaghten.

Case 1:08-cv-02065-JGK    Document 20-9    Filed 05/16/2008    Page 30 of 38

H. L. (E.)
1896
SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

Lord
Macnaghten.

ruin. Mr. Broderip's interest was not paid when it became due. He took proceedings at once and got a receiver appointed. Then, of course, came liquidation and a forced sale of the company's assets. They realized enough to pay Mr. Broderip, but not enough to pay the debentures in full; and the unsecured creditors were consequently left out in the cold.

In this state of things the liquidator met Mr. Broderip's claim by a counter-claim, to which he made Mr. Salomon a defendant. He disputed the validity of the debentures on the ground of fraud. On the same ground he claimed rescission of the agreement for the transfer of the business, cancellation of the debentures, and repayment by Mr. Salomon of the balance of the purchase-money. In the alternative, he claimed payment of 20,000*l.* on Mr. Salomon's shares, alleging that nothing had been paid on them.

When the trial came on before Vaughan Williams J., the validity of Mr. Broderip's claim was admitted, and it was not disputed that the 20,000 shares were fully paid up. The case presented by the liquidator broke down completely; but the learned judge suggested that the company had a right of indemnity against Mr. Salomon. The signatories of the memorandum of association were, he said, mere nominees of Mr. Salomon—mere dummies. The company was Mr. Salomon in another form. He used the name of the company as an alias. He employed the company as his agent; so the company, he thought, was entitled to indemnity against its principal. The counter-claim was accordingly amended to raise this point; and on the amendment being made the learned judge pronounced an order in accordance with the view he had expressed.

The order of the learned judge appears to me to be founded on a misconception of the scope and effect of the Companies Act, 1862. In order to form a company limited by shares, the Act requires that a memorandum of association should be signed by seven persons, who are each to take one share at least. If those conditions are complied with, what can it matter whether the signatories are relations or strangers? There is nothing in the Act requiring that the subscribers to the memorandum should be independent or unconnected, or

that they or any one of them should take a substantial interest in the undertaking, or that they should have a mind and will of their own, as one of the learned Lords Justices seems to think, or that there should be anything like a balance of power in the constitution of the company. In almost every company that is formed the statutory number is eked out by clerks or friends, who sign their names at the request of the promoter or promoters without intending to take any further part or interest in the matter.

When the memorandum is duly signed and registered, though there be only seven shares taken, the subscribers are a body corporate "capable forthwith," to use the words of the enactment, "of exercising all the functions of an incorporated company." Those are strong words. The company attains maturity on its birth. There is no period of minority—no interval of incapacity. I cannot understand how a body corporate thus made "capable" by statute can lose its individuality by issuing the bulk of its capital to one person, whether he be a subscriber to the memorandum or not. The company is at law a different person altogether from the subscribers to the memorandum; and, though it may be that after incorporation the business is precisely the same as it was before, and the same persons are managers, and the same hands receive the profits, the company is not in law the agent of the subscribers or trustee for them. Nor are the subscribers as members liable, in any shape or form, except to the extent and in the manner provided by the Act. That is, I think, the declared intention of the enactment. If the view of the learned judge were sound, it would follow that no common law partnership could register as a company limited by shares without remaining subject to unlimited liability.

Mr. Salomon appealed; but his appeal was dismissed with costs, though the Appellate Court did not entirely accept the view of the Court below. The decision of the Court of Appeal proceeds on a declaration of opinion embodied in the order which has been already read.

I must say that I, too, have great difficulty in understanding this declaration. If it only means that Mr. Salomon availed

H. L. (E.)

1896

SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

Lord
Macnaghten.

H. L. (E.)
1896

SALOMON
v.
SALOMON
& Co.

SALOMON
& Co.
v.
SALOMON.

Lord
Macnaghten.

himself to the full of the advantages offered by the Act of 1862, what is there wrong in that? Leave out the words "contrary to the true intent and meaning of the Companies Act, 1862," and bear in mind that "the creditors of the company" are not the creditors of Mr. Salomon, and the declaration is perfectly innocent: it has no sting in it.

In an early case, which in some of its aspects is not unlike the present, the owners of a colliery (to quote the language of Giffard L.J. in the Court of Appeal) "went on working the colliery not very successfully, and then determined to form a limited company in order to avoid incurring further personal liability." "It was," adds the Lord Justice, "the policy of the Companies Act to enable this to be done." And so he reversed the decision of Malins V.-C., who had expressed an opinion that if the laws of the country sanctioned such a proceeding they were "in a most lamentable state," and had fixed the former owners with liability for the amount of the shares they took in exchange for their property : *In re Baglan Hall Colliery Co.* (1)

Among the principal reasons which induce persons to form private companies, as is stated very clearly by Mr. Palmer in his treatise on the subject, are the desire to avoid the risk of bankruptcy, and the increased facility afforded for borrowing money. By means of a private company, as Mr. Palmer observes, a trade can be carried on with limited liability, and without exposing the persons interested in it in the event of failure to the harsh provisions of the bankruptcy law. A company, too, can raise money on debentures, which an ordinary trader cannot do. Any member of a company, acting in good faith, is as much entitled to take and hold the company's debentures as any outside creditor. Every creditor is entitled to get and to hold the best security the law allows him to take.

If, however, the declaration of the Court of Appeal means that Mr. Salomon acted fraudulently or dishonestly, I must say I can find nothing in the evidence to support such an imputation. The purpose for which Mr. Salomon and the other

(1) L. R. 5 Ch. 346.

AND PRIVY COUNCIL.

subscribers to the memorandum were associated was " lawful."
The fact that Mr. Salomon raised 5000*l.* for the company on
debentures that belonged to him seems to me strong evidence
of his good faith and of his confidence in the company.   The
unsecured creditors of A. Salomon and Company, Limited, may
be entitled to sympathy, but they have only themselves to blame
for their misfortunes.   They trusted the company, I suppose,
because they had long dealt with Mr. Salomon, and he had
always paid his way; but they had full notice that they were
no longer dealing with an individual, and they must be taken
to have been cognisant of the memorandum and of the articles
of association.   For such a catastrophe as has occurred in this
case some would blame the law that allows the creation of a
floating charge.   But a floating charge is too convenient a form
of security to be lightly abolished.   I have long thought, and I
believe some of your Lordships also think, that the ordinary
trade creditors of a trading company ought to have a preferential
claim on the assets in liquidation in respect of debts incurred
within a certain limited time before the winding-up.   But that
is not the law at present.   Everybody knows that when there
is a winding-up debenture-holders generally step in and sweep
off everything; and a great scandal it is.

It has become the fashion to call companies of this class
" one man companies."   That is a taking nickname, but it does
not help one much in the way of argument.   If it is intended
to convey the meaning that a company which is under the
absolute control of one person is not a company legally incor-
porated, although the requirements of the Act of 1862 may have
been complied with, it is inaccurate and misleading: if it merely
means that there is a predominant partner possessing an over-
whelming influence and entitled practically to the whole of the
profits, there is nothing in that that I can see contrary to the
true intention of the Act of 1862, or against public policy, or
detrimental to the interests of creditors.   If the shares are fully
paid up, it cannot matter whether they are in the hands of one
or many.   If the shares are not fully paid, it is as easy to gauge
the solvency of an individual as to estimate the financial ability
of a crowd.

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord
Macnaghten.

H. L. (E.)
1896
SALOMON
v.
SALOMON
& Co.
SALOMON
& Co.
v.
SALOMON.
Lord
Macnaghten.

One argument was addressed to your Lordships which ought perhaps to be noticed, although it was not the ground of decision in either of the Courts below. It was argued that the agreement for the transfer of the business to the company ought to be set aside, because there was no independent board of directors, and the property was transferred at an overvalue. There are, it seems to me, two answers to that argument. In the first place, the directors did just what they were authorized to do by the memorandum of association. There was no fraud or misrepresentation, and there was nobody deceived. In the second place, the company have put it out of their power to restore the property which was transferred to them. It was said that the assets were sold by an order made in the presence of Mr. Salomon, though not with his consent, which declared that the sale was to be without prejudice to the rights claimed by the company by their counter-claim. I cannot see what difference that makes. The reservation in the order seems to me to be simply nugatory.

I am of opinion that the appeal ought to be allowed, and the counter-claim of the company dismissed with costs, both here and below.

LORD MORRIS. My Lords, I quite concur in the judgment which has been announced, and in the reasons which have been so fully given for it.

LORD DAVEY. My Lords, it is possible, and (I think) probable, that the conclusion to which I feel constrained to come in this case may not have been contemplated by the Legislature, and may be due to some defect in the machinery of the Act. But, after all, the intention of the Legislature must be collected from the language of its enactments; and I do not see my way to holding that if there are seven registered members the association is not a company formed in compliance with the provisions of the Act and capable of carrying on business with limited liability, either because the bulk of the shares are held by some only, or even one of the members, and the others are what is called "dummies," holding, it may be, only one share

of 1*l.* each, or because there are less than seven persons who are beneficially entitled to the shares.

I think that this result follows from the absence of any provision fixing a minimum nominal amount of a share—the provision in s. 8 that no subscriber shall take less than one share, and the provision in s. 30 that no notice of any trust shall be entered on the register. With regard to the latter provision, it would, in my opinion, be impossible to work the machinery of the Act on any other principle, and to attempt to do so would lead only to confusion and uncertainty. The learned counsel for the respondents (wisely, as I think) did not lay any stress on the members, other than the appellant, being trustees for him of their shares. Their argument was that they were "dummies," and did not hold a substantial interest in the company, i.e., what a jury would say is a substantial interest. In the language of some of the judges in the Court below, any jury, if asked the question, would say the business was Aron Salomon's and no one else's.

It was not argued in this case that there was no association of seven persons to be registered, and the registration therefore operated nothing, or that the so-called company was a sham and might be disregarded; and, indeed, it would have been difficult for the learned counsel for the respondents, appearing, as they did, at your Lordships' Bar for the company, who had been permitted to litigate in the Courts below as actors (on their counter-claim), to contend that their clients were non-existent. I do not say that such an argument ought to or would prevail; I only observe that, having regard to the decisions, it is not certain that s. 18, making the certificate of the registrar conclusive evidence that all the requisitions of the Act in respect of registration had been complied with, would be an answer to it.

We start, then, with the assumption that the respondents have a corporate existence with power to sue and be sued, to incur debts and be wound up, and to act as agents or as trustees, and I suppose, therefore, to hold property. Both the Courts below have, however, held that the appellant is liable to indemnify the company against all its debts and liabilities.

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& CO.

SALOMON
& CO.
*v.*
SALOMON.

Lord Davey.

H. L. (E.)

1896

SALOMON
*v.*
SALOMON
& Co.

SALOMON
& Co.
*v.*
SALOMON.

Lord Davey.

Vaughan Williams J. held that the company was an "alias" for the appellant, who carried on his business through the company as his agent, and that he was bound to indemnify his own agent; and he arrived at this conclusion on the ground that the other members of the company had no substantial interest in it, and the business in substance was the appellant's. The Court of Appeal thought the relation of the company to the appellant was that of trustee to cestui que trust.

The ground on which the learned judges seem to have chiefly relied was that it was an attempt by an individual to carry on his business with limited liability, which was forbidden by the Act and unlawful. I observe, in passing, that nothing turns upon there being only one person interested. The argument would have been just as good if there had been six members holding the bulk of the shares and one member with a very small interest, say, one share. I am at a loss to see how in either view taken in the Courts below the conclusion follows from the premises, or in what way the company became an agent or trustee for the appellant, except in the sense in which every company may loosely and inaccurately be said to be an agent for earning profits for its members, or a trustee of its profits for the members amongst whom they are to be divided. There was certainly no express trust for the appellant; and an implied or constructive trust can only be raised by virtue of some equity. I took the liberty of asking the learned counsel what the equity was, but got no answer. By an "alias" is usually understood a second name for one individual; but here, as one of your Lordships has already observed, we have, ex hypothesi, a duly formed legal persona, with corporate attributes and capable of incurring legal liabilities. Nor do I think it legitimate to inquire whether the interest of any member is substantial when the Act has declared that no member need hold more than one share, and has not prescribed any minimum amount of a share. If, as was said in the Court of Appeal, the company was formed for an unlawful purpose, or in order to achieve an object not permitted by the provisions of the Act, the appropriate remedy (if any) would seem to be to set aside the certificate of incorporation, or to treat the company as a

H. L. (E.)

1896

SALOMON
v.
SALOMON
& CO.

SALOMON
& CO.
v.
SALOMON.

Lord Davey.

nullity, or, if the appellant has committed a fraud or mis-demeanour (which I do not think he has), he may be proceeded against civilly or criminally; but how either of those states of circumstances creates the relation of cestui que trust and trustee, or principal and agent, between the appellant and respondents, is not apparent to my understanding.

I am, therefore, of opinion that the order appealed from cannot be supported on the grounds stated by the learned judges.

But Mr. Farwell also relied on the alternative relief claimed by his pleadings, which was quite open to him here, namely, that the contract for purchase of the appellant's business ought to be set aside for fraud. The fraud seems to consist in the alleged exorbitance of the price and the fact that there was no independent board of directors with whom the appellant could contract. I am of opinion that the fraud was not made out. I do not think the price of the appellant's business (which seems to have been a genuine one, and for some time a prosperous business) was so excessive as to afford grounds for rescission; and as regards the cash portion of the price, it must be observed that, as the appellant held the bulk of the shares, or (the respondents say) was the only shareholder, the money required for the payment of it came from himself in the form either of calls on his shares or profits which would otherwise be divisible. Nor was the absence of any independent board material in a case like the present. I think it an inevitable inference from the circumstances of the case that every member of the company assented to the purchase, and the company is bound in a matter intra vires by the unanimous agreement of its members. In fact, it is impossible to say who was defrauded.

Mr. Farwell relied on some dicta in *Erlanger* v. *New Sombrero Phosphate Co.* (1), a case which is often quoted and not infrequently misunderstood. Of course, Lord Cairns' observations were directed only to a case such as he had before him, where it was attempted to bind a large body of shareholders by a contract which purported to have been made between the vendor and

(1) 3 App. Cas. 1218, 1236.

58                              HOUSE OF LORDS                              [1897]

H. L. (E.)

1896

SALOMON
v.
SALOMON
& Co.
___

SALOMON
& Co.
v.
SALOMON.

Lord Davey.

directors before the shares were offered for subscription; whereas it appeared that the directors were only the nominees of the vendor, who had accepted his bidding and exercised no judgment of their own. It has nothing to do with the present case. That a company may contract with the holder of the bulk of its shares, and such contract will be binding though carried by the votes of that shareholder, was decided in *North-West Transportation Co.* v. *Beatty*. (1)

For these reasons, I am of opinion that the appellant's appeal should be allowed and the cross-appeal should be dismissed. I agree to the proposed order as to costs.

> *Order of the Court of Appeal reversed and cross-appeal dismissed with costs here and below; the costs in this House to be taxed in the manner usual when the appellant sues in formâ pauperis; cause remitted to the Chancery Division.*

> *Lords' Journals*, November 16, 1896.

Solicitors for appellant: *Ralph Raphael & Co.*
Solicitors for respondents: *S. M. & J. B. Benson.*

(1) 12 App. Cas. 589.

# EXHIBIT 5

446                          HOUSE OF LORDS                     **[1962]**

H. L. (Sc.)    repudiation must be treated as if accepted.  The respondent
1961         resisted the alternative claim on the ground that the sum sued
─────        for being a penalty and not liquidated damages the appellants
WHITE AND    were not entitled to decree therefor.
CARTER
(COUNCILS)       The only material obligation which the respondent was bound
LTD.         to fulfil was to pay the sum of money claimed and it is difficult
_v._         to see how damages should be assessed for breach of this obliga-
McGREGOR.    tion.  It is, however, unnecessary in view of the opinion I have
Lord Hodson. expressed to consider the question whether the sum claimed is
─────        recoverable as a genuine pre-estimate of probable or possible
             interest in the due performance of the contract or is irrecoverable
             as a penalty.

                 I would allow the appeal.

                        *Appeal allowed.*
                        *No order as to costs.  No disturbance*
                        *of the award as to expenses in the*
                        *courts below.*


             Solicitors: *Lovell, Son & Pitfield for W. H. Creech & Douglas,*
             *Sturminster Newton, Dorset; Fairchild, Greig & Co. for Balfour*
             *& Manion, S.S.C., Edinburgh.*

                                                              F. C.

                              ──────────

                        [HOUSE OF LORDS.]

H. L. (E.)*  SCRUTTONS LTD. .    .    .    .    .    APPELLANTS;
1961                               AND
*Oct. 9, 10,*  MIDLAND SILICONES LTD. .    .    .    RESPONDENTS.
*11, 12, 16;*
*Dec. 6.*
             ON APPEAL FROM MIDLAND SILICONES LTD. _v._ SCRUTTONS LTD.

                              ──────

             *Shipping—Bill of lading—Discharge—Limitation of liability—Steve-*
                 *dores engaged by carrier—Action against stevedores for admitted*
                 *negligence — Whether entitled to protection of limitation—*
                 *"Carrier"—United States Carriage of Goods by Sea Act, 1936,*
                 *s. 4 (5)—Carriage of Goods by Sea Act, 1924 (14 & 15 Geo. 5, c. 22),*
                 *Sch., Art. IV, r. 5.*

                              ──────

                 * *Present:* VISCOUNT SIMONDS, LORD REID, LORD KEITH OF AVON-
             HOLM, LORD DENNING and LORD MORRIS OF BORTH-Y-GEST.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

*Contract—Implied term—Benefit to third party—Bill of lading—Limitation of liability—Whether protecting stevedores.*

*Contract—Parties—Enforcement by third party—Bill of lading—Limitation of liability—Stevedore sued by goods-owner—Whether protected.*

*Contract—Implied contract—Parties participating in commercial transaction—Bill of lading—Whether protecting stevedores—Whether contract to be implied between shipper and stevedores.*

*Agency—Master as agent of servant or independent contractor—Exceptions clause in contract by master—Whether protecting servant or contractor employed by master.*

*Bailment — Sub-bailment — Stevedores — Delivering goods — Whether bailees.*

*Judicial Precedent—House of Lords decision—How far binding—Ratio decidendi, obscure or too wide — Departure from long-established principle.*

*Judicial Precedent—United States decision—Commercial law—Desirability of uniformity—Hague Rules—U.S. Supreme Court.*

*Judicial Precedent—Australian decision—Commercial law—Desirability of uniformity—Hague Rules—High Court of Australia.*

By a bill of lading which incorporated the United States Carriage of Goods by Sea Act, 1936, and limited to $500 (£179) per package the liability of the carrier in the event of loss, damage or delay, a drum containing chemicals was shipped from America to London. The appellants, who were stevedores engaged by the carrier, while lowering the drum from an upper floor of a dock transit shed on to a lorry, negligently dropped and damaged the drum when delivering it to the consignees in accordance with the bill of lading, causing part (worth £593) of its contents to be lost. The consignees, the respondents, sued the stevedores in tort claiming £593. The stevedores, relying on the bill of lading, claimed that their liability was limited to $500 :—

*Held* (Lord Denning dissenting), that the stevedores were not entitled to rely on the limitation of liability contained in the bill of lading, since—

(1) The word " carrier " in the Act did not include a stevedore (post, pp. 466, 495), and there was thus nothing in the bill of lading which stated or even implied that the parties to it intended the limitation of liability to extend to stevedores (post, p. 474).

(2) The carrier did not contract as agent for the stevedores (post, pp. 466, 474, 495).

(3) There was no implied contract to which the present parties were parties that the stevedores should have the benefit of the immunity (post, pp. 466, 474, 496).

(4) The stevedores were not bailees of the drum, whether sub, bald or simple (post, p. 470).

(5) It is a fundamental principle that only a person who is party to a contract can sue upon it, and a stranger to a contract cannot in question with either of the contracting parties, take advantage of provisions of the contract even where it is clear from the contract that some provision in it was intended to benefit him (post, pp. 467, 473). There is no difference in principle between A

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
v.
SCRUTTONS
LTD.
———

promising B to pay C and A promising B that he will not claim that which C ought to pay A (post, p. 494).

*Dunlop Pneumatic Tyre Co. Ltd.* v. *Selfridge & Co. Ltd.* [1915] A.C. 847, 853; 31 T.L.R. 399, H.L.; *Adler* v. *Dickson* [1955] 1 Q.B. 158; [1954] 3 W.L.R. 696; [1954] 3 All E.R. 397, C.A.; *Robert C. Herd & Co. Inc.* v. *Krawill Machinery Corporation* (1959) 359 U.S. 297; [1959] 1 Lloyd's Rep. 305 and *Wilson* v. *Darling Island Stevedoring and Lighterage Co. Ltd.* (1955) 95 C.L.R. 43; [1956] 1 Lloyd's Rep. 346 applied.

*Elder, Dempster & Co. Ltd.* v. *Paterson, Zochonis & Co. Ltd.* [1924] A.C. 522; 40 T.L.R. 464, H.L. distinguished.

Dictum of Scrutton L.J. in *Mersey Shipping and Transport Co. Ltd.* v. *Rea Ltd.* (1925) 21 Ll.L.R. 275, 278, D.C. disapproved.

The only possible rationalisation of *Elder, Dempster & Co. Ltd.* v. *Paterson, Zochonis & Co. Ltd.* (supra) is that it decided that, in the circumstances, the master having signed the bill of lading, the proper inference was that the shipowner received the goods into his possession on the terms of the bill of lading, although he was not a party to the bill of lading (post, pp. 470, 480, 494).

*Per* Viscount Simonds. A decision of the House of Lords will not be read as departing from long-established principle unless such an intention is made abundantly clear by the majority of the Lords participating in it (post, p. 469, and see *per* Lord Morris, post, p. 494).

*Per* Lord Reid. There are at least three classes of case where the House of Lords are entitled to question or limit a previous ratio decidendi of the House: (1) where it is obscure and (2) where it is out of line with other authorities (as in that case); and also (3) where it is much wider than was necessary for the decision.

Decision of the Court of Appeal [1961] 1 Q.B. 106; [1960] 3 W.L.R. 372; [1960] 2 All E.R. 737, C.A. affirmed.

APPEAL from the Court of Appeal (Hodson, Pearce and Upjohn L.JJ.).

This was an appeal brought by leave of the Court of Appeal from an order of that court dated June 2, 1960, dismissing with costs an appeal by the appellants, Scruttons Ltd., who were the defendants in the action, from an order of Diplock J. in the Queen's Bench Division (Commercial List) dated April 28, 1959, directing that judgment be entered for the respondents, Midland Silicones Ltd., who were the plaintiffs in the action, for the sum of £620 15s. 8d., being the sum of £593 12s. 2d. in respect of damages and the sum of £27 3s. 6d. interest thereon.

The respondents began the present proceedings by writ issued against the appellants on April 14, 1958. They alleged that the appellants' servants, while loading onto a lorry a drum containing 425 lbs. of D.C. diffusion pump fluid belonging to them, negligently damaged it. In their points of defence the appellants

**A.C.**          AND PRIVY COUNCIL.                    449

admitted the negligence complained of, but claimed that they
were entitled to limit their liability to the same extent as were
United States Lines, the carriers under a bill of lading on the
terms of which the respondents were the consignees of the drum.

At all material times the appellants were employed by United
States Lines as their stevedores in London under a stevedoring
contract dated August 16, 1952. That contract contained the
following provision: " *Ship, Cargo and Property Claims.* The
" stevedores are to be fully responsible for any damage to
" the vessel or other property and any damage to or loss of cargo
" while being handled or stowed, unshipped or delivered, or while
" in stowage, if damage caused by any negligence of themselves
" or their servants. The stevedores to have such protection as is
" afforded by the terms, conditions and exceptions of the bills of
" lading westbound and eastbound." There was a further pro-
vision: " *Liability for Declared Value Including Ad Valorem*
" *Packages.* For an additional charge of ½ per cent. on the total
" of the stevedores' discharging, loading and tallying accounts
" (excluding direct expenses and management fund charge) the
" stevedores agree to effect an insurance policy on Lloyds to cover
" any damage or loss of cargo on which a value in excess of $500
" per package has been declared." The respondents were not at
any time aware of the existence or of the terms of the stevedoring
contract.

On or about March 26, 1957, Dow Corning Corporation of New
York shipped the drum in question on the *American Reporter* for
carriage from New York to London under a bill of lading of that
date by the terms whereof the drum was consigned to the respon-
dents. The respondents were at all material times the owners
of the drum, having bought it on c.i.f. terms from the corporation
under a contract made on or about February 4, 1957, and having
received the bill of lading on or about April 1, 1957. The bill of
lading was signed on behalf of United States Lines, the owners
of the ship. It was in the United States Lines' " short form "
and incorporated the United States Lines' regular " long form "
bill of lading. It was further expressly made subject to the
United States Carriage of Goods by Sea Act, 1936, whereby the
United States adopted the Hague Rules with certain modifications.

By section 1 (*a*) of the Act: " The term ' carrier ' includes the
" owner or the charterer who enters into a contract of carriage
" with a shipper."

By section 4 (5): " Neither the carrier nor the ship shall in
" any event be or become liable for any loss or damage to or

H. L. (E.)

1961
───
MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.
───

450    HOUSE OF LORDS    **[1962]**

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

" in connection with the transportation of goods in an amount
" exceeding $500 per package lawful money of the United States,
" or in the case of goods not shipped in packages, per customary
" freight unit, or the equivalent of that sum in other currency,
" unless the nature or value of such goods has been declared by
" the shipper before shipment and inserted in the bill of lading."
By clause 1 of the " short form " bill of lading: " It is agreed
" that the receipt, custody, carriage, delivery and transhipping of
" the goods are subject to the terms appearing on the face and
" back hereof and also to the terms contained in the carrier's
" regular long form of bill of lading used in this service . . . which
" shall be deemed to be incorporated in this bill of lading, which
" shall govern the relations, whatsoever they may be, between
" shipper, consignee and the carrier, master and ship in every
" contingency wheresoever and whensoever occurring and whether
" the carrier be acting as such, or as bailee, and also in the event
" of deviation or of conversion of the goods."   Clause 2 incor-
porated the Carriage of Goods by Sea Act in terms identical with
those of clause 1 of the " long form " of bill of lading.

By clause 1 of the " long form " bill of lading: " This bill of
" lading shall have effect subject to the provisions of the Carriage
" of Goods by Sea Act of the United States, approved April 16,
" 1936, which shall be deemed to be incorporated herein, and
" nothing herein contained shall be deemed a surrender by the
" carrier of any of its rights, immunities or limitations or an
" increase of any of its responsibilities or liabilities under the
" said Act.  If any term of this bill of lading be repugnant to
" the said Act to any extent, such term shall be void to that
" extent but no further. . . .   The provisions stated in the said
" Act . . . shall govern before the goods are loaded on and after
" they are discharged from the ship and throughout the entire
" time the goods are in custody of the carrier."

By clause 4: " If the ship is not owned by or chartered by
" demise to the United States Lines Co. this bill of lading shall
" with respect to the carriage, custody and care of the goods while
" aboard the ship or on her tackles have effect only as a contract
" between the shipper, consignee and the owner of the ship or
" demise charterer as the case may be, as principal made through
" the agency of the said company, which shall be under no liability
" whatsoever for loss of or damage to the goods or with respect
" to such carriage, custody and care of the goods.  If it shall be
" adjudged that the United States Lines Co. or any person other

**A.C.**         AND PRIVY COUNCIL.                    451

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
v.
SCRUTTONS
LTD.

" than the owner or demise charterer is the carrier or bailee of
" the goods, all rights, exemptions, immunities and limitations
" of liability provided by law and all terms of this bill of lading
" shall be available to it or such other person."

By clause 8: " The carrier or master, in its or his discretion,
" at any time and place, whether or not the reason for its or
" his action or inaction was known at the time of receipt of the
" goods, without notice (a) may substitute another ship, whether
" operated by the carrier or others, or of a different flag, type or
" speed, or whether before, during or after loading the goods or any
" part thereof, and whether the substituted ship arrives or
" departs or is scheduled to do so before or after the ship named
" herein; (b) may, in case the goods or any part thereof are shut
" out, have the ship proceed without the goods or any part thereof
" and the goods may be forwarded in whole or in part by any
" means; (c) may, if the goods or any part of them are damaged
" or lost or in danger of damage or loss or of becoming worthless
" or subject to charges disproportionate to their value, or because
" of their condition, take any measures to salve, protect, recon-
" dition, recover possession of, sell, return to shipper, hold, store
" or otherwise deal with or dispose of the goods or any part of
" them, or forward the goods or any part of them by any means
" to or toward port of discharge; and (d) may, if there shall be
" a forced interruption, abandonment or frustration of the voyage
" at the port of loading or elsewhere or because of the need of
" repair of the ship or of the inability of the ship to promptly
" prosecute the voyage at the port of loading or elsewhere, sub-
" stitute another vessel or may forward the goods or any part
" thereof by any means."

By clause 17: " The port authorities are hereby authorised to
" grant a general order for discharging immediately on arrival of
" the ship and the carrier or master . . . may discharge the goods
" . . . directly they come to hand, upon any dock, wharf, craft
" or place continuously . . . and the carrier and master have the
" right to appoint stevedores, master porters or other agents and
" the consignee shall receive and take delivery from ships' tackles
" or elsewhere as required by the carrier or master . . ."

By clause 24: " In the event of any loss, damage or delay to
" or in connection with goods exceeding in actual value $500 per
" package lawful money of the United States, or in the case of
" goods not shipped in packages, per customary freight unit, as
" the case may be, the carrier's liability, if any, shall be deter-
" mined on the basis of a value of $500 per package or per

452         HOUSE OF LORDS        **[1962]**

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

" customary freight unit unless the nature and a higher value
" shall be declared by the shipper in writing before shipment and
" inserted in the bill of lading. . . .   It is agreed that the meaning
" of the word ' package ' includes . . . pieces and all articles of
" any description except goods shipped in bulk."

The shipper did not declare the value of the drum to the
carrier, and its value was not inserted in the bill of lading.  The
drum was dealt with as ordinary cargo, both by the carriers and
the appellants.  It was duly carried to London.  The appellants
duly discharged the ship and put the drum in a shed.  The
respondents sent a lorry to take delivery of the drum.  The appel-
lants were lowering the drum onto the lorry when they negligently
dropped it and some of the contents worth considerably more than
$500 was lost.  The respondents now sued the appellants for the
full value.

*Eustace Roskill Q.C.* and *S. O. Olson* for the appellant com-
pany.  This is a test case, since questions of this kind often arise.
The substance of the appellants' argument is as follows: (1) At
all material times United States Lines were bailees of the drum
from the respondents as bailors on the terms of the bill of lading.
(2) The terms of the contract of bailment between the parties
were contained in or evidenced by the bill of lading; the contract
was in force at all material times and in particular at the moment
the damage was caused.   (3) That contract, so contained or
evidenced, contemplated vicarious performance by United States
Lines of various of its obligations under the contract of carriage,
for example, substituted performance, transhipment, stevedoring.
(4) The appellants were at all times the agents or sub-bailees of
United States Lines to perform part of the obligations of United
States Lines to the respondents under the contract, namely, the
discharge and ultimate delivery of the drum.  (5) In that capacity
as agents or sub-bailees in the course of their employment the
appellants negligently dropped and damaged the drum.  (6)
United States Lines were by common consent entitled to limit
their liability to $500 under clause 24 and, had they been sued
on the contract, that was the limit which the respondents could
have recovered against them.  (7) The appellants as agents or
sub-bailees are entitled to the same rights of limitation as United
States Lines, because the act complained of was done in the
course of delivering the goods under the bill of lading, which
provided that United States Lines were not to be liable for more
than $500 worth of damage.  The appellants were rendering the

very services provided for in the bill of lading.   Accordingly the
limitation of liability contained in it must operate, whatever the
form of action and whether the shipowner or the stevedore be
sued: see *Elder, Dempster & Co. Ltd.* v. *Paterson, Zochonis &
Co. Ltd.*[1]   The appellants rely on the fact that the contract could
be carried out vicariously.

The *Elder, Dempster* case,[2] which binds the House to decide
in the appellants' favour, is relied on in four ways: (1) Every ser-
vant or agent of a master or a principal performing his master's
or his principal's obligations under a contract, which accords to
the master or principal an exemption from liability for negligence,
is entitled to the same protection as the master or principal.
*Adler* v. *Dickson*[3] was wrong and so was *Cosgrove* v. *Horsfall.*[4]

(2) The same proposition applies to carriage of goods by sea.
On any view, this is clearly supported by the *Elder, Dempster*
case[5] and is founded on the fact of an agent or sub-contractor
being the agent of the carrier.   The word "agent" is used here
as meaning someone who is performing the obligations of another
under a contract but who is not his servant.   It was not contem-
plated that there should be continuous personal performance of
the contract by the carriers, and the cargo owners have no greater
rights against anyone who performs the carriers' obligations than
they would have against the carriers themselves.   That must be
contemplated by the contract; the appellants do not rest on any
implied contract.   It would be inconsistent and illogical to allow
to a substituted or vicarious carrier the protection of the carrier's
bill of lading and to deny it to a person performing another part
of the contract, that is, discharging the ship and delivering the
goods to the cargo owner.

(3) On principle and on authority it is hard to see why the
application of the *Elder, Dempster* case[5] should be limited to
cases of bailment.

(4) The appellants pray in aid *Pyrene Co. Ltd.* v. *Scindia
Navigation Co. Ltd.*[6]   The consensual basis to the whole trans-
action on the side of the shipowners and on the side of the cargo
owners is that the terms regulating the carriage and delivery of the
goods from the beginning to the end of the contract of carriage are

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

[1] [1924] A.C. 522, 547–548; 40
T.L.R. 464, H.L.
[2] [1924] A.C. 522.
[3] [1955] 1 Q.B. 158; [1954] 3
W.L.R. 696; [1954] 3 All E.R. 897,
C.A.
[4] (1945) 175 L.T. 334; 62 T.L.R.
140, C.A.
[5] [1924] A.C. 522.
[6] [1954] 2 Q.B. 402; [1954] 2
W.L.R. 1005; [1954] 2 All E.R. 158.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
v.
SCRUTTONS
LTD.

the terms contained in or endorsed on the bill of lading, and the parties have no greater rights than those contained in it. The decision of the present case does not involve overruling any previously decided English case, though it does involve not following *Robert C. Herd & Co. Inc.* v. *Krawill Machinery Corporation* [7] and *Wilson* v. *Darling Island Stevedoring and Lighterage Co. Ltd.,* [8] which are based on a misreading of the *Elder, Dempster* case. [9] The appellants' submission has commercial convenience to recommend it. It prevents people going behind their contracts to proceed against the individual tortfeasors.

It is further submitted: (a) On the true construction of the bill of lading, the Hague Rules and the United States Act, the word "carrier" includes stevedores. (b) On this particular bill of lading there is an express or implied contract between the respondents and the appellants made through the agency of United States Lines whereby it was impliedly agreed that the appellants should have the benefit of the limitation. (c) Relying on the view of Denning L.J. in *Smith and Snipes Hall Farm Ltd.* v. *River Douglas Catchment Board,* [10] it is submitted that the appellants were parties interested in the performance of this bill of lading contract, that it was intended that they should be protected by the bill of lading exemption and that they were entitled to use the $500 limitation at least as a shield if not as a sword. It provides them with a defence. If A contracts with B to do something for C's benefit, C can sue to enforce the contract, although not a party to it, quite apart from any question whether C is A's undisclosed principal or a beneficiary under a trust of which A is a trustee.

In the matter of a carrier's liability one should distinguish between passengers and goods. The common law has leant more heavily in favour of goods than of passengers. There is an absolute warranty of seaworthiness in the case of goods but not of passengers. On these two points the law has always been different.

Rowlatt J. tried the *Elder, Dempster* case [11] at first instance. His decision was affirmed by the Court of Appeal, [12] whose decision was reversed by the House of Lords. [13] The full text of the bills

[7] (1959) 359 U.S. 297; [1959] 1 Lloyd's Rep. 305.
[8] (1955) 95 C.L.R. 43; [1956] 1 Lloyd's Rep. 346.
[9] [1924] A.C. 522.
[10] [1949] 2 K.B. 500; 65 T.L.R. 628; [1949] 2 All E.R. 179, C.A.
[11] (1923) 12 Ll.L.R. 69.
[12] [1923] 1 K.B. 420.
[13] [1924] A.C. 522.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
v.
SCRUTTONS
LTD.

of lading in that case is found at pp. 114 et seq. and 124 et seq. of the appendix to the printed case on the appeal to the House of Lords. One bill of lading was signed by P. Bedford as "master" and the other by him as "agent." Elder, Dempster & Co. Ltd. were the time charterers. The master was not their servant but he acted as their agent, though he was the servant of the shipowners. The contract was between the cargo owners and the time charterers. In the bills of lading there was no express protection for the shipowners, but the exemptions in favour of the carriers covered everyone concerned on the carriers' side, including the stevedores, the master or the engineers. What Scrutton L.J. said in his dissenting judgment in the Court of Appeal [14] was right, and on that basis the appellants here are entitled to succeed. See also the footnote at p. 422. The effect of the *Elder, Dempster* case [15] was that, even if there is no general exception to the rule that one who is not a party to a contract cannot sue to enforce it, the case of carriage of goods by sea provides an exception to every person who is a servant or agent of a contracting party. It is inconceivable that Lord Sumner and Lord Dunedin, who were parties to *Dunlop Pneumatic Tyre Co. Ltd. v. Selfridge & Co. Ltd.,* [16] should have thought that in *Elder, Dempster* [17] they were deciding anything inconsistent with it. What Diplock J. said in the present case [18] ignores a vital passage in Lord Cave's opinion in *Elder, Dempster.* [19] That case is a direct decision of the House of Lords expressly affirming what Scrutton L.J. had said in the Court of Appeal. In the House of Lords there was no difference between Lord Cave's approval and Lord Finlay's. The decision lays down that in the case of carriage of goods by sea (and this applies also to carriage by land and air), where a person who is a party to a contract has an express exemption in his favour in respect of his negligence, those performing the contract on his behalf, whether his servants or not, are entitled to the same exemption. There is no distinction in principle between suing an employer direct on the ground of respondeat superior and suing his servant direct.

Reliance is placed on *Mersey Shipping and Transport Co. Ltd. v. Rea Ltd.* [20] and *The Kite.* [21] The point of *Vita Food Products*

[14] [1923] 1 K.B. 420, 440–441.
[15] [1924] A.C. 522.
[16] [1915] A.C. 847; 31 T.L.R. 399, H.L.
[17] [1924] A.C. 522.

[18] [1959] 2 Q.B. 171, 186–187; [1959] 2 W.L.R. 761; [1959] 2 All E.R. 289.
[19] [1924] A.C. 522, 528–529.
[20] (1925) 21 Ll.L.R. 375, 378, D.C.
[21] [1933] P. 154; 49 T.L.R. 525.

456                     HOUSE OF LORDS                **[1962]**

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
v.
SCRUTTONS
LTD.

*Inc.* v. *Unus Shipping Co. Ltd.*[22] was very far removed from the present case.  This was not a third party case at all.

In *Cosgrove* v. *Horsfall,*[23] which was wrongly decided, *Elder, Dempster*[24] was not cited.  The court there was wrong in refusing to find any agency at all.  It is reasonable and necessary to imply an authority in an employer to protect his employees against liability incurred in the course of their employment.  That case is the high-water mark against the present appellants.  As to *Elder, Dempster,*[24] see also *White* v. *John Warwick & Co. Ltd.*[25] See also *Alsey Steam Fishing Co. Ltd.* v. *Hillman (Owners). The Kirkness.*[26]

If cargo owners agree that stevedores should do the work provided to be done by the shipowners or their agents, then the implication is that it is to be done on terms that the liability of the shipowners' agents shall be no greater than that of the shipowners.

It is when he comes to deal with *Elder, Dempster*[27] that Fullager J. in *Wilson* v. *Darling Island Stevedoring and Lighterage Co. Ltd.*[28] starts to go wrong.  The majority in that case support a rigid theory which would make it impossible for a contractor ever to protect his servants or agents.  The view of the minority was right.

In *Robert C. Herd & Co. Inc.* v. *Krawill Machinery Corporation*[29] the case of *Elder, Dempster*[30] is dismissed in half a page of the report and its effect was misstated and misunderstood.  See also *A. M. Collins & Co.* v. *Panama R. C.,*[31] where even in the majority judgments *Elder, Dempster*[32] was not cited.

Reliance is placed on Salmond on Torts, 9th ed., pp. 10–11, as to the concurrence of tort and breach of contract.  The passage was repeated in the 11th ed., pp. 9–11.  There is nothing helpful in Winfield on Torts, but see Anson on Contracts, 21st ed., pp. 159–160, and Cheshire and Fifoot on the Law of Contract, 5th ed., p. 370.

It is not necessary for the appellants to go as far as the way of putting the decision in *Elder, Dempster*[32] adopted in *Mersey*

[22] [1939] A.C. 277, 300–301; 55 T.L.R. 402; [1939] 1 All E.R. 513, P.C.

[23] 175 L.T. 334.

[24] [1924] A.C. 522.

[25] [1953] 1 W.L.R. 1285, 1294; [1953] 2 All E.R. 1021, C.A.

[26] [1957] P. 51, 64–67; [1957] 2 W.L.R. 20; [1957] 1 All E.R. 97.

[27] [1924] A.C. 522.

[28] 95 C.L.R. 43, 68–69; [1956] 1 Lloyd's Rep. 346, 358.

[29] 359 U.S. 297; [1959] 1 Lloyd's Rep. 305.

[30] [1924] A.C. 522.

[31] (1952) 197 F. 2d 893.

[32] [1924] A.C. 522.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

*Shipping and Transport Co. Ltd.* v. *Rea Ltd.*[33] But in the case of carriage of goods by sea there is an exception to *Dunlop's* case.[34] There should be a clear recognition of the doctrine that in the case of carriage of goods by sea, where cargo owners make a contract with the carrier, with whom there is privity of contract, and the contract provides an express exception to liability or a limitation of liability in respect of the goods subject to the bill of lading, this provision should be available to protect anyone whom the carrier employs in the course of the performance of the contract, whether a servant or some other person not a servant, who is performing the carrier's obligations. In the past, where questions of business convenience have arisen, the courts have not been slow to treat cases not in terms within an exception as coming within it, if rigid adherence to the exact words would produce extraordinary results. There is a commercial basis for the appellants' contentions, even when there is no contractual nexus. Thus in a common form insurance policy an underwriter often enters into a contract for the benefit of someone who was never in contractual relation with the seller of the goods insured. Difficulties of privity of contract also arise in bills of exchange.

There is nothing in *Dunlop's* case[34] binding the House of Lords to say that carriage of goods by sea is not an exception to the principle there laid down. The strict ratio decidendi of that case was " no consideration," which imports nothing contrary to the appellants' contentions here. Despite what Lord Haldane seemed to say in *Dunlop's* case,[34] a person can contract in the same contract both as principal and agent, though not, of course, in respect of the same subject-matter. In the present case the consideration for the contract was the moving of the goods by the appellants and their exposing themselves to an action for damages for the negligence of the persons who performed it: see *Shadwell* v. *Shadwell*[35] and *Scotson* v. *Pegg*.[36]

On the true construction of the bill of lading and the Hague Rules the appellants as stevedores are entitled to the benefit of the $500 limitation because " carriers " includes stevedores. The United States Act has been incorporated into the contract and the American decision already cited is against the appellants. That would be fatal against them if it were not that the Act was enacting an international convention which has also been enacted in England and pronounced on by the English courts. See the

---

[33] 21 Ll.L.R. 375.
[34] [1915] A.C. 847.

[35] (1860) 9 C.B.N.S. 159.
[36] (1861) 6 H. & N. 295.

458                        HOUSE OF LORDS                   **[1962]**

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Hague Rules as set out in the Schedule to the Carriage of Goods by Sea Act, 1924, article I, article II, article III, rules 3, 5 and 7, article IV, rules 1 and 3, article V and article VI; and see the introduction to the Act in Scrutton on Charterparties, 16th ed., p. 455. The expression " carrier " must be taken to include the carrier's agents.

Taking the provisions of the bill of lading, the final result is that it does enure to protect the stevedores, even though they are not parties to the contract. A stevedore can be a bailee. If stevedores receive goods from shipowners for the purposes for which the appellants received these goods, they have enough exclusive right to amount to a bailment, enough to entitle them to take advantage of the limitation under the bill of lading.

There was an implied contract between the respondents and the appellants. Under the bill of lading the Hague Rules are to govern the contract. It is as if there were a label attached to the effect that the goods were carried, loaded and discharged on Hague Rules terms. In clause 17 there is express authority to appoint stevedores, and it must be taken that whenever goods are loaded or discharged by stevedores, it is on the terms of the bill of lading. Everyone giving vicarious performance of the contract will be entitled to perform it on terms of the bill of lading. That is supported by the *Pyrene* case.[37] The consideration here was the handling of the drum by the appellants.

Even if the appellants are held not to be parties to the contract, they can still use it as a defence: see *Smith and Snipes Hall Farm Ltd.* v. *River Douglas Catchment Board*[38] and *Drive Yourself Hire Co. (London) Ltd.* v. *Strutt.*[39] *Green* v. *Russell,*[40] which made it impossible to argue this point in the Court of Appeal, expresses the other view. It is still part of the common law that a party who is a stranger to a contract can yet take advantage of it, although he is not a party to it, if it affords him some protection. There is a principle engrafted onto the common law, which has not been reversed by *Dunlop's* case,[41] by which, where two persons have provided by contract that in certain circumstances X shall not be liable in damages to one of them, X may take advantage of that contract. It is admitted that *In re*

[37] [1954] 2 Q.B. 402.
[38] [1949] 2 K.B. 500, 513–515.
[39] [1954] 1 Q.B. 250, 272–273; [1953] 3 W.L.R. 1111; [1953] 2 All E.R. 1475. C.A.
[40] [1959] 2 Q.B. 226, 232–233, 239–240; [1958] 3 W.L.R. 371; [1958] 3 All E.R. 44. C.A.
[41] [1915] A.C. 847.

*Schebsman*[42] is to the opposite effect of the propositions of Lord Denning in the cases relied on by the appellants on this point. The old cases are *Dutton* v. *Poole*,[43] *Bourne* v. *Mason*[44] and *Price* v. *Easton*.[45] *Tweddle* v. *Atkinson*[46] is the first expression of the other view. There is nothing in any of the early cases which would prevent a person not a party to a contract from taking advantage of a provision inserted in it for his protection. None of the relevant cases support the respondents' propositions. A stranger to a bill of lading can rely on an exemption in his favour. *Dunlop's* case[47] does not impinge on *Elder, Dempster*.[48] Nothing in it touches the principle that the clause here relied on can be used by the appellants as a shield, if not as a sword. This appeal can be decided in favour of the appellants by keeping *Dunlop's* case[49] within the confines of the matters to which the decision was directed, namely, that one cannot sue on a contract when no consideration has moved from the plaintiffs to the defendants.

*Ashton Roskill Q.C.* and *Michael Kerr Q.C.* for the respondent company. The respondents take their stand on orthodoxy. That is the correct approach. Departure from it is not justified and would necessarily produce confusion in the law, since those who make contracts are entitled to have their meaning ascertained in accordance with established legal principle. This case must be decided on the fundamental and elementary principle long enshrined in the common law and recapitulated in *Dunlop's* case,[49] namely, that only a person who is a party to a contract can sue on it. It is more important that the law should be clear than that it should be clever. On this principle the law is clear. The law is not perfect and it may sometimes produce hardship and inconvenience, which from time to time are, as circumstances change, corrected by the intervention of Parliament; for example, by the Carriage of Goods by Sea Act, 1924, or by the Civil Aviation Act, 1949. But there is no ground for not applying the well-established rule that a third party cannot take advantage of a contract, to which he is not a party, whether as a sword or as a shield. *Elder, Dempster*[50] is not to be taken as providing an exception to the rule in *Dunlop's* case.[51] Lying at the root of

H. L. (E.)

1961

──────

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

──────

[42] [1944] Ch. 83; 60 T.L.R. 128; [1943] 2 All E.R. 768, C.A.
[43] (1678) 2 Lev. 210.
[44] (1669) 1 Vent. 6.
[45] (1833) 4 B. & Ad. 433.
[46] (1861) 1 B. & S. 393.

[47] [1915] A.C. 847.
[48] [1924] A.C. 522.
[49] [1915] A.C. 847.
[50] [1924] A.C. 522.
[51] [1915] A.C. 847.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
v.
SCRUTTONS
LTD.
———

the appellants' case is the necessity to put the decision in *Dunlop's case*[51] on the basis of its own particular facts and to elevate *Elder, Dempster*[52] into a rule, but the opposite is right; *Elder, Dempster*[52] does not lay down a rule; *Dunlop's case*[53] does. The rule of law suggested by the appellants to derive from *Elder, Dempster*[54] has no pride of ancestry and should have no hope of posterity.

In this bill of lading there is no reference at all to stevedores in the "short form." In the "long form" the sole reference is in clause 17 and then only in contradistinction to the carrier. There is a basic confusion of thought in the appellants' conception of agency. Contracts of this kind are sometimes said to be contracts which can be vicariously performed. But almost all contracts can be performed by a third party; the original party remains liable and the third party is not concerned with the terms, beneficial or otherwise, of the contract between the other parties. Here the only two contracts are (1) that between the shipowners and the consignees, and (2) that between the shipowners and the stevedores, with which the consignees had nothing to do.

In *Robert C. Herd & Co. Inc.* v. *Krawill Machinery Corporation*[55] the United States Supreme Court held on indistinguishable facts that stevedores are not within the expression "carrier" under the United States Act. In *Adler* v. *Dickson*[56] Denning L.J. expressed the opinion that Parliament must have intended stevedores to have the benefit of the limitations in the Carriage of Goods by Sea Act, 1924. That was not necessary for the decision of the case. But, in any event, this is a matter of statutory interpretation. When that Act, incorporating the Hague Rules, was passed, stevedores were not unknown and, if it had been intended to include them, they could and would have been named.

*Cavalier* v. *Pope*[57] is relied on. See also *Vandepitte* v. *Preferred Accident Corporation of New York.*[58]

There is no distinction in principle between the right to sue on a contract and the right to rely on it in defence as a source of protection. In either case the party relying on it is setting it up and that is something which a third party cannot do. The

[51] [1915] A.C. 847.
[52] [1924] A.C. 522.
[53] [1915] A.C. 847.
[54] [1924] A.C. 522.
[55] 359 U.S. 297; [1959] 1 Lloyd's Rep. 305.

[56] [1955] 1 Q.B. 158, 182.
[57] [1906] A.C. 428; 22 T.L.R. 648, H.L.
[58] [1933] A.C. 70, 79; 49 T.L.R. 90, P.C.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.
———

" shield " concept is not an exception to the *Dunlop* [59] principle.
See also *Tweddle* v. *Atkinson*,[60] *per* Wightman and Crompton JJ.
(There are certain passages in the Law Journal report which are
not in the other report.)

As to the appellants' submissions, the respondents agree to
(1) and (2). As to submission (3), it is false emphasis to speak
of " contemplated vicarious performance," since even personal
contracts can be so performed. In submission (4) " agents "
is a misnomer and " sub-bailees " defies definition. The mere
handling of goods does not create a bailment. For there to be a
bailment there must be exclusive possession. As to submission
(5), one does not drop a drum in any particular capacity; one
just drops it. The respondents agree submission (6), but not
submission (7).

It is said by the appellants that the contract contended for
by them emerges by implication. It is always possible to infer
a contractual nexus; but whether such inference falls to be drawn
must turn on the facts of the particular case: see the *Pyrene*
case.[61] There must be some fact from which the necessary con-
tractual nexus can be inferred. When one is trying to establish a
contractual nexus the test of business necessity is elusive. Here
there are no facts from which any contract between the respon-
dents and the appellants can be inferred. The appellants were
acting under the contract between themselves and the shipowners,
a contract about which the respondents knew nothing. The
appellants may have made the wrong contract, but this affords
no reason why the respondents' rights should not be determined
according to established principles of law. In certain cases, on
all the facts and documents, the position may arise that a con-
tractual nexus may be inferred, but that is not the case here. It
depends on the facts, and the facts here do not give rise to the
necessity of the alleged nexus. In this case the appellants are in
difficulties because, if they are right, the shippers at the time of
the bill of lading must have made two contracts, one with the
shipowners and another with the stevedores.

No authority precludes the owner of a chattel tortiously
damaged through a breach of duty from suing the tortfeasor,
unless he has by contract debarred himself from doing so. Apart
from a contractual nexus enabling the party sued to take advan-
tage of a restrictive provision in a contract between the plaintiff

---

[59] [1915] A.C. 847.                [61] [1954] 2 Q.B. 402.
[60] 1 B. & S. 393, 397–398; 30 L.J.
Q.B. 265, 266, 267.

**H. L. (E.)**

**1961**

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

and some other person, the rule of law must prevail, unless the case falls within well-recognised exceptions.  *The Kite* [62] does not support the rule for which the appellants here contend.  There Langton J. said that *Elder, Dempster* [63] was no help.  The passage in *The Kirkness* [64] relied on by the appellants was obiter and· is of no help here.  What Scrutton L.J. said in *Elder, Dempster* [65] and in *Mersey Shipping and Transport Co. Ltd.* v. *Rea Ltd.* [66] was wrong.  Even if there were no authorities in the respondents' favour, a rule of law such as that suggested by the appellants will not be adopted because of a mere negative.  Moreover, there is authority for the respondents in the divergence of view between Bankes and Scrutton L.JJ. in the *Mersey Shipping* case. [66]  By seeking to invoke the rule they rely on to escape from their common law liability for negligence the appellants accept the onus of establishing their proposition.  The respondents rely on *Hamzeh Malas & Sons* v. *British Imex Industries Ltd.* [67]

The *Elder, Dempster* case [68] was anomalous and contrary to principle.  Reliance is· placed on what Diplock J. said about it in the present case. [69]  It is to be noted that in the *Elder, Dempster* case [70] emphasis is laid on the possession by the ship of the cargo.  As to the terms of the bailment there, see *per* Lord Sumner. [71]  It is possible to extract from what Lord Cave said some agreement with what Scrutton L.J. said in the Court of Appeal, though this is only a possibility; Lord Finlay used different language. [72]  Diplock J. in the present case [73] refused to equate Lord Finlay's observations with Lord Cave's.

Reliance is placed on the *Vita Food* case [74] and on *Wilson* v. *Darling Island Stevedoring and Lighterage Co. Ltd.* [75]  From the latter case it appears that a contract may be made with one company for one part of the journey and with another company for the other part.  See also *Gilbert Stokes & Co. Proprietary Ltd.* v. *Dalgety & Co. Ltd.* [76]  As to the topic of ratio decidendi, see *Great Western Railway Co.* v. *Mostyn (Owners).* [77]

[62] [1933] P. 154.
[63] [1924] A.C. 522.
[64] [1957] P. 51.
[65] [1923] 1 K.B. 420.
[66] 21 Ll.L.Rep. 375.
[67] [1958] 2 Q.B. 127, 129; [1958] 2 W.L.R. 100; [1958] 1 All E.R. 262, C.A.
[68] [1924] A.C. 522.
[69] [1959] 2 Q.B. 171, 187.
[70] [1924] A.C. 522.

[71] Ibid. 534.
[72] Ibid. 547–548.
[73] [1959] 2 Q.B. 171, 186.
[74] [1939] A.C. 277, 301.
[75] 95 C.L.R. 43, 68–69; [1956] 1 Lloyd's Rep. 346, 358.
[76] [1948] S.R.(N.S.W.) 435; 81 Ll.L.Rep. 337.
[77] [1928] A.C. 57, 73; 44 T.L.R. 179, H.L.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

No authoritative view emerges that in *Elder, Dempster*[78] there was a majority decision for the principle of vicarious exemption from liability for tort. The facts of that case were infinitely removed from those of the present case: see *Adler's* case[79] and *Wilson* v. *Darling Island Stevedoring and Lighterage Co. Ltd.*[80] If no previous legal ground can be ascertained on which to found immunity for the stevedores here, there is a high probability that no such legal ground exists. To find for the appellants it would be necessary to reject *Robert C. Herd & Co. Inc.* v. *Krawill Machinery Corporation*[81] in the United States, *Wilson* v. *Darling Island Stevedoring and Lighterage Co. Ltd.*[82] in Australia, *Adler's* case,[83] *Cosgrove's* case[84] and *Green's* case.[85] So remarkable an exercise in forensic iconoclasm should not be approved in this House.

International decisions on the Hague Rules should develop on parallel and not divergent lines: *Stag Line Ltd.* v. *Foscolo Mango & Co. Ltd.*,[86] *Riverstone Meat Co. Pty. Ltd.* v. *Lancashire Shipping Co. Ltd.*[87] and Scrutton on Charterparties, 16th ed., p. 453.

If the so-called *Elder, Dempster*[88] rule existed, it would confer rights on servants and agents, but it does not: see *Earl* v. *Lubbock*[89] and *Donoghue* v. *Stevenson*.[90] There is neither logic nor authority for limiting it to carriage of goods by sea.

The appellants had no exclusive possession of the respondents' drum, because there was no bailment: see Pollock and Wright on Possession, pp. 20–21. There was no bailment, because the appellants were only performing the shipowners' functions in and about the discharge of the goods. As to exclusive possession, see *Hobson* v. *Impett*.[91] The gist of the matter is that the mere handling of goods does not give possession in law. Clause 4 of the bill of lading (" long form ") does not make the appellants bailees.

There is here no consideration for the alleged contract moving from the appellants to the respondents. The consideration alleged

[78] [1924] A.C. 522.

[79] [1955] 1 Q.B. 158, 195, 199–200.

[80] 95 C.L.R. 43, 80; [1956] 1 Lloyd's Rep. 346, 363.

[81] 359 U.S. 297; [1959] 1 Lloyd's Rep. 305.

[82] 95 C.L.R. 43; [1956] 1 Lloyd's Rep. 346.

[83] [1955] 1 Q.B. 158.

[84] 175 L.T. 334.

[85] [1959] 2 Q.B. 227.

[86] [1932] A.C. 328, 350; 48 T.L.R. 127, H.L.

[87] [1961] A.C. 807, 840; [1961] 2 W.L.R. 278; [1961] 1 All E.R. 495, H.L.

[88] [1924] A.C. 522.

[89] [1905] 1 K.B. 253, 256; 21 T.L.R. 71, C.A.

[90] [1932] A.C. 562, 575, 591; 48 T.L.R. 494, H.L.

[91] [1957] Crim.L.R. 476, D.C.

H. L. (E.)
1961
─────
MIDLAND
SILICONES
LTD.
v.
SCRUTTONS
LTD.

is the handling of the drum, but that was not done in respect of, or as the price for, the respondents' alleged agreement to exempt the appellants from liability for damage over $500. There was no request by the respondents to the appellants: see *Combe* v. *Combe*.[92]  The reasoning in that case can be applied to the handling of goods or to the driving of a bus, as in *Cosgrove's* case.[93] See also *Dunlop's* case.[94]  If here there was a contract between the appellants and the respondents, its terms must have included the provision that the appellants or any other stevedores should do the handling in consideration of, or partly in consideration of, or as the price of, the respondents' alleged promise to such stevedores. That consideration could only arise in the present case by implication.  Even if an express contract could be found, a provision for limitation of liability could only be imported by implication into the contract between the appellants and the respondents.  On the facts of this case any such implication is impossible.  The appellants never handled the drum in consideration of any such promise.

The observations of Denning L.J. in *Smith and Snipes Hall Farm Ltd.* v. *River Douglas Catchment Board*[95] and *Drive Yourself Hire Co. (London) Ltd.* v. *Strutt*[96] with regard to a third party's right to enforce a contract go too far.  They should be reconsidered because the expressions " benefit " and " interest " introduce uncertainty into the consideration of the rights and obligations of persons in contractual relationship.  The words have no precise meaning in the law of contract.

The conception of " participating " in a contract to which one is not a party, expressed by Devlin J. in the *Pyrene* case[96a] and by Denning L.J. in *Adler* v. *Dickson*,[97] is too vague and is unsupported as a legal proposition.

*Eustace Roskill Q.C.* in reply. There is nothing in any decided case which would prevent this appeal being allowed. *Elder, Dempster*[98] blazed the trail. Appeals to orthodoxy get one nowhere. The question is not what *Dunlop's* case[99] decided, but whether *Elder, Dempster*[100] can be rationalised in any other way than in accordance with the appellants' submissions. One must find its ratio decidendi. As to the duty of seeing what are the

[92] [1951] 2 K.B. 215, 226–227; [1951] 1 T.L.R. 811; [1951] 1 All E.R. 707, C.A.
[93] 175 L.T. 334.
[94] [1915] A.C. 847, 855.
[95] [1949] 2 K.B. 500, 514–515.
[96] [1954] 1 Q.B. 250, 272–273.
[96a] [1954] 2 Q.B. 402, 426.
[97] [1955] 1 Q.B. 158, 182–183.
[98] [1924] A.C. 522.
[99] [1915] A.C. 847.
[100] [1924] A.C. 522.

reasons of a decision of the House of Lords, see *Workington Harbour and Dock Board* v. *Towerfield (Owners)*.[101] In *Elder, Dempster*[102] there is some support for Lord Cave's view among the other Lords. Lord Finlay said the same thing in slightly different words. Lord Carson agreed with them both. There was not one word of criticism of what Scrutton L.J. had said in the Court of Appeal. In the *Mersey Shipping* case[103] he repeated what he had said in *Elder, Dempster*.[104] The observations of Lord Sumner in *Elder, Dempster*[104] relied on by the respondents are no more than a dictum.

It is not true that there is no difference between enforcing a contract and relying on it as a defence. An exemption may be relied on as a defence by a person who could not sue on the contract. It can be used as a shield and not a sword. The whole essence of *Elder, Dempster*[104] is that this is a shield.

*Cosgrove's* case[105] was wrongly decided.

The question of promoting uniformity between English and United States decisions does not arise in finding what the House of Lords decided in *Elder, Dempster*.[106]

For the meaning of "sub-bailee," see Pollock and Wright on Possession, p. 169.

As to the question of limiting the *Elder, Dempster*[106] rule to carriage of goods by sea, no difficulty arises: see *per* Denning L.J. in *Adler's* case.[107]

Their Lordships took time for consideration.

December 6. VISCOUNT SIMONDS. My Lords, the facts in this case are not in dispute. They are fully and accurately stated in the judgment of the learned trial judge, Diplock J., and I do not think it necessary to restate them. I come at once to the question of law which arises upon them.

The question is whether the appellants, a well-known firm of stevedores, who admittedly by their negligence caused damage to certain cargo consigned to the respondents under a bill of lading of March 26, 1957, can take advantage of a provision for limitation of liability contained in that document. In judgments, with which I entirely agree and to which, but for the importance

---

[101] [1951] A.C. 112, 157; 66 T.L.R. (Pt. 2) 387; [1950] 2 All E.R. 414, H.L.

[102] [1924] A.C. 522.

[103] 21 Ll.L.R. 375.

[104] [1924] A.C. 522.

[105] 175 L.T. 334.

[106] [1924] A.C. 522.

[107] [1955] 1 Q.B. 158.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
v.
SCRUTTONS
LTD.

Viscount
Simonds.

of the case, I should not think it necessary to add anything, the learned judge and the Court of Appeal have unanimously answered the question in the negative.

The appellants' claim to immunity (for so I will call it for short) was put in a number of different ways, but I think that I do no injustice to the able argument of their counsel if I say that he rested in the main on the well-known case of *Elder, Dempster & Co. Ltd.* v. *Paterson, Zochonis & Co. Ltd.*,[1] contending that that is an authority binding this House to decide in his favour.

Let me, then, get rid shortly of some of the other arguments advanced on behalf of the appellants.

In the first place, I see no reason for saying that the word " carrier " either in the bill of lading or in the United States Carriage of Goods by Sea Act, 1936 (which the bill of lading incorporated) means or includes a stevedore. This is a proposition which does not admit of any expansion. A stevedore is not a carrier according to the ordinary use of language and, so far from the context supplying an extended meaning to the latter word, the contrary is indicated, as Hodson L.J. points out,[2] by clause 17 of the bill of lading which authorises the carrier or master to appoint stevedores.

Then, to avert the consequences which would appear to follow from the fact that the stevedores were not a party to the contract conferring immunity on the carriers, it was argued that the carriers contracted as agents for the stevedores. They did not expressly do so: if then there was agency, it was a case of an agent acting for an undisclosed principal. I am met at once by the difficulty that there is no ground whatever for saying that the carriers were contracting as agent either for this firm of stevedores or any other stevedores they might employ. The relation of the stevedores in this case to the carriers was that of independent contractors. Why should it be assumed that the carriers entered into a contract of affreightment or into any part of it as agents for them?

Next it was urged that there was an implied contract between the cargo owners, the respondents, and the stevedores that the latter should have the benefit of the immunity clause in the bill of lading. This argument presents, if possible, greater difficulties. When A and B have entered into a contract, it is not uncommon to imply a term in order to give what is called " business

---

[1] [1924] A.C. 522; 40 T.L.R. 464, H.L.

[2] [1961] 1 Q.B. 106, 119; [1960] 3 W.L.R. 372; [1960] 2 All E.R. 737, C.A.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Viscount
Simonds.

" efficacy " to it—a process, I may say, against the abuse of
which the courts must keep constant guard. But it is a very
different matter to infer a contractual relation between parties
who have never entered into a contract at all. In the present
case the cargo owners had a contract with the carrier which
provided amongst other things for the unloading of their cargo.
They knew nothing of the relations between the carrier and the
stevedores. It was no business of theirs. They were concerned
only to have the job done which the carriers had contracted to
do. There is no conceivable reason why an implication should
be made that they had entered into any contractual relation
with the stevedores.

But, my Lords, all these contentions were but a prelude to
one which, had your Lordships accepted it, would have been the
foundation of a dramatic decision of this House. It was argued,
if I understood the argument, that if A contracts with B to do
something for the benefit of C, then C, though not a party to
the contract, can sue A to enforce it. This is independent of
whether C is A's undisclosed principal or a beneficiary under a
trust of which A is trustee. It is sufficient that C is an " inter-
" ested person." My Lords, if this is the law of England, then,
subject always to the question of consideration, no doubt, if the
carrier purports to contract for the benefit of the stevedore, the
latter can enforce the contract. Whether that premiss is satisfied
in this case is another matter, but, since the argument is advanced,
it is right that I should deal with it.

Learned counsel for the respondents met it, as they had
successfully done in the courts below, by asserting a principle
which is, I suppose, as well established as any in our law, a
" fundamental " principle, as Lord Haldane called it in *Dunlop
Pneumatic Tyre Co. Ltd.* v. *Selfridge & Co. Ltd.,*[3] an " elemen-
" tary " principle, as it has been called times without number,
that only a person who is a party to a contract can sue upon it.
" Our law," said Lord Haldane, " knows nothing of a jus
" quaesitum tertio arising by way of contract." Learned counsel
for the respondents claimed that this was the orthodox view and
asked your Lordships to reject any proposition that impinged
upon it. To that invitation I readily respond. For to me
heterodoxy, or, as some might say, heresy, is not the more
attractive because it is dignified by the name of reform. Nor will
I easily be led by an undiscerning zeal for some abstract kind of

[3] [1915] A.C. 847, 853; 31 T.L.R. 399, H.L.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
v.
SCRUTTONS
LTD.

Viscount
Simonds.

justice to ignore our first duty, which is to administer justice according to law, the law which is established for us by Act of Parliament or the binding authority of precedent. The law is developed by the application of old principles to new circumstances. Therein lies its genius. Its reform by the abrogation of those principles is the task not of the courts of law but of Parliament. Therefore I reject the argument for the appellants under this head and invite your Lordships to say that certain statements which appear to support it in recent cases such as *Smith and Snipes Hall Farm Ltd.* v. *River Douglas Catchment Board* [4] and *White* v. *John Warwick & Co. Ltd.* [5] must be rejected. If the principle of jus quaesitum tertio is to be introduced into our law, it must be done by Parliament after a due consideration of its merits and demerits. I should not be prepared to give it my support without a greater knowledge than I at present possess of its operation in other systems of law.

I come finally to the case which is said to require us to decide in favour of the appellants. The *Elder, Dempster* case [6] has been the subject of so much analytical criticism, and so many different conclusions, that one may well despair of finding out what was decided by which of the five noble and learned Lords who took part in it. In the course of the discussion before your Lordships my mind turned to what was said by Lord Dunedin (who was himself a party to the *Elder, Dempster* decision [6]) some four years later in *Great Western Railway Co.* v. *Mostyn (Owners)*. [7] He said: " . . . if from the opinions delivered it is clear—as is the " case in most instances—what the ratio decidendi was which led " to the judgment, then that ratio decidendi is also binding. " But, if it is not clear, then I do not think it is part of the " tribunal's duty to spell out with great difficulty a ratio decidendi " in order to be bound by it. That is what the Court of Appeal " has done here. With great hesitation they have added the " opinion of Lord Hatherley to that of Lord Cairns and then, " with still greater difficulty, that of Lord Blackburn, and so have " secured what they think was a majority in favour of Lord " Cairns' very clear view. I do not think that the respect which " they hold and have expressed for the judgments of your Lord- " ships' House compelled them to go through this difficult and " most unsatisfactory performance."

[4] [1949] 2 K.B. 500; 65 T.L.R. 628; [1949] 2 All E.R. 179, C.A.

[5] [1953] 1 W.L.R. 1285; [1953] 2 All E.R. 1021, C.A.

[6] [1924] A.C. 522.

[7] [1928] A.C. 57, 73–74; 44 T.L.R. 179, H.L.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Viscount
Simonds.

My Lords, Lord Dunedin's was a dissenting speech and at a later date this House was able to ascertain the principle which was decided by that case and the case that he was discussing, *River Wear Commissioners* v. *Adamson* [8] (see *Workington Harbour and Dock Board* v. *Towerfield (Owners)* [9]). But that does not, I think, detract from the value and importance of his observations upon the ascertainment of the *ratio decidendi* of a decision which is said to bind this House. I would cast no doubt upon the doctrine of stare decisis, without which law is at hazard. But I do reserve the right at least to say of any decision of this House that it does not depart from a long-established principle, and particularly does not do so without even mentioning it, unless that is made abundantly clear by the majority of the noble Lords who take part in it. When, therefore, it is urged that the *Elder, Dempster* case [10] decided that, even if there is no general exception to what I have called the fundamental rule that a person not a party to a contract cannot sue to enforce it, there is at least a special exception in the case of a contract for carriage of goods by sea, an exception which is to be available to every person, servant or agent of the contracting party or independent contractor, then I demand that that particular exception should be plainly deducible from the speeches that were delivered. Nor should I forget the warning given by Lord Halsbury in *Quinn* v. *Leathem* [11] in a passage quoted by Diplock J. in this case,[12] which I need not repeat. For it is undeniable that the facts in *Elder, Dempster* [13] which enabled the House to hold that both shipowners and charterers could take advantage of a provision in a bill of lading, are remote from the facts of the present case. The question, then, is whether there is to be extracted from *Elder, Dempster* [13] a decision that there is in a contract for carriage of goods by sea a particular exception to the fundamental rule in favour of all persons including stevedores and, presumably, other independent contractors. This question must clearly, in my opinion, be answered in the negative.

In the course of this opinion I have already borrowed freely, without acknowledgment, from the judgment of the late Fullagar J.

[8] (1877) L.R. 2 App.Cas. 743, H.L.

[9] [1951] A.C. 112, 157; 66 T.L.R. (Pt. 2) 387; [1950] 2 All E.R. 414, H.L.

[10] [1924] A.C. 522.

[11] [1901] A.C. 495, 506; 17 T.L.R. 749, H.L.

[12] [1959] 2 Q.B. 171, 187; [1959] 2 W.L.R. 761; [1959] 2 All E.R. 289.

[13] [1924] A.C. 522.

470            HOUSE OF LORDS            **[1962]**

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Viscount
Simonds.

in *Wilson* v. *Darling Island Stevedoring and Lighterage Co. Ltd.*,[14] and I shall say something more about that judgment presently. In the meantime I will quote a passage from it which expresses my own view of *Elder, Dempster*.[15] After referring to a passage in Carver on the Law of Carriage of Goods by Sea, 9th ed., at p. 294, that learned judge said [16]: " In my opinion, what the " *Elder, Dempster* case [17] decided, and all that it decided, is that " in such a case, the master having signed the bill of lading, the " proper inference is that the shipowner, when he receives the " goods into his possession, receives them on the terms of the bill " of lading. The same inference might perhaps be drawn in some " cases even if the charterer himself signed the bill of lading, but " it is unnecessary to consider any such question." This appears to me to be the only possible generalisation, or, if your Lordships think " rationalisation " an appropriate word, the only possible rationalisation of *Elder, Dempster*,[17] and it is a far cry from the circumstances to which it is sought to apply that decision in the present case.

I shall not further discuss *Elder, Dempster* [17] except to say two things. The first is that in so far as the case turned on a question of bailment (which I think it largely did) it has no relevance to the present case. For I agree with Diplock J.[18] in thinking that the appellants were not bailees " whether sub, bald, or " simple." Secondly, I must say a few words upon a passage, much relied on by the appellants, in the judgment of Scrutton L.J. in *Mersey Shipping and Transport Co. Ltd.* v. *Rea Ltd.*,[19] where he pronounced that the effect of the *Elder, Dempster* decision [20] was as follows: " . . . where there is a contract which contains an " exemption clause, the servants or agents who act under that " contract have the benefit of the exemption clause. They cannot " be sued in tort as independent people, but they can claim the " protection of the contract made with their employers on whose " behalf they are acting." The observation was admittedly obiter and Bankes L.J., who sat with Scrutton L.J., clearly did not agree with it. Nor do I agree with it: that follows from what I have already said. And, with all deference to a very learned judge, I do not think that the use of the word " independent " is felicitous. If the cargo owner sues a stevedore for negligence, he

[14] (1955) 95 C.L.R. 43; [1956] 1
Lloyd's Rep. 346.
[15] [1924] A.C. 522.
[16] 95 C.L.R. 43, 78; [1956] 1
Lloyd's Rep. 346, 364.

[17] [1924] A.C. 522.
[18] [1959] 2 Q.B. 171, 189.
[19] (1925) 21 Ll.L.R. 375, D.C.
[20] [1924] A.C. 522.

**A.C.**                    AND PRIVY COUNCIL.                    471

sues him not as a dependent or independent tortfeasor but just as a tortfeasor. It may be that, if he is a " dependent " tortfeasor in the sense that he is the servant or agent of a master or principal, the latter may be made vicariously liable, but that does not touch his personal liability. From that he can only escape if there is a contractual relation between him and the cargo owner which provides him with immunity for his tort or a principle of law which entitles him to rely on a contract made by another. The first line of escape depends on the facts of the particular case: the second is denied by the fundamental rule which was reasserted in the *Dunlop* case.[21] I will only add that in the passage that I have cited the Lord Justice uses the word " agents," and, whatever else may be attributed to him, I should hesitate to say that he intended to include independent contractors in that word.

It follows from what I have said that the case of *Cosgrove* v. *Horsfall*,[22] upon which doubt was cast by counsel for the appellants, was rightly decided, and that Devlin J.'s decision in *Pyrene Co. Ltd.* v. *Scindia Navigation Co. Ltd.*[23] can be supported only upon the facts of the case, which may well have justified the implication of a contract between the parties.

In the consideration of this case I have not yet mentioned a matter of real importance. It is not surprising that the questions in issue in this case should have arisen in other jurisdictions where the common law is administered, and where the Hague Rules have been embodied in the municipal law. It is (to put it no higher) very desirable that the same conclusions should be reached in whatever jurisdiction the question arises. It would be deplorable if the nations should, after protracted negotiations, reach agreement, as in the matter of the Hague Rules, and that their several courts should then disagree as to the meaning of what they appeared to agree upon: see *Riverstone Meat Co. Pty. Ltd.* v. *Lancashire Shipping Co. Ltd.*,[24] and cases there cited. It is therefore gratifying to find that the Supreme Court of the United States in the recent case of *Robert C. Herd & Co. Inc.* v. *Krawill Machinery Corporation*,[25] not only unanimously adopted the meaning of the word " carrier " in the relevant Act, which I invite your Lordships to adopt, but also expressed the view that the

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Viscount
Simonds.

[21] [1915] A.C. 847.
[22] (1945) 175 L.T. 334; 62 T.L.R. 140, C.A.
[23] [1954] 2 Q.B. 402; [1954] 2 W.L.R. 1005; [1954] 2 All E.R. 158.
[24] [1961] A.C. 807; [1961] 2 W.L.R. 278; [1961] 1 All E.R. 495, H.L.
[25] (1959) 359 U.S. 297; [1959] 1 Lloyd's Rep. 305.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Viscount
Simonds.

*Elder, Dempster* decision [26] did not decide what is claimed for it by the appellants.

Finally, I must refer again to the case of *Wilson* v. *Darling Island Stevedoring and Lighterage Co. Ltd.*,[27] which is fortunately reported also in Lloyd's Reports, fortunately, since the Commonwealth Law Reports are too seldom to be found in counsel's chambers. In that case, in which the facts are not in any material respect different from those in the present case, the late Fullagar J. delivered a judgment with which Dixon C.J. said that he entirely agreed. So do I—with every line and every word of it, and, having read and reread it with growing admiration, I cannot forbear from expressing my sense of the loss which not only his colleagues in the High Court of Australia but all who anywhere are concerned with the administration of the common law have suffered by his premature death. I have already cited one passage from his judgment. Perhaps I may refer also with respectful approbation to those passages in which he asserts the view that the exceptions to the rule in *Tweddle* v. *Atkinson* [28] are apparent rather than real and explains the so-called on-carrier cases, and in which he protests against a tendency by some artifice to save negligent people from the normal consequence of their fault.

I would dismiss this appeal with costs.

LORD REID. My Lords, the case for the respondents is simple. Goods which they had bought were damaged by the negligence of stevedores, who are the appellants. Before the damage occurred the property in the goods had passed to the respondents and they sue in tort for the amount of the loss to them caused by that damage. The appellants seek to take advantage of provisions in the bill of lading made between the sellers of the goods and the carrier. Those provisions in the circumstances of this case would limit liability to $500. They are expressed as being in favour of the carrier but the appellants maintain on a number of grounds that they can rely on these provisions with the result that, though the damage to the respondents' goods considerably exceeded $500, the respondents cannot recover more than the equivalent of that sum from them as damages. We were informed that questions of this kind frequently arise and that this action has been brought as a test case.

In considering the various arguments for the appellants, I think

---

[26] [1924] A.C. 522.

[27] 95 C.L.R. 43; [1956] 1 Lloyd's Rep. 346.

[28] (1861) 1 B. & S. 393.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Reid.

it is necessary to have in mind certain established principles of the English law of contract. Although I may regret it, I find it impossible to deny the existence of the general rule that a stranger to a contract cannot in a question with either of the contracting parties take advantage of provisions of the contract, even where it is clear from the contract that some provision in it was intended to benefit him. That rule appears to have been crystallised a century ago in *Tweddle* v. *Atkinson* [28] and finally established in this House in *Dunlop Pneumatic Tyre Co. Ltd.* v. *Selfridge & Co. Ltd.* [29] There are, it is true, certain well-established exceptions to that rule—though I am not sure that they are really exceptions and do not arise from other principles. But none of these in any way touches the present case.

The actual words used by Lord Haldane in the *Dunlop* case [30] were made the basis of an argument that, although a stranger to a contract may not be able to sue for any benefit under it, he can rely on the contract as a defence if one of the parties to it sues him in breach of his contractual obligation—that he can use the contract as a shield though not as a sword. I can find no justification for that. If the other contracting party can prevent the breach of contract well and good, but if he cannot I do not see how the stranger can. As was said in *Tweddle* v. *Atkinson,* [31] the stranger cannot "take advantage" from the contract.

It may be that in a roundabout way the stranger could be protected. If A, wishing to protect X, gives to X an enforceable indemnity, and contracts with B that B will not sue X, informing B of the indemnity, and then B does sue X in breach of his contract with A, it may be that A can recover from B as damages the sum which he has to pay X under the indemnity, X having had to pay it to B. But there is nothing remotely resembling that in the present case.

The appellants in this case seek to get round this rule in three different ways. In the first place, they say that the decision in *Elder, Dempster & Co. Ltd.* v. *Paterson, Zochonis & Co. Ltd.* [32] establishes an exception to the rule sufficiently wide to cover the present case. I shall later return to consider this case. Secondly, they say that through the agency of the carrier they were brought into contractual relation with the shipper and that they can now found on that against the consignees, the respondents. And thirdly, they say that there should be inferred from the facts an implied contract, independent of the bill of lading, between them

[28] [1915] A.C. 847.
[30] Ibid. 853.
[31] 1 B. & S. 393, 398.
[32] [1924] A.C. 522.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
v.
SCRUTTONS
LTD.

Lord Reid.

and the respondents. It was not argued that they had not committed a tort in damaging the respondents' goods.

I can see a possibility of success of the agency argument if (first) the bill of lading makes it clear that the stevedore is intended to be protected by the provisions in it which limit liability, (secondly) the bill of lading makes it clear that the carrier, in addition to contracting for these provisions on his own behalf, is also contracting as agent for the stevedore that these provisions should apply to the stevedore, (thirdly) the carrier has authority from the stevedore to do that, or perhaps later ratification by the stevedore would suffice, and (fourthly) that any difficulties about consideration moving from the stevedore were overcome. And then to affect the consignee it would be necessary to show that the provisions of the Bills of Lading Act, 1855, apply.

But again there is nothing of that kind in the present case. I agree with your Lordships that " carrier " in the bill of lading does not include stevedore, and if that is so I can find nothing in the bill of lading which states or even implies that the parties to it intended the limitation of liability to extend to stevedores. Even if it could be said that reasonable men in the shoes of these parties would have agreed that the stevedores should have this benefit, that would not be enough to make this an implied term of the contract. And even if one could spell out of the bill of lading an intention to benefit the stevedore, there is certainly nothing to indicate that the carrier was contracting as agent for the stevedore in addition to contracting on his own behalf. So it appears to me that the agency argument must fail.

And the implied contract argument seems to me to be equally unsound. From the stevedores' angle, they are employed by the carrier to deal with the goods in the ship. They can assume that the carrier is acting properly in employing them and they need not know whom the goods belong to. There was in their contract with the carrier a provision that they should be protected, but that could not by itself bind the consignee. They might assume that the carrier would obtain protection for them against the consignee and feel aggrieved when they found that the carrier did not or could not do that. But a provision in the contract between them and the carrier is irrelevant in a question between them and the consignee. Then from the consignees' angle they would know that stevedores would be employed to handle their goods, but if they read the bill of lading they would find nothing to show that the shippers had agreed to limit the liability of the stevedores. There is nothing to show that they ever thought about this or

**A.C.**          AND PRIVY COUNCIL.          475

that if they had they would have agreed or ought as reasonable men to have agreed to this benefit to the stevedores. I can find no basis in this for implying a contract between them and the stevedores. It cannot be said that such a contract was in any way necessary for business efficiency.

So this case depends on the proper interpretation of the *Elder, Dempster* case.[32] What was there decided is clear enough. The ship was under time charter, the bill of lading made by the shippers and the charterers provided for exemption from liability in the event which happened and this exemption was held to enure to the benefit of the shipowners who were not parties to the bill of lading but whose servant the master caused damage to the shippers' goods by his negligence. The decision is binding on us but I agree that the decision by itself will not avail the present appellants because the facts of this case are very different from those in the *Elder, Dempster* case.[32] For the appellants to succeed it would be necessary to find from the speeches in this House a ratio decidendi which would cover this case and then to follow that ratio decidendi.

Before dealing further with that case I think it necessary to make some general observations about the binding character of rationes decidendi of this House. Unlike most supreme tribunals this House holds itself bound by its own previous decisions. That was the decision of this House in *London Street Tramways Co. Ltd. v. London County Council.*[33] It was founded on immemorial practice, and the justification given by Lord Halsbury L.C.,[34] with whom the other noble Lords concurred, was "the incon-"venience—the disastrous inconvenience—of having each ques-"tion subject to being reargued and the dealings of mankind "rendered doubtful by reason of different decisions, so that in "truth and in fact there would be no real final Court of Appeal." I have on more than one occasion stated my view that this rule is too rigid and that it does not in fact create certainty. In illustration of that I need go no further than the series of decisions in this House on workmen's compensation. But I am bound by the rule until it is altered.

But I can find no invariable practice with regard to rationes decidendi. In the first place it must be noted that only three years later Lord Halsbury said in *Quinn v. Leathem*[35]: ". ... there

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Reid.

[32] [1924] A.C. 522.
[33] [1898] A.C. 375; 14 T.L.R. 360, H.L.
[34] Ibid. 380.
[35] [1901] A.C. 495, 506.

476                          HOUSE OF LORDS                    [1962]

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
v.
SCRUTTONS
LTD.

Lord Reid.

" are two observations of a general character which I wish to make,
" and one is to repeat what I have very often said before, that
" every judgment must be read as applicable to the particular
" facts proved, or assumed to be proved, since the generality of
" the expressions which may be found there are not intended
" to be expositions of the whole law, but governed and qualified by
" the particular facts of the case in which such expressions are to
" be found. The other is that a case is only an authority for
" what it actually decides. I entirely deny that it can be quoted
" for a proposition that may seem to follow logically from it."
And, if one has to assume that every case has a ratio decidendi
to be extracted from the speeches in this House by the ordinary
methods of construction of written documents, I think that quite
a number of cases will be found of which the rationes decidendi
have not in fact been followed. I give only a few examples which
I happen to have noted from time to time. They may not be very
modern, but, if there was no unbroken practice, modern pronounce-
ments (in themselves at best only rationes decidendi) cannot
have created a rule preventing your Lordships from exercising the
full traditional jurisdiction of this House. A fairly recent example
is *Goodman* v. *Saltash Corporation*,[36] and with that I couple a
note by Mr. Macqueen to *Scott* v. *Maxwell* [37] where, having dealt
with the question of previous decisions being binding, he says:
" Notwithstanding all this, it must be owned that one or two well
" known decisions of the House have been tabooed by the profes-
" sion; not, however, by holding them to be wrong, but by making
" out invariably that they have no application to other cases.
" I think, however, it will be found that the House itself has
" never revoked what it has once deliberately laid down on an
" appeal or writ of error." And very soon after that was said
Lord Chelmsford L.C. said in *Dundee Magistrates* v. *Morris* [38]:
" . . . your Lordships will probably think that *Ewen* v. *Provost of*
" *Montrose* [39] can only be urged as an authority where the circum-
" stances of the case to which it is sought to be applied are
" precisely similar to the circumstances of that case."

I would certainly not lightly disregard or depart from any ratio
decidendi of this House. But there are at least three classes of
case where I think we are entitled to question or limit it: first,
where it is obscure, secondly, where the decision itself is out of
line with other authorities or established principles, and thirdly,

[36] (1882) 7 App.Cas. 633, H.L.        [38] (1858) 3 Macq. 134, 155, H.L.
[37] (1854) 1 Macq. 791, 792, H.L.     [39] (1830) 1 Wils. & Shaw 346, H.L.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Reid.

where it is much wider than was necessary for the decision so that it becomes a question of how far it is proper to distinguish the earlier decision. The first two of these grounds appear to me to apply to the present case.

It can hardly be denied that the ratio decidendi of the *Elder, Dempster* decision [40] is very obscure. A number of eminent judges have tried to discover it, hardly any two have reached the same result, and none of the explanations hitherto given seems to me very convincing. If I had to try, the result might depend on whether or not I was striving to obtain a narrow ratio. So I turned to the decision itself. Two quite separate points were involved in the case. The first was whether the damage to the cargo was caused by bad stowage or by the ship being unseaworthy. This was very fully considered and the decision was bad stowage. On the conditions in the bill of lading this clearly freed the charterer of liability. The other question was whether those conditions were also available as a defence to the shipowner. From the report of the case it would seem that this was not very fully argued, and none of the three noble Lords who spoke devoted more than a page of print to it. They cannot have thought that any important question of law or any novel principle was involved. Lord Finlay said [41] that a decision against the shipowner would be absurd and the other noble Lords probably thought the same. They must all have thought that they were merely applying an established principle to the facts of the particular case.

But when I look for such a principle I cannot find it, and the extensive and able arguments of counsel in this case have failed to discover it. The House sustained the dissenting judgment of Scrutton L.J. in the Court of Appeal (*Paterson, Zochonis & Co. Ltd.* v. *Elder, Dempster & Co. Ltd.*[42]). The majority there did not have to consider this question, but Scrutton L.J. did and he also devoted less than a page to its consideration. His reasoning, though brief, is quite clear, but he gives no reason or authority for the proposition on which he bases his judgment and it is not derived from the argument as reported. He said [43]: '' The real '' answer to the claim is in my view that the shipowner is not in '' possession as a bailee, but as the agent of a person, the charterer, '' with whom the owner of the goods has made a contract defining '' his liability, and that the owner as servant or agent of the '' charterer can claim the same protection as the charterer. Were

[40] [1924] A.C. 522.
[41] Ibid. 548.

[42] [1923] 1 K.B. 420, C.A.
[43] Ibid. 441–442.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Reid.

" it otherwise there would be an easy way round the bill of lading
" in the case of every chartered ship; the owner of the goods
" would simply sue the owner of the ship and ignore the bill of
" lading exceptions, though he had contracted with the charterer
" for carriage on those terms and the owner had only received
" the goods as agent for the charterer." It is true that an
unreasonable proposition is seldom good law, and, perhaps for
that reason, it would seem that that great lawyer did not pause
to consider how great an exception he was making to the rule
that a stranger to a contract cannot take advantage from it. For
he was saying in terms that servants and " agents " can take
advantage of contracts made by their master or " principal."
I would not dissent from a proposition that something of that kind
ought to be the law if that was plainly the intention of the contract,
and it may well be that this matter is worthy of consideration
by those whose function it is to consider amending the law. But
it seems to me much too late to do that judicially.

    That this House made an exception to the general principle
seems to me clear: the question we have now to consider is how
wide an inroad did they make. It is very far from clear that any
of those who spoke in this House intended to go all the way with
Scrutton L.J.: if they had intended to do so it would have been
easy to say so. And it is not clear just how far Scrutton L.J.
himself intended to go. The use of the term " agent " is one
difficulty: he cannot have been using that word accurately in its
legal sense. The charterer or anyone else under obligation to do
certain things employs servants or independent contractors and
instructs them to do those things. But they do not act as agents;
they have nothing to do with the party to whom their master or
employer is under contractual obligation; their duty is to
carry out the instructions of their master or employer under
the contracts which they have made with him. But in
the course of carrying out that duty they may by their own
negligence do damage to the property of a third party, the person
who has made a contract with their master or employer. On what
ground are they to be better off than if they had damaged the
property of some other person? On that analysis it becomes still
more difficult to find a legal justification for what Scrutton L.J.
said. And was there any implicit limitation to the rule which he
enunciated? There seems to be no logical reason why it should
be confined to carriage of goods by sea or indeed to carriage of any
kind. If it is a good rule for bills of lading it would seem to be an
equally good rule for all cases where the master or employer has

some protection under a contract and employs someone else to do the things which have to be done under that contract. I must say I have considerable doubt whether Scrutton L.J. can really have intended his rule to be so far-reaching.

In such circumstances I do not think that it is my duty to pursue the unrewarding task of seeking to extract a ratio decidendi from what was said in this House in *Elder, Dempster*.[44] Nor is it my duty to seek to rationalise the decision by determining in any other way just how far the scope of the decision should extend. I must treat the decision as an anomalous and unexplained exception to the general principle that a stranger cannot rely for his protection on provisions in a contract to which he is not a party. The decision of this House is authoritative in cases of which the circumstances are not reasonably distinguishable from those which gave rise to the decision. The circumstances in the present case are clearly distinguishable in several respects. Therefore I must decide this case on the established principles of the law of England apart from that decision, and on that basis I have no doubt that this appeal must be dismissed.

Lord Keith of Avonholm. My Lords, I agree with the opinions that have just been delivered by my noble and learned friends, Lord Simonds and Lord Reid, and would only say a few words about the *Elder, Dempster* case[44] in view of the importance that has been attached to it in the argument for the appellants.

There was a specialty in that case which did not go unobserved in the course of its decision, in that the ship, the *Grelwen*, had been hired under a time charter to augment a line of vessels owned by Elder, Dempster & Co. Ltd., or its subsidiary shipping companies, engaged in the West African trade. It was in a sense a chance whether the cargo in question in that case was loaded on the *Grelwen* or was carried by one of the other vessels of the Elder, Dempster line. To the shippers it was no doubt a matter of indifference whether their cargoes were carried on one of the regular ships of the line or on the chartered ship. In fact they were probably unaware that the *Grelwen* was a chartered ship and the bills of lading signed for the voyage in question followed the well-known form of bill of lading issued for all the other of the respondents' ships. (See Lord Sumner.[45]) There could thus have resulted the anomaly, on one view of the case, of the cargo-owners recovering damages from the owners of the *Grelwen*, which

H. L. (E.)

1961

Midland
Silicones
Ltd.
*v.*
Scruttons
Ltd.

Lord Reid.

[44] [1924] A.C. 522.          [45] Ibid. 564.

480         HOUSE OF LORDS       **[1962]**

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Keith of
Avonholm.

they could not have recovered if their goods had been carried on the other ships, whose owners would have been fully covered against damage resulting from bad stowage. These considerations may have been in some measure irrelevant and they were immaterial if the view of Rowlatt J. and the Court of Appeal (Scrutton L.J. dissenting) that there was unseaworthiness at the start of the voyage had been upheld in this House. But they may well have played their part in leading Rowlatt J. to hold that the contract of carriage under the bills of lading was, exceptionally, between the shippers and the charterers, a finding which was acquiesced in at all later stages of the case. As Fullagar J. pointed out in *Wilson* v. *Darling Island Stevedoring and Lighterage Co. Ltd.*,[46] this might be thought to lead to the result that the charterers alone were responsible for the bad stowage (though they would, of course, have the benefit of the exemption clause), and that no question of liability of the shipowners could arise. I am not sure that this was not also Lord Sumner's view in the *Elder, Dempster* case,[47] but he preferred to base his decision on bailment. I do not read him as subscribing to the view that if the captain signed the bills of lading as agent for the charterers, that secured immunity for the charterers' servants and agents. Be that as it may, this House was able, on one view or another, to exempt both charterers and owners from liability for bad stowage.

The present case on its facts is far removed from the *Elder, Dempster* case[47] and it is doubtful whether any appeal would have been made to that case but for the principle which Scrutton L.J. in *Mersey Shipping and Transport Co. Ltd.* v. *Rea Ltd.*[48] found himself able to extract from the judgment of this House. This principle does not, I think, materially differ from what he himself enunciated, though in somewhat more limited terms, in his dissenting judgment in the Court of Appeal in the *Elder, Dempster* case,[49] as his ground for exempting the shipowners from liability for bad stowage. I do not repeat the relevant passages from Scrutton L.J.'s judgments which have already been quoted. An agent or servant, acting within the scope of his authority, may, of course, make a contract on behalf of his principal which stipulates for immunity for negligence or tort in the performance of the contract. That would be a contractual stipulation on which the principal could rely. The converse proposition favoured by Scrutton L.J., that the servants or agents of a principal who is

46 95 C.L.R. 43, 68; [1956] 1
Lloyd's Rep. 346, 358.
47 [1924] A.C. 522.

48 21 Ll.L.R. 375.
49 [1924] A.C. 522.

entitled to some contractual immunity for negligence in perform-
ance of his contract could claim the same immunity, does not
appear to me to proceed on any known principle in English law.

It may be difficult to discover any common ratio decidendi in
the speeches of their Lordships who decided the *Elder, Dempster*
case[49] in favour of the owners of the *Grelwen*. But I take the
preferred view of Lord Sumner, which had the support of Lord
Dunedin and Lord Carson, as meaning that in the circumstances
of that case, including the fact that the bills of lading were signed
by the master of the ship, the cargo was received by the ship
and its owners, with the assent of the shippers, on the same
condition as regards immunity in respect of stowage as had been
obtained by the charterers under their contract of carriage. There
is nothing in the facts covered by the present appeal that in any
way corresponds to the facts of that case and no principle to be
derived from the case on which, in my opinion, the appellants can
successfully rely. I agree the appeal should be dismissed.

LORD DENNING. My Lords, there are three contracts which
fall for consideration in this case :

(1) *The Bill of Lading.* This evidenced a contract between
the shipper and the carrier whereby the carrier agreed to carry a
drum of silicone diffusion pump fluid by ship from New York to
London and deliver it there to the consignee. In this contract
the carrier stipulated that, in case of loss, damage or delay the
value was to be deemed to be $500 and he was not to be liable
for more than $500 per package " unless the nature and value
" thereof was declared by the shipper in writing before shipment
" and inserted in the bill of lading."

(2) *The Stevedoring Contract.* This was a contract between
the carrier and the stevedores whereby the stevedores agreed to
discharge the vessels of the carrier in the Port of London. The
stevedores agreed to be responsible for any damage to or loss of
cargo while being handled or stowed, unshipped or delivered.
But the stevedores stipulated that they should have " such protec-
" tion as is afforded by the terms, conditions and exceptions of
" the bills of lading." By this stipulation the stevedores clearly
sought to be protected by the same conditions as the carrier was,
so that they too would not be liable for more than $500 a package
on undeclared cargo. It is noteworthy that so far as declared
cargo was concerned, the stevedores agreed " to effect an insurance

**H. L. (E.)**

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Keith
of Avonholm.

[49] [1924] A.C. 522.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Denning.

" policy on Lloyds to cover any damage or loss on which a value
" in excess of $500 per package has been declared."

(3) *The Sale of the Goods.*  This was a contract between the
shipper and the consignee under which the property in the goods
passed to the consignee whilst the goods were on board the ship.
Thereupon there was transferred to the consignee all rights of suit
and he was subject to the same liabilities in respect of the goods
as if the contract contained in the bill of lading had been made
with the consignee himself.

The shipper did not declare the value of the drum to the
carrier, and its value was not inserted in the bill of lading.  If a
declaration of value had been made, the drum would have been
included in a list of special cargo for the use of the carriers and
the stevedores, and, in accordance with the usual practice, it
would have been given special stowage: and it would, no doubt,
have been covered by the insurance policy referred to in the steve-
doring contract.  But as there was no declaration of value in
this case, the drum was dealt with as ordinary cargo, both by the
carriers and the stevedores.

The drum was duly carried to London.  The stevedores duly
discharged the ship and put the drum into a shed.  The consignees
sent a lorry to take delivery of the drum.  The stevedores were
in the very act of lowering the drum on to the lorry when they
negligently dropped it and some of the contents were lost.  The
drum was worth far more than $500 and the loss was far more
than $500.  If the consignee had sued the carrier for the loss,
the consignee could not have recovered more than $500.  If the
carrier had sued the stevedores for the loss, the carrier could not
have recovered more than $500.  But it is said that the consignee
can sue the stevedores in tort for negligence and recover the full
value (£593 12s. 0d.) from them, despite the fact that the value
was never declared as being in excess of $500 (£179 1s. 0d.).

Now, there are two principal questions in this case which need
separate consideration: The first is whether the stevedores can
rely on the limitation clause in the bill of lading to which they
were *not* parties: The second is whether they can rely on the
protection given by the stevedoring contract to which they *were*
parties.

So far as the first question is concerned the stevedores rely on
the reasoning of this House in the *Elder, Dempster* case,[49] which
was stated by Scrutton L.J. to be that " where there is a contract

[49] [1924] A.C. 522.

**A.C.**          AND PRIVY COUNCIL.                                    483

" which contains an exemption clause, the servants or agents who
" act under that contract have the benefit of the exemption
" clause," see *Mersey Shipping and Transport Co. Ltd.* v. *Rea
Ltd.*[50]  By " servants or agents " there the Lord Justice clearly
means to comprehend all those who do the actual work in perform-
ance of the contract; " servants " being those under the direct
control of the contracting party, and " agents " being those who
are employed as sub-contractors for the purpose.  The books are
full of the use of the word " agent " in that sense: and I propose
in this judgment to continue to use it so.  And I think that the
Lord Justice had in mind only exemption clauses in the carriage of
goods.  He knew as well as anyone that the law of England has
always drawn a broad distinction between the carriage of goods
and the carriage of passengers: see the classic judgment of the
Court of Exchequer Chamber in *Readhead* v. *Midland Railway
Co.*[51]

My Lords, it is said that, in stating this proposition, for once
Homer nodded and that this great master of our commercial law—
and the members of this House too—overlooked the " funda-
" mental principle " that no one who is not a party to a contract
can sue or be sued upon it or take advantage of the stipulations
or conditions that it contains.  I protest they did nothing of the
kind.  You cannot understand the *Elder, Dempster* case [52] with-
out some knowledge of the previous law and I would draw the
attention of your Lordships to it.

First of all let me remind your Lordships that this " funda-
" mental principle " was a discovery of the nineteenth century.
Lord Mansfield and Buller J. knew nothing of it.  But in the
nineteenth century it was carried to the most extravagant lengths.
It was held that, where a duty to use reasonable care arose out
of a contract, no one could sue or be sued for a breach of that
contract except a party to it, see *Winterbottom* v. *Wright*,[53]
*Alton* v. *Midland Railway Co.*[54]  In the nineteenth century if a
goods owner had sought to sue stevedores for negligence, as he has
in this case, he would have failed utterly.  The reason being that
the duty of the stevedores to use reasonable care arose out of their
contract with the carrier; and no one could sue them for a breach
of that duty except the other party to the contract, namely, the
carrier.  If the goods were damaged, the only remedy of the

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Denning.

[50] 21 Ll.L.R. 375, 378.
[51] (1869) L.R. 4 Q.B. 379, 382.
[52] [1924] A.C. 522.

[53] (1842) 10 M. & W. 109.
[54] (1865) 19 C.B.N.S. 213.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
v.
SCRUTTONS
LTD.

Lord Denning.

owner of the goods was against the carrier with whom he contracted, and not against the stevedores with whom he had no contract. If proof were needed that the doctrine was carried so far, it is provided by the many cases in the middle of the nineteenth century where the owner of goods sent them by railway for " through transit " to a destination on another line. The first carrier carried them safely over his line but they were damaged by the negligence of the second carrier. It was repeatedly held that the goods owner had no remedy against the second carrier: for the simple reason that he had no contract with him. The owner's only remedy was against the first carrier with whom he contracted, see *Scothorn* v. *South Staffordshire Railway Co.*[55]: and not against the second carrier with whom he had no contract, see *Mytton* v. *Midland Railway Co.*,[56] *Cozon* v. *Great Western Railway Co.*[57] If the first carrier was exempted from liability by the conditions of the contract, the goods owner had no remedy at all: none against the first carrier because he was protected by the conditions: and none against the second carrier because he was " not liable at all." It was so held by this House in *Bristol and Exeter Railway Co.* v. *Collins.*[58] See especially what Lord Chelmsford said [59] with the entire agreement of Lord Brougham, and what Lord Cranworth said.[60]

What an irony is here! This " fundamental principle " which was invoked 100 years ago for the purpose of holding that the agents of the carrier were " not liable at all " is now invoked for the purpose of holding that they are inescapably liable, without the benefit of any of the conditions of carriage. How has this come about?

The reason is because in the nineteenth century negligence was not an independent tort. If you wished to sue a man for negligence, you had to show some special circumstances which put him under a duty of care towards you. You might do it by reason of a contract, by a bailment, by his inviting you on to his premises on business, by his leaving about a thing which was dangerous in itself, and in other ways. But apart from some such special circumstances, there was no general duty to use care. Brett M.R. (afterwards Lord Esher) made a valiant attempt in *Heaven* v. *Pender* [61] to enunciate such a general duty but he had failed. Suppose in those days that you tried to show that the

**A.C.**          AND PRIVY COUNCIL.          485

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Denning.

defendant was under a duty of care, then if you could only show it by reason of contract, your remedy lay only in contract and not in tort. But if you could show it, not only by reason of contract, but also for some other reason, as for instance by reason of his inviting you to his premises, you could sue either in contract or in tort. It was by a development of this principle that, in the "through transit" cases, the courts eventually found a way of making the second carrier liable. It was held that if, on through transit, the second carrier accepted a person as a passenger, the second carrier was under a duty, irrespective of contract, to carry him with reasonable care, see *Foulkes* v. *Metropolitan District Railway Co.*[62] Likewise, if a second carrier accepted goods for carriage, so that they were lawfully on his premises, he was under a duty to the owner to use reasonable care, although there was no contract between them, see *Hooper* v. *London and North Western Railway Co.*[63] (overruling *Mytton* v. *Midland Railway Co.*[64]); and *Meux* v. *Great Eastern Railway Co.*[65] But when the courts found this way of making the second carrier liable, they did not thereby open a way by which the injured person could escape the conditions of carriage. If he had agreed that the carriage was to be " at owner's risk " for the whole journey, he was held to his agreement, even when he sued the second carrier in tort, see *Hall* v. *North Eastern Railway Co.*,[66] *Barratt* v. *Great Northern Railway Co.*[67] It has been suggested that in such cases the contract is made with one company for one part of the journey and with the other company for the other part of the journey, see *Wilson* v. *Darling Island Stevedoring and Lighterage Co. Ltd.*[68] by Fullagar J.; but this explanation cannot stand with the decision of this House in *Bristol and Exeter Railway Co.* v. *Collins,*[69] where it was clearly held that there was only one contract by the goods owner, namely, his contract with the first carrier, and none by him with the second carrier. This being so, the only acceptable explanation of the "through transit" cases, to my mind, is that the second carrier falls within Scrutton L.J.'s proposition, being an "agent," that is, a sub-contractor employed to carry out the contract of the first carrier, and so entitled to the benefit of the conditions.

This brings me to the *Elder, Dempster* case[70] itself. It is

[62] (1880) 5 C.P.D. 157, C.A.
[63] (1880) 50 L.J.Q.B. 103.
[64] 4 H. & N. 615.
[65] [1895] 2 Q.B. 387; 11 T.L.R. 517, C.A.
[66] (1875) L.R. 10 Q.B. 437.

[67] (1904) 20 T.L.R. 175, D.C.
[68] 95 C.L.R. 43, 67; [1956] 1 Lloyd's Rep. 346, 357.
[69] 7 H.L.Cas. 194.
[70] [1924] A.C. 522.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
v.
SCRUTTONS
LTD.

Lord Denning.

important to notice that the contract of carriage there was between the shippers and the charterers. The shipowners were not parties to it. The word " shipowners " in the bill of lading designated only the charterers. (That appears from the judgment of Rowlatt J.[71] and *The Okehampton*,[72] which Lord Sumner clearly had in mind.) The charterers performed their contract of carriage by means of a hired ship which they hired from the shipowners. They broke their contract because the master stowed the goods badly and they were damaged. The goods owner sued the charterers but failed against them because the bill of lading contained an exception of bad stowage. He then sought to recover against the shipowners. Now at that time negligence was not an independent tort: and it was not at all easy for the goods owner to say why the shipowners were liable to him. His proper remedy would seem to be against the charterers with whom he contracted and not against the shipowners with whom he had no contract. To overcome this difficulty he said that the shipowners were bailees liable for negligence,[73] or were liable in tort because the goods were lawfully on their ship.[74] He relied on seven cases, especially on the observations of the Court of Appeal in *Hayn Roman & Co.* v. *Culliford*,[75] but Lord Sumner dismissed them as obiter. The speeches in this House make it clear that, in order to make the shipowners liable, the goods owner would have to show " an independent tort uncon-"nected with the performance of the contract " (*per* Viscount Finlay [76]) or a " tortious handling entirely independent of con-"tract " (*per* Lord Sumner [77]). For instance, if the shipowner owned another ship which negligently ran into this one, that would be an independent tort for which the shipowner would be liable: and the exceptions would not avail him. But here the negligence was in the very course of the performance of the contract—"in the course of rendering the very services provided for in the "bill of lading "[78]—and the shipowners were not liable. Two reasons were given for this decision.

*The first reason*, which I give in the words of Viscount Cave [79]: The shipowners " were not directly parties to the contract; but "they took possession of the goods (as Scrutton L.J. says) on "behalf of and as the agents of the charterers, and so can claim

[71] (1922) 12 Ll.L.R. 69, 71–72.
[72] [1913] P. 173, 180; 29 T.L.R. 731, C.A.
[73] [1923] 1 K.B. 420, 427, 441; [1924] A.C. 522, 564.
[74] [1923] 1 K.B. 420, 427; [1924] A.C. 522, 526, 564.

[75] (1879) 4 C.P.D. 182, C.A.
[76] [1924] A.C. 522, 548.
[77] Ibid. 564–565.
[78] Ibid. 548.
[79] Ibid. 534.

**A.C.**          AND PRIVY COUNCIL.                    487

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
v.
SCRUTTONS
LTD.

Lord Denning.

" the same protection as their principals." I feel no difficulty about the word " agents " in this context. It is clearly used to denote people employed as sub-contractors to do the work. Such people are entitled to the same protection as their principals. This was the proposition stated by Scrutton L.J. It was clearly approved not only by Viscount Cave but also by Viscount Finlay[80] with the concurrence of Lord Carson.[81] It was treated, too, as a correct proposition by Lord Sumner, with whom Lord Dunedin agreed, for he accepted that " the charterers *and their agents* " were not liable.[82] Lord Sumner's only hesitation seems to have been whether in this case the shipowners took possession of the goods as " agents." They had a possessory lien for hire and might have been in possession on their own account. He put forward, therefore, another reason which he regarded as preferable.

*The second reason.* The shipowners were bailees and liable as such for negligence quasi ex contractu: but they were protected because the bailment to them was not a " bald bailment with " unrestricted liability " but a " bailment upon terms, which " include the exceptions and limitations stipulated in the known " and contemplated form of bill of lading." [83]

These two reasons were complementary and not alternative as is shown by the fact that Lord Carson agreed with both.[83]

My Lords, I am not unduly attached to the strict doctrine of precedent but I should have thought there was good ground here to hold yourselves bound by the first reason in the *Elder, Dempster* case.[84] Just as your Lordships held yourselves bound by a ratio decidendi of three out of five in *Fairman* v. *Perpetual Investment Building Society,*[85] see *Jacobs* v. *London County Council,*[86] and by a ratio decidendi of four out of five in *Nicholls* v. *Austin (Leyton) Ltd.,*[87] see *Close* v. *Steel Company of Wales Ltd.,*[88] so should you be bound by the reasoning in the *Elder, Dempster* case.[89] I confess that I should do my best to distinguish it in some way if I was quite satisfied that it was wrong, but I am not in the least satisfied of this.

It is said that the decision is anomalous and contrary to principle, but that is only because you are looking at it through the

[80] [1924] A.C. 522, 548.
[81] Ibid. 565.
[82] Ibid. 564.
[83] Ibid. 565.
[84] [1924] A.C. 522.
[85] [1923] A.C. 74; 39 T.L.R. 54, H.L.

[86] [1950] A.C. 361, 368–371; 66 T.L.R. (Pt. 1) 659; [1950] 1 All E.R. 737, H.L.
[87] [1946] A.C. 493; 62 T.L.R. 320; [1946] 2 All E.R. 92, H.L.
[88] [1961] 3 W.L.R. 319, 330, 334, 347; [1961] 2 All E.R. 953, H.L.
[89] [1924] A.C. 522.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Denning.

spectacles of 1961 and not those of 1924. Since the decision of *Donoghue* v. *Stevenson* [90] in 1932 we have had negligence established as an independent tort in itself. Small wonder, then, that nowadays it is said that the tortfeasor cannot rely for his protection on provisions in a contract to which he was not a party. But the very point in the *Elder, Dempster* case [91] was that the negligence there was not an independent tort in itself. It was negligence in the very course of performing the contract—done, it is true, by the sub-contractor and not by the principal—but if you permit the owner of the goods to sue the sub-contractor in tort for what is in truth a breach of the contract of carriage, then at least you should give him the protection of the contract. Were it otherwise there would be an easy way round the conditions of the contract of carriage. That is how the judges in the *Elder, Dempster* case [91] looked at it and I am not prepared to say they were wrong. I am sure that the profession looked at it, too, at that time in the same way. If the draftsmen of the Hague Rules had thought in those days that the goods owner could get round the exceptions by suing the stevedores or the master in tort, they would surely have inserted provisions in those Rules to protect them. They did not do so because they did not envisage their being made liable at all.

But if you look at the *Elder, Dempster* case [91] with the spectacles of 1961, then there is a way in which it can be supported. It is this: Even though negligence is an independent tort, nevertheless it is an accepted principle of the law of tort that no man can complain of an injury if he has voluntarily consented to take the risk of it on himself. This consent need not be embodied in a contract. Nor does it need consideration to support it. Suffice it that he consented to take the risk of injury on himself. So in the case of through transit, when the shipper of goods consigns them " at owner's risk " for the whole journey, his consent to take the risk avails the second carrier as well as the first, even though there is no contract between the goods owner and the second carrier. Likewise in the *Elder, Dempster* case [91] the shipper, by exempting the charterers from bad stowage, may be taken to have consented to exempt the shipowners also. But I am afraid that this reasoning would not avail the stevedores in the present case: for the simple reason that the bill of lading is not expressed so as to protect the stevedores but only the " carrier." The

[90] [1932] A.C. 562; 48 T.L.R. 494.    [91] [1924] A.C. 522.
H.L.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Denning.

shipper has therefore not consented to take on himself the risk of the negligence of the stevedores and is not to be defeated on that ground. But if the bill of lading were expressed in terms by which the owner of the goods consented to take on himself the risk of loss in excess of $500, whether due to the negligence of the carrier or the stevedores, I know of no good reason why his consent, if freely given, should not be binding on him. The case of *Cosgrove* v. *Horsfall*[92] appears to suggest the contrary, but that was a contract for the carriage of passengers and not for the carriage of goods: and, as I said in *Adler* v. *Dickson*,[93] it is not so easy to find an assent by a passenger to take the risk of personal injury on himself. The mere issue of a ticket or pass will not suffice.

I suppose, however, that I must be wrong about all this: because your Lordships, I believe, take a different view. But it means that I must go on to consider the second question, namely, whether the stevedores can avail themselves of the protection clause in their own " stevedoring contract." Here your Lordships are untrammelled by authority. The cases in the High Court of Australia and in the United States Supreme Court do not touch the point. The stevedores in those two cases, for aught that appears, had agreed to do their work on a " bald " stevedoring contract " with unrestricted liability ": where as here they stipulated that they should " have such protection as is afforded by the " terms, conditions and exceptions of the bill of lading."

It is said here again that the owners of the goods cannot be affected by the " stevedoring contract " to which they were not parties: but it seems to me that we are now in a different branch of the law. When considering the contract between the carrier and the stevedores, it is important to remember that the carrier of goods, like a hirer, is a bailee: and the law of bailment is governed by somewhat different principles from those of contract or of tort: for " bailment," as Sir Percy Winfield said, " is more " fittingly regarded as a distinct branch of the Law of Property, " under the title Possession than as appropriate to either the law " of contract or the law of tort," see The Province of the Law of Tort, p. 100. One special feature of the law of bailment is that the bailee can make a contract in regard to the goods which will bind the owner, although the owner is no party to the contract and cannot sue or be sued upon it. The contract must, no doubt,

92 175 L.T. 334.                    93 [1955] 1 Q.B. 158, 184; [1954] 3
                                   W.L.R. 696; [1954] 3 All E.R. 397.
                                   C.A.

490        **HOUSE OF LORDS**        **[1962]**

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Denning.

be of a category which the owner impliedly authorised the bailee to make, such as a contract for repair, storage, loading, unloading or removal; but, provided it is impliedly authorised, the true owner is bound by it. (By "authorised" in this context I do not mean authorised so as to make the owner the principal to the contract. I mean only that the owner *impliedly consented* to the bailee making the contract on his (the bailee's) own behalf.) Thus if a bailee stores goods in a warehouse on his own account, and the warehouseman stipulates for a general lien on the terms usual in the trade, the owner of the goods is bound by it. He cannot claim the goods in defiance of the lien. Again, if the hirer of goods hands them to a furniture remover to be carried to his new home, and the remover stipulates, in the usual way of the trade, for exemption from liability for fire, the remover is entitled to the benefit of the exemption, not only as against the hirer, but also as against the owner. The reason for this may be seen by considering what would be the position if there were no exemption from liability. The bailee would then be able to recover the full value of the goods from the negligent wrongdoer, but he would have to account to the true owner for the proceeds, see *The Winkfield*.[94] If the bailee is to be treated as the owner of the goods for the purpose thus of imposing full liability on the negligent wrongdoer, he is also to be treated as the owner for the purpose of exempting him from liability, at any rate where the true owner has impliedly authorised it. And, just as the original owner cannot sue in defiance of the exemption, nor can anyone who buys the goods from him: for the purchaser takes the goods subject to the subsisting bailment and the rights of anyone validly claiming under it, see *Jowitt & Sons* v. *Union Cold Storage Co.*[95]

A good illustration of these principles is *The Kite*.[96] The lightermen were bailees in possession of the goods. They employed the tug-owners on the usual terms, which included exemption from negligence. This contract was made with the implied authority of the owners of the goods. They were, therefore, bound by the exemption, although they were not parties to the contract and could not sue or be sued on it. Likewise *Pyrene Co. Ltd.* v. *Scindia Navigation Co. Ltd.*[97] It was not strictly a bailment case, but it is covered by the same principles. The buyers employed the shipowners to carry the goods subject

[94] [1902] P. 42; 18 T.L.R. 178, C.A.

[95] [1913] 3 K.B. 1; 29 T.L.R. 477.

[96] [1933] P. 154; 49 T.L.R. 525.

[97] [1954] 2 Q.B. 402.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Denning.

to the limitation of liability under the Hague Rules. This contract was on the terms usual in the trade and it was made with the implied authority of the seller of the goods. He was not a party to the contract. He could not sue or be sued upon it. But nevertheless he was bound by the limitation contained in it.

Applying this principle, the question is: Did the owners of the goods impliedly authorise the carrier to employ the stevedores on the terms that their liability should be limited to $500? I think they did. Put in simple language, the shipper said to the carrier: " Please carry these goods to London and deliver them " to the consignee. You may take it that they are not worth " more than $500 so your liability is limited to $500. If they " were worth more, we would declare it to you." The carrier carries them to London and says to the stevedores: " Please " deliver these goods to the consignee. They have not been " declared as being in excess of $500, so you need not insure them " for more. You are to have the same protection as I have, " namely, your liability is limited to $500." It is quite plain that the consignee cannot sue the carrier for more than $500, and the carrier cannot sue the stevedores for more than $500. But can the consignee turn round and say to the stevedores: " Although the goods were not declared as being worth more than " $500, yet they were worth in fact $1,500 and I can make you " liable for it " ? I do not think our law permits him to do this. The carrier simply passed on the self-same limitation as he himself had, and this must have been within his implied authority. It seems to me that when the owner of goods allows the person in possession of them to make a contract in regard to them, then he cannot go back on the terms of the contract, if they are such as he expressly or impliedly authorised, that is to say, consented to be made, even though he was no party to the contract and could not sue or be sued upon it. It is just the same as if he stood by and watched it being made. And his successor in title is in no better position.

My Lords, I have dealt with this case at some length because it is the first case ever recorded in our English books where the owner of goods has sued a stevedore for negligence. If the owner can, by so doing, escape the exceptions in the contract of carriage and the limitations in the Hague Rules, it will expose a serious gap in our commercial law. It has great potentialities too. If you can sue the stevedore for his negligence in unloading, why should you not sue the master and officers of the ship for their negligence in the navigation or management of the ship? No

492                           HOUSE OF LORDS                    **[1962]**

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Denning.

longer need you worry about the limitation to £100 or £200 a package. You can recover the value of the most precious package without disclosing its nature or value beforehand. No longer need you worry about bringing an action within one year. You can bring it within six years. Nor are the potentialities limited to carriage by sea. They can be profitably extended to carriage by air and by road and rail. You have only to sue the servants of the carrier for negligence and you can get round all the exceptions and limitations that have hitherto been devised. No doubt the carrying company will stand behind its servants. It will foot the bill, as any good employer would, for the sake of good relations. But when you find that the carrying company has, in the long run, to pay for the damage, you see at once that you have turned the flank of the Hague Rules (for carriage by sea) and the Warsaw Convention (for carriage by air). The exemptions and limitations which are there so clearly given to the " carrier " do not avail his servants and agents when they are sued. By suing them, the goods owner will be able completely to upset the balance of risks as hitherto covered by insurance. No wonder that Parliament has already found it necessary to step in. It has done so in sections 2 and 3 of the Merchant Shipping (Liability of Shipowners and Others) Act, 1958: and sections 1, 5 and 10 and Schedule I, Article 25a of the Carriage by Air Act, 1961, which is not yet in force nor likely to be for some time. But these are only piecemeal efforts of very limited scope. Much more is needed if the law is such as your Lordships today declare it to be. For myself, however, I would not allow this gap to be driven in our commercial law. I would not give the " funda- " mental principle " of the nineteenth century a free rein. It should not have unbridled scope to defeat the intentions of business men. I would stand by the proposition stated by Scrutton L.J. and affirmed, as I believe, by this House 37 years ago.

I would allow this appeal.

LORD MORRIS OF BORTH-Y-GEST. My Lords, the drum which, on May 3, 1957, the stevedores (the defendants) negligently damaged then belonged to the plaintiffs. It had been shipped by consignors in America upon a ship owned by United States Lines Incorporated for carriage to London. It was consigned to the order of the plaintiffs upon the terms of a bill of lading signed on behalf of the shipowners and forwarded by the consignors to the

plaintiffs, who received it on April 1, 1957. The bill of lading contained certain clauses limiting the measure of liability.

To the claim made against them based upon their admittedly negligent act the only defence which the stevedores sought to advance was that their liability was limited. They sought to say that they were in direct contractual relationship with the plaintiffs (either by a contract made expressly or by a contract made impliedly) and that as a result there was a contractual provision, sustained by good consideration, by which their liability was limited. That contention raises issues which depend for their determination upon the facts of this particular case. Their main contention, however, was one which raised far-reaching issues of principle for they asserted that they could claim the benefit of the limitations of liability contained in the contract of carriage to which they were not parties. If, they said, a cargo owner makes a contract with a named carrier which contains a provision which excludes or limits liability, such provision extends to the relief of anyone whom the carrier engages—either as a servant or otherwise—to perform any of his (the carrier's) obligations. The bill of lading, they said, contemplated that there would be vicarious performance of some of the United States Lines' obligations and expressly or impliedly provided that those by whom the obligations of United States Lines would be performed should be entitled to the benefit of the same provisions regarding limitation of liability as United States Lines themselves. Accordingly, they said, the stevedores, on May 3, 1957, when the bill of lading was admittedly still in force, were in the course of performing one part of the carrier's obligations (i.e. the obligation to deliver the drum to the plaintiffs) and could avail themselves of the limiting provisions which were contained in the bill of lading.

The United States Lines (the owners of the ship and the carriers of the drum), had some years previously (in 1952) made a stevedoring contract with the stevedores: it was upon the terms of this contract that the stevedores were acting on May 3, 1957, and at such other times as they were performing services for the shipowners. There was a term in the contract which provided that the stevedores were to have such protection as was afforded by the terms of bills of lading. The existence of that term can have no effect in regard to the issues raised in this appeal. The plaintiffs had no knowledge of the existence of or of the terms of the stevedoring contract. All that the plaintiffs knew or may be taken to have known was that United States Lines were at liberty to engage stevedores. The extent to which or the terms upon

*H. L. (E.)*

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Morris of
Borth-y-Gest.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Morris of
Borth-y-Gest.

which United States Lines availed themselves of such liberty was never the plaintiffs' concern.

The broad proposition contended for by the stevedores calls for examination.  My Lords, there is a clear pronouncement of your Lordships' House that only a person who is a party to a contract can sue on it (*Dunlop Pneumatic Tyre Co. Ltd.* v. *Selfridge & Co. Ltd.*[98]).  If then A (for good consideration) promises B that he will make a gift to C, no claim for the gift can be made by C against A.  There will be no difference in principle if A promises B that he will not claim from C that which C ought to pay to him (A).  On a claim against him by A, C could not set up the promise which A had made to B.  I exclude for present purposes contracts relating to land, and any questions of agency or assignment or trust or any statutory provisions.  So if A contracts (for good consideration) with B that he (A) will not sue C if C is negligent, and if C by negligence causes damage to A, C cannot defend himself by asserting a contract to which he is a stranger.  This will be so whether C is or is not a servant of B.  It will be an *a fortiori* case if A (for good consideration) promises B that he (A) will not sue B if damage is caused to A by the negligence of C.  If A had occasion to sue C the latter could not set up the promise of A to B and even if he could, the promise would not avail for it would only have been a promise not to sue B.

My Lords, the speeches in the case of *Elder, Dempster & Co. Ltd.* v. *Paterson, Zochonis & Co. Ltd.*[99] have often been the subject of close judicial examination.  In that case the shipowners received goods from the shippers.  In the present case there were no dealings which could properly be said to be dealings between the plaintiffs and the stevedores.  Whether or not the view of the facts in the *Elder, Dempster* case[100] which was expressed by Lord Sumner in his speech, a speech which commanded the agreement of Lord Dunedin and of Lord Carson, can be regarded as a satisfactory explanation of the case, the speeches do not contain any statements which are expressed as qualifications of, or which suggest any modifications of, the basic rule which, with the binding force of a pronouncement in your Lordships' House, had been, a few years before, clearly stated in *Dunlop Pneumatic Tyre Co. Ltd.* v. *Selfridge & Co. Ltd.*[101]  For better or for worse, that rule was then firmly built into the structure of English law.  The stevedores' main contention is, in my view, not tenable.

[98] [1915] A.C. 847.
[99] [1924] A.C. 522.
[100] Ibid. 548.
[101] [1915] A.C. 853.

When the plaintiffs became holders of the bill of lading (which incorporated section 4 (5) of the United States Carriage of Goods by Sea Act, 1936), their rights were limited by the provision that the " carrier " would not (unless a certain condition was satisfied) be liable to a greater amount than $500 per package or customary freight unit. So far as it incorporated the provisions of the United States Carriage of Goods by Sea Act, 1936, the bill of lading did not limit the liability of stevedores but limited that of the ship and of the " carrier " and I would respectfully adopt the views expressed in the judgment of the Supreme Court of the United States in *Robert C. Herd & Co. Inc.* v. *Krawill Machinery Corporation* [102] to the effect that in the United States Carriage of Goods by Sea Act the word " carrier " should not be read as including stevedores engaged by the carrier.

Reliance was also placed upon the limiting provision contained in condition 24 of the United States Lines' long form of bill of lading the terms of which were incorporated in the bill of lading. When condition 24 is being regarded, consideration must also be given to condition 3 which provided that in the bill of lading the word " carrier " was to include the ship, her owner, operator and demise charterer " and also any time charterer or person to " the extent bound by this bill of lading, whether acting as " carrier or bailee." These conditions do not avail the stevedores, first, because they are not comprehended within the words that I have quoted and, secondly, because in any event they were not parties to the contract.

If the United States Lines had been wishing to make or intending to make some contract as agents on behalf of the stevedores, there was no reason why that could not have been so stated in the contract. It is clear that the contract did not state that it was made by United States Lines on behalf of the stevedores (Scruttons Ltd.). They are not mentioned in the contract. It seems to me to be wholly unreal to suggest, in spite of this, that United States Lines did as to some matters contract as agents for the stevedores. They did not purport to contract as such agents. Even apart from this, the process of selecting which particular terms of the bill of lading might or could form the substance of the suggested contract would be speculative and there could be no certainty in defining what would be the obligations contractually undertaken by the stevedores towards the plaintiffs.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Morris of
Borth-y-Gest.

[102] 359 U.S. 297; [1951] 1 Lloyd's Rep. 305.

H. L. (E.)

1961

MIDLAND
SILICONES
LTD.
*v.*
SCRUTTONS
LTD.

Lord Morris of
Borth-y-Gest.

Furthermore, I see no rational basis for implying some contract between the plaintiffs and the stevedores. When the plaintiffs were ready to take delivery of the drum and when a landing order in respect of it had been issued, the arrangements made by United States Lines for effecting delivery did not in any way involve the plaintiffs. There were no circumstances out of which it could be implied that the plaintiffs made some contract with the steve- dores. Nor does any different result follow from the use of the word " participation " or by asserting that the stevedores were " participating " in the contractual obligations owed by the United States Lines to the plaintiffs. What the stevedores were doing was to perform their own obligations under the contract which they had made with United States Lines. United States Lines had engaged them to do something which they (United States Lines) by the terms of the bill of lading were under obligation to do. The stevedores were not " participating " in anyone else's contract: they were setting out to do only what they, by their own contract with the United States Lines, had undertaken to do.

I would dismiss the appeal.

*Appeal dismissed.*

Solicitors: *Hill, Dickinson & Co.; Ince & Co.*

F. C.

---

[HOUSE OF LORDS.]

H. L. (E.)*    RYE    .    .    .    .    .    .    .    .    APPELLANT;

1961              AND

*Nov.* 15, 16;    RYE    .    .    .    .    .    .    .    .    RESPONDENT.
*Dec.* 19.

*Landlord and Tenant — Agreement — Oral lease to oneself — Lease of three years or under—Freehold owned by two tenants in common —Whether competent for freeholders to grant lease by parol to themselves — " Conveyance " — Meaning — Whether including oral transactions—Law of Property Act, 1925 (15 & 16 Geo. 5, c. 20), ss. 72 (3) (4), 205 (1).*

By section 72 (3) of the Law of Property Act, 1925: " After the " commencement of this Act a person may convey land to or vest " land in himself."

---

\* *Present:* VISCOUNT SIMONDS, LORD MACDERMOTT, LORD REID, LORD RADCLIFFE and LORD DENNING.